UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

NO. 24-1386
_____

**UNITED STATES,**
**APPELLEE**

**v.**

**MICHAEL FRANCIS,**
**DEFENDANT - APPELLANT**
_____

ON APPEAL FROM A JUDGMENT OF THE UNITED STATES
DISTRICT COURT FOR THE DISTRICT OF NEW HAMPSHIRE
_____

**JOINT APPENDIX**
_____

Richard Guerriero
1st Circuit Bar ID 1164673
Oliver Bloom
1st Circuit Bar ID 1211240
Lothstein Guerriero, PLLC
39 Central Square, Suite 202
Keene, NH 03431
(603) 352-5000
richard@nhdefender.com
oliver@nhdefender.com

## **Table of Contents**

Docket Report
…………………………………………………...……………………………………1

2021-12-13 Superseding Indictment (doc. no. 18)
………………………….………………………………………………………..20

2022-09-27 Defendant's Motion to Suppress (doc. no. 35)
………………………………….…………………………………………………..25

2022-09-27 Defendant's Motion to Suppress – Exhibit 1 (doc. no. 35-1)
………………………………………………………………………………………44

2022-09-27 Defendant's Motion to Suppress – Exhibit 2 (doc. no. 35-2)
………………………………………………………………………………………50

2022-09-27 Defendant's Motion to Suppress – Exhibit 3 (doc. no. 35-3)
………………………………………………………………………………………58

2022-10-31 Government's Objection to Motion to Suppress (doc. no. 46)
………………………………………………………………………………………83

2022-10-31 Government's Objection to Motion to Suppress – Exhibit 1 (doc. no. 46-1)……………………………………………………………………………...108

2022-10-31 Government's Objection to Motion to Suppress – Exhibit 2 (doc. no. 46-2)…………………………………………………………………………...115

2022-11-20 Defendant's Reply to Objection to Motion to Suppress (doc. no. 50)
…………………………………………………………..………………………119

2022-11-20 Defendant's Reply to Objection to Motion to Suppress – Exhibit 1 (doc. no. 50-1)……….……………………………..…………………………128

2023-06-14 Government's Notice of Supplemental Case Law (doc. no. 70)
………………………………………………..…………………………………148

2023-06-14 Transcript of Hearing Day 1 (doc. no. 95)
………………………………………………………………………………149

2023-07-11 Defendant's Supplemental Motion to Suppress (doc. no. 73)
………………………..……………………………………..…………………...288

2023-07-12 Transcript of Hearing Day 2 (doc. no. 94)
…………………………………………………………………………………295

2023-09-15 Government's Objection to Supplemental Motion to Suppress (doc. no. 86)………………………………………………………………………………...368

2023-10-13 United States District Court Order (doc. no. 87)
………………………………………………………………………………...373

2023-11-06 Plea Agreement (doc. no. 97)
………………………………………………………………………………...396

2024-04-10 United States District Court Judgment (doc. no. 108)
…..…………………………………………………………………………...410

2024-04-18 Defendant's Notice of Appeal (doc. no. 109)
……………………………………………………………………………………..417

APPEAL,CLOSED,FILE,PRIOR

# U.S. District Court
## District of New Hampshire (Concord)
## CRIMINAL DOCKET FOR CASE #: 1:21-cr-00153-PB-1

Case title: USA v. Francis

Date Filed: 09/13/2021

Magistrate judge case number: 1:21-mj-00226-DL

Date Terminated: 04/10/2024

---

Assigned to: Judge Paul J. Barbadoro

Appeals court case number: 24-1386 First
Circuit Court of Appeals

**Defendant (1)**

**Michael Francis**
*TERMINATED: 04/10/2024*

represented by **Richard Guerriero**
Lothstein Guerriero
39 Central Sq, Ste 202
Keene, NH 03431
603 352-5000
Email: richard@nhdefender.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: CJA Appointment*

**Behzad Mirhashem (FPD)**
Federal Defender's Office
The Ralph Pill Bldg
22 Bridge St
Concord, NH 03301
603 226-7360
Email: behzad_mirhashem@fd.org
*TERMINATED: 01/19/2022*
*Designation: Public Defender or*
*Community Defender Appointment*

**Nicholas C. Howie**
Howie Law Office
One Stiles Rd, Ste 103
Salem, NH 03079
603 893-8008
Email: nhowieesq@hotmail.com
*TERMINATED: 03/15/2022*
*Designation: CJA Appointment*

**Pending Counts**                          **Disposition**

**JOINT APPENDIX 1**

Case: 24-1386     Document: 00118186996     Page: 5     Date Filed: 09/06/2024     Entry ID: 6665919

| | |
|---|---|
| 21 U.S.C. §§ 841(a)(1) & 841(b)(1)(B)(ii) Possession with Intent to Distribute 500 Grams or More of Cocaine (2s) | Defendant to be imprisoned for a term of 150 months. 4 years Supervised Release with mandatory, standard and special conditions. $100.00 Special Assessment. |

**Highest Offense Level (Opening)**

Felony

| **Terminated Counts** | **Disposition** |
|---|---|
| 18 U.S.C. §§ 922(g)(1), 924(a)(2) Possession of a Firearm by a Prohibited Person (1) | Dismissed. |
| 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B)(ii) and 846 Conspiracy to distribute and Possess with Intent to Distribute 500 Grams or More of Cocaine (1s) | Dismissed. |
| 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(vi) & 841(b)(1)(A)(vii) Possession with Intent to Distribute 400 Grams or More of Fentanyl and 50 Grams or More of Methamphetamine (3s) | Dismissed upon unopposed Oral Motion of the United States. |
| 18 U.S.C. §§ 922(g)(1) & 924(a)(2) Possession of Firearms and Ammunition by a Prohibited Person (4s) | Dismissed upon unopposed Oral Motion of the United States. |
| 18 U.S.C. § 924(c)(1)(A)(i) Possession of Firearms in Furtherance of a Drug Trafficking Crime (5s) | Dismissed upon unopposed Oral Motion of the United States. |

**Highest Offense Level (Terminated)**

Felony

| **Complaints** | **Disposition** |
|---|---|
| 18 U.S.C. 922(g)(1) FELON IN POSSESSION OF A FIREARM | |

---

| **Plaintiff** | |
|---|---|
| **USA** | represented by **Charles L. Rombeau** US Attorney's Office (NH) James C Cleveland Federal Bldg |

**JOINT APPENDIX 2**

53 Pleasant St, 4th Flr
Concord, NH 03301
603 225-1552
Fax: 603 225-1470
Email: charles.rombeau@usdoj.gov
*TERMINATED: 10/26/2023*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Aaron G. Gingrande**
DOJ-USAO
MA
53 Pleasant St.
Concord, NH 02199
603-230-2504
Email: aaron.gingrande@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Jarad Hodes**
US Attorney's Office (NH)
James C Cleveland Federal Bldg
53 Pleasant St, 4th Flr
Concord, NH 03301
603 225-1552
Email: jarad.hodes@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Joachim H. Barth**
US Attorney's Office (NH)
James C Cleveland Federal Bldg
53 Pleasant St, 4th Flr
Concord, NH 03301
603 225-1552
Email: joachim.barth@usdoj.gov
*TERMINATED: 10/17/2022*
*Designation: Assistant US Attorney*

| Date Filed | # | Docket Text |
|---|---|---|
| 09/03/2021 | 1 | **COMPLAINT signed by Magistrate Judge Daniel J. Lynch as to Michael Francis (1). (Attachments: # 1 Redacted Affidavit)** *Original document available in clerks office.*(kad) [1:21-mj-00226-DL] (Entered: 09/03/2021) |
| 09/03/2021 | | Arrest Warrant Issued as to Michael Francis by Magistrate Judge Daniel J. Lynch. Original warrant and copies to US Marshal and US Probation.(kad) [1:21-mj-00226-DL] (Entered: 09/03/2021) |
| 09/07/2021 | | Arrest of Michael Francis.(kad) [1:21-mj-00226-DL] (Entered: 09/07/2021) |
| 09/07/2021 | | NOTICE OF HEARING as to Michael Francis. Initial Appearance set for 9/7/2021 01:30 PM before Magistrate Judge Andrea K. Johnstone. (kad) [1:21-mj-00226-DL] (Entered: |

**JOINT APPENDIX 3**

| 09/07/2021 | | 09/07/2021) |
|---|---|---|
| 09/07/2021 | 3 | MOTION to Appoint Counsel with Financial Declaration by Michael Francis. (Attachments: # 1 Financial Affidavit) *Document available in clerks office.* (kad) [1:21-mj-00226-DL] (Entered: 09/07/2021) |
| 09/07/2021 | | **ENDORSED ORDER approving 3 Motion to Appoint Counsel. Behzad Mirhashem appointed in the case as to Michael Francis (1).** *Text of Order: Request approved. Appoint counsel.* **So Ordered by Magistrate Judge Andrea K. Johnstone. (kad)** [1:21-mj-00226-DL] (Entered: 09/07/2021) |
| 09/07/2021 | | Minute Entry for proceedings held before Magistrate Judge Andrea K. Johnstone: INITIAL APPEARANCE as to Michael Francis held on 9/7/2021. Court approves financial affidavit. Defendant advised of rights & charges. Prosecutor's Brady disclosure obligations confirmed. Defendant stipulated to detention without prejudice. PC hearing scheduled for 9/16/2021 at 2:00 p.m. by video and video consent form executed. (Tape #1:37) (Govt Atty: Joachim Barth) (Defts Atty: Behzad Mirhashem) (USP: Karin Hess) (Total Hearing Time: 8 min.) (kad) [1:21-mj-00226-DL] (Entered: 09/07/2021) |
| 09/07/2021 | 4 | STIPULATION TO DETENTION and WAIVER of Detention Hearing without prejudice as to Michael Francis. Approved by Magistrate Judge Andrea K. Johnstone. (kad) [1:21-mj-00226-DL] (Entered: 09/07/2021) |
| 09/07/2021 | | **ENDORSED ORDER as to Michael Francis: Pursuant to FRCrP 5. In compliance with the Due Process Protections Act, the court issues the following Order: Consistent with Brady v. Maryland, 373 U.S. 83 (1963), and its progeny, the United States is ordered to disclose all exculpatory information, in a timely manner, to the defendant. This information includes, but is not limited to, evidence that is material and is favorable to the accused. The failure to discharge this obligation may result in consequences, including the reversal of any conviction, exclusion of evidence, adverse jury instructions, dismissal of charges, contempt proceedings and/or sanctions by the court. So Ordered by Magistrate Judge Andrea K. Johnstone. (kad)** [1:21-mj-00226-DL] (Entered: 09/07/2021) |
| 09/07/2021 | | NOTICE OF HEARING as to Michael Francis. Show Cause Hearing re: Indictment and compliance with 18:3161(b) is set for 10/8/2021 09:00 AM before Magistrate Judge Andrea K. Johnstone. HEARING WILL NOT BE NECESSARY IF MOTION TO EXTEND GRANTED OR INDICTMENT RETURNED PRIOR TO HEARING DATE. (kad) [1:21-mj-00226-DL] (Entered: 09/07/2021) |
| 09/07/2021 | | NOTICE OF HEARING as to Michael Francis. Preliminary Hearing via Video set for 9/16/2021 02:00 PM before Magistrate Judge Andrea K. Johnstone. (kad) [1:21-mj-00226-DL] (Entered: 09/07/2021) |
| 09/07/2021 | 5 | Consent to Video/Telephonic Conference and Waiver of Right to Appear in Person for Preliminary Hearing Fed. R. Crim. P. 5.1, as to Michael Francis. (kad) [1:21-mj-00226-DL] (Entered: 09/07/2021) |
| 09/07/2021 | | **ENDORSED ORDER as to Michael Francis approving 5 Consent to Video/Telephonic Conference Waiver to Appear in Person.** *Text of Order: APPROVED.* **So Ordered by Magistrate Judge Andrea K. Johnstone. (kad)** [1:21-mj-00226-DL] (Entered: 09/07/2021) |

## JOINT APPENDIX 4

| 09/10/2021 | 6 | Arrest Warrant Returned Executed as to Michael Francis.(bt) [1:21-mj-00226-DL] (Entered: 09/10/2021) |
|---|---|---|
| 09/13/2021 | 7 | **INDICTMENT as to Michael Francis (1) count 1 with Notice of Forfeiture.** *Original document available in clerk's office.***(ko)** Modified on 9/15/2021 to add: Forfeiture text(ko). (Entered: 09/14/2021) |
| 09/13/2021 | 9 | Praecipe for Warrant by USA as to Michael Francis. (ko) (Entered: 09/14/2021) |
| 09/14/2021 | | Arrest Warrant Issued as to Michael Francis. Original warrant and copies to US Marshal and US Probation.(ko) (Entered: 09/14/2021) |
| 09/15/2021 | | NOTICE OF HEARING as to Michael Francis. Arraignment via video set for 9/27/2021 02:00 PM before Magistrate Judge Andrea K. Johnstone. (bt) (Entered: 09/15/2021) |
| 09/20/2021 | 10 | Arrest Warrant Returned Unexecuted as to Michael Francis.(lw) (Entered: 09/20/2021) |
| 09/22/2021 | 11 | Assented to MOTION to Continue arraignment by Michael Francis. (Mirhashem (FPD), Behzad) (Entered: 09/22/2021) |
| 09/23/2021 | | **ENDORSED ORDER granting: 11 Assented to MOTION to Continue arraignment as to Michael Francis (1).** *Text of Order: Granted* **So Ordered by Magistrate Judge Andrea K. Johnstone. Arraignment via video set for 10/6/2021 02:00 PM before Magistrate Judge Andrea K. Johnstone. (bt)** (Entered: 09/23/2021) |
| 09/28/2021 | 12 | WAIVER of Personal Appearance at Arraignment and Entry of Plea of Not Guilty by Michael Francis. (bt) (Entered: 09/29/2021) |
| 09/29/2021 | | **ENDORSED ORDER approving: 12 Waiver of Presence at Arraignment as to Michael Francis.** *Text of Order: Approved* **So Ordered by Magistrate Judge Andrea K. Johnstone. (bt)** (Entered: 09/29/2021) |
| 09/29/2021 | | TRIAL NOTICE: Final Pretrial Conference set for 10/27/2021 04:30 PM before Judge Steven J. McAuliffe. JERS Statement due 11/2/2021. Jury Selection/Trial set for two week period beginning 11/9/2021 09:30 AM before Judge Steven J. McAuliffe. (lw) (Entered: 09/29/2021) |
| 09/29/2021 | | **ENDORSED ORDER - This case is scheduled for trial in November. Unless the case has been continued by 10/8/2021, counsel shall file a Joint Trial Status Report on or before that date. Counsel shall meet and confer, and defense counsel shall confer with the defendant, prior to making any submission pursuant to this order. The information provided in the Joint Trial Status report will be used to assist in scheduling the case.** <br> **The court is no longer using a monthly priority list for trial scheduling. The court anticipates scheduling this for trial in its two-week trial period.** <br> **So Ordered by Judge Steven J. McAuliffe. (lw)** (Entered: 09/29/2021) |
| 10/01/2021 | 13 | NOTICE OF ATTORNEY APPEARANCE Aaron G. Gingrande appearing for USA. Attorney Aaron G. Gingrande added to party USA(pty:pla).(Gingrande, Aaron) (Entered: 10/01/2021) |
| 10/01/2021 | 14 | Assented to MOTION to Continue Trial for 60 days (Waiver of Speedy Trial to be filed conventionally) by Michael Francis. (Mirhashem (FPD), Behzad) (Entered: 10/01/2021) |
| 10/04/2021 | 15 | **ORDER granting 14 Assented to Motion to Continue Trial in the interest of justice as to Michael Francis (1). Final Pretrial Conference set for 1/5/2022 10:00 AM** |

**JOINT APPENDIX 5**

| | | before Judge Steven J. McAuliffe. JERS Statement due 1/12/2022. Jury Selection/Trial set for two week period beginning 1/19/2022 09:30 AM before Judge Steven J. McAuliffe. So Ordered by Judge Steven J. McAuliffe.(lw) (Entered: 10/05/2021) |
|---|---|---|
| 12/03/2021 | [16](#) | Assented to MOTION to Continue Trial for 30 days (Waiver of Speedy Trial to be filed conventionally) by Michael Francis. (Mirhashem (FPD), Behzad) (Entered: 12/03/2021) |
| 12/06/2021 | [17](#) | **ORDER granting [16](#) Assented to Motion to Continue Trial in the interest of justice as to Michael Francis (1). Final Pretrial Conference set for 2/2/2022 03:00 PM before Judge Steven J. McAuliffe. JERS Statement due 2/8/2022. Jury Selection/Trial set for two week period beginning 2/15/2022 09:30 AM before Judge Steven J. McAuliffe. So Ordered by Judge Steven J. McAuliffe.(lw)** (Entered: 12/06/2021) |
| 12/13/2021 | [18](#) | **SUPERSEDING INDICTMENT as to Michael Francis (1) counts 1s, 2s, 3s, 4s, 5s. With Notice of Forfeiture.** *Original document available in clerks office.*(lw) (Entered: 12/14/2021) |
| 12/13/2021 | [20](#) | Praecipe for Warrant by USA as to Michael Francis. (lw) (Entered: 12/14/2021) |
| 12/14/2021 | | Arrest Warrant Issued as to Michael Francis. Original warrant and copies to US Marshal and US Probation.(lw) (Entered: 12/14/2021) |
| 12/15/2021 | | NOTICE OF HEARING as to Michael Francis. Arraignment (SUPERSEDING INDICTMENT) set for 12/29/2021 11:00 AM before Magistrate Judge Andrea K. Johnstone. (kad) (Entered: 12/15/2021) |
| 12/17/2021 | [21](#) | Arrest Warrant Returned Unexecuted as to Michael Francis.(lw) (Entered: 12/21/2021) |
| 12/27/2021 | [22](#) | WAIVER of Personal Appearance at Arraignment and Entry of Plea of Not Guilty by Michael Francis. (kad) (Entered: 12/27/2021) |
| 12/27/2021 | | **ENDORSED ORDER as to Michael Francis approving [22](#) Waiver of Presence at Arraignment.** *Text of Order: WAIVER APPROVED.* **So Ordered by Magistrate Judge Daniel J. Lynch. (kad)** (Entered: 12/27/2021) |
| 01/06/2022 | [23](#) | Assented to MOTION for Behzad Mirhashem to Withdraw as Attorney by Michael Francis. (Mirhashem (FPD), Behzad) (Entered: 01/06/2022) |
| 01/19/2022 | | **ENDORSED ORDER granting [23](#) Assented to Motion for Behzad Mirhashem to Withdraw as Attorney as to Michael Francis (1).** *Text of Order: Granted, the clerk's office shall appoint new counsel from the CJA panel.* **So Ordered by Judge Steven J. McAuliffe. (lw)** (Entered: 01/19/2022) |
| 01/19/2022 | | NOTICE of Appointment of Counsel as to Michael Francis. Attorney Nicholas C. Howie appointed in this case. Appointment accepted on January 19, 2022. (lw) (Entered: 01/19/2022) |
| 01/19/2022 | | **ENDORSED ORDER as to Michael Francis.** *Text of Order: To minimize potential exposure to the COVID-19 Omicron Variant following holiday gatherings and travel, jury selection scheduled for February 15, 2022 is rescheduled to March 15, 2022. The time period of this continuance will be excluded under the Speedy Trial Act, 18 U.S.C. § 3161(h)(7)(A) due to the public health considerations associated with conducting criminal jury trials during the COVID-19 pandemic. The court finds that the ends of justice served by ordering this short continuance outweighs the best interest of the public and the defendants right to speedy trial. Within seven (7) days of the date this* |

**JOINT APPENDIX 6**

| | | |
|---|---|---|
| | | *order is docketed, if there exists an individualized concern not addressed by this order, the defendant may file a motion for a determination regarding his or her rights under the Speedy Trial Act, and the court will consider the ends of justice finding de novo.* **So Ordered by Judge Steven J. McAuliffe. (lw)** (Entered: 01/19/2022) |
| 01/19/2022 | | Rescheduled Trial Notice: Final Pretrial Conference reset for 3/8/2022 03:00 PM before Judge Steven J. McAuliffe. JERS Statement due 3/8/2022. Jury Selection/Trial reset for two week period beginning 3/15/2022 09:30 AM before Judge Steven J. McAuliffe. (lw) (Entered: 01/19/2022) |
| 01/20/2022 | 24 | BILL OF PARTICULARS by USA as to Michael Francis (Gingrande, Aaron) (Entered: 01/20/2022) |
| 01/21/2022 | | **ENDORSED ORDER re: 24 Bill of Particulars as to Michael Francis.** *Text of Order: Reviewed.* **So Ordered by Judge Steven J. McAuliffe. (lw)** (Entered: 01/21/2022) |
| 02/02/2022 | 25 | Assented to MOTION to Continue Trial 60 days (Waiver of Speedy Trial to be filed conventionally) by Michael Francis. (Howie, Nicholas) (Entered: 02/02/2022) |
| 02/03/2022 | 26 | ADDENDUM re: 25 Assented to MOTION to Continue Trial 60 days (Waiver of Speedy Trial to be filed conventionally) by Michael Francis. (Howie, Nicholas) (Entered: 02/03/2022) |
| 02/05/2022 | 27 | **ORDER granting 25 Assented to Motion to Continue Trial in the interest of justice as to Michael Francis (1). Final Pretrial Conference set for 5/3/2022 02:00 PM before Judge Steven J. McAuliffe. JERS Statement due 5/10/2022. Jury Selection/Trial set for two week period beginning 5/17/2022 09:30 AM before Judge Steven J. McAuliffe. So Ordered by Judge Steven J. McAuliffe.(lw)** (Entered: 02/07/2022) |
| 03/09/2022 | 28 | REQUEST for Appointment of New Counsel by Michael Francis. (lw) (Entered: 03/09/2022) |
| 03/09/2022 | | **ENDORSED ORDER granting 28 Request for Appointment of New Counsel. Richard Guerriero appointed as substitute counsel for Nicholas C. Howie in the case. Assignment accepted on 3/15/2022. Appointment Nunc Pro Tunc to 3/9/2022. Counsel withdrawing from the case shall submit a completed CJA-20 through the CJA eVoucher system within 45 days from the date of substitution. The voucher will be held until the disposition of the case. Should counsel have grounds to justify payment prior to the final disposition of the case, such a request should be made as part of the CJA-20 voucher submission in eVoucher as to Michael Francis (1).** *Text of Order: Granted. Defendant is reminded that he is not entitled to multiple successive counsel absent legitimate reasons. As this is a first request and Attorney Mirhashem was conflicted out, the court will grant the motion.* **So Ordered by Judge Steven J. McAuliffe. (lw)** (Entered: 03/15/2022) |
| 04/18/2022 | 29 | Assented to MOTION to Continue Trial For Approximately 90 Days by Michael Francis. (Guerriero, Richard) (Entered: 04/18/2022) |
| 04/18/2022 | 30 | ADDENDUM re: 29 Assented to MOTION to Continue Trial For Approximately 90 Days by Michael Francis. (Guerriero, Richard) (Entered: 04/18/2022) |
| 04/19/2022 | 31 | **ORDER granting 29 Assented to Motion to Continue Trial in the interest of justice as to Michael Francis (1). Final Pretrial Conference set for 8/3/2022 02:00 PM before Judge Steven J. McAuliffe. JERS Statement due 8/9/2022. Jury Selection/Trial set** |

**JOINT APPENDIX 7**

| | | |
|---|---|---|
| | | **for two week period beginning 8/16/2022 09:30 AM before Judge Steven J. McAuliffe. So Ordered by Judge Steven J. McAuliffe.(lw)** (Entered: 04/19/2022) |
| 07/18/2022 | [32](#) | Assented to MOTION to Continue Trial for 60 days by Michael Francis. (Guerriero, Richard) (Entered: 07/18/2022) |
| 07/22/2022 | [33](#) | **ORDER granting [32](#) Assented to Motion to Continue Trial in the interest of justice as to Michael Francis (1). Final Pretrial Conference set for 10/5/2022 02:00 PM before Judge Steven J. McAuliffe. JERS Statement due 10/11/2022. Jury Selection/Trial set for two week period beginning 10/18/2022 09:30 AM before Judge Steven J. McAuliffe. So Ordered by Judge Steven J. McAuliffe.(lw)** (Entered: 07/22/2022) |
| 09/20/2022 | | TRIAL REMINDER: There is an upcoming trial in this case. Any Motion to Continue shall be filed 1 week before the Final Pretrial Conference or the Final Pretrial will be held as scheduled. (lw) (Entered: 09/20/2022) |
| 09/27/2022 | [34](#) | MOTION to Suppress EVIDENCE SEIZED AS A RESULT OF THE WARRANTLESS PROTECTIVE SWEEP OF UNIT 3 AT 231 THORNTON STREET by Michael Francis. **HEARING REQUESTED.**Follow up on Objection on 10/11/2022. The court only follow up date DOES NOT include 3 additional days that may apply per FRCP 6(d) and FRCrP 45(c). **Certain exhibit(s) maintained conventionally in Clerks Office. (Attorney filers must submit conventional materials to the court within 72 hours.)** (Attachments: # [1](#) Exhibit A Skerry Report, # [2](#) Exhibit B Search Application and Search Warrant, # [3](#) Exhibit C Report of Arrest, # [4](#) Exhibit D Report of Arrest, # [5](#) Exhibit E Report of Evidence from Apartment, # [6](#) Exhibit F Report Describing Protective Sweep, # [7](#) Exhibit G Search Warrant Log) (Guerriero, Richard) (Additional attachment(s) added on 9/27/2022: # [8](#) Exhibit H & I - Notice of Conventional Filing) (lw). (Entered: 09/27/2022) |
| 09/27/2022 | [35](#) | MOTION to Suppress EVIDENCE SEIZED WHEN EXECUTING SEARCH WARRANT FOR A WHITE HONDA ACCORD by Michael Francis. **HEARING REQUESTED.**Follow up on Objection on 10/11/2022. The court only follow up date DOES NOT include 3 additional days that may apply per FRCP 6(d) and FRCrP 45(c). (Attachments: # [1](#) Exhibit A Report of Search of Honda, # [2](#) Exhibit B Return of Search of Honda, # [3](#) Exhibit C Search Warrant and Affidavit for Honda) (Guerriero, Richard) (Entered: 09/27/2022) |
| 09/27/2022 | [36](#) | MOTION to Suppress DEFENDANTS STATEMENTS ON SEPTEMBER 7, 2021 by Michael Francis. **HEARING REQUESTED.**Follow up on Objection on 10/11/2022. The court only follow up date DOES NOT include 3 additional days that may apply per FRCP 6(d) and FRCrP 45(c). **Certain exhibit(s) maintained conventionally in Clerks Office. (Attorney filers must submit conventional materials to the court within 72 hours.)** (Attachments: # [1](#) Exhibit A Report of Arrest, # [2](#) Exhibit B Interrogation 2021-09-01, # [3](#) Exhibit C Interrogation 2021-09-07, # [4](#) Notice ECF D and E - Notice of Conventionally Filed) (Guerriero, Richard) (Entered: 09/27/2022) |
| 09/27/2022 | [37](#) | NOTICE of of Conventional Filing of Exhibits H and I to [34](#) MOTION to Suppress EVIDENCE SEIZED AS A RESULT OF THE WARRANTLESS PROTECTIVE SWEEP OF UNIT 3 AT 231 THORNTON STREET and Exhibits D and E to [36](#) MOTION to Suppress DEFENDANTS STATEMENTS ON SEPTEMBER 7, 2021, by Michael Francis. (lw) (Entered: 09/28/2022) |

**JOINT APPENDIX 8**

| 09/28/2022 | 38 | Assented to MOTION to Continue Trial Until Ruling On Pending Suppression Motions, At Least 45 Days by Michael Francis. (Attachments: # 1 Exhibit) (Guerriero, Richard) (Entered: 09/28/2022) |
| 10/03/2022 | 39 | **ORDER granting 38 Assented to Motion to Continue Trial in the interest of justice as to Michael Francis (1). Final Pretrial Conference set for 11/30/2022 04:00 PM before Judge Steven J. McAuliffe. JERS Statement due 12/6/2022. Jury Selection/Trial set for two week period beginning 12/13/2022 09:30 AM before Judge Steven J. McAuliffe. So Ordered by Judge Steven J. McAuliffe.(lw)** (Entered: 10/03/2022) |
| 10/06/2022 | 40 | Assented to MOTION to Extend Time to Object/Respond to 36 MOTION to Suppress DEFENDANTS STATEMENTS ON SEPTEMBER 7, 2021 , 35 MOTION to Suppress EVIDENCE SEIZED WHEN EXECUTING SEARCH WARRANT FOR A WHITE HONDA ACCORD , 34 MOTION to Suppress EVIDENCE SEIZED AS A RESULT OF THE WARRANTLESS PROTECTIVE SWEEP OF UNIT 3 AT 231 THORNTON STREET to October 25, 2022 by USA as to Michael Francis. (Gingrande, Aaron) (Entered: 10/06/2022) |
| 10/07/2022 | 41 | **ENDORSED ORDER granting 40 Assented to Motion to Extend Time to Object/Respond as to Michael Francis (1). *Text of Order: Granted.* So Ordered by Judge Steven J. McAuliffe. Follow up on Objection on 10/25/2022. (lw)** (Entered: 10/07/2022) |
| 10/17/2022 | 41 | Notice to Substitute Attorney. Added attorney Charles L. Rombeau. Attorney Joachim Barth terminated. Attorney Charles L. Rombeau added to party USA(pty:pla).(Rombeau, Charles) (Entered: 10/17/2022) |
| 10/25/2022 | 42 | Assented to MOTION to Extend Time to Object/Respond to 36 MOTION to Suppress DEFENDANTS STATEMENTS ON SEPTEMBER 7, 2021 , 35 MOTION to Suppress EVIDENCE SEIZED WHEN EXECUTING SEARCH WARRANT FOR A WHITE HONDA ACCORD , 34 MOTION to Suppress EVIDENCE SEIZED AS A RESULT OF THE WARRANTLESS PROTECTIVE SWEEP OF UNIT 3 AT 231 THORNTON STREET to October 31, 2022 by USA as to Michael Francis. (Gingrande, Aaron) (Entered: 10/25/2022) |
| 10/28/2022 | 43 | Assented to MOTION for Protective Order by USA as to Michael Francis. (Attachments: # 1 Proposed Order) (Gingrande, Aaron) (Entered: 10/28/2022) |
| 10/28/2022 | | **ENDORSED ORDER granting 42 Assented to Motion to Extend Time to Object/Respond as to Michael Francis (1). *Text of Order: Granted.* So Ordered by Judge Steven J. McAuliffe. Follow up on Objection on 10/31/2022. (lw)** (Entered: 10/31/2022) |
| 10/31/2022 | 44 | RESPONSE to Motion by USA as to Michael Francis re 34 MOTION to Suppress EVIDENCE SEIZED AS A RESULT OF THE WARRANTLESS PROTECTIVE SWEEP OF UNIT 3 AT 231 THORNTON STREET . (Rombeau, Charles) (Entered: 10/31/2022) |
| 10/31/2022 | 45 | RESPONSE to Motion by USA as to Michael Francis re 36 MOTION to Suppress DEFENDANTS STATEMENTS ON SEPTEMBER 7, 2021 . (Rombeau, Charles) (Entered: 10/31/2022) |

**JOINT APPENDIX 9**

| 10/31/2022 | 46 | OBJECTION by USA as to Michael Francis re 35 MOTION to Suppress EVIDENCE SEIZED WHEN EXECUTING SEARCH WARRANT FOR A WHITE HONDA ACCORD . (Attachments: # 1 Exhibit Informant's Falsification of Physical Evidence Conviction, # 2 Exhibit Affidavit of Parole Officer Benard)(Gingrande, Aaron) (Entered: 10/31/2022) |
|---|---|---|
| 11/03/2022 | 47 | Assented to MOTION to Extend Time to Object/Respond to 46 Objection to Motion, 35 MOTION to Suppress EVIDENCE SEIZED WHEN EXECUTING SEARCH WARRANT FOR A WHITE HONDA ACCORD to 11/11/2022 by Michael Francis. (Guerriero, Richard) (Entered: 11/03/2022) |
| 11/04/2022 | | **ENDORSED ORDER granting 47 Assented to Motion to Extend Time to Object/Respond as to Michael Francis (1).** *Text of Order: Granted.* **So Ordered by Judge Steven J. McAuliffe. Follow up on Reply on 11/11/2022. (lw)** (Entered: 11/04/2022) |
| 11/10/2022 | 48 | Assented to MOTION to Extend Time Time to Reply to Objection Until 11/18/2022 by Michael Francis. (Guerriero, Richard) (Entered: 11/10/2022) |
| 11/10/2022 | | **ENDORSED ORDER granting 48 Assented to Motion to Extend Time to Reply to Objection Until 11/18/2022 as to Michael Francis (1).** *Text of Order: Granted.* **So Ordered by Judge Steven J. McAuliffe. (lw)** (Entered: 11/14/2022) |
| 11/10/2022 | | **ENDORSED ORDER granting 43 Assented to Motion for Protective Order as to Michael Francis (1).** *Text of Order: Granted; the proposed order is adopted as an order of the court.* **So Ordered by Judge Steven J. McAuliffe. (lw)** (Entered: 11/14/2022) |
| 11/10/2022 | 49 | **PROTECTIVE ORDER as to Michael Francis. So Ordered by Judge Steven J. McAuliffe. (lw)** (Entered: 11/14/2022) |
| 11/14/2022 | | TRIAL REMINDER: There is an upcoming trial in this case. Any Motion to Continue shall be filed 1 week before the Final Pretrial Conference or the Final Pretrial will be held as scheduled. (lw) (Entered: 11/14/2022) |
| 11/20/2022 | 50 | REPLY TO OBJECTION to Motion by Michael Francis re 35 MOTION to Suppress EVIDENCE SEIZED WHEN EXECUTING SEARCH WARRANT FOR A WHITE HONDA ACCORD . (Attachments: # 1 Exhibit Affidavit of Agent Burke from Another Case)(Guerriero, Richard) (Entered: 11/20/2022) |
| 11/28/2022 | 51 | Assented to MOTION to Continue Trial for 60 days by Michael Francis. (Guerriero, Richard) (Entered: 11/28/2022) |
| 11/28/2022 | 52 | Certification of Speedy Trial Waiver by Michael Francis (Guerriero, Richard) (Entered: 11/28/2022) |
| 11/28/2022 | 53 | **ORDER granting 51 Assented to Motion to Continue Trial in the interest of justice as to Michael Francis (1). Final Pretrial Conference set for 2/8/2022 11:30 AM before Judge Steven J. McAuliffe. JERS Statement due 2/15/2023. Jury Selection/Trial set for two week period beginning 2/22/2023 09:30 AM before Judge Steven J. McAuliffe. So Ordered by Judge Steven J. McAuliffe.(lw)** (Entered: 11/29/2022) |
| 01/09/2023 | 54 | MOTION to Suppress Cell Phone Evidence and Statements Resulting from Unconstitutional Arrest by Michael Francis. **HEARING REQUESTED.**Follow up on Objection on 1/23/2023. The court only follow up date DOES NOT include 3 additional days that may apply per FRCP 6(d) and FRCrP 45(c). (Attachments: # 1 Exhibit A |

**JOINT APPENDIX 10**

| | | O'Neill arrest on PV re address, # 2 Exhibit B Lorenzo report re arrest and phone, # 3 Exhibit C O'Neill arrest on PV seizure of phone, # 4 Exhibit D Detention Order from Parole Officer, # 5 Exhibit E Warrant from Parole Board, # 6 Exhibit F Francis Vehicle Registration) (Guerriero, Richard) (Entered: 01/09/2023) |
|---|---|---|
| 01/09/2023 | 55 | MOTION for Bail by Michael Francis. **HEARING REQUESTED.**Follow up on Objection on 1/23/2023. The court only follow up date DOES NOT include 3 additional days that may apply per FRCP 6(d) and FRCrP 45(c). (Guerriero, Richard) (Entered: 01/09/2023) |
| 01/17/2023 | | **ENDORSED ORDER re: 55 Motion for Bail as to Michael Francis (1). *Text of Order: Granted only to the extent that the clerk's office shall schedule a hearing.* So Ordered by US Magistrate Judge Andrea K Johnstone. (lw)** (Entered: 01/18/2023) |
| 01/18/2023 | | NOTICE OF HEARING as to Michael Francis. Bail Hearing set for 1/23/2023 03:00 PM before US Magistrate Judge Andrea K Johnstone. (kad) (Entered: 01/18/2023) |
| 01/18/2023 | | TRIAL REMINDER: There is an upcoming trial in this case. Any Motion to Continue shall be filed 1 week before the Final Pretrial Conference or the Final Pretrial will be held as scheduled. (lw) (Entered: 01/18/2023) |
| 01/23/2023 | | RESCHEDULING NOTICE OF HEARING as to Michael Francis. Bail Hearing RESET for 1/25/2023 at 04:30 PM before US Magistrate Judge Andrea K Johnstone. (bf) (Entered: 01/23/2023) |
| 01/24/2023 | 56 | Assented to MOTION to Extend Time to Object/Respond to 54 MOTION to Suppress Cell Phone Evidence and Statements Resulting from Unconstitutional Arrest to February 6, 2023 by USA as to Michael Francis. (Gingrande, Aaron) (Entered: 01/24/2023) |
| 01/24/2023 | | RESCHEDULING NOTICE OF HEARING as to Michael Francis. Bail Hearing reset for 1/30/2023 02:00 PM before US Magistrate Judge Andrea K Johnstone. (kad) (Entered: 01/24/2023) |
| 01/25/2023 | | **ENDORSED ORDER granting 56 Assented to Motion to Extend Time to Object/Respond to 54 MOTION to Suppress Cell Phone Evidence and Statements Resulting from Unconstitutional Arrest to February 6, 2023 as to Michael Francis (1). *Text of Order: Granted.* So Ordered by Judge Steven J. McAuliffe. Follow up on Objection on 2/6/2023. (lw)** (Entered: 01/25/2023) |
| 01/30/2023 | | Minute Entry for proceedings held before US Magistrate Judge Andrea K Johnstone: BAIL HEARING as to Michael Francis held on 1/30/2023. Further bail hearing to be scheduled. (Tape #2:10) (Govt Atty: Charles Rombeau) (Defts Atty: Richard Guerriero) (USP: Riaka McCormick)(Total Hearing Time: 27 min)(CJA Time: 37 min) (bf) (Entered: 01/30/2023) |
| 01/30/2023 | 57 | NOTICE OF HEARING as to Michael Francis. Bail Hearing set for 2/14/2023 at 10:00 AM before US Magistrate Judge Andrea K Johnstone. (bf) (Entered: 01/30/2023) |
| 01/30/2023 | 58 | Assented to MOTION to Continue Trial to May 16, 2023 by Michael Francis. (Guerriero, Richard) (Entered: 01/30/2023) |
| 01/30/2023 | 59 | Certification of Speedy Trial Waiver by Michael Francis (Guerriero, Richard) (Entered: 01/30/2023) |
| 02/02/2023 | 60 | **ORDER granting 58 Assented to Motion to Continue Trial in the interest of justice as to Michael Francis (1). Final Pretrial Conference set for 5/8/2023 11:00 AM before** |

**JOINT APPENDIX 11**

| | | |
|---|---|---|
| | | **Judge Steven J. McAuliffe. JERS Statement due 5/9/2023. Jury Selection/Trial set for two week period beginning 5/16/2023 09:30 AM before Judge Steven J. McAuliffe. So Ordered by Judge Steven J. McAuliffe.**(lw) Modified on 2/3/2023 to correct FPT date (lw). (Entered: 02/03/2023) |
| 02/06/2023 | 61 | OBJECTION by USA as to Michael Francis re 54 MOTION to Suppress Cell Phone Evidence and Statements Resulting from Unconstitutional Arrest . (Attachments: # 1 Exhibit Conditions of Parole, Michael Francis, # 2 Exhibit Report of MPD Detective Mefford)(Gingrande, Aaron) (Entered: 02/06/2023) |
| 02/12/2023 | 62 | Supplement to Request for Bail by Michael Francis (Guerriero, Richard) (Entered: 02/12/2023) |
| 02/13/2023 | | **ENDORSED ORDER -** *Text of Order: At the February 14, 2023 hearing, the parties shall be prepared to address what appears to be a consensus among courts rejecting the argument that bond is appropriate for a defendant subject to a state detainer because he will merely be transferred from federal to state custody.* <u>*See United States v. Dimmick,*</u> *82 F. Supp. 3d 866, 870 (N.D. Iowa 2015) (denying defendant's motion for bond despite the fact that Defendant would remain in custody, albeit state custody).* **So Ordered by US Magistrate Judge Andrea K Johnstone. (lw)** (Entered: 02/13/2023) |
| 02/13/2023 | 63 | REPLY TO OBJECTION to Motion by Michael Francis re 54 MOTION to Suppress Cell Phone Evidence and Statements Resulting from Unconstitutional Arrest . (Guerriero, Richard) (Entered: 02/13/2023) |
| 02/14/2023 | | Minute Entry for proceedings held before US Magistrate Judge Andrea K Johnstone: BAIL HEARING as to Michael Francis held on 2/14/2023. Motion for bail denied. Defendant detained. Order to issue. (Tape #10:14) (Govt Atty: Charles Rombeau, Aaron Gingrande) (Defts Atty: Richard Guerriero) (USP: Karin Hess)(Total Hearing Time: 22 min.)(CJA Time: 36 min.) (kad) (Entered: 02/14/2023) |
| 02/17/2023 | 64 | **ORDER OF DETENTION as to Michael Francis. So Ordered by US Magistrate Judge Andrea K Johnstone. (kad)** (Entered: 02/17/2023) |
| 04/25/2023 | | TRIAL REMINDER: There is an upcoming trial in this case. Any Motion to Continue shall be filed 1 week before the Final Pretrial Conference or the Final Pretrial will be held as scheduled. (lw) (Entered: 04/25/2023) |
| 05/08/2023 | | Final Pretrial Conference as to Michael Francis set for 5/8/2023 11:00 AM, via video conference, before Judge Steven J. McAuliffe. (lw) (Entered: 05/08/2023) |
| 05/08/2023 | | Minute Entry for proceedings held before Judge Steven J. McAuliffe: FINAL PRETRIAL CONFERENCE as to Michael Francis held on 5/8/2023. (Govt Atty: Charles Rombeau, Aaron Gingrande) (Defts Atty: Richard Guerriero)(Total Hearing Time: 05 min.)(CJA Time: 05 min.) (lw) (Entered: 05/08/2023) |
| 05/08/2023 | | NOTICE OF HEARING as to Michael Francis. Evidentiary Hearing set for 6/14/2023 01:30 PM before Judge Steven J. McAuliffe. (lw) (Entered: 05/08/2023) |
| 05/11/2023 | 65 | Assented to MOTION to Continue Trial to *August 15, 2023 Trial Period* by Michael Francis. (Guerriero, Richard) (Entered: 05/11/2023) |
| 05/11/2023 | 66 | Certification of Speedy Trial Waiver by Michael Francis (Guerriero, Richard) (Entered: 05/11/2023) |

**JOINT APPENDIX 12**

| 05/22/2023 | 67 | **ORDER granting 65 Assented to Motion to Continue Trial in the interest of justice as to Michael Francis (1). Final Pretrial Conference set for 8/2/2023 02:30 PM before Judge Steven J. McAuliffe. JERS Statement due 8/8/2023. Jury Selection/Trial set for two week period beginning 8/15/2023 09:30 AM before Judge Steven J. McAuliffe. So Ordered by Judge Steven J. McAuliffe.**(lw) (Entered: 05/22/2023) |
|---|---|---|
| 06/07/2023 | 68 | FINAL WITNESS LIST by Michael Francis.(Guerriero, Richard) (Entered: 06/07/2023) |
| 06/13/2023 | 69 | FINAL WITNESS LIST by USA as to Michael Francis.(Gingrande, Aaron) (Entered: 06/13/2023) |
| 06/14/2023 | 70 | NOTICE of Supplemental Case Law *To Be Cited at Suppression Hearing* by USA as to Michael Francis. (Gingrande, Aaron) (Entered: 06/14/2023) |
| 06/14/2023 | 71 | Government's Exhibit List by USA as to Michael Francis (Gingrande, Aaron) (Entered: 06/14/2023) |
| 06/14/2023 |  | Minute Entry for proceedings held before Judge Steven J. McAuliffe: EVIDENTIARY HEARING as to Michael Francis held on 6/14/2023. Witnesses Appearing: Ryan Burke, Brian Benard, Joseph Lorenzo. Continuation of hearing to be rescheduled. (Court Reporter: Liza Dubois) (Govt Atty: Aaron Gingrande, Charles Rombeau) (Defts Atty: Richard Guerriero)(Total Hearing Time: 2 hrs. 40 min.)(CJA Time: 2 hrs. 40 min.) (lw) (Entered: 06/16/2023) |
| 06/27/2023 |  | NOTICE OF HEARING as to Michael Francis. Evidentiary Hearing set for 7/12/2023 01:30 PM before Judge Steven J. McAuliffe. (lw) (Entered: 06/27/2023) |
| 06/27/2023 | 72 | Supplemental Assented to MOTION for Protective Order by USA as to Michael Francis. (Attachments: # 1 Exhibit Proposed Protective Order) (Gingrande, Aaron) (Entered: 06/27/2023) |
| 07/11/2023 | 73 | Supplemental MOTION to Suppress EVIDENCE SEIZED WHEN EXECUTING SEARCH WARRANT FOR A WHITE HONDA ACCORD by Michael Francis. **HEARING REQUESTED.**Follow up on Objection on 7/25/2023. The court only follow up date DOES NOT include 3 additional days that may apply per FRCP 6(d) and FRCrP 45(c). (Guerriero, Richard) Modified on 7/11/2023 to link to doc. no. 35 (lw). (Entered: 07/11/2023) |
| 07/11/2023 | 74 | Assented to MOTION to File Exhibits Under Seal by Michael Francis. (lw) (Entered: 07/11/2023) |
| 07/12/2023 |  | Minute Entry for proceedings held before Judge Steven J. McAuliffe: EVIDENTIARY HEARING - Day 2 as to Michael Francis held on 7/12/2023. Witnesses Appearing: Ryan Burke. Counsel to file supplemental briefing within 10 days. Motions taken under advisement. (Court Reporter: Brenda Hancock) (Govt Atty: Aaron Gingrande, Charles Rombeau) (Defts Atty: Richard Guerriero)(Total Hearing Time: 1 hr. 42 min.)(CJA Time: 1 hr. 52 min.) (lw) (Entered: 07/12/2023) |
| 07/12/2023 | 76 | FINAL WITNESS LIST by USA as to Michael Francis.(lw) (Entered: 07/13/2023) |
| 07/12/2023 | 77 | FINAL WITNESS LIST by Michael Francis.(lw) (Entered: 07/13/2023) |
| 07/12/2023 | 78 | FINAL EXHIBIT LIST by USA as to Michael Francis.(lw) (Entered: 07/13/2023) |
| 07/12/2023 |  | **ORAL ORDER granting 72 Supplemental Assented to Motion for Protective Order as to Michael Francis (1). So Ordered by Judge Steven J. McAuliffe. (lw)** (Entered: |

**JOINT APPENDIX 13**

| | | |
|---|---|---|
| | | 07/13/2023) |
| 07/12/2023 | 79 | **SUPPLEMENTAL PROTECTIVE ORDER as to Michael Francis. So Ordered by Judge Steven J. McAuliffe. (lw)** (Entered: 07/13/2023) |
| 07/17/2023 | | TRIAL REMINDER: There is an upcoming trial in this case. Any Motion to Continue shall be filed 1 week before the Final Pretrial Conference or the Final Pretrial will be held as scheduled. (lw) (Entered: 07/17/2023) |
| 07/18/2023 | | **ENDORSED ORDER granting 74 Assented to MOTION to File Exhibits Under Seal as to Michael Francis (1). *Text of Order: Granted.* So Ordered by Judge Steven J. McAuliffe. (lw)** (Entered: 07/20/2023) |
| 07/19/2023 | 80 | Assented to MOTION to Continue Trial to October 17, 2023 by Michael Francis. (Guerriero, Richard) (Entered: 07/19/2023) |
| 07/19/2023 | 81 | Certification of Speedy Trial Waiver by Michael Francis (Guerriero, Richard) (Entered: 07/19/2023) |
| 07/21/2023 | 82 | Assented to MOTION to Extend Time to Object/Respond to September 5, 2023 by USA as to Michael Francis. (Gingrande, Aaron) (Entered: 07/21/2023) |
| 07/30/2023 | 83 | **ORDER granting 80 Assented to Motion to Continue Trial in the interest of justice as to Michael Francis (1). Final Pretrial Conference set for 10/4/2023 03:00 PM before Judge Steven J. McAuliffe. JERS Statement due 10/10/2023. Jury Selection/Trial set for two week period beginning 10/17/2023 09:30 AM before Judge Steven J. McAuliffe. So Ordered by Judge Steven J. McAuliffe.(lw)** (Entered: 07/31/2023) |
| 07/30/2023 | | **ENDORSED ORDER granting 82 Motion to Extend Time to Object/Respond as to Michael Francis (1). *Text of Order: Granted.* So Ordered by Judge Steven J. McAuliffe. Follow up on Objection and supplemental briefing due 9/5/2023. (lw)** (Entered: 07/31/2023) |
| 09/07/2023 | 84 | Assented to MOTION to Extend Time to Object/Respond to Order on Motion to Extend Time to Object/Respond, to Sept 15, 2023 by USA as to Michael Francis. (Rombeau, Charles) (Entered: 09/07/2023) |
| 09/12/2023 | | **ENDORSED ORDER granting 84 Motion to Extend Time to Object/Respond as to Michael Francis (1). *Text of Order: Granted.* So Ordered by Judge Steven J. McAuliffe. Follow up on Objection and supplemental briefing due on 9/15/2023. (lw)** (Entered: 09/13/2023) |
| 09/15/2023 | 85 | MEMORANDUM in Opposition by USA as to Michael Francis re 54 MOTION to Suppress Cell Phone Evidence and Statements Resulting from Unconstitutional Arrest - *Supplemental Memorandum.* (Rombeau, Charles) (Entered: 09/15/2023) |
| 09/15/2023 | 86 | OBJECTION by USA as to Michael Francis re 73 Supplemental MOTION to Suppress EVIDENCE SEIZED WHEN EXECUTING SEARCH WARRANT FOR A WHITE HONDA ACCORD . (Gingrande, Aaron) (Entered: 09/15/2023) |
| 10/03/2023 | 87 | **ORDER mooting 34 MOTION to Suppress EVIDENCE SEIZED AS A RESULT OF THE WARRANTLESS PROTECTIVE SWEEP OF UNIT 3 AT 231 THORNTON STREET; denying 35 MOTION to Suppress EVIDENCE SEIZED WHEN EXECUTING SEARCH WARRANT FOR A WHITE HONDA ACCORD; mooting 36 MOTION to Suppress DEFENDANTS STATEMENTS ON SEPTEMBER 7,** |

**JOINT APPENDIX 14**

| | | |
|---|---|---|
| | | **2021; denying 54 MOTION to Suppress Cell Phone Evidence and Statements Resulting from Unconstitutional Arrest; denying 73 Supplemental MOTION to Suppress EVIDENCE SEIZED WHEN EXECUTING SEARCH WARRANT FOR A WHITE HONDA ACCORD as to Michael Francis (1).** *Defendant's motion to suppress evidence seized when executing the search warrant for the white Honda Accord (document nos. 35 and 73) is* **DENIED.** *Defendant's motion to suppress cell phone evidence and statements resulting from unconstitutional arrest (document no. 54) is* **DENIED.** *Defendant's motions to suppress the introduction of evidence gathered by law enforcement during a search of his apartment on September 2, 2021, (document no. 34), and to suppress his statements made on September 7, 2021, (document no. 36) are deemed moot.* **So Ordered by Judge Steven J. McAuliffe. (lw)** (Entered: 10/03/2023) |
| 10/04/2023 | | Minute Entry for proceedings held before Judge Steven J. McAuliffe: FINAL PRETRIAL CONFERENCE as to Michael Francis held on 10/4/2023. Counsel to file assented to motion to continue trial to November trial period. (Govt Atty: Charles Rombeau, Aaron Gingrande) (Defts Atty: Richard Guerriero)(Total Hearing Time: 05 min.)(CJA Time: 05 min.) (lw) (Entered: 10/04/2023) |
| 10/05/2023 | 88 | Assented to MOTION to Continue Trial to November 14, 2023 by Michael Francis. (Guerriero, Richard) (Entered: 10/05/2023) |
| 10/05/2023 | 89 | Certification of Speedy Trial Waiver by Michael Francis (Guerriero, Richard) (Entered: 10/05/2023) |
| 10/05/2023 | 90 | **ORDER granting 88 Assented to Motion to Continue Trial in the interest of justice as to Michael Francis (1). Final Pretrial Conference set for 11/1/2023 03:30 PM before Judge Steven J. McAuliffe. JERS Statement due 11/7/2023. Jury Selection/Trial set for two week period beginning 11/14/2023 09:30 AM before Judge Steven J. McAuliffe. So Ordered by Judge Steven J. McAuliffe.(lw)** (Entered: 10/06/2023) |
| 10/11/2023 | 91 | Petition for Writ of Habeas Corpus ad Testificandum for Emilio Flores on 11/14/2023 and thereafter as needed for trial re: defendant Michael Francis.(Guerriero, Richard) (Entered: 10/11/2023) |
| 10/11/2023 | | Writ of Habeas Corpus ad Testificandum Issued as to Emilio Flores for 11/14/2023.(lw) (Entered: 10/11/2023) |
| 10/26/2023 | 92 | Notice to Substitute Attorney. Added attorney Jarad Hodes. Attorney Charles Rombeau terminated. Attorney Jarad Hodes added to party USA(pty:pla).(Hodes, Jarad) (Entered: 10/26/2023) |
| 10/26/2023 | | RESCHEDULING NOTICE OF HEARING (Time Change Only) as to Michael Francis. Final Pretrial Conference set for 11/1/2023 11:00 AM, via video conference, before Judge Steven J. McAuliffe. (lw) (Entered: 10/26/2023) |
| 11/01/2023 | | Minute Entry for proceedings held before Judge Steven J. McAuliffe: FINAL PRETRIAL CONFERENCE as to Michael Francis held on 11/1/2023. Order to Issue. (Govt Atty: Aaron Gingrande, Jarad Hodes) (Defts Atty: Richard Guerriero)(Total Hearing Time: 10 min.)(CJA Time: 10 min.) (lw) (Entered: 11/01/2023) |
| 11/01/2023 | 93 | **Final Pretrial Order. Exhibit List and Witness List due by 11/7/2023. Motions in Limine due by 11/6/2023. Responses due 11/13/2023. Jury Selection set for 11/14/2023 09:30 AM before Judge Steven J. McAuliffe. Jury Trial set for 11/15/2023** |

**JOINT APPENDIX 15**

| | | **09:00 AM before Judge Steven J. McAuliffe. So Ordered by Judge Steven J. McAuliffe. (Attachments: # 1 Procedure for Marking Exhibits) (lw)** (Entered: 11/01/2023) |
|---|---|---|
| 11/02/2023 | 94 | TRANSCRIPT of Proceedings as to Michael Francis for Evidentiary Hearing - Day 2 held on July 12, 2023. Court Reporter: Brenda Hancock, Telephone # 603 225-1454. Transcript is available for public inspection, but may not be copied or otherwise reproduced, at the Clerk's Office for a period of 90 days. Additionally, only attorneys of record and pro se parties with an ECF login and password who purchase a transcript from the court reporter will have access to the transcript through PACER during this 90-day period. If you would like to order a copy, please contact the court reporter at the above listed phone number.<br><br>**NOTICE: Any party who requests an original transcript has 21 days from service of this notice to determine whether it is necessary to redact any personal identifiers and, if so, to electronically file a Redaction Request.**<br><br>Redaction Request Follow Up 11/27/2023. Redacted Transcript Follow Up 12/4/2023. Release of Transcript Restriction set for 1/31/2024. (lw) (Entered: 11/02/2023) |
| 11/02/2023 | 95 | TRANSCRIPT of Proceedings as to Michael Francis for Evidentiary Hearing - Day 1 held on June 14, 2023. Court Reporter: Liza Dubois, Telephone # 603 225-1442. Transcript is available for public inspection, but may not be copied or otherwise reproduced, at the Clerk's Office for a period of 90 days. Additionally, only attorneys of record and pro se parties with an ECF login and password who purchase a transcript from the court reporter will have access to the transcript through PACER during this 90-day period. If you would like to order a copy, please contact the court reporter at the above listed phone number.<br><br>**NOTICE: Any party who requests an original transcript has 21 days from service of this notice to determine whether it is necessary to redact any personal identifiers and, if so, to electronically file a Redaction Request.**<br><br>Redaction Request Follow Up 11/27/2023. Redacted Transcript Follow Up 12/4/2023. Release of Transcript Restriction set for 1/31/2024. (lw) (Entered: 11/02/2023) |
| 11/06/2023 | 96 | JUROR QUESTIONNAIRES: Access to this document is available to the Court and temporarily available to counsel for USA, Michael Francis only.<br><br>**The retrieval or viewing of these questionnaires constitutes confirmation that you will adhere to L.R. 47.1, which requires that any individual given access to the questionnaires shall not disclose the questionnaires, or information contained therein, to anyone other than the attorneys, their agents, or the parties involved in trial. Violation of this rule may be treated as contempt of court.**(lw) (Entered: 11/06/2023) |
| 11/06/2023 | 97 | PLEA AGREEMENT as to Michael Francis. (lw) (Additional attachment(s) added on 11/6/2023: # 1 Filed Stamp Copy) (lw). (Entered: 11/06/2023) |
| 11/06/2023 | | NOTICE OF HEARING as to Michael Francis. Change of Plea Hearing set for 11/14/2023 10:00 AM before Judge Steven J. McAuliffe. **NOTICE: For cost containment purposes, the court prefers that the USPO conduct the PSR interview immediately following the COP hearing. Thus, prior to the COP hearing, a USPO** |

**JOINT APPENDIX 16**

| | | |
|---|---|---|
| | | may contact counsel for the purpose of scheduling the PSR interview after the COP hearing.(lw) (Entered: 11/06/2023) |
| 11/14/2023 | | Minute Entry for proceedings held before Judge Steven J. McAuliffe: CHANGE OF PLEA HEARING held on 11/14/2023 as to Michael Francis (1): Defendant sworn and advised of rights/charge(s). No objection to offer of proof. Defendant plead guilty to Count 2s. Court accepts guilty plea. Court defers acceptance of plea agreement (stipulations) until time of sentencing. Oral request for a recommendation for the defendant to participate in TC Program at Strafford County. Court made an oral recommendation that should it be feasible to move Mr. Francis to Strafford County that he be allowed to participate in the TC Program. Oral request to dismiss counts 3, 4, & 5 of Superseding Indictment. Upon no objection, Oral order dismissing counts 3, 4 & 5. Defendant remanded to the custody of the US Marshal. (Court Reporter: Brenda Hancock) (Govt Atty: Aaron Gingrande) (Defts Atty: Richard Guerriero)(Total Hearing Time: 20 min.)(CJA Time: 25 min.) (lw) (Entered: 11/14/2023) |
| 11/14/2023 | | ORAL MOTION to Dismiss Counts 3, 4 and 5 by USA as to Michael Francis. (lw) (Entered: 11/14/2023) |
| 11/14/2023 | | **ORAL ORDER granting [ ] Oral Motion to Dismiss Counts 3, 4 and 5 as to Michael Francis (1). So Ordered by Judge Steven J. McAuliffe. (lw)** (Entered: 11/14/2023) |
| 11/14/2023 | | NOTICE OF HEARING as to Michael Francis. Sentencing set for 2/20/2024 11:00 AM before Judge Steven J. McAuliffe.*The court has allotted 1 hour for the hearing. Please contact the court immediately if you anticipate the hearing will exceed the allotted time.* **Any motion seeking a departure or variance, as well as any sentencing memorandum, shall be filed 10 days prior to the sentencing date. Any response shall be filed 4 days prior to sentencing date. Defense counsel should advise the defendant that any monetary portion of the sentence will be payable only by cash, bank check, money order or debit or credit card via pay.gov (after obtaining a transaction ID from the probation officer.) No card payments can be made at the counter.**(lw) (Entered: 11/14/2023) |
| 01/24/2024 | 99 | Assented to MOTION to Continue Sentencing Hearing for Approximately 21 days by Michael Francis. (Guerriero, Richard) (Entered: 01/24/2024) |
| 01/29/2024 | | **ENDORSED ORDER granting 99 Assented to MOTION to Continue Sentencing Hearing for Approximately 21 days as to Michael Francis (1).** *Text of Order: Granted.* **So Ordered by Judge Steven J. McAuliffe. Any motion seeking a departure or variance, as well as any sentencing memorandum, shall be filed 10 days prior to the sentencing date. Any response shall be filed 4 days prior to sentencing date.**(lw) (Entered: 01/31/2024) |
| 02/01/2024 | | Case as to Michael Francis reassigned to Judge Paul J. Barbadoro. (lw) (Entered: 02/01/2024) |
| 02/01/2024 | | RESCHEDULING NOTICE OF HEARING as to Michael Francis. Sentencing reset for 4/10/2024 11:00 AM before Judge Paul J. Barbadoro.*The court has allotted 1 hour for the hearing. Please contact the court immediately if you anticipate the hearing will exceed the allotted time.* **Any motion seeking a departure or variance, as well as any sentencing memorandum, shall be filed 10 days prior to the sentencing date. Any response shall be filed 4 days prior to sentencing date.**(lw) (Entered: 02/01/2024) |

**JOINT APPENDIX 17**

| 03/26/2024 | 102 | Assented to MOTION to Extend Time Deadline for Filing Sentencing Memorandum and Request for a Variance from March 29, 2024 to April 2, 2024 by Michael Francis. (Guerriero, Richard) (Entered: 03/26/2024) |
| 04/02/2024 | 103 | SENTENCING MEMORANDUM *And MOTION FOR DOWNWARD VARIANCE* by Michael Francis. (Guerriero, Richard) (Entered: 04/02/2024) |
| 04/03/2024 | | **ENDORSED ORDER granting 102 Motion to Extend Time Deadline for Filing Sentencing Memorandum and Request for a Variance from March 29, 2024 to April 2, 2024 as to Michael Francis (1). *Text of Order: Granted.* So Ordered by Judge Paul J. Barbadoro. (jwb)** (Entered: 04/03/2024) |
| 04/08/2024 | 104 | SENTENCING MEMORANDUM by USA as to Michael Francis. (Gingrande, Aaron) (Entered: 04/08/2024) |
| 04/09/2024 | 105 | SENTENCING MEMORANDUM *to Replace ECF Document 104* by USA as to Michael Francis. (Gingrande, Aaron) (Entered: 04/09/2024) |
| 04/09/2024 | 106 | Assented to MOTION to Dismiss *Bill of Particulars* by USA as to Michael Francis. (Gingrande, Aaron) (Entered: 04/09/2024) |
| 04/10/2024 | | Minute Entry for proceedings held before Judge Paul J. Barbadoro: SENTENCING held on 4/10/2024 for Michael Francis (1): Defendant sentenced on Count 2s. Court accepts binding stipulations in plea agreement. Fine waived due to inability to pay. Appeal rights to defendant. Defendant remanded to the custody of the US Marshal. (Court Reporter: Liza Dubois) (Govt Atty: Aaron Gingrande) (Defts Atty: Richard Guerriero) (USP: Maggie Gildea)(Total Hearing Time: 21 min.)(CJA Time: 32 min.) (lw) (Entered: 04/10/2024) |
| 04/10/2024 | | **ORAL ORDER granting 106 Motion to Dismiss Bill of Particulars as to Michael Francis (1). So Ordered by Judge Paul J. Barbadoro. (lw)** (Entered: 04/10/2024) |
| 04/10/2024 | 107 | ACKNOWLEDGMENT of Sentencing Options by Michael Francis. (lw) (Entered: 04/10/2024) |
| 04/10/2024 | 108 | **JUDGMENT as to Michael Francis (1): Defendant to be imprisoned for a term of 150 months. 4 years Supervised Release with mandatory, standard and special conditions. $100.00 Special Assessment. So Ordered by Judge Paul J. Barbadoro. (lw)** (Entered: 04/10/2024) |
| 04/18/2024 | 109 | NOTICE OF APPEAL by Michael Francis re 87 Order on Motion to Suppress,,,,,,,,,,,,,,,,,,,,,,. (No fee paid, USA or IFP.). [NOTICE TO COUNSEL: A Transcript Report/Order Form, which can be downloaded from the Forms & Notices section of the First Circuit website at www.ca1.uscourts.gov, MUST be completed and submitted to the U.S. Court of Appeals for the First Circuit.]<br><br>**NOTICE TO COUNSEL: Counsel should register for a First Circuit CM/ECF Appellate Filer Account at http://pacer.psc.uscourts.gov/cmecf/. Counsel should also review the First Circuit requirements for electronic filing by visiting the CM/ECF Information section at http://www.ca1.uscourts.gov/cmecf** (Guerriero, Richard) (Entered: 04/18/2024) |
| 04/18/2024 | 110 | Appeal Cover Sheet as to Michael Francis re: 109 Notice of Appeal. (lw) (Entered: 04/18/2024) |

**JOINT APPENDIX 18**

| 04/18/2024 | [111] | Clerk's Certificate transmitting Record on Appeal to US Court of Appeals, documents numbered 87, 97, 108-111, as to Michael Francis to USCA re: [109] Notice of Appeal. A copy of the Notice of Appeal mailed to all parties this date. (lw) (Entered: 04/18/2024) |
| 04/18/2024 | | Appellate Case Number: First Circuit Court of Appeals 24-1386 for [109] Notice of Appeal, filed by Michael Francis. (lw) (Entered: 04/18/2024) |
| 06/03/2024 | | CJA 20 Payment Information as to Michael Francis. Authorization given to pay counsel for representation under the Criminal Justice Act in the following amount. **Nicholas C. Howie:** $1,316.65. **Richard Guerriero:** $26,128.23. (mp) (Entered: 06/03/2024) |
| 06/14/2024 | [113] | TRANSCRIPT of Proceedings as to Michael Francis for Sentencing Hearing held on April 10, 2024. Court of Appeals Docket Number 24-1386. Court Reporter: Liza Dubois, Telephone # 603-225-1442. Transcript is available for public inspection, but may not be copied or otherwise reproduced, at the Clerk's Office for a period of 90 days. Additionally, only attorneys of record and pro se parties with an ECF login and password who purchase a transcript from the court reporter will have access to the transcript through PACER during this 90-day period. If you would like to order a copy, please contact the court reporter at the above listed phone number.<br><br>**NOTICE: Any party who requests an original transcript has 21 days from service of this notice to determine whether it is necessary to redact any personal identifiers and, if so, to electronically file a Redaction Request.**<br><br>Redaction Request Follow Up 7/5/2024. Redacted Transcript Follow Up 7/15/2024. Release of Transcript Restriction set for 9/12/2024. (jwb) (Entered: 06/14/2024) |

| **PACER Service Center** | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 09/05/2024 14:10:44 | | | |
| **PACER Login:** | odbloom23 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:21-cr-00153-PB |
| **Billable Pages:** | 17 | **Cost:** | 1.70 |

**JOINT APPENDIX 19**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | Criminal Case No. 1:21-cr-153-01-SM |
| v. | ) | |
| | ) | |
| MICHAEL FRANCIS | ) | |
| | ) | |

## SUPERSEDING INDICTMENT

**The Grand Jury charges:**

## COUNT ONE

## [21 U.S.C. §§ 841(a)(1), 841(b)(1)(B)(ii) & 846

## Conspiracy to Distribute and Possess with Intent to Distribute 500 Grams or

## More of Cocaine]

From in or around May 2021 and continuing through September 2021, in the District of

New Hampshire, the defendant,

MICHAEL FRANCIS,

did knowingly and willfully combine, conspire and agree with other persons known and

unknown to the Grand Jury, to distribute and possess with the intent to distribute a controlled

substance, specifically, 500 grams and more of a mixture and substance containing a detectable

amount of cocaine, its salts, optical and geometric isomers, and salts of its isomers, a Schedule II

controlled substance.

In violation of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(B)(ii), and

846.

MICHAEL FRANCIS's conduct as a member of the conspiracy charged above, which

includes the reasonably foreseeable conduct of other members of the narcotics conspiracy

**JOINT APPENDIX 20**

charged above, involved 500 grams and more of a mixture and substance containing a detectable amount of cocaine, its salts, optical and geometric isomers, and salts of its isomers, a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1), (b)(1)(B)(ii), and 846.

## COUNT TWO

**[21 U.S.C. §§ 841(a)(1) & 841(b)(1)(B)(ii)**
**Possession with Intent to Distribute 500 grams or More of Cocaine]**

On or about September 1, 2021, in the District of New Hampshire, the defendant,

MICHAEL FRANCIS,

did knowingly and intentionally possess with intent to distribute a controlled substance, specifically, 500 grams and more of a mixture and substance containing a detectable amount of cocaine, its salts, optical and geometric isomers, and salts of its isomers, a Schedule II controlled substance.

In violation of Title 21, United States Code, Sections 841(a)(1) & 841(b)(1)(B)(ii).

## COUNT THREE

**[21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(vi) & 841(b)(1)(A)(viii)**
**Possession with Intent to Distribute 400 grams or More of Fentanyl and 50 grams or More of Methamphetamine]**

On or about September 1, 2021, in the District of New Hampshire, the defendant,

MICHAEL FRANCIS,

did knowingly and intentionally possess with intent to distribute controlled substances, specifically, 400 grams and more of a mixture and substance containing a detectable amount of N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide, also known as fentanyl, a Schedule II controlled substance, and 50 grams and more of methamphetamine, its salts, isomers, and

**JOINT APPENDIX 21**

salts of its isomers, a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(A)(vi) & 841(b)(1)(A)(vii).

## COUNT FOUR
### [18 U.S.C. §§ 922(g)(1) & 924(a)(2)
### Possession of Firearms and Ammunition by a Prohibited Person]

On or about September 1, 2021, in the District of New Hampshire, the defendant,

MICHAEL FRANCIS,

knowing he had previously been convicted of a crime punishable by imprisonment for a term exceeding one year, did knowingly possess in and affecting interstate and foreign commerce, firearms and ammunition, namely:

- a Springfield Armory, model XDm-40, .40 S&W caliber pistol bearing serial number MG126009;
- a Bulgarian, model Makarov, 9 x 18 caliber pistol bearing serial number BA19 281;
- a Sig Sauer, model 320, 9 mm pistol bearing serial number 58C317762;
- a Glock, Model 23, .40 S&W caliber pistol bearing serial number EKM675;
- five rounds of Fiochhi 9x18 Makarov caliber ammunition;
- three rounds of Hornady 9x18 Makarov caliber ammunition;
- twenty-six rounds of Starline Brass .40 S&W caliber ammunition;
- five rounds of Atlanta Arms .40 S&W caliber ammunition;
- ten rounds of Winchester 9mm caliber ammunition; and
- twelve rounds of Hornady .40 S&W caliber ammunition.

In violation of Title 18, United States Code, Sections 922(g)(1) and 924(a)(2).

## COUNT FIVE

### [18 U.S.C. § 924(c)(1)(A)(i)
### Possession of Firearms
### in Furtherance of a Drug Trafficking Crime]

On or about September 1, 2021, in the District of New Hampshire, the defendant,

**JOINT APPENDIX 22**

MICHAEL FRANCIS,

did knowingly possess firearms, namely, the firearms described in Count 4 of this Superseding Indictment, in furtherance of a drug trafficking crime for which he may be prosecuted in a court of the United States, namely, Possession with Intent to Distribute Controlled Substances as charged in Count 3 of this Superseding Indictment.

In violation of Title 18, United States Code, Section 924(c)(1)(A)(i).

## NOTICE OF FORFEITURE

Upon conviction of the offense alleged in Count One of this Superseding Indictment, the defendant shall forfeit to the United States pursuant to 21 U.S.C. § 853, any property constituting, or derived from, proceeds obtained, directly or indirectly, as a result of the charged offenses and any property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of the charged offense.

Upon conviction of one or more of the offenses alleged in Counts One through Five of this Superseding Indictment, the defendant shall forfeit to the United States pursuant to 18 U.S.C. § 924(d) and 28 U.S.C. § 2461(c), any firearms and ammunition used, or intended to be used, to commit, or to facilitate the commission of the charged offense.

**JOINT APPENDIX 23**

A TRUE BILL

Dated: December 13, 2021                    /s/ Foreperson of the Grand Jury
                                            Foreperson of the Grand Jury


          JOHN J. FARLEY
          Acting United States Attorney


By:       /s/ Aaron G. Gingrande
          Aaron G. Gingrande
          Assistant U.S. Attorney


**JOINT APPENDIX 24**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**

UNITED STATES OF AMERICA

        v.                               No. 1:21-cr-00153-01-SM

MICHAEL FRANCIS

<u>MOTION TO SUPPRESS EVIDENCE SEIZED WHEN EXECUTING
SEARCH WARRANT FOR A WHITE HONDA ACCORD</u>

     Michael Francis is charged in a 5-count superseding indictment with conspiracy and

possession with intent to distribute cocaine, fentanyl, and methamphetamine, and two firearms

charges. The Government's evidence against Mr. Francis includes evidence seized from his

Honda Accord pursuant to a search warrant. That evidence should be suppressed because the

search was not justified by probable cause. The claimed probable cause is based on information

from a confidential informant, but the facts stated in the affidavit for the search warrant are

insufficient to establish the reliability of the informant. More importantly, if the defense is

correct about the identity of the informant, the agent recklessly failed to disclose to the court that

the informant has a prior conviction for falsifying physical evidence – a felony crime of

dishonesty. If that information had been provided to the Magistrate, the search warrant would not

have issued. The Government is not saved by the good-faith exception because that exception

applies when the police rely on the mistake of a third party. Here, the Magistrate's mistaken

issuance of the search warrant was the result of law enforcement not including information

highly relevant to the informant's credibility. Law enforcement cannot claim good-faith reliance

when their omission caused wrongful issuance of the search warrant. Thus, the evidence seized

from the car should be suppressed.

<u>Factual Background</u>[1]

 At some point prior to September 1, 2021, law enforcement developed the belief that Michael Francis was illegally selling drugs and that, because of his status of a felon, he was unlawfully possessing a firearm. The primary source of information was an informant. The identity of the informant and the dates the informant provided information have not been revealed to the defense, despite requests. That information is redacted from the documents provided to the defense in discovery. Nonetheless, the defense believes it has identified the informant, as explained below. The defense does not state the informant's name in this motion for obvious reasons.

Special Agent Ryan Burke put the information from the confidential informant in an application for a search warrant for Mr. Francis's car. That affidavit is attached to this motion as Exhibit C. The search warrant was executed on September 1, 2021, and evidence, including cocaine, was seized. Exhibits A and B.

The information from the informant, as stated in the application for the warrant, is described below, along with a description of what information was not provided.

The informant had been arrested twice before agreeing to cooperate with law enforcement. Exhibit C, pars. 7 and 8. Both times the informant was arrested with significant quantities of illegal drugs including methamphetamine, fentanyl, and crack cocaine. *Id*. The informant claimed that he had obtained drugs from Mr. Francis, first through another person, and then directly. *Id*. at pars 10 and 11. The informant described what he claimed were multiple prior purchases of drugs from Mr. Francis. *Id*. at par. 12. He said Mr. Francis is a member of the

---

[1] The factual allegations in this motion are based directly on the discovery provided by the Government to the defense. Selected reports and the relevant search warrant application and search warrant for the Honda are attached as exhibits A, B, and C.

**JOINT APPENDIX 26**

Gangster Disciples. *Id*. at par. 10. The informant said Mr. Francis drove a white Honda Accord with New Hampshire plates. *Id*. at par. 14. The informant also said Mr. Francis had a firearm in the white Honda Accord. *Id*. at par. 9 and 14. The agents confirmed through vehicle registration records, and Mr. Francis's parole officer, that Mr. Francis drove a white Honda Accord. *Id*. at par. 15. They also confirmed that Mr. Francis is a felon. *Id*. at par. 14. Finally, the informant claimed the sales took place some blocks away an address the police believed was associated with Mr. Francis.

The application includes almost no significant facts which confirm the accuracy of the informant's information or his credibility. The allegations made by the informant were allegations of alleged past crimes of Mr. Francis. The affidavit does not state that those alleged past crimes were corroborated by other witnesses or evidence. The facts corroborated by the agents were innocent facts, such as that Mr. Francis drove a white Honda Accord and that the sales were near an address police associated with Mr. Francis (whether or not he lived there). The informant never predicted any future criminal, or even suspicious, conduct by Mr. Francis which the agents corroborated. The informant only claimed to be a witness to past conduct not corroborated by other evidence. The informant never made a controlled buy from Mr. Francis. The informant never made a law enforcement monitored phone call to Mr. Francis in which Mr. Francis made an incriminating statement. The informant never had some other kind of corroborated communication with Mr. Francis, such as a text message, in which Mr. Francis incriminated himself. Nor did the agents corroborate any of the informant's claims through forensic evidence, such as fingerprints or DNA on an object Mr. Francis alleged touched (a plastic baggie containing drugs for example).

**JOINT APPENDIX 27**

Regarding the informant's reliability in general, the affidavit does not say that the informant had provided reliable information in prior cases. The affidavit does not describe any similar indicia of reliability. In other words, this was not an informant with a track record of credibility. The only background offered by Agent Burke regarding the informant was the pending drug charges the informant faced. Exhibit C, par. 9. In the first instance, it is clear that those pending charges provided a strong motivation for the informant to curry favor with an FBI agent. The informant surely knew he was facing a lengthy period of incarceration which he could mitigate by cooperating with police.

Second, and more importantly, it would be common for the agents to run a criminal background check on an arrestee / informant. This is significant because the defense believes that a criminal background check on this informant would have revealed devastating information about his lack of credibility. Yet, that information is not in the affidavit.

The defense does not make this claim lightly. Based on public records regarding pending prosecutions in state and federal court, the dates of alleged offenses, the specific drugs involved, and the specific weights of the specific drugs, the defense believes it knows the identity of the informant. For example, the affidavit in support of the complaint in this court against the suspected informant is signed by the same agent, Agent Burke. The complaint affidavit regarding the informant describes two motor vehicle stops of the suspected informant, just as in the affidavit for the search warrant for the Honda. The amounts and kinds of drugs seized in each stop are the same in both the complaint against the suspected informant and the affidavit for the search of the Honda. Defense counsel told the government the name of the person the defense believes to be the informant, but the government has not confirmed whether the defense is correct. Again, for obvious reasons, the defense is not stating that name in this motion.

**JOINT APPENDIX 28**

If the defense is correct about the identity of the informant, that person not only has a serious criminal record which was not revealed to the court, one of those convictions is a felony conviction in New Hampshire Superior Court for falsifying physical evidence. To be clear, the defense believes the informant had a felony conviction for a crime of dishonesty, but that conviction was not revealed to the magistrate in the affidavit which bases probable cause almost entirely on the credibility of that same informant.  The suspected informant's criminal record, obtained by the defense, has been provided to the government. The defense expects that, if the defense is correct about the informant's identity, the government will confirm as much and will provide an official criminal record check and other information consistent with the government's *Brady* obligations. The defense would, of course, agree to any reasonable protective order the government requested.

In any event and in summary, the defense asserts that Agent Burke's affidavit for the warrant to search Michael Francis's white Honda Accord is so defective that the evidence obtained when that warrant was executed must be suppressed. It is defective because it does not state probable cause for the search of the Honda. Moreover, it is defective because the agent failed to include in the affidavit that the informant, who was the agent's primary source of information, had a conviction for a prior felony involving acts of dishonesty.

<u>The Warrant Was Defective Because the Information from the Informant Did Not Establish Probable Cause to Search the Honda.</u>

 Under the Fourth Amendment, a person has the right to "be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures," and "no warrants shall issue, but upon probable cause, supported by oath…." Although there are exceptions to the warrant requirement for cars*, see generally* <u>Pennsylvania v. Labron</u>, 518 U.S. 938 (1996); <u>United States v. Ross</u>, 456 U.S. 798 (1982), law enforcement here did not rely on such an exception.

**JOINT APPENDIX 29**

Instead, they claim they had a valid search warrant based on the information Agent Burke received from his informant. Furthermore, if the Government responds by relying on such an exception, the argument will still fail because the agents did not have probable cause to search the car and cannot rely on the good-faith exception, as explained in this motion.

In *Illinois v. Gates*, 462 U.S. 213, 103 S. Ct. 2317 (1983), the Supreme Court abandoned the two-pronged approach for evaluating probable cause in the context of confidential informant reliability from *Aguilar v. Texas*, 378 U.S. 108, 84 S. Ct. 1509 (1964) and *Spinelli v. United States*, 393 U.S. 410, 89 S. Ct. 584 (1969), and instead adopted a totality-of-the-circumstances approach. *Gates*, 462 U.S. at 238. While an informant's "'veracity,' 'reliability,' and 'basis of knowledge' are all highly relevant in determining the value of his report," "these elements should not be understood as entirely separate and independent requirements to be rigidly exacted in every case" but "should be understood simply as closely intertwined issues that may usefully illuminate the commonsense, practical question whether there is 'probable cause' to believe that contraband or evidence is located in a particular place." *Id.* at 230. When assessing whether sufficient probable cause exists, the magistrate judge "is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Id.* at 238. The majority opinion referred to prior decisions, *Jones v. United States*, 362 U.S. 257 (1960), *Aguilar v. Texas*, 378 U.S. 108 (1964), and *Draper v. United States*, 358 U.S. 307 (1959), "that recognized the value of corroboration of details of an informant's tip by independent police work." *Gates*, 462 at 241.

**JOINT APPENDIX 30**

In *United States v. Maglio*, 21 F.4th 179 (U.S. 1st Cir. 2021), a challenge to a search of a marijuana grow that relied, in part, on the information from an informant, the First Circuit summarized its jurisprudence regarding an informant's credibility:

> "An informant's trustworthiness may be enhanced in a number of ways, including his willingness to reveal his identity, the level of detail in his account, the basis of his knowledge, and the extent to which his statements are against his interest." *United States v. Tanguay*, 787 F.3d 44, 50 (1st Cir. 2015) (citation omitted). "A probable cause finding may be based on an informant's tip so long as the probability of a lying or inaccurate informer has been sufficiently reduced." *United States v. Gifford*, 727 F.3d 92, 99 (1st Cir. 2013). In addition to the factors demonstrating probable veracity cited above, we consider "whether some or all of the informant's factual statements were corroborated wherever reasonable or practicable" and "whether a law enforcement affiant assessed, from his professional standpoint, experience, and expertise, the probable significance of the informant's provided information."

*See id.,Maglio*, 21 F.4th at 185.

As to indicia of trustworthiness, the First Circuit in *Maglio* pointed to the facts that the informant's identity was revealed, that he was in law enforcement custody, that he provided personal, first-hand observations of criminal activity, and that he was potentially implicating himself in a criminal conspiracy. *Id.* at 185-86. In addition, "the affidavit independently corroborated critical portions of [the informant']s information. *Id.* at 186.

The First Circuit's discussion in *United States v. Gifford*, 727 F.3d 92 (1st Cir. 2013), affirming the trial court's suppression of evidence, expounds on the factors necessary for a magistrate to credit the informant's credibility:

> We apply a 'nonexhaustive list of factors' to examine the affidavit's probable cause showing, which include, among others: (1) whether the affidavit establishes the probable veracity and basis of knowledge of persons supplying hearsay information; (2) whether an informant's statements reflect first-hand knowledge; (3) whether some or all of the informant's factual statements were corroborated wherever reasonable or practicable (e.g., through police surveillance); and (4) whether a law enforcement affiant assessed, from his professional standpoint, experience, and expertise, the probable significance of the informant's provided information.

*Id.* at 99, 102 (citing *United States v. Tiem Trinh*, 665 F.3d 1, 10 (1st Cir. 2011)).

**JOINT APPENDIX 31**

The First Circuit has also opined on how an informant's criminal record affects his credibility. So, for example, in *United States v. Brown*, 500 F.3d 48 (1st Cir. 2007), where the defendant was arrested for drug trafficking and then challenged whether the informant's information supplied probable cause in light of the informant's criminal record and outstanding criminal charges, the court said:

> To be sure, factors like an informant's prior criminal record and desire to advantage himself with respect to pending criminal charges are to be considered in evaluating his reliability. But such considerations are not dispositive. The fact of the matter is that those who possess information about the inner workings of the drug trade are unlikely to be persons of impeccable moral integrity. While the source's general credibility must be considered, all that the law requires is that, when all the pertinent considerations are weighed, the information reasonably appears to be reliable.

*Id.* at 55. Because the confidential informant "provided a plethora of details about the alleged drug trafficker's modus operandi" specifically "the type and quantity of the drugs in transit, the transporter's method of travel, what bus line he would patronize, and the name of one of his confederates" as well as "the date, time, and place of the suspect's arrival [], the identity of the person who would meet him there, the exact vehicle that would be deployed, and the suspect's intended destination…the tip was sufficiently laden with details to demonstrate that the CI had inside knowledge of the events that he was describing." *Id.* Thus, "the CI's description, viewed in light of the totality of the circumstances, was constitutionally sufficient to justify reasonable suspicion." *Id.*

In *United States v. Link*, 238 F.3d 106 (1st Cir. 2001), a defendant challenged the probable cause for his arrest for being a felon in possession of a firearm on the grounds that the informant's information was "either uncorroborated, non-incriminating, or unreliable." *Id.* at 109. The First Circuit disagreed because the district court had "correctly looked to the totality of the circumstances in evaluating whether Link's arrest was supported by probable cause,"

**JOINT APPENDIX 32**

specifically the "numerous pieces of information corroborated by the police." *Id.* (internal quotations and citation omitted). The defendant also challenged the district court's limitations on his cross-examination of the informant's criminal history and police compensation. *Id.* at 111. The First Circuit disagreed, because Link was permitted to establish that the informant had a criminal record and his fee arrangement with police. *Id.* In addition, however, the court said, "any additional evidence concerning the informant's convictions or payments was ultimately irrelevant" because "cross-examination serves to impeach credibility and expose witness's biases and possible motives" and "[t]hat purpose becomes less germane where, as here, the information underlying a probable cause determination has already been corroborated." *Id.* (internal citations and quotations omitted). Because "the informant's tips in this case were diligently verified and, combined with the officers' own observations," there was "ample probable cause" and "[n]either a detailed account of the informant's criminal record nor a further description of his payment schedule would alter this analysis." *Id.* at 112.

In *United States* v. *Campbell*, 732 F.2d 1017 (1st Cir. 1984), the First Circuit found insufficient probable cause for a search that relied on hearsay from two individuals, including a confidential informant. *Id.* at 1019-20. While not explicitly addressing how criminal records factor into a confidential informant's credibility, the court did say, "[i]n substitution for a track record of reliability…the fact that he was not a professional informant, but a private citizen with no known criminal record or other criminal contacts, who came forward on his own…the informant's story may be more easily accepted." *Id.* at 1019 (citing *Gates*, 462 U.S. at 233; *United States v. Burke*, 517 F.2d 377, 379-81 (2d Cir. 1975); *United States v. Mark Polus*, 516 F.2d 1290 (1st Cir., 1975), *cert. denied*, 423 U.S. 895, 46 L. Ed. 2d 127, 96 S. Ct. 195 (1975)). The First Circuit has referenced this language in *United States v. Scalia*, 993 F.2d 984, 987 (1st

**JOINT APPENDIX 33**

Cir. 1993) ("In the absence of a prior record of reliability, we have recognized that, where the informant was *not a professional* . . . but a private citizen with *no known criminal record* or other criminal contacts, who came forward on his own . . . [,] the informant's story may be more easily accepted . . . .") (italics in original, quotation omitted);

*United States v. Tanguay*, 787 F.3d 44, 50 (1st Cir. 2015) ("the statements of a law-abiding eyewitness to a crime are generally considered reliable without further corroboration"); *United States v. Croto*, 570 F.3d 11, 14 (1st Cir. 2009) (same); *United States v. Schaefer*, 87 F.3d 562, 567 (1st Cir. 1996) (neighbors' "complaints enjoy special stature since information provided by ordinary citizens has particular value in the probable cause equation").

Considering the law as established by the United States Supreme Court and the First Circuit, the totality of the circumstances stated in the affidavit for the search of the Honda do not establish probable cause for the search.

Veracity. The informant's veracity is not demonstrated in the affidavit. He was facing charges including 284 grams of methamphetamine in one instance, and 463 grams of methamphetamine in the other instance. He surely knew he was facing many years of prison. He had every motive to lie to help himself. In addition, there is no evidence that he had a track record of providing reliable information. The only track record he had was that, unlike a presumably reliable law-abiding private citizen, he had a long criminal record.

Basis of Knowledge. The informant's claimed basis of knowledge was that he purchased drugs in person from the defendant. He asserted purchases of certain amounts of drugs for certain prices. He claimed that the purchases were at or near Francis's Honda, and that Francis had a gun in the car. However, these details of the alleged drug sales were not corroborated in any way.

**JOINT APPENDIX 34**

Corroboration. The only corroboration of the informant's claims are innocent facts. The informant stated the fact, which could be observed by anyone in public, that Francis drove a white Honda Accord. The informant also claimed that the location of the sales was some blocks from an address police associated with Mr. Francis in their database. Otherwise, the informant's claims are uncorroborated. The agents did not observe Francis appearing to make a sale near the white Honda. The agents did not send the informant to make an undercover buy. The agents did not obtain fingerprints or some other link between the drugs the informant had and Francis. The informant did not even predict any innocent future behavior of Francis (beyond continued ownership of a white Honda).

Law Enforcement Assessment of the Probable Significance of the Informant's Information. Considering the pending charges and background of the informant, one would have expected the law enforcement assessment of the informant's credibility to be thorough and detailed. It would be reasonable to expect that they would try to corroborate important details, or otherwise establish some basis for believing the informant was reliable. In the alternative, in some situations, the agent might describe how the informant had provided reliable information in other past cases. However, there is no such confirmation of reliability in Agent Burke's affidavit. Thus, the law enforcement assessment of credibility should be given little weight.

In summary, when an informant has a strong motive to lie and no track record as a reliable informant, there has to be something more, typically corroboration of the information provided, or a prediction of future criminal behavior by the suspect which comes to pass, or documented interaction involving a crime, such as a drug sale. That is simply lacking in Agent Burke's application for a warrant to search the Honda. The affidavit does not establish the probable veracity and basis of the informant's information. Rather, the informant has no track

**JOINT APPENDIX 35**

11

record of providing reliable information. To the contrary, it is clear the informant has a motivation to lie to help himself try to avoid harsh sentence in his pending criminal cases. Considering these flaws in the affidavit, the court should find that it did not state probable cause for a search of the car.

<u>The Warrant Was Defective Because the Agent Omitted Critically Important Information About the Informant's Credibility Which Further Confirms the Unreliability of the Informant.</u>

The lack of probable cause in the warrant is only the preliminary question because, if all of the information about the informant had been included, it would have been entirely clear that the informant lacked credibility.

As noted above, it is common for informants to have criminal records. A criminal record alone would not raise major concerns. The distinction here is that this informant has a felony record for dishonesty. This information should be treated differently from merely "having a criminal record." This point is explained in *United States v. Rumney*, 867 F.2d 714 (1st Cir. 1989). In that case the defendant asked for a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978) (discussed in detail below). The defendant alleged omissions in the affidavit for a search warrant, one of which was the informant's criminal record. *Id.* at 720. The First Circuit rejected the argument, finding that "the inclusion of [the informant's] criminal record would not have altered the finding of probable cause" because "appellant d[id] not contend that [the informant's] crimes were ones involving perjury or false statements[, a] criminal record, no matter how lengthy, does not necessarily impugn one's veracity[, a]nd [the informant's] criminal record ha[d] no bearing on his intimate knowledge of the crime." *Id.* at 720-21. *See also*, *Tanguay*, 787 F.3d at 82 ("Excluding from a warrant application bare arrests for crimes that do not impugn an informant's veracity does not offend the *Franks* standard.").

**JOINT APPENDIX 36**

This case has the critical fact which was missing in *Rumney*. If the defendant is correct about the informant's identity, he was convicted of a crime of dishonesty. The agent either knew or should have known about that conviction, yet it was not in the affidavit. For this reason, the court should conduct a "*Franks*" hearing regarding the omission of that information, and thereafter grant the motion to suppress.

The Supreme Court's decision in *Franks* allowed defendants to attack the veracity of a warrant's affidavit after the warrant had been issued and executed. The First Circuit's understanding of the *Franks'* standard is well-captured in *United States v. McLellan*, 792 F.3d 200 (1st Cir. 2015) and thus worth quoting in full:

> As we have repeatedly emphasized, "[a]n affidavit supporting a search warrant is presumptively valid." *United States v. Gifford*, 727 F.3d 92, 98 (1st Cir. 2013). Still, a defendant may attempt to rebut this presumption and challenge the veracity of the affidavit. *Id.; see also Franks*, 438 U.S. at 171. To do so, he or she must make "two substantial preliminary showings." *United States v. Rigaud*, 684 F.3d 169, 173 (1st Cir. 2012) (internal quotation marks omitted). First, the defendant must show "that a false statement or omission in the affidavit was made knowingly and intentionally or with reckless disregard for the truth." *Id.; see also Franks*, 438 U.S. at 155-56; [*United States v. ]Grant*, 218 F.3d [72,] 77 [(1st Cir. 2000).]. Second, this "falsehood or omission [must have been] necessary to the finding of probable cause." *Rigaud*, 684 F.3d at 173. In the case of an omission, this means establishing that the inclusion of the omitted information "would have led to a *negative* finding by the magistrate on probable cause." *Id.* at 173 n.5. A failure to make a showing on either of these two elements dooms the defendant's challenge. *Id.* at 173.
>
> If, however, this preliminary showing is made, the defendant is entitled to a hearing – known as a *Franks* hearing – where he or she can try to establish by a preponderance of the evidence that the affiant did in fact make a false statement or omission "knowingly and intentionally, or with reckless disregard for the truth" and that "with the recklessly omitted information added to the affidavit, the reformed affidavit fails to establish probable cause." *Gifford*, 727 F.3d at 98 (internal quotation marks omitted); *see also Franks*, 438 U.S. at 156; *Rigaud*, 684 F.3d at 173. Should the defendant establish by proof that these standards have been met, the warrant is voided and the fruits of the search are excluded. *Gifford*, 727 F.3d at 98; *see also Franks*, 438 U.S. at 156; *Rigaud*, 684 F.3d at 173.
>
> As to the second prong, a warrant is based on probable cause when "'the affidavit upon which a warrant is founded demonstrates in some trustworthy fashion the likelihood that

**JOINT APPENDIX 37**

an offense has been committed and that there is sound reason to believe that a particular search will turn up evidence of it.'" *United States v. Chiaradio*, 684 F.3d 265, 279 (1st Cir. 2012)(quoting *United States v. Aguirre*, 839 F.2d 854, 857-58 (1st Cir. 1988)). It is not necessary, however, for that "'belief [to] be correct or more likely true than false.'" *United States v. Feliz*, 182 F.3d 82, 86 (1st Cir. 1999) (quoting *Texas v. Brown*, 460 U.S. 730, 742, 103 S. Ct. 1535, 75 L. Ed. 2d 502 (1983) (plurality opinion)); *see also United States v. Khounsavanh*, 113 F.3d 279, 283 (1st Cir. 1997) ("[P]robable cause need not be tantamount to proof beyond a reasonable doubt. . . . Probability is the touchstone." (alteration in original) (internal quotation marks omitted)). Instead, we "examine [an] affidavit in a practical, commonsense fashion." *United States v. Woodbury*, 511 F.3d 93, 98 (1st Cir. 2007) (alteration in original) (quoting *Feliz, 182 F.3d at 86*).

*McLellan*, 792 F.3d at 208-9.

In *McLellan*, the defendant appealed the denial of his request for a *Franks* hearing tied to a search of his residence for evidence of child pornography. *Id.* at 204. The First Circuit concluded that the information omitted from the warrant—namely the origins of the tip and links to other individuals—would have been "immaterial to the probable cause determination" nor would it have rendered the information in the warrant stale. *Id.* at 209-10. Because the defendant's claim failed to satisfy *Franks'* second prong, the First Circuit never addressed the *Franks* first prong. *Id.* at 210.

The First Circuit's decision in *Tanguay*, 787 F.3d 44, (a case arising from this court), provides an additional wrinkle to the *Franks* analysis. In *Tanguay*, the defendant appealed the district court's denial of his motion to suppress on the grounds that with the inclusion of omitted material, the affidavit no longer supported a finding of probable cause, and that the district court erred in its "categorical ruling that the *Franks* doctrine is never implicated by the omission from a warrant affidavit of facts unknown to the affiant at the time of the application." *Id.* at 48. As to the first argument, the First Circuit considered the question "close," but nevertheless upheld "the district court's conclusion that the affidavit, reformed only to include the recklessly omitted facts, remain[ed] sufficient to establish probable cause." *Id.* at 51. But as to second argument, the

**JOINT APPENDIX 38**

First Circuit held "that the district court erred in ruling as a matter of law that an affiant never

has a duty to make further inquiry before presenting a warrant application to a magistrate." *Id.* at

53. The court added:

> All that is required to trigger an officer's duty of further inquiry is her knowledge of an
> obvious and unexplored reason to doubt the truthfulness of the allegations. *See* [*United
> States v. ]Ranney*, 298 F.3d [74,] 78 [(1st Cir. 2002)]. When confronted with such a red
> flag, the officer should look into the matter even if she does not believe that what she will
> discover is likely to vitiate probable cause. After all, the officer is the only party who, in
> this context, has the tools to undertake any meaningful investigative work.
>
> The trigger for further investigation may function even when the officer's obvious reason
> only serves to diminish her confidence to some modest degree. Pieces of evidence should
> not be assessed in isolation: "the whole sometimes can exceed the sum of the parts, and
> the appropriate test focuses on the totality of the circumstances." *Mariko v. Holder*, 632
> F.3d 1, 6-7 (1st Cir. 2011).

*Tanguay*, 787 F.3d at 53. As Circuit Judge Selya framed the discussion: "[i]t is common ground

that a police officer seeking to obtain a search warrant should include in the affidavit

accompanying the warrant application any facts known to her that are material to the existence

vel non of probable cause." *Id.* at 46 (citing *United States v. Stewart*, 337 F.3d 103, 107 (1st

Cir.), *as amended* (Oct. 14, 2003)). "Under some limited circumstances, however, the officer's

duty may be broader: she may be obliged to inquire further in order to dispel serious doubts

about either the credibility of an informant upon whom she relies or the veracity of the

allegations underlying the attempted showing of probable cause." *Tanguay*, 787 F.3d at 46. The

First Circuit remanded the "fact-sensitive" inquiry to the district court so it could determine

"whether the information known to [the officer] gave her an obvious reason to doubt [the

informant's] truthfulness and, thus, triggered a duty of further inquiry," and "[i]f so, the court

then must ask whether [the officer's] doubts were of such a magnitude that her failure to conduct

an additional inquiry evinced a reckless disregard for the truth as opposed to, say, mere

negligence." *Id.* at 54 (citing *Ranney*, 298 F.3d at 78).

**JOINT APPENDIX 39**

On remand, Judge Laplante concluded that information known to police about the informant—namely that he had mental health issues, was a "police groupie," and had a criminal record, most critically a conviction for uttering a false prescription—triggered the officer's duty of inquiry. *United States v. Tanguay*, 2015 DNH 188 at *3. The court also found the officer to be reckless, and not merely negligent, in failing to inquire further, "by inference from circumstances evincing obvious reasons to doubt the veracity of the allegations." *Id.* at *4 (quoting *Tanguay*, 787 F.3d at 52). Next, the district court found that had the officer made good-faith efforts to inquire further, she "would have discovered new information that should have been included in the affidavit," namely the informant's juvenile adjudication for making a false report to law enforcement. *Id.* at *9-10. However, the district court then concluded that even with the additional information, the totality of circumstances still supported a finding of probable cause because the informant, was an eyewitness not involved in the crime of which he reported, had no ulterior motive, admitted that compromising photos of himself would be found in the defendant's possession, and was willing to be identified despite the potential revelation of his sexual orientation. *Id.* at *12-13. The district court thought these factors were not overborne "by the 1998 false report juvenile adjudication" given the latter's staleness and lack of false accusation against any specific individual. *Id.* at *14. On appeal to the First Circuit a second time, the court affirmed the district court's finding. *United States v. Tanguay*, 811 F.3d 78 (1st Cir. 2016).

Here, the defense asserts that the omission of the critically important material fact – that the informant had a criminal record for dishonesty – was at least reckless. Even if Agent Burke did not subjectively know that the informant had a felony criminal record for dishonesty, it was reckless of him to not find out that information and include it in the application for the warrant. After all, he had the informant in custody for serious drug charges. Both for investigative and

security purposes, it would be normal to run a criminal records check. If the omitted information had been included in the affidavit, it would have tipped the balance towards not issuing the warrant. The affidavit was already lacking indicia of the informant's reliability. Under New Hampshire law, the crime of falsifying physical evidence is a crime in the chapter of the Criminal Code called "Falsification in Official Matters." The crime is committed when, "believing that an official proceeding . . . or investigation is pending or about to be instituted," the person "[a]lters, destroys, conceals or removes any thing with a purpose to impair its verity or availability in such proceeding or investigation," or "[m]akes, presents or uses any thing which he knows to be false with a purpose to deceive a public servant who is or may be engaged in such proceeding or investigation." *See* NH RSA 641:5. In other words, Agent Burke presented the Magistrate with information from an informant who, unbeknownst to the Magistrate, was exactly the kind of person who is not reliable – someone who has been convicted of falsification in an official proceeding.

Agent Burke knew or should have known about the informant's conviction. When the conviction is considered along with the lack of corroboration in the affidavit, it is clear probable cause is lacking. If Magistrate Lynch had known of the informant's conviction, he would not have issued the search warrant for the car.

The Good-Faith Exception Does Not Save the Government Here.

"Suppression therefore remains an appropriate remedy if the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth. *Franks* v. *Delaware*, 438 U.S. 154 (1978)." *United States v. Leon*, 468 U.S. 897, 923 (1984). *See also*. *Illinois v. Gates*, 462 U.S. 213, 264 (1983), White, J., concurring ("Similarly, the good-faith

**JOINT APPENDIX 41**

exception would not apply if the material presented to the magistrate or judge is false or misleading….").

In *Leon*, the Supreme Court held that even in the absence of probable cause, the exclusionary rule should apply only where excluding evidence would have a substantial deterrent effect on the police. *See* 468 U.S. at 906. Thus, the police are not entitled to rely on a warrant where, *inter alia*, the issuing magistrate "was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth." *Id.* at 924. Stated another way, the police cannot claim good-faith reliance on a magistrate's determination of probable cause when the police have reckless failed to provide the magistrate with important information.  First Circuit law is, of course, in agreement. See *United States v. Vigeant*, 176 F.3d 565, 571-72 (1st Cir. 1999) (refusing to apply good-faith exception where affiant's "numerous omissions of material facts were at least reckless" and government "offered no rational explanation" for them); *see also Pagán-González v. Moreno*, 919 F.3d 582, 613 (1st Cir. 2019), Barron, J., concurring.

For this reason, the Government cannot point to Magistrate Lynch's issuance of the search warrant and claim that law enforcement relied on that. In plain English, it would not be fair to let law enforcement recklessly fail to provide information to the court, then claim good-faith reliance on the court's issuance of a warrant.

The Court Should Conduct an Evidentiary Hearing on this Motion

If the only issue raised was the sufficiency of the affidavit, a hearing would not be necessary. However, the defense asserts that Agent Burke omitted important evidence regarding the credibility of the informant, namely, that he was convicted of a crime of dishonesty. This is information which the Agent should have known, and which would have resulted in the search

**JOINT APPENDIX 42**

warrant not being issued. Unless the government is able to demonstrate by evidence filed with the court that the defense is wrong about the identity of the informant, the court should hold an evidentiary hearing.  The defense has shown "that material facts are in doubt or dispute, and that such facts cannot reliably be resolved on a paper record . . . ." *United States v. Maglio*, 21 F.4th 179, 187 (1st Cir. 2021), *quoting United States v. Ponzo*, 853 F.3d 558, 572 (1st Cir. 2017) (internal quotation marks and other citations omitted).

Conclusion

For the foregoing reasons, the defense requests that all evidence seized from the white Honda Accord be suppressed.

WHEREFORE, the defense respectfully asks the court to schedule a hearing on this motion and thereafter suppress from use at trial all evidence resulting from the search of the Honda Accord described in Exhibit C, including the evidence described in Exhibits A and B.

Date: September 27, 2022                              Respectfully submitted
                                                     by counsel for Michael Francis,

                                                     */s/ Richard Guerriero*
                                                     Richard Guerriero, Esq.
                                                     N.H. Bar No. 10530
                                                     Lothstein Guerriero, PLLC
                                                     Chamberlain Block Building
                                                     39 Central Square, Suite 202
                                                     Keene, NH 03431
                                                     Telephone: (603) 352-5000
                                                     richard@nhdefender.com

CERTIFICATE OF SERVICE

I hereby certify that this document, filed through the ECF system, will be sent electronically to registered participants identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to the nonregistered participants on the date the document was signed by me.

‒                          */s/ Richard Guerriero*
                           Richard Guerriero

**JOINT APPENDIX 43**

19



# Manchester NH Police Department
405 Valley St, Manchester, NH 03103
603-668-8711



Case Number: 21-012527

In speaking with Francis's Parole officer, PPO Duffy, it was established by PPO Duffy that Francis would be violated on his Parole. At the above said time, Francis was observed exiting his white 2021 Honda Accord NH 4917333, and entering into T.D. Bank on 293 S. Main St. Another subject in the vehicle identified as:

(SUSPECT)

Emilio Flores

███████/1991

█████████████

Manchester NH

had a Parole Warrant issued for his violations of Rules 1,3,7, and 11 which were signed into effect on 05/22/2019 by PPO Bernard.

Both subjects were identified and MPD SWAT took both subjects into custody without incident.

Francis's vehicle was seized and towed to Manchester Police Department Headquarters (MPDHQ). The vehicle was followed into HQ by Detective Nocella.

The vehicle was secured in the MPD HQ secure lot and a search warrant issued by the FBI was effected on the vehicle. Inside the vehicle was located $10,000.00 and 1,017.2 grams of a white powdery substance which tested positively presumptive for cocaine.

NFI/CMM

USANH-00000011



## Manchester Police Department
405 Valley St, Manchester, NH 03103

Case Number: 21-012527

### Officer(s):

| Officer: | Involvement Date: | Involvement Type: |
|---|---|---|
| Nocella, Matthew 100493 | 09/01/2021 17:31:00 | REPORT::Reporting |

### Event Details:

| Date / Time Reported: | Start Date / Time: | End Date / Time: |
|---|---|---|
| | | |

Location of Incident:

, ,

### Suspect(s):

| 1 | Name:<br>FRANCIS, MICHAEL T | DOB:<br>▓▓▓/1987 | Age:<br>34 | Race: | Sex:<br>M | Hair:<br>BLK | Eye:<br>BRO | Height:<br>6'00" | Weight:<br>215 |
|---|---|---|---|---|---|---|---|---|---|

| Address:<br>▓▓▓▓, Chester,NH 031025235 | Phone 1: | Phone 2: | Email: |
|---|---|---|---|

| Employer: | Occupation Type: | Work Phone: |
|---|---|---|

| 2 | Name:<br>FLORES, EMILIO | DOB:<br>▓▓▓/1991 | Age:<br>30 | Race:<br>W | Sex:<br>M | Hair:<br>BRO | Eye:<br>BRO | Height:<br>6'03" | Weight:<br>245 |
|---|---|---|---|---|---|---|---|---|---|

| Address:<br>▓▓▓▓Manchester,NH 03103 | Phone 1:<br>▓▓▓-0689 | Phone 2: | Email: |
|---|---|---|---|

| Employer:<br>UNEMPLOYED | Occupation Type:<br>UNEMPLOYED | Work Phone: |
|---|---|---|

### Organization(s):

| | Address:<br>, , | Phone: |
|---|---|---|

### Involved Person(s):

| 1 | : | DOB: | Age: | Race: | Sex: | Hair: | Eye: | Height:<br>" | Weight: |
|---|---|---|---|---|---|---|---|---|---|

| Address:<br>, , | Phone 1: | Phone 2: | Email: |
|---|---|---|---|

| Employer: | Occupation Type: | Work Phone: |
|---|---|---|

**JOINT APPENDIX 45**

USANH-00000012



### Manchester Police Department
405 Valley St, Manchester, NH 03103

Case Number: 21-012527

## Property:

| | Description: | | | Status: | | Make: | | Model: |
|---|---|---|---|---|---|---|---|---|
| **1** | MN1 Holster | | | SEIZED | | | | |
| | Serial Number: | Year: | Color: | Quantity: | | Value: | Property Taken into Evidence? Yes | |

| | Description: | | | Status: | | Make: | | Model: |
|---|---|---|---|---|---|---|---|---|
| **2** | MN2 Black Iphone | | | SEIZED | | | | |
| | Serial Number: | Year: | Color: | Quantity: | | Value: | Property Taken into Evidence? Yes | |

| | Description: | | | Status: | | Make: | | Model: |
|---|---|---|---|---|---|---|---|---|
| **3** | MN3 Silver Iphone | | | SEIZED | | | | |
| | Serial Number: | Year: | Color: | Quantity: | | Value: | Property Taken into Evidence? Yes | |

| | Description: | | | Status: | | Make: | | Model: |
|---|---|---|---|---|---|---|---|---|
| **4** | MN7 (2) Black Bandanas | | | SEIZED | | | | |
| | Serial Number: | Year: | Color: | Quantity: 2.0000 | | Value: | Property Taken into Evidence? Yes | |

| | Description: | | | Status: | | Make: | | Model: |
|---|---|---|---|---|---|---|---|---|
| **5** | MN4 $5,000 | | | SEIZED | | | | |
| | Serial Number: | Year: | Color: | Quantity: | | Value: | Property Taken into Evidence? Yes | |

| | Description: | | | Status: | | Make: | | Model: |
|---|---|---|---|---|---|---|---|---|
| **6** | MN5 $5,000 | | | SEIZED | | | | |
| | Serial Number: | Year: | Color: | Quantity: | | Value: | Property Taken into Evidence? Yes | |

## Vehicle(s):

| | Plate #: | Plate State: | Plate Type: | Year: | Make: | Model: | Colors: |
|---|---|---|---|---|---|---|---|
| **1** | 4917333 | NH | | 2021 | Honda | ACCORD S | White |
| | VIN: 1HGCV1F5XMA001620 | | | Vehicle Type: | | Value: | |
| | Status: | Towed? | | Towed By: | | Towed To: | |

## Drug(s):

| | Drug Type: | Quantity: | Drug Description: |
|---|---|---|---|
| **1** | COCAINE (ALL FORMS EXCEPT "CRACK") | 1017.2000 GRAM | MN6 Cocaine |

## Narrative

### Nocella - Search Warrant / Evidence Tech - 09/01/2021

MO: Executed a search warrant on NH 4917333 at the MPD secured lot.

On 09/01/2021 at approximately 0900 I (Detective Nocella) was assigned to the Special Enforcement Division / Street Crime Unit. I was dressed in plain clothes while operating an unmarked police vehicle. At the aforementioned date and time, surveillance was set on 231 Thornton Street in

**JOINT APPENDIX 46**

USANH-00000013



**Manchester Police Department**
405 Valley St, Manchester, NH 03103

Case Number: 21-012527

reference to a search warrant that had been signed for the following vehicle:

NH Reg: 4917333
2021 Honda Accord
White

The search warrant for the aforementioned vehicle was signed by the Honorable Daniel J. Lynch out of the Federal Court District of NH. The registered owner of the vehicle was identified as:

Michael Francis
DOB: ███/1987
████████████ City

Francis was ultimately stopped at the TD Bank located at 293 S. Main Street, City, and placed under arrest. The front passenger of the vehicle at the time was identified as:

Emilio Flores
DOB: ██████1991
█████████████ City

and also placed under arrest. Queen City responded to the scene to tow the aforementioned vehicle back to HQ for the search warrant. I secured the vehicle and followed the tow back to HQ calling in the proper mileage. Once off at HQ, Sergeant Lorenzo and I executed the search of the vehicle. Prior to beginning the search, I took overview photos of the exterior and interior of the vehicle. These photographs were saved on my Bodyworn Camera. At approximately 1620, the search began and the following items of evidentiary value were seized and entered into evidence as follows:

MN1: At approximately 1633, I located a tan Blackhawk firearm holster underneath the driver seat.
MN2: At approximately 1635, Sergeant Lorenzo located a Black Iphone on the front passenger seat.
MN3: At approximately 1635, Sergeant Lorenzo located a Silver Iphone on the front passenger floorboard.
MN4: At approximately 1638, I located US currency in the center console. This would later be counted and totaled $5,000.00 which was all in one hundred dollar bill denominations (50 one hundred dollar bills).
MN5: At approximately 1639, Sergeant Lorenzo located US currency in the front passenger side door handle. This would later be counted and totaled $5,000.00 which was all in one hundred dollar bill denominations (50 one hundred dollar bills).
MN6: At approximately 1642, Sergeant Lorenzo located a large amount of suspected Cocaine on the rear passenger side seat. The suspected Cocaine was inside of a white gift bag with tissue paper stuffed inside of it. Upon further examination, the suspected Cocaine was pressed and in the form of a "Brick" which is the terminology used to describe the appearance and the weight which is usually equivalent to a kilogram. The suspected Cocaine was in a vacuum sealed plastic packaging, and this was placed into a large freezer zip lock bag. The suspected Cocaine also had a stamp on it which is usually developed when a press is utilized to package the substance in the form of a brick. I would photograph this stamp and save it on my Bodyworn Camera. I weighed the suspected Cocaine

USANH-00000014



**Manchester Police Department**
405 Valley St, Manchester, NH 03103

Case Number: 21-012527

which was 1017.2 grams. I then utilized a SIRCHIE NARK test kit #NAR10013. The test produced a brilliant blue flaky precipitate which is indicative of Cocaine.
MN7: At approximately 1649, Sergeant Lorenzo located (2) Black Bandanas in the trunk of the vehicle.

The search was concluded at 1653. All items seized as evidence during the search were photographed in place and saved to my Bodyworn Camera. I would then take interior and exterior photographs of the vehicle after the search was completed and save them on my Bodyworn Camera. During the search, 38 photographs were taken and the following is a description of each:

1: Front of the vehicle prior to the search.
2: Driver side of the vehicle prior to the search.
3: Trunk of the vehicle prior to the search.
4: Passenger side of the vehicle prior to the search.
5: Interior of driver side door prior to the search.
6: Interior of the driver side prior to the search.
7: Interior of the rear driver side door prior to the search.
8: Interior of the rear driver side prior to the search.
9: Interior of the trunk prior to the search.
10: Interior of the rear passenger side door prior to the search.
11: Interior of the rear passenger side prior to the search.
12: Interior of the front passenger side door prior to the search.
13: Interior of the front passenger side prior to the search.
14: Tan Blackhawk holster located under the drivers seat (MN1).
15: Close up of tan Blackhawk holster located under the drivers seat (MN1).
16: Black Iphone located on the front passenger seat (MN2).
17: Silver Iphone located on the front passenger floorboard (MN3).
18: $5,000.00 located in the center console (MN4).
19: $5,000.00 located in the door handle of the front passenger door (MN5).
20: Suspected Cocaine located in a white gift bag on the rear passenger side seat (MN6).
21: Black bandana located in the trunk (MN7).
22: Black Bandana located in the trunk (MN7)
23: Vehicle registration to Michael Francis for the aforementioned vehicle.
24: Vehicle identification number (VIN #) for the aforementioned vehicle.
25: Copy of the search warrant and evidence log.
26: Interior of the driver side door after the search
27: Interior of the driver side after the search.
28: Interior of the rear driver side door after the search.
29: Interior of the rear driver side after the search.
30: Interior of the trunk after the search.
31: Interior of the rear passenger side door after the search.
32: Interior of the rear passenger side after the search.
33: Interior of the front passenger side door after the search.
34: Interior of the front passenger side after the search.
35: Front of the vehicle after the search.

USANH-00000015



**Manchester Police Department**
405 Valley St, Manchester, NH 03103

Case Number: 21-012527

36: Driver side of the vehicle after the search.
37: Trunk of the vehicle after the search.
38: Passenger side of the vehicle after the search.

NFI/MN

USANH-00000016

<u>AO 93C (08/18) Warrant by Telephone or Other Reliable Electronic Means</u>　　　☐ Original　　　☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

District of New Hampshire

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>WHITE 2021 HONDA ACCORD REGISTERED TO<br>"FRANCIS, MICHAEL T" ASSINGED NH LICENSE<br>PLATE 4917333 WITH A LISTED VIN OF<br>1HGCV1F5XMA001620 AS OF AUGUST 23, 2021 | )<br>)<br>)　　Case No. 21-mj-220-01-DL<br>)<br>)<br>) |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:　　Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____ District of _____ New Hampshire _____
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B

**YOU ARE COMMANDED** to execute this warrant on or before _____ *(not to exceed 14 days)*
☑ in the daytime 6:00 a.m. to 10:00 p.m.　　☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____ Daniel J. Lynch _____.
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
　　☐ for _____ days *(not to exceed 30)*　　☐ until, the facts justifying, the later specific date of _____.

Date and time issued:　　**8/25/21 @ 12:27 pm**　　　　　　　　　　　　　　　　　　　　　　　
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　*Judge's signature*

City and state:　　Concord, New Hampshire　　　　　　　　Daniel J. Lynch, US Magistrate Judge
　　　　　　　　　　　　　　　　　**JOINT APPENDIX 50**　　*Printed name and title*

AO 93C (08/18) Warrant by Telephone or Other Reliable Electronic Means (Page 2)

| Return | | |
|---|---|---|
| Case No.:<br>21-mj- 220-01-DL | Date and time warrant executed:<br>9/1/2021 @ 1620 | Copy of warrant and inventory left with:<br>Left in vehicle |
| Inventory made in the presence of : Sgt. Joe Lorenzo | | |

Inventory of the property taken and name(s) of any person(s) seized:

See attached search warrant log.

**Certification**

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date:   09/08/2021

Ryan S. Burke

Digitally signed by Ryan S. Burke
DN: cn=Ryan S. Burke, o, ou=FBI,
email=rsburke@fbi.gov, c=US
Date: 2021.09.08 13:59:29 -04'00'

*Executing officer's signature*

Ryan S. Burke, Special Agent

*Printed name and title*

**JOINT APPENDIX 51**

USANH-00000190



# Manchester Police Department
## Search Warrant Log

Location of Search Warrant: MPD

Name of Defendant: Michael Francis

Search Start: Date 9/1/21   Time 1620

Search End: Date 9/1/21   Time 1653

| Item # | Time | Evidence Seized | Location of Evidence | Seized by |
|--------|------|-----------------|----------------------|-----------|
| MN1 | 1633 | Holster | under Driver Side seat | Nocelk |
| MN2 | 1635 | Black Iphone | On passenger Seat | Lorenzo |
| MN3 | 1635 | Silver Iphone | on Passenger floorboard | Lorenzo |
| MN4 | 1638 | US Currency | Center Console | Nocelk |
| MN5 | 1639 | US Currency | Passenger side Dew head | Lorenzo |
| MN6 | 1642 | Suspected Crack/Cocain | Rear passenger Zip Bag. | Lorenzo |
| MN7 | 1649 | (2) Black Bandanas | Trunk | Lorenzo |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

Officers Present for Search:

Nocelk + Lorenzo

**JOINT APPENDIX 52**

Page _____ of _____

MPD FORM 241 (revised 4/6/17)

USANH-00000191

**ATTACHMENT A**

*Property to be Searched*

The property to be searched is the entire passenger compartment and trunk or storage space,

and any closed or locked containers found therein, including mobile electronic devices, of the

> White 2021 Honda Accord registered to "Francis, Michael T" assigned New
> Hampshire license plate 4917333 with a listed Vehicle Identification Number of
> 1HGCV1F5XMA001620, as of August 23, 2021,

which is currently in the possession of Michael Francis within the District of New Hampshire.

**JOINT APPENDIX 53**

**ATTACHMENT B**

*Description of Information or Items to Be Seized*

I.      All records, in whatever form, and tangible objects that constitute evidence, fruits, or

instrumentalities of 18 U.S.C. § 922(g)(1) [Felon in Possession of Ammunition & Firearm], 18

U.S.C. § 924(c) [Possession of a Firearm in Furtherance of a Drug Trafficking Offense], 21 U.S.C.

§ 841 [Distribution of Controlled Substances], 21 U.S.C. § 846 [Conspiracy to Distribute

Controlled Substances], and 18 U.S.C. § 521 [Criminal Street Gangs], including information and

items related to:

   a.   The identities of who uses, occupies, or controls the vehicle;

   b.   Firearms, weapons, ammunition, and firearms-related accessories;

   c.   Controlled substances and materials consistent with controlled substances
        packaging;

   d.   DNA sample(s) from the vehicle's occupants;

   e.   Criminal street gang affiliation and criminal street gang activity, such as acts of
        violence and other criminal activity in furtherance of the criminal street gang or
        conducted by its members;

   f.   United States currency, foreign currencies, and other forms of currency acquired
        or used during transactions involving contraband;

   g.   Places and locations where evidence of the above-referenced criminal offenses
        was obtained or discarded, or is currently stored;

   h.   The identities of any co-conspirators, as well as any co-conspirators' acts taken in
        furtherance of the offenses enumerated in this application;

   i.   Electronic devices, including mobile electronic equipment, serial numbers or any
        electronic identifiers that serve to identify the equipment, and the information
        stored electronically on the devices, specifically:

      i.      telephone logs, contact lists, other records reflecting names, aliases,
              addresses, telephone numbers, and other contact or identification data;

      ii.     the actual and attempted possession, purchase, receipt, sale, pawn, trade,
              transfer, transportation, shipment, or other disposition of firearms and
              ammunition and controlled substances, including buyer lists, seller lists,
              notes, pay-owe sheets, records of sales, logs, receipts, and communications;

**JOINT APPENDIX 54**

USANH-00000193

iii.     criminal street gang affiliation and criminal street gang activity, such as acts of violence and other criminal activity in furtherance of the criminal street gang or conducted by its members;

iv.     messages and other communications related to firearms and controlled substances violations and criminal street gang affiliation and activity;

v.     photographs, images, and depictions of firearms, controlled substances, criminal street gang affiliation and activity, and currency;

vi.     who used, owned or controlled the equipment;

vii.     when the equipment was used;

viii.     the travel and whereabouts of the user of the equipment;

ix.     the attachment of other hardware or storage media;

x.     the use of counter-forensic programs and associated data that are designed to eliminate data;

xi.     passwords, encryption keys, and other access devices that may be necessary to use the equipment;

xii.     accounts associated with software services or services providing Internet access or remote storage of either data or storage media; and

xiii.     serial numbers and any electronic identifiers that serve to identify the equipment.

II.     For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

a.   Items described in Paragraph I (a) through (i);

b.   evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

c.   evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

**JOINT APPENDIX 55**

USANH-00000194

d.  evidence of the lack of such malicious software;

e.  evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

f.  evidence indicating the computer user's state of mind as it relates to the crimes under investigation;

g.  evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

h.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

i.  evidence of the times the COMPUTER was used;

j.  passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

k.  documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

l.  records of or information about Internet Protocol addresses used by the COMPUTER;

m.  records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

n.  contextual information necessary to understand the evidence described in this attachment.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and

**JOINT APPENDIX 56**

USANH-00000195

network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

During the execution of the search of the property described in Attachment A, law enforcement officers are authorized to (1) press or swipe the fingers (including thumbs) of any individual, who is found in the Target Vehicle and reasonably believed by law enforcement to be a user of the device, to the fingerprint scanner of the device; and/or (2) hold the device in front of the face of those same individuals and activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search its contents as authorized by this warrant.

**JOINT APPENDIX 57**

USANH-00000196

AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT
### for the
District of New Hampshire

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>WHITE 2021 HONDA ACCORD REGISTERED TO<br>"FRANCIS , MICHAEL T" ASSINGED NH LICENSE PLATE<br>4917333 WITH A LISTED VIN OF 1HGCV1F5XMA001620<br>AS OF AUGUST 23, 2021 | )<br>)<br>)<br>)<br>)<br>)    Case No. 21-mj- 220-01-DL |

### APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the _____ District of _____New Hampshire_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 USC §922(g)(1); 18 USC §924(c) | Felon in Possession of Ammunition and Firearm; possession of firearm in furtherance of Drug Trafficking |
| 21 USC §§846; 841(a) | Conspiracy to Distribute and Distribution of Controlled Substances |
| 18 USC §521 | Criminal Street Gang |

The application is based on these facts:

See the Affidavit of Ryan S. Burke, FBI

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

/s/ Ryan S. Burke
*Applicant's signature*

Ryan S. Burke, SA FBI
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____ *(specify reliable electronic means).*

Date:  **8/25/21 @ 12:27pm**

City and state:  Concord, New Hampshire

*Judge's signature*

Daniel J. Lynch, US Magistrate Judge
*Printed name and title*

**JOINT APPENDIX 58**

## AFFIDAVIT IN SUPPORT OF AN
## APPLICATION FOR A SEARCH WARRANT

I, Ryan S. Burke, depose and state as follows:

### AGENT BACKGROUND

1.      I am a Special Agent of the Federal Bureau of Investigation ("FBI") and have been so employed since October 2012. I am currently assigned to the FBI's New Hampshire Resident Agency where I am tasked with investigating violent criminals and major offenders throughout the state. I primarily work alongside the Manchester Police Department ("MPD") as part of an initiative focused on reducing gun violence and other crime in the city of Manchester.

2.      Throughout my career, I have led and/or been involved with investigations of robberies, kidnappings, murders, fugitives, extortions, threats, drug distribution, illegal possession of firearms, and other crimes. My investigations have included the use of the following investigative techniques: physical surveillance; handling of cooperating sources and witnesses; exploitation of cellular, social media, and Internet Protocol ("IP") based communications data; execution of search and seizure warrants; wire, electronic, and oral wiretaps; and the execution of arrest warrants.

3.      Based on my training, experience, and information provided to me by other law enforcement officers, I am familiar with the modus operandi used by individuals engaged in the violation of various criminal offenses, such as those related to acts of violence, firearms, and controlled substances. For example, I have handled many cooperating sources and witnesses who have provided information to me specifically related to shootings, the distribution of controlled substances, and various firearms offenses. I have also reviewed thousands of court-authorized wiretap intercepts between drug traffickers, violators of firearm offenses, individuals conspiring to commit armed robberies, and individuals engaged in the violation of other offenses. Many of

**JOINT APPENDIX 59**

these investigations have resulted in the execution of search warrants, arrest warrants, and eventual convictions.

## PURPOSE OF AFFIDAVIT

4.      I submit this affidavit in support of an application for a warrant to search the following vehicle (hereafter, the "**Target Vehicle**"):

> a.      White 2021 Honda Accord registered to "Francis, Michael T" assigned New Hampshire license plate 4917333 with a listed Vehicle Identification Number of 1HGCV1F5XMA001620, as of August 23, 2021.

5.      Based on the information contained herein, there is probable cause to believe that the **Target Vehicle** contains evidence, fruits, and instrumentalities of the crimes of 18 U.S.C. § 922(g)(1) [Felon in Possession of Ammunition & Firearm], 18 U.S.C. § 924(c) [Possession of a Firearm in Furtherance of a Drug Trafficking Offense], 21 U.S.C. § 841 [Distribution of Controlled Substances], 21 U.S.C. § 846 [Conspiracy to Distribute Controlled Substances], and 18 U.S.C. § 521 [Criminal Street Gangs].

6.      The information set forth in this affidavit is based on my personal participation in this investigation, as well as my training and experience, and information received from other law enforcement officers. I have not set forth every detail I or other law enforcement officers know about this investigation but have set forth facts that I believe are sufficient to evaluate probable cause as it relates to the issuance of the requested warrant.

## PROBABLE CAUSE

7.      On ███, 2021, MPD conducted a motor vehicle stop of ███████ ███████████████████ As a result of the motor vehicle stop, the ████ ███ was seized pending application for a search warrant, which was ultimately granted. The search of the vehicle resulted in the seizure of approximately 284.5 grams of a substance which

2

**JOINT APPENDIX 60**

USANH-00000859

field-tested positive for methamphetamine, 85.9 grams of a substance believed to be heroin/fentanyl, 7.5 grams of a substance which field-tested positive for crack cocaine, and a digital scale commonly used by drug traffickers. These items were all retrieved from a backpack located in the area where ████████████ during the motor vehicle stop. Consequently, a warrant was issued for █████ for Controlled Drug Violations [RSA 318-B:2].

8. On█████ 2021, MPD conducted another motor vehicle stop ████████ ████████████ was arrested ████████████████████. As a result ████████████████ the █████ was seized pending application for a search warrant, which was ultimately granted. The search of the vehicle resulted in the seizure of approximately $████ in US currency, approximately 464.7 grams of a substance which field-tested positive for methamphetamine, and two digital scales commonly used by drug traffickers. Consequently, another warrant was issued ████████ for Controlled Drug Violations [RSA 318-B:2].

9. ●n ████████, 2021, █████ arrested in █████ NH pursuant to the active state warrant for Controlled Drug Violations referenced above. ████████████ transported to MPD for processing and to be interviewed. Prior to the interview, ███ was informed of ███ Miranda rights, acknowledged ███ understanding of those rights, and signed a form to memorialize ███ willingness to answer questions without an attorney present. In the audio-video recorded interview that followed, ███ provided, amongst other things, information related to ███ supplier's storage of a firearm and controlled substances inside the **Target Vehicle.**

10. ████████ the controlled substances from the first motor vehicle stop were personally provided to ███ a member of the Gangster Disciples ████████████ ███ had met ████████████ and maintained a personal relationship █████ Prior

3

**JOINT APPENDIX 61**

████████████████

to the first motor vehicle stop, ███████████ that the controlled substances originated from ███████████████ Gangster Disciples member Michael Francis (YOB: 1987).

11.    In ███████ 2021, █████████████████████████████████ as of the writing of this affidavit. █████████████ was contacted by Francis who informed ██ that he would now be supplying controlled substances to █████████████. Consequently, the controlled substances from the second motor vehicle stop were personally provided to ██ by Francis.

12.    ██████████ received controlled substances from Francis █████████. On average, ██████████ would receive approximately one pound of methamphetamine ($6,600 – $6,800 per pound), a couple ounces of cocaine ($1,400 per ounce), and a half-pound of heroin/fentanyl ($5,000 per 500 grams) ████ from Francis. ██ would subsequently distribute it to customers located in and between ██████████████████████████████ ██████.

13.    ██████████ and Francis would meet █████████ to conduct ████████ controlled substances transactions including near ██████████████████████████ █████████████. The meetings would be arranged by traditional cellular voice calls and text messages. ██ believed Francis lives near the intersection of Rimmon Street at Putnam Street.

14.    Francis would meet with █████████ to supply ██ with controlled substances █████████████████████████████ Francis would drive a "white Honda Accord…newer…got greyish rims on it…20s…permanent plates [from NH]" – the **Target Vehicle** – to conduct the deals. During some deals, Francis would have the controlled substances in the passenger compartment of the **Target Vehicle** and other times he would have the controlled substances in the trunk of the **Target Vehicle**. Additionally, █████████ observed Francis keep

4

**JOINT APPENDIX 62**

a pistol tucked between the driver's seat and the center console of the **Target Vehicle** during the controlled substances transactions.   Based on a review of the criminal history for Francis, I know he has been convicted of a crime punishable by imprisonment for a term exceeding one year. Therefore, Francis is federally prohibited from possessing firearms.

15.     A records check for vehicles registered to Francis led investigators to the **Target Vehicle**, which matches the description provided by ▮▮▮▮▮▮▮ Francis' parole officer informed law enforcement that Francis uses the **Target Vehicle**. On August 20, 2021, law enforcement identified a residence associated with Francis located at 231 Thornton Street, Manchester, NH via the search of a database accessible by law enforcement which collates various public records. Later that day, a shirtless individual matching the description of and believed to be Francis (based on physical characteristics and the presence of tattoos) was observed in the rear parking lot of the residence next to the **Target Vehicle**. The residence is located in the immediate vicinity of the intersection of Rimmon Street at Putnam Street, which corroborates ▮▮▮▮ ▮▮▮▮ regarding where Francis would be living.

16.     Based on the above information, I believe the **Target Vehicle** will contain at least one firearm, ammunition, controlled substances, and electronic devices which likely contain various content and communications related to violations of 18 U.S.C. § 922(g)(1) [Felon in Possession of Ammunition & Firearm], 18 U.S.C. § 924(c) [Possession of a Firearm in Furtherance of a Drug Trafficking Offense], 21 U.S.C. § 841 [Distribution of Controlled Substances], 21 U.S.C. § 846 [Conspiracy to Distribute Controlled Substances], and 18 U.S.C. § 521 [Criminal Street Gangs].

## COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

5

**JOINT APPENDIX 63**

USANH-00000862

17.     As described in Attachment B, this application seeks permission to search for records that might be found in the **Target Vehicle**, in whatever form they are found. One form in which the records might be found is data stored on a computer's hard drive or other storage media. Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

18.     Based on my training and experience, I use the following technical terms to convey the following meanings:

    a.  IP Address: The Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet.   An IP address looks like a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178).   Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses.   Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

    b.  Internet: The Internet is a global network of computers and other electronic devices that communicate with each other.   Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

6

**JOINT APPENDIX 64**

USANH-00000863

      c.  Storage medium: A storage medium is any physical object upon which computer data can be recorded.   Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

19.    *Probable cause.* I submit that if a computer or storage medium is found in the **Target Vehicle**, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

      a.  Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

      b.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

      c.  Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used

7

**JOINT APPENDIX 65**

USANH-00000864

it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

20.    *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the **Target Vehicle** because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment

8

**JOINT APPENDIX 66**

USANH-00000865

of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b. As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the

9

**JOINT APPENDIX 67**

USANH-00000866

IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c. A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions

10

**JOINT APPENDIX 68**

USANH-00000867

about how computers were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

21. *Necessity of seizing or copying entire computers or storage media.* In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage

11

USANH-00000868

media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

    a.   The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

    b.   Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

12

**JOINT APPENDIX 70**

      c.  Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

22.   *Nature of examination*. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

### AUTHORIZATION TO USE BIOMETRIC FEATURES TO UNLOCK DEVICES

23.   The warrant I am applying for would permit law enforcement to obtain from certain individuals the display of physical biometric characteristics (such as fingerprint, thumbprint, or facial characteristics) in order to unlock devices subject to search and seizure pursuant to this warrant.

24.   I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners and facial recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

13

**JOINT APPENDIX 71**

25.    If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

26.    If a device is equipped with a facial recognition feature, a user may enable the ability to unlock the device through his or her face. For example, Apple offers a facial recognition feature called "Face ID." During the Face ID registration process, the user holds the device in front of his or her face. The device's camera then analyzes and records data based on the user's facial characteristics. The device can then be unlocked if the camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Face ID.

27.    In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

28.    As discussed in this affidavit, based on my training and experience I believe that one or more digital devices will be found during the search. The passcode or password that would unlock the device(s) subject to search under this warrant is not known to law enforcement. Thus,

14

**JOINT APPENDIX 72**

USANH-00000871

law enforcement personnel may not otherwise be able to access the data contained within the device(s), making the use of biometric features necessary to the execution of the search authorized by this warrant.

29.     I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time.

30.     For example, Apple devices cannot be unlocked using Touch ID when (1) more than 48 hours has elapsed since the device was last unlocked or (2) when the device has not been unlocked using a fingerprint for 4 hours and the passcode or password has not been entered in the last 156 hours. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

31.     In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device. However, in my training and experience, that person may not be the only user of the device whose physical characteristics are among those that will unlock the device via biometric features, and it is also possible that the person in whose possession the device is found is not actually a user of that device at all. Furthermore, in my training and experience, I know that in some cases it may not be possible to know with certainty who is the user of a given device, such as if the device is found in a common area of a premises without any identifying information on the exterior of the device. Thus, it will likely be necessary for law enforcement to have the ability to require any

15

**JOINT APPENDIX 73**

USANH-00000872

individual, who is found in the subject Target Vehicle and reasonably believed by law enforcement to be a user of the device, to unlock the device using biometric features in the same manner as discussed above.

32.    Due to the foregoing, if law enforcement personnel encounter a device that is subject to search and seizure pursuant to this warrant and may be unlocked using one of the aforementioned biometric features, the warrant I am applying for would permit law enforcement personnel to (1) press or swipe the fingers (including thumbs) of any individual, who is found in the subject Target Vehicle and reasonably believed by law enforcement to be a user of the device, to the fingerprint scanner of the device; (2) hold the device in front of the face of those same individuals and activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search its contents as authorized by this warrant.

## AUTHORIZATION TO COLLECT DNA SAMPLES

33.    Because the **Target Vehicle** may be occupied by numerous individuals, I respectfully request authorization to obtain DNA (Deoxyribonucleic acid) samples from Francis and other occupants at the time of seizure. The DNA samples would be used for comparative analyses of any firearms, ammunition, controlled substances, or other items seized from the **Target Vehicle**, and any other relevant items collected during the course of this investigation. The request to collect DNA samples from Francis is subject to his presence in the **Target Vehicle** during the execution of the requested warrant.

## CONCLUSION

34.    I submit that this affidavit supports probable cause for a warrant to search the **Target Vehicle** described in Attachment A and seize the items described in Attachment B. The seizure of these items will aid law enforcement in their investigation of various violations of 18

16

**JOINT APPENDIX 74**

USANH-00000873

U.S.C. § 922(g)(1) [Felon in Possession of Ammunition & Firearm], 18 U.S.C. § 924(c) [Possession of a Firearm in Furtherance of a Drug Trafficking Offense], 21 U.S.C. § 841 [Distribution of Controlled Substances], 21 U.S.C. § 846 [Conspiracy to Distribute Controlled Substances], and 18 U.S.C. § 521 [Criminal Street Gangs] committed by ▮▮▮▮▮▮ Francis.

## REQUEST FOR SEALING

35.    I request that the Court order that all papers in support of these applications, including the affidavit and search warrants, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public and/or known to all parties relevant to the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

/s/ Ryan S. Burke
Ryan S. Burke, Special Agent
Federal Bureau of Investigation

The affiant appeared before me by telephonic conference on this date pursuant to Fed. R. Crim. P. 4.1 and affirmed under oath the content of this affidavit and application.

Date: **8/25/21**
Time: **12:27 pm**

HONORABLE DANIEL J. LYNCH
UNITED STATES MAGISTRATE JUDGE

17

**JOINT APPENDIX 75**

## ATTACHMENT A

*Property to be Searched*

The property to be searched is the entire passenger compartment and trunk or storage space,

and any closed or locked containers found therein, including mobile electronic devices, of the

White 2021 Honda Accord registered to "Francis, Michael T" assigned New
Hampshire license plate 4917333 with a listed Vehicle Identification Number of
1HGCV1F5XMA001620, as of August 23, 2021,

which is currently in the possession of Michael Francis within the District of New Hampshire.

**JOINT APPENDIX 76**

USANH-00000875

**ATTACHMENT B**

*Description of Information or Items to Be Seized*

1. All records, in whatever form, and tangible objects that constitute evidence, fruits, or instrumentalities of 18 U.S.C. § 922(g)(1) [Felon in Possession of Ammunition & Firearm], 18 U.S.C. § 924(c) [Possession of a Firearm in Furtherance of a Drug Trafficking Offense], 21 U.S.C. § 841 [Distribution of Controlled Substances], 21 U.S.C. § 846 [Conspiracy to Distribute Controlled Substances], and 18 U.S.C. § 521 [Criminal Street Gangs], including information and items related to:

 a. The identities of who uses, occupies, or controls the vehicle;

 b. Firearms, weapons, ammunition, and firearms-related accessories;

 c. Controlled substances and materials consistent with controlled substances packaging;

 d. DNA sample(s) from the vehicle's occupants;

 e. Criminal street gang affiliation and criminal street gang activity, such as acts of violence and other criminal activity in furtherance of the criminal street gang or conducted by its members;

 f. United States currency, foreign currencies, and other forms of currency acquired or used during transactions involving contraband;

 g. Places and locations where evidence of the above-referenced criminal offenses was obtained or discarded, or is currently stored;

 h. The identities of any co-conspirators, as well as any co-conspirators' acts taken in furtherance of the offenses enumerated in this application;

 i. Electronic devices, including mobile electronic equipment, serial numbers or any electronic identifiers that serve to identify the equipment, and the information stored electronically on the devices, specifically:

  i. telephone logs, contact lists, other records reflecting names, aliases, addresses, telephone numbers, and other contact or identification data;

  ii. the actual and attempted possession, purchase, receipt, sale, pawn, trade, transfer, transportation, shipment, or other disposition of firearms and ammunition and controlled substances, including buyer lists, seller lists, notes, pay-owe sheets, records of sales, logs, receipts, and communications;

**JOINT APPENDIX 77**

USANH-00000876

    iii.      criminal street gang affiliation and criminal street gang activity, such as acts of violence and other criminal activity in furtherance of the criminal street gang or conducted by its members;

    iv.      messages and other communications related to firearms and controlled substances violations and criminal street gang affiliation and activity;

    v.      photographs, images, and depictions of firearms, controlled substances, criminal street gang affiliation and activity, and currency;

    vi.      who used, owned or controlled the equipment;

    vii.      when the equipment was used;

    viii.      the travel and whereabouts of the user of the equipment;

    ix.      the attachment of other hardware or storage media;

    x.      the use of counter-forensic programs and associated data that are designed to eliminate data;

    xi.      passwords, encryption keys, and other access devices that may be necessary to use the equipment;

    xii.      accounts associated with software services or services providing Internet access or remote storage of either data or storage media; and

    xiii.      serial numbers and any electronic identifiers that serve to identify the equipment.

II.    For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

    a.    Items described in Paragraph I (a) through (i);

    b.    evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

    c.    evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

**JOINT APPENDIX 78**

d. evidence of the lack of such malicious software;

e. evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

f. evidence indicating the computer user's state of mind as it relates to the crimes under investigation;

g. evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

h. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

i. evidence of the times the COMPUTER was used;

j. passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

k. documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

l. records of or information about Internet Protocol addresses used by the COMPUTER;

m. records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

n. contextual information necessary to understand the evidence described in this attachment.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and

**JOINT APPENDIX 79**

network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

During the execution of the search of the property described in Attachment A, law enforcement officers are authorized to (1) press or swipe the fingers (including thumbs) of any individual, who is found in the Target Vehicle and reasonably believed by law enforcement to be a user of the device, to the fingerprint scanner of the device; and/or (2) hold the device in front of the face of those same individuals and activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search its contents as authorized by this warrant.

**JOINT APPENDIX 80**

AO 93C  (08/18)  Warrant by Telephone or Other Reliable Electronic Means      ❏ Original          ❏ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

District of New Hampshire

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched*<br>*or identify the person by name and address)*<br>WHITE 2021 HONDA ACCORD REGISTERED TO<br>"FRANCIS, MICHAEL T" ASSINGED NH LICENSE<br>PLATE 4917333 WITH A LISTED VIN OF<br>1HGCV1F5XMA001620 AS OF AUGUST 23, 2021 | )<br>)<br>)    Case No. 21-mj-220-01-DL<br>)<br>)<br>) |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____ District of _____ New Hampshire _____
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B

**YOU ARE COMMANDED** to execute this warrant on or before _____ *(not to exceed 14 days)*
☑ in the daytime 6:00 a.m. to 10:00 p.m.      ❏ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____ Daniel J. Lynch _____ .
*(United States Magistrate Judge)*

❏ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
❏ for _____ days *(not to exceed 30)*    ❏ until, the facts justifying, the later specific date of _____ .

Date and time issued:    **8/25/21 @ 12:27 pm**              _____
                                                                                    *Judge's signature*

City and state:    Concord, New Hampshire              Daniel J. Lynch, US Magistrate Judge
                                                                                    *Printed name and title*

**JOINT APPENDIX 81**

USANH-00000880

AO 93C (08/18) Warrant by Telephone or Other Reliable Electronic Means (Page 2)

| Return | | |
|---|---|---|
| Case No.:<br>21-mj- 220-01-DL | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name(s) of any person(s) seized: | | |

| Certification |
|---|
|      I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge. |

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

**JOINT APPENDIX 82**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW HAMPSHIRE**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | **Criminal Case No. 1:21-cr-153-SM** |
| **v.** | ) | |
| | ) | |
| **MICHAEL FRANCIS** | ) | |
| | ) | |

**OBJECTION TO DEFENDANT'S MOTION TO SUPPRESS EVIDENCE SEIZED FROM SEARCH OF DEFENDANT'S HONDA ACCORD**

On September 1, 2021, law enforcement officers executed a federal search warrant issued on August 25, 2021, which authorized the search of the defendant's car. The search yielded a kilogram of cocaine, $10,000 in cash, a gun holster, and other evidence showing the defendant and a passenger in his vehicle, Emilio Flores, were engaged in drug distribution. The defendant now seeks to suppress this evidence, arguing (1) the warrant was unsupported by probable cause because the affidavit did not establish the reliability and credibility of the named informant who provided the bulk of the information in the supporting affidavit; and (2) the government is not entitled to good faith reliance on the warrant due to alleged material omissions about the named informant's criminal history.

The Court should deny defendant's motion because the affidavit contained ample support for the reliability of the informant's information, and it established probable cause to search the car. Alternatively, even if this Court finds that that affidavit did not establish probable cause, under the good faith exception to the warrant requirement, investigators were entitled to rely on the magistrate's probable cause finding.

The information provided by the informant was inherently credible. He was not an anonymous tipster, but rather was known to law enforcement and provided information while in

**JOINT APPENDIX 83**

law enforcement custody, which allowed investigators to assess his credibility. The informant was named in the affidavit, so he could be held accountable if the information he provided was false. Perhaps most significantly, the informant provided statements against his penal interest by implicating himself in a drug distribution conspiracy that subjected him to greater criminal liability than he would have faced had he remained silent. Additionally, the informant was incentivized to be accurate because he hoped to receive consideration on his pending charges by providing information, but also risked receiving no benefit and possibly additional charges if he provided false information. The informant shared detailed information showing his personal knowledge about the defendant taking over the informant's former drug supplier's business; the prices and amounts of drugs the defendant sold; the defendant's appearance, gang affiliation, and vehicle; and the defendant's use of the vehicle in criminal activity. Finally, law enforcement corroborated portions of the informant's information through investigation and surveillance.

The defendant's argument for a *Franks* hearing on the grounds that the affiant intentionally or recklessly omitted from the affidavit the informant's conviction for falsifying physical evidence lacks merit and his request for a *Franks* hearing should be denied. A *Franks* hearing is not warranted because the defendant has made no showing that the omission was a deliberate effort by the affiant to present false information to the court or was the product of the affiant's reckless disregard for the truth. Moreover, even if the omission of the conviction was deliberate or reckless, including the conviction in the affidavit does not vitiate the magistrate's probable cause finding. Since these foundational requirements have not been met, the defendant is not entitled to a *Franks* hearing. *United States* v. *Rumney*, 867 F.2d 714, 720 (1st Cir. 1989).

Even if probable cause were a close question, the magistrate's decision is entitled to great deference, and law enforcement was entitled to rely on the magistrate's issuance of the warrant in

**JOINT APPENDIX 84**

good faith in searching the defendant's vehicle. Finally, the evidence from the search should not be suppressed regardless since it would have inevitably been discovered during a search of the car based on Flores's parole violation.

## I.     FACTUAL BACKGROUND

### A.  The Affidavit Supporting the Application for a Search Warrant of the Defendant's Vehicle

An informant named in the unredacted affidavit provided information about the defendant in a post-arrest interview with law enforcement on August 19, 2021. Affidavit at ¶ 9. [1] The informant was arrested on warrants related to two separate motor vehicle stops leading to the seizure of large amounts of drugs, as described in the affidavit. First, a June 13, 2021, traffic stop by the Manchester Police Department ("MPD") of a vehicle occupied by the informant led to issuance of a search warrant and subsequent seizure of approximately 284.5 grams of methamphetamine, 85.9 grams of heroin/fentanyl, and 7.5 grams of crack cocaine, along with a digital scale commonly used by drug traffickers. ¶ 7. These items were all retrieved from a backpack located in the area where the informant had been sitting, and a warrant was issued for his arrest for Controlled Drug Act violations. ¶ 7. Second, an authorized search of a different vehicle the informant was driving on July 30, 2021, resulted in the seizure of approximately $2,408 in US currency, 464.7 grams of methamphetamine, and two digital scales commonly used by drug traffickers. ¶ 8. Consequently, another warrant was issued for the informant's arrest for Controlled Drug Act violations [RSA 318-B:2]. *Id.*

---

[1] All paragraph references are to the affidavit in support of the search warrant of the defendant's Honda Accord, which is contained in Exhibit C to the defendant's instant motion to suppress. Once the Court signs the proposed protective order in this matter, the government will produce the unredacted affidavit to the defendant and file it under seal as an Exhibit to this Objection.

On August 19, 2021, the informant was arrested pursuant to the above-mentioned warrants. ¶ 9. In a post-arrest interview, the informant waived his *Miranda* rights and provided detailed information about his drug suppliers. *Id.* Specifically, the informant stated that the drugs seized in the first motor vehicle stop were personally provided to him by a member of the Gangster Disciples, whom the informant had met in prison and with whom the informant subsequently maintained a relationship (the "initial supplier").[2] This initial supplier had told the informant the drugs originated from another member of the Gangster Disciples gang: the defendant, Michael Francis. ¶ 10.

In early July 2021, the initial supplier was arrested in Manchester. ¶ 11. Following the initial supplier's arrest, the defendant contacted the informant and said he would now be his drug supplier, given the initial supplier's incarceration. *Id.* Consequently, the drugs from the second motor vehicle stop were personally provided to the informant by the defendant. *Id.*

The informant provided details about the price and quantity of drugs he received from the defendant. The informant stated he received drugs from the defendant on a daily basis: on average each day, one pound of methamphetamine at a price of $6,600 to $6,800 per pound, a couple ounces of cocaine at a price of $1,400 per ounce, and a half-pound of heroin/fentanyl at a price of $5,000 per 500 grams. ¶ 12. The informant confessed that he would distribute these drugs to customers located throughout New Hampshire. *Id.*

The informant provided locations where the drug transactions with the defendant would take place. The informant would meet the defendant personally—with no drug "runner"

---

[2] The initial supplier is named in the unredacted affidavit the government provided to the magistrate, but to protect the identity of both the informant and the initial supplier, the initial supplier's name is redacted in the publicly filed version of the affidavit.

**JOINT APPENDIX 86**

involved—in Manchester to conduct their daily drug transactions, including near Rimmon St. and Putnam St. ¶¶ 13-14. The informant believed the defendant lived near this intersection.  ¶ 13.

The informant described the vehicle the defendant would use to conduct drug transactions: a "white Honda Accord…newer…got greyish rims on it…20s…permanent plates [from New Hampshire]" (the "Target Vehicle," the subject of the search warrant). ¶ 14. The informant described that, during some deals, the defendant would have drugs in the passenger compartment of the Target Vehicle and other times he would store the drugs in the trunk.  *Id.*

The informant also observed the defendant regularly keep a pistol tucked between the driver's seat and the center console of the Target Vehicle during drug transactions.  ¶ 14.

Law enforcement corroborated various facts provided by the informant. Law enforcement corroborated that the initial supplier the informant named was arrested in early July 2021, and remained incarcerated as of the writing of the affidavit, ¶ 11, thus confirming the reason the informant gave for the defendant becoming his drug supplier.

Furthermore, law enforcement conducted a record check for vehicles registered to the defendant, and corroborated that the Target Vehicle matched the description provided by the informant. ¶ 15. Law enforcement also confirmed with the defendant's parole officer that the defendant regularly used the Target Vehicle.  *Id.*

Finally, investigators used a law enforcement database to corroborate that the defendant resided at 231 Thornton Street in Manchester, which was near the vicinity that the informant said he conducted drug transactions with the defendant.  ¶¶ 13 and 15.  On August 20, 2021, law enforcement conducted surveillance at this address and observed a shirtless individual in the rear parking lot of the residence next to the Target Vehicle.  The man appeared to law enforcement to be the defendant, based on his physical characteristics.  ¶ 15.

**JOINT APPENDIX 87**

Law enforcement also determined that the defendant, whom the informant described as regularly carrying a gun in the Target Vehicle, was a convicted felon. ¶ 14. The defendant was thus federally prohibited from possessing a firearm. *Id.*

### B. Signing of the Search Warrant, Arrest of the Defendant, and Search of the Defendant's Vehicle

On August 25, 2021, the magistrate issued the warrant for the Target Vehicle. On September 1, 2021, law enforcement conducted surveillance of the defendant's Thornton Street residence. Law enforcement observed the defendant leave the residence, enter the Target Vehicle, and drive to a residence on Joliette Street in Manchester. There, he picked up an associate whom Manchester Police identified as Emilio Flores. Flores was known by Manchester Police to be subject to arrest for a 2018 parole violation. The defendant, who was also on parole, was prohibited by his parole conditions from associating with other parolees.

After the defendant's arrival at the Joliette Street residence, law enforcement observed Flores carry a bag out of that residence and place it in the back seat of the Target Vehicle, then enter the front passenger seat. The defendant and Mr. Flores then traveled together in the Target Vehicle to a TD Bank in Manchester.

Law enforcement contacted the defendant's parole officer and notified him about what had transpired. Once the defendant parked in the TD Bank parking lot, the defendant exited the Target Vehicle and entered the TD Bank, while Flores remained in the vehicle. Law enforcement arrested the defendant inside the TD bank on a parole detention hold. At the time of his arrest, the defendant was attempting to deposit a check for over $50,000. Law enforcement also arrested Flores on his outstanding parole violation while Flores was sitting inside the Target Vehicle. The Target Vehicle was subsequently towed to the Manchester Police Department.

The Target Vehicle was searched later that day, resulting in the seizure of, among other

**JOINT APPENDIX 88**

items, a tan Blackhawk firearm holster underneath the driver's seat; a black bandana, affiliated

with members of the Gangster Disciples, in the trunk; $5,000 in cash in the center console;

another $5,000 in cash in the front passenger side door handle; and what Drug Enforcement

Administration lab analysis later revealed to be a one kilogram "brick" of cocaine in a vacuum-

sealed plastic bag placed in a large freezer bag within a bag on the rear passenger side seat.

The kilogram of cocaine from the Target Vehicle forms the basis of the conspiracy and

possession with intent to distribute counts of the superseding indictment against the defendant.

## ARGUMENT

I.   **The Totality of the Circumstances Stated in the Affidavit Provides Probable Cause for the Search of the Defendant's Vehicle**

### A.  The Information in the Affidavit Establishes Probable Cause

A warrant application "must demonstrate probable cause to believe that (1) a crime has

been committed—the 'commission' element, and (2) enumerated evidence of the offense will be

found at the place to be searched—the so-called 'nexus' element." *United States* v. *Feliz*, 182

F.3d 82, 86 (1st Cir. 1999). There must be "a fair probability that contraband or evidence of a

crime will be found in a particular place." *Illinois* v. *Gates*, 462 U.S. 213, 238 (1983).  As the

defendant points out in his brief, in *United States v. Gifford* and other cases, the First Circuit has

cited a "nonexhaustive list of factors" for a judge to assess in determining whether information

provided by an informant establishes probable cause for a search warrant, including:

> (1) whether the affidavit establishes the probable veracity and basis
> of knowledge of persons supplying hearsay information; (2)
> whether an informant's statements reflect firsthand knowledge; (3)
> whether some or all [of] the informant's factual statements were
> corroborated wherever reasonable and practicable (e.g., through
> police surveillance); and (4) whether a law enforcement affiant
> assessed, from his professional standpoint, experience, and
> expertise, the probable significance of the informant's provided
> information.

**JOINT APPENDIX 89**

Defendant's Brief ("Def's Br.") at 7, citing *United States* v. *Gifford*, 727 F.3d 92 (1st Cir. 2013); *see United States v. Leonard*, 17 F.4th 218, 225 (1st Cir. 2021) (citing same factors). None of the factors is indispensable; stronger evidence on one or more factors may compensate for a weaker showing on another. *United States v. Zayas–Diaz,* 95 F.3d 105, 111 (1st Cir. 1996).

Each of these four *Gifford* factors supports the magistrate's finding of probable cause.

**(1)  The Affidavit establishes the veracity and basis of knowledge of the informant's information**

The defendant argues the informant did not provide reliable information to law enforcement, because the affidavit does not say he had provided reliable information in other cases and does not include "similar indicia of reliability" (Def's Br. at 4).  But here, the informant was not an anonymous tipster; he was a known individual in law enforcement custody who was named in the unredacted affidavit submitted to the magistrate.  The information provided by the informant had strong indicators of veracity and reliability, and showed the informant's firsthand knowledge—he was not simply reporting hearsay.  The information therefore easily satisfied the first of the *Gifford* factors supporting probable cause.

Regarding the informant's veracity and reliability, the defendant rightfully cites the First Circuit's decision in *United States* v. *Maglio* where the Court found probable cause based on information provided by an informant, and explained that the following constitute indicia of the informant's trustworthiness:  (a) the informant's identity was revealed; (b) the informant was in law enforcement custody; (c) the informant provided personal firsthand observations of criminal activity; and (d) the informant was potentially implicating him or herself with the information the informant shared with law enforcement.  Def's Br. at 7, *citing United States v. Maglio*, 21 F.4th 179 (1st Cir. 2021).  Here, as in *Maglio*, law enforcement knew the informant's identity, "which in itself bolsters [the informant's] credibility because it opens [the informant] up for charges

**JOINT APPENDIX 90**

related to making a false report." *United States v. Croto,* 570 F.3d 11, 14 (1st Cir. 2009). The

fact that an informant is named, as here, when supported by other indicators of reliability,

strongly supports a finding of probable cause. *See Maglio,* 21 F.4th at 186; *United States v.

Pelham,* 801 F.2d 875, 878 (6th Cir.1986) ("When a witness has seen evidence in a specific

location in the immediate past, and is willing to be named in the affidavit, the 'totality of the

circumstances' presents a 'substantial basis' for conducting a search for that evidence.")

Other indicia of reliability are also present in the Affidavit. Also as in *Maglio*, the

informant was in law enforcement custody, and provided information in a post-arrest interview.

Unlike a faceless telephone communication from an anonymous tipster, a face-to-face encounter

with a known informant like the post-arrest interview of the informant here can afford law

enforcement the ability to assess many of the elements relevant to determining whether

information is sufficiently reliable to warrant law enforcement action. *See Alabama* v. *White*, 496

U.S. 325, 328, 110 S. Ct. 2412, 2415 (1990). The post-arrest interview gave law enforcement

"the opportunity to perceive and evaluate personally [the] informant's mannerisms, expressions,

and tone of voice (and, thus, to assess the informant's veracity ...)." *United States v. Romain,* 393

F.3d 63, 73 (1st Cir. 2004). In-person communications also tend to be more reliable because,

having revealed one's physical appearance and location, the informant knows that he or she can

be tracked down and held accountable if his or her assertions prove inaccurate. *See id.* (*citing

Fla.* v. *J.L.*, 529 U.S. 266, 270, 120 S. Ct. 1375, 1378 (2000)).

As described further below, the information the informant provided was based on his

firsthand knowledge of the defendant's criminal activity, and the defendant's use of the Target

Vehicle to carry it out, which rendered it inherently more reliable than hearsay from a third party.

Furthermore, as in *Maglio*, in this case, the informant made statements that subjected him

**JOINT APPENDIX 91**

to further prosecution, including self-incriminating statements that he purchased large quantities

of various drugs from the defendant, which he distributed to customers throughout New

Hampshire.  The informant also acknowledged he personally observed drugs and a firearm in the

defendant's possession.  His statements implicated him in a conspiracy with both the defendant

and his prior supplier, who was already incarcerated.  The informant's statements against penal

interest have inherent reliability.  *Cf. United States v. Leonard*, 17 F.4th 218, 225 (1st Cir. 2021)

(finding probable cause where informant known to the police who provided information about

defendant's drug-dealing and gun possession implicated himself and noting that this enhanced

his trustworthiness).   In *United States v. Harris,* 403 U.S. 573, 583, 91 S.Ct. 2075, 29 L.Ed.2d

723 (1971), a plurality of the Supreme Court explained

> [p]eople do not lightly admit a crime and place critical evidence in
> the hands of the police in the form of their own admissions.
> Admissions of crime, ... carry their own indicia of credibility—
> sufficient at least to support a finding of probable cause to
> search. *Id.*

Finally, while the defendant argues the informant had "every motive to lie to help

himself" since he was facing drug charges, Def's Br. at 10, the opposite is true: an informant's

interest in obtaining leniency creates a strong incentive to supply accurate information.  *United*

*States v. Miller,* 925 F.2d 695, 699 (4th Cir.1991); *United States v. Reivich,* 793 F.2d 957, 962–

963 (8th Cir. 1986) (offers of leniency are consistent with inferences of reliability that attach to

statements against penal interest).  As the First Circuit recognized in *United States* v.

*Vongkaysone*, when an informant "ha[s] been caught dealing in drugs, it [is] to his advantage to

produce accurate information to the police so as to qualify for the leniency he [seeks]." 434 F.3d

68, 74 (1st Cir. 2006).  This provides reason to credit the information the informant provides.

*See United States* v. *Batista*, 31 F.4th 820, 823 (1st Cir. 2022) (upholding denial of motion to

**JOINT APPENDIX 92**

suppress and finding the information provided by an informant, who had been arrested in a fentanyl trafficking investigation and agreed to provide information about the defendant, supported probable cause).  Moreover, the Affidavit clearly presented to the magistrate the context in which the informant, having been arrested on multiple drug charges, was supplying the information about the defendant, and the magistrate was entitled to draw his own inferences about the reliability of the information in that context.  That inference is entitled to deference.

### (2)  The Informant's statements reflected firsthand knowledge

The informant also demonstrated personal knowledge of the information he provided, meeting the second of the *Gifford* factors cited above and supporting probable cause. "The credibility of an informant is enhanced to the extent he has provided information that indicates first-hand knowledge." *United States* v. *Barnard*, 299 F.3d 90, 93–94 (1st Cir. 2002) (citing *United States v. Taylor,* 985 F.2d 3, 6 (1st Cir.1993)); *see also Gates,* 462 U.S. at 234 (stating that the informant's "explicit and detailed description of alleged wrongdoing, along with a statement that the event was observed first-hand entitles the tip to greater weight than might otherwise be the case"). Here, the informant provided explicit and detailed descriptions of the defendant's drug trafficking based on personal observation as a participant.  He described that the defendant took over supplying him with drugs after the informant's former supplier—with whom the informant had established a personal relationship in prison and knew to be a member of the same gang as the defendant (the Gangster Disciples)—was incarcerated; he said he personally met the defendant near Rimmon Street and Putnam Street to conduct drug deals; and he provided the quantities and prices of drugs he received from the defendant, described where the drugs were kept in the defendant's car (the Target Vehicle) during drug deals, and stated that the defendant regularly stored a pistol in between the driver's seat and center console in the

Target Vehicle.[3]  This "first-hand information provided a link between the illegal activity

observed and the place to be searched"—in this case, the Target Vehicle—and demonstrated the

informant's "knowledge of concealed illegal activity as opposed to easily knowable,

nonincriminating facts."  *Barnard*, 299 F.3d at 94 (finding informant's firsthand observations of

two firearms at defendant's house and his identifying types of guns, along with his statement that

the defendant had threatened him with the SKS, showed knowledge of concealed illegal activity

that provided assurance of reliability, and overturning district court's suppression of evidence in

felon-in-possession case) (quoting *United States* v. *Tiem Trinh*, 665 F.3d 1, 10 (1st Cir. 2011)).

### (3) Law enforcement corroborated portions of the information provided by the informant

In this case, law enforcement was able to corroborate a number of important pieces of

information the informant provided, establishing the third of the *Gifford* factors. Specifically, the

informant reported that the informant's drug deals with the defendant, which the two conducted

in person, took place near Rimmon St. and Putnam St. Law enforcement conducted a search of a

database to find the defendant's residence, which was near that intersection. The magistrate

could reasonably find that the proximity of the informant's reported drug deals to the defendant's

confirmed address corroborated the informant's information.

Law enforcement also confirmed, through contacting the defendant's parole officer and

through on-site surveillance, that the defendant's vehicle matched the detailed description

provided by the informant (which included the make, color, and license plates of the vehicle,

showing the informant's familiarity with the vehicle).

---

[3] That the defendant regularly carried a gun in the Target Vehicle supported that the gun would
still be in the vehicle and the criminal activity was "ongoing." *United States v. Lamon*, 930 F.2d
1183, 1188 (7th Cir. 1991) (reasoning that passage of time between the report of criminal
behavior and a search does not render the information stale when criminal activity is ongoing).

**JOINT APPENDIX 94**

Furthermore, the informant described that the defendant took over supplying the informant with drugs after the informant's former supplier, a member of the same gang as the defendant, the Gangster Disciples, was incarcerated, and law enforcement corroborated that that former supplier was arrested in early July 2021 and was still incarcerated as of the writing of the Affidavit. This is corroborative of the informant's description that the defendant took over the informant's former supplier's operations after the former supplier was arrested, which was between the first traffic stop resulting in seizure of drugs from the informant's vehicle on June 13, 2021, and the second car stop resulting in additional drug seizure on July 30, 2021.

The informant's description of the amount of methamphetamine he bought from the defendant each week—one pound—was consistent with the amount recovered from the informant's vehicle in the second car search (464.7 grams—roughly one pound).

Finally, law enforcement determined that the defendant was a convicted felon. "An affiant's knowledge of the target's prior criminal activity or record clearly is material to the probable cause determination." *United States* v. *Taylor*, 985 F.2d 3, 6 (1st Cir. 1993) (citing *United States v. Asselin,* 775 F.2d 445, 446 (1st Cir.1985)). The defendant's being a felon both lent credibility to the informant's assertions that the defendant was engaging in illegal activity and confirmed that his regularly carrying a gun in between the driver's seat and center console of the Target Vehicle, as reported by the informant, was itself criminal activity.

Although law enforcement did not observe or corroborate any illegal activity firsthand, law enforcement did not have to do so to establish the reliability of the informant's information. As the Supreme Court reasoned in *Illinois* v. *Gates*:

> Because an informant is right about some things, he is more probably right about other facts—including the claim regarding the [defendants'] illegal activity. This may well not be the type of "reliability" or "veracity" necessary to satisfy some views of the

**JOINT APPENDIX 95**

> "veracity prong" of *Spinelli,* but we think it suffices for the practical, common-sense judgment called for in making a probable cause determination.

462 U.S. at 244 (citing *Spinelli v. United States,* 393 U.S. 410, 89 S.Ct. 584 (1969), which the

*Gates* court overturned).  Similarly, in order for an informant's information to establish probable

cause, it was not necessary for law enforcement to be certain that the informant was not lying.

"[T]he risk that an informant is lying or in error need not be wholly eliminated." *United States* v.

*Barnard*, 299 F.3d 90, 94 (1st Cir. 2002).  In *Illinois v. Gates*, the Supreme Court reasoned that

law enforcement's corroboration of seemingly innocent facts, events described in an anonymous

letter, sufficed to establish a fair probability that the defendants were engaged in the

(uncorroborated) criminal activity that the letter described.  *Gates*, 462 U.S. at 246.  The

Supreme Court reasoned:

> [P]robable cause does not demand the certainty we associate with formal trials. It is enough that there was a fair probability that the writer of the anonymous letter had obtained his entire story either from the [defendants] or someone they trusted.   *Id*.

Here, the informant's account already carried much greater reliability than the

anonymous letter in *Gates*, based on the indicia of reliability described at length above.  *A*

*fortiori*, and per the reasoning in *Gates*, law enforcement's corroboration of portions of the

information provided by the informant was sufficient to establish a "fair probability" that the

informant was being truthful and accurate about the defendant's criminal activity, and a search of

the defendant's car would yield evidence of such criminal activity. *See United States v. Taylor*,

985 F.2d 3, 6 (1st Cir. 1993) (holding that an informant's detailed and specific account that the

appellant was growing marijuana established probable cause for a search of appellant's residence

and was corroborated where law enforcement simply conducted a criminal background check of

the defendant which revealed marijuana convictions in her past).

**JOINT APPENDIX 96**

**(4)  The affiant assessed the probable significance of the informant's information**

Finally, the Affidavit establishes the fourth of the *Gifford* factors because the affiant found, based on the informant's information and law enforcement's corroboration of portions of it, there was probable cause to believe the Target Vehicle would "contain at least one firearm, ammunition, controlled substances, and electronic devices" which relate to, *inter alia*, violations of 18 U.S.C. 922(g)(1) [Felon in Possession of Ammunition and a Firearm], 21 U.S.C. 841 [Distribution of Controlled Substances], and 21 U.S.C. 846 [Conspiracy to Distribute Controlled Substances]. Aff. ¶ 16. The magistrate could rightfully attribute weight to that assessment because the affiant's opinion was based on his experience "handl[ing] many cooperating sources and witnesses who have provided information to [him] specifically related to shootings, the distribution of controlled substances, and various firearms offenses" and his knowledge of "the modus operandi used by individuals engaged" in such offenses. Aff. ¶ 3. The defendant's point that the affidavit does not establish the informant's past record of reliability is of little moment to the probable cause analysis. The informant was not an anonymous tipster.  He was known to law enforcement, he was in their custody, and he was named in the affidavit. "[A] known informant's statement can support probable cause even though the affidavit fails to provide any additional basis for the known informant's credibility and the informant has never provided information to the police in the past."  *United States v. Kinison*, 710 F.3d 678, 682–83 (6th Cir. 2013).

**B.  The Magistrate's Finding of Probable Cause Was Proper and Is Entitled to Deference**

In reviewing a magistrate's decision to issue a warrant, the court gives "considerable deference" to the magistrate's determination that information in the affidavit establishes probable cause and focuses on whether the magistrate had a "substantial basis" for concluding probable cause existed. *United States* v. *Taylor*, 985 F.2d 3, 6 (1st Cir 1993). The reviewing court must

**JOINT APPENDIX 97**

read the affidavit in "a practical, 'common sense' fashion, and [ ] accord considerable deference to reasonable inferences the [issuing magistrate] may have drawn from the attested facts.'" *United States* v. *Bucuvalas*, 970 F. 2d 937, 940 (1st Cir. 1992) (citations omitted).  Moreover, given the strong preference for warrants under Fourth Amendment jurisprudence, a reviewing court will normally defer to an issuing magistrate's "probable cause" determination in a marginal case. *United States* v. *Zayas-Diaz*, 95 F.3d 105, 111 (1st Cir. 1996).

Hence, even if it were a close call as to whether the Affidavit established probable cause to search the defendant's car (and it is not), the Court should defer to the magistrate's finding.

## II.     Defendant Has Not Met the High Standard for a *Franks* Hearing

The defendant argues for a *Franks* hearing on the grounds that a physical falsification conviction from the informant's criminal history[4] was either recklessly or intentionally omitted from the Affidavit, and that including it would have led the magistrate not to find probable cause. To obtain a *Franks* hearing, a defendant must make "a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and [that] the allegedly false statement is necessary to the finding of probable cause." *United States v. Cartagena,* 593 F.3d 104, 112 (1st Cir.2010) (quoting *Franks,* 438 U.S. at 155–56).   "In the case of an omission, this means establishing that the inclusion of the omitted information would have led to a negative finding by the magistrate on probable cause." *United States v. McLellan,* 792 F.3d 200, 208-9 (1st Cir. 2015).  A failure to prove either of these elements—that an omission was made knowingly and intentionally or with reckless disregard for the truth, and inclusion of the information would have led to a finding of no probable cause, "dooms the defendant's challenge."  *Id.*

---

[4] A copy of the informant's criminal history, with personal identifying information redacted, has been provided to defense counsel as of the time of filing of this Objection.

**JOINT APPENDIX 98**

Because the defendant cannot show that this information was intentionally omitted from the Affidavit or omitted with reckless disregard for the truth, and because the informant's physical falsification conviction did not involve an element of deceit or any false statement and would not have changed the finding of probable cause had it been referenced in the affidavit, his request for a *Franks* hearing should be denied. These issues will be addressed in reverse order.

**A. Inclusion of the Informant's Falsification Conviction Would Not Negate a Finding of Probable Cause**

Because the nature of the "physical falsification" conviction in the informant's criminal record does not impugn the veracity of the information he provided to law enforcement in his post-arrest interview, including the conviction in the affidavit would not have undermined probable cause. As documented in the certified copy of the informant's physical falsification conviction, attached hereto as Exhibit A, the violation of NH RSA 641:6 for which the informant was convicted was based on the informant's "conceal[ing] what appeared to be drugs by dropping them to the ground and stepping on them in order to impair their availability [in a simple drug possession investigation]." The language in this description of the informant's offense conduct tracks subsection I of the New Hampshire Statute, RSA 641:6, which states:

> **641:6 Falsifying Physical Evidence.** A person commits a class B felony if, believing that an official proceeding, as defined in RSA 641:1, II, or investigation is pending or about to be instituted, he:
>
> I. Alters, destroys, conceals or removes any thing with a purpose to impair its verity or availability in such proceeding or investigation; or
>
> II. Makes, presents or uses any thing which he knows to be false with a purpose to deceive a public servant who is or may be engaged in such proceeding or investigation.

While Subsection II of the statute criminalizes making knowing falsehoods with "a purpose to deceive," the informant was not charged with violating this subsection. Instead, the informant was charged with violating Subsection I, relating to physical acts. Though attempting

**JOINT APPENDIX 99**

to render drugs unavailable to be used in a trial against oneself is certainly a criminal act, it is comparable to a criminal trying to hide evidence or dust off his fingerprints so he does not get caught. The Subsection under which the informant was convicted, in contrast to Subsection II, does not establish an element related to deceit or lying to law enforcement.

Therefore, the facts in this case are more similar to the facts of *United States* v. *Rumney*, cited in the defendant's brief on page 12, where the First Circuit found "the inclusion of [the informant's] criminal record would not have altered the finding of probable cause" because "appellant d[id] not contend that [the informant's] crimes were ones involving perjury or false statements" and "a criminal record, no matter how lengthy, does not necessarily impugn one's veracity." *Rumney*, 867 F.2d at 720.  As in *Rumney*, the informant's crimes in this case do not involve perjury or false statements.  Moreover, as in *Rumney*, the informant's criminal record here "ha[d] no bearing on his intimate knowledge of the crime."  *Id*. Simply put, the informant's act of trying to destroy drugs before they could be used against him in a simple possession case does not in any way negate his intimate knowledge of the drug distribution activities (or gun possession) of the defendant, who was the informant's most recent drug supplier.

Moreover, the fact that an informant has a criminal conviction for falsification does not mean that his account cannot establish probable cause: "information from dishonest informants may still provide a basis for probable cause." *United States v. Patayan Soriano,* 361 F.3d 494, 506–07 (9th Cir. 2004). The defendant cites *United States* v. *Tanguay*, 907 F. Supp. 2d 165, 184 (D.N.H. 2012), *aff'd*, 811 F.3d 78 (1st Cir. 2016), and *aff'd*, 811 F.3d 78 (1st Cir. 2016) in his brief. Def's Br. at 15. In that case, the trial court held an omission from an affidavit in support of a search warrant of an informant's conviction for uttering a false prescription did not alter the finding of probable cause in light of other indicators of reliability, including: the informant's

**JOINT APPENDIX 100**

exposure to prosecution by providing information implicating himself in a crime; his personal knowledge of the defendant and relevant events; and law enforcement's corroboration of certain information he provided.  In upholding the trial court's finding of probable cause despite the omission of the falsification charge, the First Circuit Court of Appeals reasoned:

> Here, we do not think that the court erred in ascribing such limited significance to the altered prescription conviction. . . . An informant's trustworthiness may be enhanced in a number of ways, including his willingness to reveal his identity, the level of detail in his account, the basis of his knowledge, and the extent to which his statements are against his interest. A number of such factors bolster the district court's determination that the essence of [the informant's] account was worthy of credence.

*United States* v. *Tanguay*, 787 F.3d 44, 50 (1st Cir. 2015) (internal citation omitted).

Similarly, here, the indicia of reliability of the informant's information—statements against penal interest implicating the informant in conspiracy and drug distribution the informant made in law enforcement's custody during a post-arrest interview, which reflect the informant's personal knowledge of the defendant and his criminal activity—coupled with law enforcement's corroboration of portions of the information, demonstrate that including the informant's falsification charge in the affidavit would not have changed the magistrate's finding of probable cause.  And even if the informant had reasons to level false criminal charges against the defendant, a warrant application need not entirely eliminate the risk that the informant was lying to establish probable cause. *Barnard*, 299 F.3d at 94; *United States v. Capozzi,* 347 F.3d 327, 333 (1st Cir. 2003). Instead, the application must merely "suggest a 'fair probability' that evidence of a crime will be found in the place to be searched." *Gates*, 462 U.S. at 238.  The affiant's Affidavit does so and would do so regardless of reference to the falsification conviction.

Accordingly, inclusion of the conviction would not have changed the probable cause determination. The defendant fails to meet the standard for a *Franks* hearing.

**JOINT APPENDIX 101**

**B. Defendant cannot show that the informant's falsification conviction was omitted intentionally or with reckless disregard for the truth**

Should the Court proceed to assess whether the informant's falsification conviction was intentionally or recklessly omitted (and it need not), the Court should find that the informant's 2015 conviction for falsifying physical evidence was not omitted from the Affidavit with reckless disregard for the truth, let alone intentionally to mislead the magistrate. "To prove reckless disregard for the truth, the defendant must prove that the affiant 'in fact entertained serious doubts as to the truth' of the allegations.'" *United States v. Ranney*, 298 F.3d 74, 78 (1st Cir. 2002) (quoting *United States v. Williams*, 737 F.2d 594, 602 (7th Cir. 1984). The First Circuit has made it clear that the focus of the inquiry is upon the information known to the law enforcement agent making the statements in the affidavit at the time the statements were made. *See United States v. Tzannos*, 460 F.3d 128, 138 (1st Cir. 2006).

There is no evidence whatsoever that the affiant entertained such doubts as to the truth of the informant's allegations of the defendant's criminal activity. To the contrary, the affiant's opinions and his and other law enforcement officers' corroboration of information show that he believed the information provided by the affiant to be true. Any omitted evidence that otherwise may have called the informant's reliability into question is undermined by the corroboration of the information the informant provided, as well as the many other indicia of reliability of the information discussed above. *United States v. Rigaud*, 684 F.3d 169, 175 (1st Cir. 2012) ("We also agree with the district court that ample corroboration of the information that Trainor provided neutralizes any apparent untrustworthiness….").

Moreover, the disclosures in the Affidavit belie the defendant's unfounded contention

**JOINT APPENDIX 102**

that the affiant deliberately or recklessly omitted the informant's past convictions.[5] The affiant

made "no secret" of the informant's criminality.  *See United States v. Belton*, 414 F. Supp. 2d

101, 110 (D.N.H. 2006). The Affidavit describes the informant had been arrested on two separate

criminal warrants for drug offenses, and he provided information about the defendant in a post-

arrest interview. The Affidavit's statements about the large quantities of fentanyl,

methamphetamine, and crack cocaine found in the informant's possession, the informant's

associations with gang members and convicts, and the fact the informant had met his former drug

supplier while in prison, all put the magistrate on notice the informant "was not a model citizen,"

and provided sufficient context for the magistrate to assess his reliability. *Id.*; *see United States v.

Hall*, 171 F.3d 1133, 1143 (8th Cir. 1999) (concluding that omission of informant's full criminal

history from warrant application was immaterial to probable cause where application cited her

participation in prostitution and auto theft); *United States v. Avery*, 295 F.3d 1158, 1168 (10th

Cir. 2002) (abrogated on other grounds) (finding affidavit that did not mention the informant's

criminal history nonetheless sufficient to show informant was not a model citizen and violated

laws where it stated informant sold cocaine in the past).  The defendant has not made the

showing to warrant a *Franks* hearing, and the request should be denied.

### III.     The Leon Good Faith Exception Militates Against Suppression

Even if the magistrate's probable cause determination was in error, the evidence derived

from the search of the defendant's car is still admissible under the *Leon* "good faith" exception.

*United States* v. *Leon*, 468 U.S. 897 (1984). In *Leon*, the Supreme Court held that suppression of

evidence seized in reliance on a warrant later found invalid is only required where: (1) the

---

[5] Even if the Court were to find the falsification conviction should have been specifically
referenced in the Affidavit, and it was negligent not to do so, a negligent omission is insufficient
to require a *Franks* hearing. *Franks*, 438 U.S. at 171.

**JOINT APPENDIX 103**

issuing magistrate was misled by information in the affidavit the affiant knew was false or would have known was false except for reckless disregard of the truth; (2) the issuing magistrate wholly abandoned his detached and neutral judicial role; (3) the affidavit is so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; or (4) a warrant is so facially deficient the executing officers cannot reasonably presume it to be valid. *Id.* at 923.

None of these four circumstances exist here. As described above, the affiant did not recklessly or intentionally omit material information about the informant's criminal history from the affidavit, or otherwise mislead the magistrate. Inclusion of the additional information about the informant's falsification conviction would not have changed the finding of probable cause.

Furthermore, the affidavit is not so lacking in indicia of probable cause as to render law enforcement's reliance on the magistrate's issuance of the warrant improper. In conducting this inquiry, the Court should look to whether the executing officers "reasonably believed that the warrant was properly issued, *not* whether probable cause existed in fact." *United States v. Laughton,* 409 F.3d 744, 752 (6th Cir.2005) (quotations omitted). If the warrant was later held invalid, that error "rests with the issuing magistrate, not the police officer, and punishing the errors of judges is not the office of the exclusionary rule." *Davis,* 131 S. Ct. at 2428.

Even if the Court were to conclude that the magistrate's decision was "arbitrarily exercised," *Gates,* 462 U.S. at 248, 103 S. Ct. at 2317, the police conduct here does not justify the "heavy toll" generated by excluding the evidence in this case. *Davis* v. *United States*, 564 U.S. 229, 236-37 (2011). In *Davis,* the Supreme Court made clear that exclusion is "not a personal constitutional right," nor is it designed to "redress the injury occasioned by an unconstitutional search;" instead, the "sole purpose" of the exclusionary rule "is to deter further Fourth Amendment violations." *Id.* at 237 (citing *Herring v. United States,* 555 U.S. 135, 141,

**JOINT APPENDIX 104**

129 S.Ct. 695, 172 L.Ed.2d 496 (2009)).  As the Court described in *Davis*, exclusion is only

appropriate as a "last resort" where the deterrent effect outweighs the costs:

> The analysis must also account for the "substantial social costs"
> generated by the rule. Exclusion exacts a heavy toll on both the
> judicial system and society at large.  It almost always requires
> courts to ignore reliable, trustworthy evidence bearing on guilt or
> innocence.  And its bottom-line effect, in many cases, is to
> suppress the truth and set the criminal loose in the community
> without punishment. Our cases hold that society must swallow this
> bitter pill when necessary, but only as a "last resort."  For
> exclusion to be appropriate, the deterrence benefits of suppression
> must outweigh its heavy costs. *Id.*

In this case, there is simply no law enforcement conduct that evidences a "deliberate,

reckless, or grossly negligent" disregard for the defendant's Fourth Amendment rights justifying

application of the exclusionary rule.  *Id.* (describing that such level of disregard is the necessary

level of culpability for the value of exclusion to "tend to outweigh resulting costs").  To the

contrary, the informant provided detailed information based on his personal knowledge about the

defendant's criminal activity—ranging from drug quantities and amounts obtained on a daily

basis from the defendant, to the fact that defendant regularly carried a gun in the Target Vehicle

tucked between the driver's seat and center console—as well as information corroborated by law

enforcement related to that activity—such as the informant's description of the defendant's

vehicle, the defendant's associate and fellow gang member (the informant's prior supplier), and

the defendant's criminal history—such that law enforcement was well-founded in their belief

that the magistrate properly found probable cause when issuing the warrant.

Therefore, the officers executing the search warrant were entitled to rely on the apparent

legality of their doing so, and no deterrence benefit would be gained by suppression here.

**JOINT APPENDIX 105**

**IV.** **Even If the Search Warrant Lacked Probable Cause, Suppression of the Evidence Seized from the Defendant's Vehicle Is Inappropriate Because the Evidence Would Have Inevitably Been Discovered**

Finally, even were the Court to hold the search warrant invalid, and the good faith exception unavailable, the evidence recovered from the defendant's vehicle should not be suppressed because it would have inevitably been discovered. "Evidence which comes to light by unlawful means nonetheless can be used at trial if it ineluctably would have been revealed in some other (lawful) way." *United States v. Zapata*, 18 F.3d 971, 978 (1st Cir. 1994). To determine applicability of the inevitable discovery doctrine, courts use the following test:

> first, whether the legal means by which the evidence would have been discovered was truly independent; second, whether the use of the legal means would have inevitably led to the discovery of the evidence; and third, whether applying the inevitable discovery rule would either provide an incentive for police misconduct or significantly weaken constitutional protections.

*United States* v. *Almeida*, 434 F.3d 25, 28 (1st Cir. 2006); *see also United States v. Crespo–Ríos,* 645 F.3d 37, 42 (1st Cir. 2011). The government must show the doctrine's applicability by a preponderance of the evidence. *United States v. Infante–Ruiz,* 13 F.3d 498, 503 (1st Cir. 1994).

Here, a search of the Target Vehicle would have inevitably occurred as a result of the parole violations of both Emilio Flores and the defendant, which subjected their persons and property to a warrantless search based on their parole conditions. *See* Exhibit B, Parole Officer Brian Benard's Affidavit in Support of Objection to Motion to Suppress, at ¶¶ 10-12. On September 1, 2021, law enforcement conducted surveillance of the defendant and observed him pick up Emilio Flores, who was known by Manchester Police to be subject to arrest for a 2018 parole violation. Flores carried a bag into the defendant's vehicle and the two men then drove together to a TD bank. Both men were on parole and prohibited by their parole conditions from associating with other parolees. *See* Ex. B at ¶¶ 9-12.

**JOINT APPENDIX 106**

If called to testify, Flores's parole officer would explain that, had law enforcement not already obtained a signed warrant authorizing the search of the defendant's vehicle, he would have searched the vehicle, including the bag that Flores brought into the vehicle, to make sure it did not contain additional evidence of parole violations, such as narcotics. *See* Ex. B at ¶¶ 12-13. Flores's parole officer had authority to conduct this search, supported by the defendant's and Flores's parole conditions, which require them to submit to searches of their person, property, and possessions as requested by the parole officer. *See id.* at ¶¶ 9-14.

Accordingly, the evidence at issue, including the kilogram of cocaine inside the bag that Flores brought into the Target Vehicle, would have been inevitably discovered, independent of the authorization of the search warrant. This satisfies the first two parts of the test described in *Almeida*. *Almeida*, 434 F.3d at 28. The third part of the test is also satisfied because, as described above, there was simply not any egregious misconduct or reckless disregard for Fourth Amendment rights that would be encouraged by applying the inevitable discovery rule in this case.

Because the kilogram of cocaine in the bag and other evidence in defendant's car would have inevitably been discovered even absent the search warrant, it should not be suppressed.

## CONCLUSION

For the foregoing reasons, the Court should deny the defendant's motion to suppress evidence seized from the Target Vehicle, the defendant's Honda Accord.

Dated: October 31, 2022                    Respectfully submitted,

                                           JANE E. YOUNG
                                           United States Attorney

                        By:          /s/ Aaron G. Gingrande
                                           Aaron G. Gingrande
                                           Assistant United States Attorney
                                           53 Pleasant Street, 4th Floor
                                           Concord, New Hampshire 03301

**JOINT APPENDIX 107**

# EXHIBIT A

# THE STATE OF NEW HAMPSHIRE
## JUDICIAL BRANCH
### SUPERIOR COURT

Merrimack Superior Court
163 North Main St./PO Box 2880
Concord NH 03302-2880

Telephone: 1-855-212-1234
TTY/TDD Relay: (800) 735-2964
http://www.courts.state.nh.us

### RETURN FROM SUPERIOR COURT – STATE PRISON SENTENCE

Case Name:  **State v.** ████████████
Case Number:  **217-2014-CR-00716**
Name: ████████████████████████████
DOB: ████████████████

Charging document:  Indictment

**Offense:** | **Charge ID:** | **RSA:** | **Date of Offense:**
Falsify Phys Evidence | 987911C | 641:6 | July 16, 2014
Disposition:   Guilty/Chargeable By:   Plea    T/N: _____

**A finding of GUILTY/CHARGEABLE is entered.**
Conviction:   Felony

Sentence: see attached

True Copy Attest:

*Catherine J. Ruffle*

Catherine J. Ruffle, Clerk of Court

August 12, 2022

January 13, 2015
Date

Larry M. Smukler
Presiding Justice

William S. McGraw
Clerk of Court

### MITTIMUS

In accordance with this sentence, the Sheriff is ordered to deliver the defendant to the **New Hampshire State Prison.** Said institution is required to receive the Defendant and detain him/her until the Term of Confinement has expired or s/he is otherwise discharged by due course of law.

_____
Date

Attest: _____
Clerk of Court

### SHERIFF'S RETURN

I delivered the defendant to the **New Hampshire State Prison** and gave a copy of this order to the Warden.

_____
Date

_____
Sheriff

C:  ☒ State Police   ☐ DMV   ☒ Dept. of Corr.   ☒ Offender Recs   ☐ Sheriff   ☒ Sentence Review Board
☐ Defendant   ☒ Pros. Atty Rachel C. Harrington, ESQ   ☒ Defense Attorney John M. Draghi, ESQ
☒ Office of Cost Cont.   ☐ Sex Offender Registry   ☒ Other MCHOC; MCPTS; SOAR
☐ _____ Dist Ct. _____

## JOINT APPENDIX 109



NHJB-2572-S (07/01/2011)

# THE STATE OF NEW HAMPSHIRE
## JUDICIAL BRANCH
http://www.courts.state.nh.us

Court Name: **Merrimack Superior Court**

Case Name: State v. ████████

Case Number: 14-CR-716     Charge ID Number: 987911c
(If known)

## STATE PRISON SENTENCE

| Plea/Verdict: | Guilty    Dep | Clerk: | K Frazier |
|---|---|---|---|
| Crime: | Falsifying Physical Evidence | Date of Crime: | July 16, 2014 |
| Monitor: | J. Labae | Judge: | Lm Smukler |

A finding of GUILTY/TRUE is entered.

[X] 1. The defendant is sentenced to the New Hampshire State Prison for not more than __5__ year(s) / ~~months~~, nor less than __2__ year(s) / ~~months~~. There is added to the minimum sentence a disciplinary period equal to 150 days for each year of the minimum term of the defendant's sentence, to be prorated for any part of the year.

[ ] 2. This sentence is to be served as follows: [X] Stand committed  [X] Commencing

[X] 3. _____ All _____ of the minimum sentence is suspended
_____ All _____ of the maximum sentence is suspended
Suspensions are conditioned upon good behavior and compliance with all of the terms of this order. Any suspended sentence may be imposed after a hearing brought by the State within __7__ years of  [X] today's date  [ ] _____

[ ] 4. _____ of the sentence is deferred for a period of _____ year(s). The Court retains jurisdiction up to and after the deferred period to impose or terminate the sentence or to suspend or further defer the sentence for an additional period of _____ year(s). Thirty (30) days prior to the expiration of the deferred period, the defendant may petition the Court to show cause why the deferred commitment should not be imposed, suspended and/or further deferred. Failure to petition within the prescribed time will result in the immediate issuance of a warrant for your arrest.

[ ] 5. _____ of the minimum sentence may be suspended by the Court on application of the defendant provided the defendant demonstrates meaningful participation in a sexual offender program while incarcerated.

[X] 6. The sentence is [X] consecutive to  14-CR-716 (987909c) _____
[X] concurrent with _____

[ ] 7. Pretrial confinement credit: _____ days.

[ ] 8. The Court recommends to the Department of Corrections:
[ ] A. Drug and alcohol treatment and counseling
[ ] B. Sexual offender program
[ ] C. Sentence to be served at the House of Corrections
[ ] D. _____

Pursuant to RSA 499:10:a, the clerk shall notify the appropriate health care regulatory board if this conviction is for a felony and the person convicted is licensed or registered as a health care provider.

## JOINT APPENDIX 110

NHJB-2115-S (10/21/2013)

Case Name: S___ v ████████████████                    987911 C
Case Number: 14-C-716
STATE PRISON SENTENCE

## PROBATION

[X] 9. The defendant is placed on probation for a period of __5__ year(s), upon the usual terms of probation and any special terms of probation determined by the Probation/Parole Officer.
Effective:   [ ] Forthwith   [X] Upon Release from incarceration
   [ ] The defendant is ordered to report immediately to the nearest Probation/Parole Field Office.

[X] 10. Subject to the provisions of RSA 504-A:4, III, *if the underlying conviction is for a felony,* the probation/parole officer is granted the authority to impose a jail sentence of 1 to 7 days in response to a violation of a condition of probation, not to exceed a total of 30 days during the probationary period.

[X] 11. Violation of probation or any of the terms of this sentence may result in revocation of probation and imposition of any sentence within the legal limits for the underlying offense.

## OTHER CONDITIONS

[X] 12. The following conditions of this sentence are applicable whether incarceration is suspended, deferred or imposed or whether there is no incarceration ordered at all. Failure to comply with these conditions may result in the imposition of any suspended or deferred sentence.

[ ] A. The defendant is fined $ _____ plus statutory penalty assessment of $ _____
   [ ] The defendant shall also pay the time payment fee of $25.00.
   [ ] The fine, penalty assessment and any fees shall be paid:
   [ ] Now   [ ] By _____   [ ] Through the Department of Corrections as directed by the Probation/Parole Officer.
   [ ] $ _____ of the fine is suspended for _____ years(s).
   [ ] $ _____ of the penalty assessment is suspended for _____ year(s).

[ ] B. The defendant is ordered to make restitution of $ _____ plus statutory 17% administrative fee
   [ ] Through the Department of Corrections as directed by the Probation/Parole Officer
   [ ] At the request of the defendant or the Department of Corrections, a hearing may be scheduled on the amount or method of payment of restitution.
   [ ] Restitution is not ordered because: _____

[X] C. The defendant is to participate meaningfully and complete any counseling, treatment and educational programs as directed by the correctional authority or Probation/Parole Officer.

[ ] D. Under the direction of the Probation/Parole Officer, the defendant shall tour the
   [ ] New Hampshire State Prison   [ ] House of Corrections

[ ] E. The defendant shall perform _____ hours of community service under the direction of the Probation/Parole Officer.

[ ] F. The defendant is ordered to have no contact with _____
   either directly or indirectly, including but not limited to contact in-person, by mail or telephone or by means of any communications, electronic or otherwise.

[X] G. The defendant and the State have waived sentence review in writing or on the record.

[X] H. The defendant is ordered to be of good behavior and comply with all the terms of this sentence.

[X] I. Other: Defendant shall successfully complete the SOAR Program as a condition of this sentence.

__1/3/15__                                    _____
Date                                          Presiding Justice

NHJB-2115-S (10/21/2013)                **JOINT APPENDIX 111**

THE STATE OF NEW HAMPSHIRE

**MERRIMACK, SS.**                    SUPERIOR COURT                    *SEPTEMBER TERM, 2014*

## INDICTMENT

*At the Superior Court, held at Concord, in the County of Merrimack on the **18th day of SEPTEMBER, 2014**, the Grand Jurors for the State of New Hampshire, upon their oath, present that*

████████████

## of CONCORD, NEW HAMPSHIRE

*did commit the crime of* **FALSIFYING PHYSICAL EVIDENCE**
**contrary to RSA 641:6, a CLASS B FELONY**

**on or about the 16th day of JULY, 2014**
**at HOOKSETT, NEW HAMPSHIRE**

*In that:*

1. ████████ believed that an investigation by the New Hampshire State Police was about to be instituted into the Possession of Narcotic Drugs;

2. ████████ concealed what appeared to be drugs by dropping them to the ground and stepping on them in order to impair their availability in such investigation;

3. ████████ committed the above acts purposely.

*contrary to the form of the statute, in such cases made and provided, and against the peace and dignity of the State. This is a true bill.*

_____
*Grand Jury Foreman*

**RCH**

_____
Scott W. Murray
*Merrimack County Attorney*

State v. ████████
Date of Birth ████████

**INDICTMENT:**

2014 SEP 19 AM 1:   SUPERIOR COURT   0 2 9:

MCSC #217   2014 CR 716
**JOINT APPENDIX 112**
CHG ID# 98191 C

# THE STATE OF NEW HAMPSHIRE
## JUDICIAL BRANCH
**http://www.courts.state.nh.us**

Court Name: **Merrimack Superior Court**

Case Name: STATE v ███████████

Case Number: 14-CR- 116  855
(if known)

## ACKNOWLEDGMENT AND WAIVER OF RIGHTS - FELONY

I, ████████████ of CONCORD

my attorney being JOHN DRAGHE , do voluntarily make the following statements which I understand shall apply to each and every indictment to which I intend to plead GUILTY.

If I am not a citizen of the United States, I understand that conviction of the crime(s) for which I intend to plea GUILTY may have immigration consequences, including but not limited to, deportation from the United States, exclusion from admission into the United States, or denial of naturalization pursuant to the laws of the United States.

I have discussed this present plea of GUILTY to the charge in the indictment with my attorney who has explained the nature of the charge to me. I fully understand the charge of which I stand accused, which is:

Poss of heroin / Poss of cocaine / PPB / Poss. msth

I understand that I am under no obligation to plead GUILTY, and that even after signing this form I am still under no obligation to plead GUILTY.

I understand that by pleading GUILTY to the indictment I am giving up the following constitutional rights as to that crime.

**MY RIGHT** to a speedy and public trial.

**MY RIGHT** to a trial by Jury.

**MY RIGHT** to see, hear, and question all witnesses. This gives me the opportunity and right to confront my accusers and cross-examine them myself or through my attorney.

**MY RIGHT** to present evidence and call witnesses in my favor and to testify on my own behalf.

**MY RIGHT** to remain silent if I choose, which is my right against self-incrimination, and the jury can draw no inference of guilt from my silence.

**MY RIGHT** to have the Judge order into court all evidence and witnesses in my favor.

**MY RIGHT** to have my lawyer continue to defend me, and to present all defenses that I may have.

**MY RIGHT** not to be convicted except by proof beyond a reasonable doubt with respect to all elements of the charge, which have been explained to me by my attorney.

**MY RIGHT** to have excluded from evidence any confessions or other evidence obtained in violation of my constitutional rights.

**MY RIGHT** to appeal, if convicted.

**I GIVE UP ALL THE ABOVE RIGHTS OF MY OWN FREE WILL.**

I understand that by pleading GUILTY I am admitting to the truth of the charge against me in the indictment, and that, on my admission that I am GUILTY and the Judge's acceptance of my GUILTY plea, a conviction will be entered against me.

16

Case Name: _____

Case Number: _____

**ACKNOWLEDGMENT AND WAIVER OF RIGHTS - FELONY**

I am pleading GUILTY because I am GUILTY. I admit that I committed the acts charged in the indictment and that I committed the acts _purposely / knowingly_ (state of mind). No force has been used upon me, nor have any threats been made to me, by any member of the Prosecutor's Office or anyone else in an effort to have me enter this plea of GUILTY to the indictment. No promises have been made to me by any member of the Prosecutor's Office or anyone else in the effort to have me enter this plea of GUILTY to the indictment, except as follows:

_____

However, I understand that the Judge is not bound by the Prosecutor's recommendation as to sentence. I understand that I may withdraw my plea if the Judge exceeds the limits of a negotiated plea.

I understand as a consequence of my plea of GUILTY that the Judge may impose such sentence as in his/her discretion s/he considers appropriate, subject, however, to those limits prescribed by law. My attorney, with whose services I am satisfied, has advised me of the penalties that the Judge can impose for the crime to which I have pleaded GUILTY. I understand that this or these charge(s) against me are a Class _A/B_ Felony and that the maximum penalty is _15/7_ years, and that in addition a fine may be imposed not to exceed $ _50,000_ dollars.

I understand that if probation is a condition of my sentence, the Judge may give the probation/parole officer authority to impose a 1 to 7 day jail sentence in response to a violation of a condition of probation, not to exceed a total of 30 days during the probationary period. Such a sentence would only be imposed on me if I waived my right to counsel and a preliminary hearing with respect to that violation, and agreed to serve that sentence in lieu of a violation of probation hearing.

I understand that even though I am pleading GUILTY and giving up my right to call witnesses and testify myself, that this does not apply to the calling of witnesses and testifying on the question of the sentence to be imposed.

I am not under the influence of drugs or alcohol.

ALL OF THESE STATEMENTS THAT I HAVE GIVEN TODAY IN THIS ACKNOWLEDGMENT AND WAIVER OF RIGHTS ARE TRUTHFUL AND VOLUNTARILY GIVEN.

I do not have any questions at this time of my attorney or of the Prosecutor's Office. If there are any questions of the Judge or if there is anything I would like to say prior to sentencing in this case, my attorney will make this known to the Judge at the time of my plea to this indictment. I understand the entire contents of this Acknowledgment and Waiver of Rights, and I freely and voluntarily sign this form below. I also understand that I may have a copy of this form upon request.

1-13-15
Date _____

As counsel for the defendant, I have thoroughly explained to the defendant all the above, including the nature of the charge, the elements of the offense which the State must prove beyond a reasonable doubt, the maximum and minimum penalties, and the possible immigration consequences of entering a plea of guilty. I believe the defendant fully understands the meaning of this Acknowledgment and Waiver of Rights, that s/he is not under the influence of drugs or alcohol, and that s/he knowingly, intelligently and voluntarily waives all of his/her rights as set forth in this form.

1 13 15
Date _____          As Counsel for the Defendant

The undersigned Justice of the _____ Court, having inquired into the education and background of the defendant, is satisfied that s/he fully understands all of his/her rights as set forth above, and that s/he is not under the influence of drugs or alcohol. Court finds that the defendant has the mental capacity to evaluate these rights and, having done so, to knowingly and intelligently waive all of his/her rights as set forth in this form, and the defendant does knowingly, intelligently, and voluntarily waive those rights.

1 13 15
Date _____

**JOINT APPENDIX 114**

Presiding Justice

NHJB-2334-S (03/20/2014)                     Page 2 of 2

# EXHIBIT B

## AFFIDAVIT IN SUPPORT OF OBJECTION TO MOTION TO SUPPRESS

I, Brian Benard, depose and state as follows:

1.      I am a Probation/Parole Officer of the New Hampshire Department of Corrections, with offices based in Manchester, New Hampshire.   I was hired by the New Hampshire Department of Corrections on February 2, 2007.   I was promoted to Probation/Parole Officer in September 2008, and have remained employed in that capacity since then.   In my capacity as a Probation/Parole Officer, I provide supervision of adult probationers and parolees and enforce compliance with conditions imposed by the New Hampshire courts and New Hampshire Adult Parole Board in accordance with state law and departmental policies.

2.      In my capacity as a Probation/Parole Officer, I have been involved in numerous investigations of parole violations.   In my experience, such investigations often include searching a defendant's residence, vehicle, or personal property for evidence, such as contraband, supporting the violation.

3.      I submit this affidavit in support of the government's objection to a motion to suppress evidence obtained pursuant to a search of a vehicle belonging to the defendant, Michael Francis, in which a parolee I was supervising, Emilio Flores, was a passenger on the day that the defendant and Mr. Flores were arrested.

4.      In November of 2014, Mr. Flores was released on parole from a term of incarceration in connection with a sentence for armed robbery and burglary.   He was assigned to the supervision of another Parole Officer upon the inception of his parole, and I became his supervising Parole Officer in May of 2018.   His parole did not expire until August 23, 2022.

5.      While he was on parole, Mr. Flores violated his conditions of parole by failing to report to me in October 2018 as instructed, failing to obtain my permission before changing

**JOINT APPENDIX 116**

residences, and by consuming THC on multiple occasions.    On September 30, 2018, law enforcement also found heroin in his vehicle in connection with an investigation of a report of suspicious activity at the Country Inn and Suites in Bedford, New Hampshire.    Mr. Flores was criminally charged with possession of heroin as a result of the incident.

6.    After Mr. Flores's arrest on the above-referenced heroin charge, he posted bail, and then absconded from parole supervision.    Furthermore, he failed to appear for the court proceedings in Hillsborough Superior Court North in connection with that criminal charge, and instead became a fugitive from justice.

7.    Mr. Flores was still on parole, and was still wanted on this parole violation, as of September 1, 2021, when he was arrested by the Manchester Police Department in the parking lot of TD Bank in Manchester.    Just prior to his arrest, Mr. Flores was an occupant of a vehicle belonging to Michael Francis that was parked in that parking lot.

8.    I know that on the day of Mr. Flores's arrest, law enforcement had observed Mr. Flores associating with Michael Francis, who was also on parole at the time and was supervised by my office.

9.    One of Mr. Flores's conditions of parole at the time includes our standard condition that the parolee will not associate with other criminal companions, including other parolees.

10.    Another one of Mr. Flores's conditions of parole includes our standard condition that the parolee will permit the parole officer to visit the parolee's residence at any time for the purpose of examination and inspection in the enforcement of the conditions of parole, and submit to searches of the parolee's person, property, and possessions as requested by the parole officer. This condition authorizes the parole officer to conduct reasonable searches of the parolee, his residence, and his property and possessions, including but not limited to a vehicle.

**JOINT APPENDIX 117**

11.     Because Mr. Francis was also being supervised by my office and through conversations with his parole officer, I am aware that Mr. Francis was subject to the same standard parole conditions stated above on the date of his and Mr. Flores's arrest.

12.     Based on the knowledge I had during the time surrounding Mr. Flores's arrest, had law enforcement not already obtained a search warrant to search Mr. Francis's vehicle, in which Mr. Flores had been an occupant, I would have conducted a search of Mr. Francis's vehicle, including a search of the bag that Mr. Flores was seen carrying into that vehicle.  In my capacity as a Parole Officer, I would have had authority to search Mr. Francis's person and property, including his vehicle, based on his status as a parolee.

13.     I would have conducted this search based on what I knew: (a) Mr. Flores was wanted for arrest on a parole violation; (b) Mr. Flores had been charged with possessing heroin; (c) Mr. Flores was a fugitive from justice; and (d) Mr. Flores had been associating with Mr. Francis, another parolee. Accordingly, I would have conducted the search of the vehicle and Mr. Flores's person and personal property for evidence of a further parole violation, such as contraband that Mr. Flores had carried into the vehicle, or drugs that Mr. Flores was otherwise in the presence of in the vehicle.

14.     Conducting a search of Mr. Francis's vehicle, including the bag that Mr. Flores carried into the vehicle, would have been consistent with New Hampshire Department of Corrections' policy and standard procedure, and in accordance with my training and experience as a parole officer.

Date:  October 31, 2022

/s/ Brian Benard_____
Brian Benard, Probation/Parole Officer
Division of Field Services
New Hampshire Department of Corrections

**JOINT APPENDIX 118**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE**

UNITED STATES OF AMERICA

       v.                             No. 1:21-cr-00153-01-SM

MICHAEL FRANCIS

<u>REPLY TO GOVERNMENT OBJECTION
TO MOTION TO SUPPRESS EVIDENCE SEIZED WHEN EXECUTING
SEARCH WARRANT FOR A WHITE HONDA ACCORD</u>

     The defense submits this reply, pursuant to Local Rule 7.1(e)(1), to rebut factual and legal arguments raised in the Government's Objection to the Motion to Suppress Evidence Seized When Executing Search Warrant for a White Honda Accord.

     The Government argues that the affidavit offered in support of the search warrant provided probable cause and that, in any event, the good faith exception bars application of the exclusionary rule. To the defense assertion that the *Franks* doctrine applies because of the agent's deliberate or reckless omission of evidence of the informant's dishonesty, the Government claims that there is no evidence of dishonesty and that the defense has not made a showing of deliberate or reckless conduct by the agent. Finally, if all else fails, the Government claims it is saved by the "inevitable discovery" doctrine. All of the Government's arguments fail, as set forth in the original motion and below.

<u>The Agent Ran a Criminal Record Check on the Informant On the Day the Agent Applied for the
Warrant Yet Failed to Reveal the Informant's Felony Conviction for a Crime of Dishonesty to
the Magistrate, Thus Compounding the Flaws of the Affidavit.</u>

     The Government says a *Franks* hearing is not necessary because the defense has not shown that the informant was convicted of a crime of dishonesty, that the agent recklessly or deliberately omitted evidence from the affidavit, or that the evidence would have made a difference to the Magistrate. The Government is wrong on all counts.

**JOINT APPENDIX 119**

The Government acknowledges the informant's prior conviction but argues that "Falsifying Physical Evidence," under N.H. RSA 641:6, I, is not a crime of dishonesty that reflects on the informant's credibility. First, the name of the crime includes the word "falsifying." Second, the crime is in Chapter 641 of the New Hampshire Criminal Code, which is entitled "Falsification in Official Matters." Nonetheless, the Government argues that since the informant was convicted of trying to conceal evidence of his guilt from law enforcement, the informant did not have a purpose to deceive. That argument defies common sense.  A person worried about being charged with drug possession who hides the drugs from police is obviously trying to deceive the police into believing that the person does not possess drugs. Moreover, as a matter of New Hampshire law, when the informant pleaded guilty, he admitted to more than simple abandonment of the evidence. He admitted to actively concealing evidence of a crime with a purpose to prevent disclosure. *See* *In re Juvenile 2003-187, 151 N.H. 14, 17 (2004)* (the offense requires more than "simple abandonment" of the evidence); *see also* *State v. Daoud*, 158 N.H. 334, 337 (2009). Finally, the Government fails to give any weight to the fact that the very person the informant sought to deceive when committing the crime of Falsifying Physical Evidence was a law enforcement officer. *See* Doc. 46-1, p.5 (the indictment of the informant). Surely, a law enforcement officer asking a United States Magistrate to take the word of an informant should have told the Magistrate that the informant has a prior felony conviction not just for dishonesty, but for trying to deceive a fellow law enforcement officer. Isn't that exactly the kind of information a Magistrate needs to assess probable cause and the reliability of an informant?

Next, the Government says it does not matter if the informant was convicted of a felony crime of dishonesty, because Agent Burke did not recklessly or deliberately leave that conviction

out of his affidavit. In his affidavit to search the Honda, Agent Burke does not mention that the informant has <u>any</u> criminal record, at all, much less a conviction for a felony crime of dishonesty. *See* Doc. 35-3, p. 3-6. Although he did not reveal it, Agent Burke very well knew the informant's record. Agent Burke had in fact run a criminal record check of the informant on the same day that he filed the affidavit in this case. In a different affidavit he filed in this court in another case, Burke describes running a criminal record check on several people, including the informant from this case. *See* attached Exhibit A, p. 3, par. 8 (the attached affidavit is redacted to maintain confidentiality of the informant). Agent Burke states in that other affidavit that he reviewed the criminal history of the informant and that the informant has been convicted of a crime punishable by a term longer than one year. *Id*. Thus, there is no doubt that Agent Burke knew the informant's criminal record, which includes conviction of a felony crime of dishonesty. The failure to include that criminal record in the affidavit for the search of the Honda was at least reckless.

Notably, Agent Burke was careful in his affidavit to describe all of the other records he reviewed. Without mentioning that he had run a criminal history on the informant, Burke said he had run a criminal history on Francis. *See* Doc. 35-3, p. 6, par. 14. Burke also checked the motor vehicle registry to determine what kind of car was registered to Francis. *Id*. at par. 15. And Burke used a law enforcement database to search for addresses associated with Francis. *Id*. In this context, where the agent discussed many other relevant records, it is not reasonable to believe that the failure to mention the informant's conviction of a crime of dishonesty, or even that he had a criminal record, was unintentional. It was, at a minimum, reckless.

Contrary to the Government's arguments, having the criminal history would have made a difference to Magistrate Lynch when he was deciding whether to issue a search warrant for the

Honda. Agent Burke was asking Magistrate Lynch to make a finding of probable cause based on the claims of an informant who had everything to gain by currying favor with law enforcement. The informant told an elaborate story. The Government even says, "the information the informant provided was based on his firsthand knowledge of the defendant's criminal activity." Government Objection, p. 9. Despite such claims, the Government and Agent Burke have nothing more than the informant's word. The only corroborated information from the informant was an address and the kind of car Francis drove. That was information which almost any person could provide about another person with minimal effort. The Government argues that the informant provided so much detail that his claims must be true. Perhaps uncorroborated details claimed by an informant would carry some weight if the informant was a normal citizen. Here, such uncorroborated details must be viewed with skepticism. This is not a case where a concerned citizen has related details he would not be expected to have. Rather, the context here is that a felon, previously convicted of trying to deceive law enforcement, told a detailed story about criminal conduct but the agent did not verify a single instance of criminal conduct by the suspect. Rather, the agent omitted the informant's background from his affidavit.

The omission of the Falsifying Physical Evidence conviction should also be considered in light of what is not in Agent Burke's affidavit. There is no account of the informant making a controlled buy of drugs from Francis. There is no incriminating evidence from any other witness. There is not a single text message, much less a recorded phone call, in which Francis and the informant discuss some drug deal. There is no evidence that the informant provided reliable information in some other case, and thus had a track record of credibility.

Finally, the Government's claim that the informant's credibility was bolstered because he incriminated himself along with Francis, is wrong and contrary to the practical reality of what

**JOINT APPENDIX 122**

happens in criminal cases. The informant did not take a risk by naming Francis. He kept himself safe by naming Francis. The informant was arrested for drug amounts that would surely send him to prison for a long time. His only way out was to give law enforcement the name of a person who would have a hard time defending himself. This informant knew Francis because they had both been incarcerated. The informant knew Francis would be an easy person to accuse because of Francis's criminal record. A serious concern for the Magistrate reviewing the warrant application would have been whether the informant was trying to save himself by telling a tale about Francis. Unfortunately, the Magistrate had no opportunity to assess such motivations because the informant's background of trying to deceive law enforcement in drug cases was not revealed by Agent Burke.

As noted in the original motion, the Government cannot rely on the good faith exception where the Magistrate was misled by law enforcement's reckless omission of important information. *See United States v. Vigeant*, 176 F.3d 565, 571-72 (1st Cir. 1999). What has been confirmed since the filing of the original motion is that there was a reckless omission of very important information. The informant had a conviction for a felony of trying to deceive law enforcement in a drug case. Even though the agent's claim of probable cause was based almost entirely on the word of the informant, the agent did not reveal the conviction to the Magistrate. In these circumstances, the Government cannot claim good faith reliance on the Magistrate's determination of probable cause when that determination resulted from the reckless and misleading omission by a government agent.

<u>The Inevitable Discovery Doctrine Does Not Apply.</u>

The Government claims that, if its other arguments fail, it is nonetheless saved by the "Inevitable Discovery" doctrine. Under that doctrine:

**JOINT APPENDIX 123**

Evidence improperly obtained under the Fourth Amendment may, nevertheless, be admissible, notwithstanding the exclusionary rule, if that evidence would have been discovered inevitably.

*United States v. Wilson*, 2019 DNH 208, 2019 U.S. Dist. LEXIS 212524, at *16, *citing United States v. Almeida*, 748 F.3d 41, 49 (1st Cir. 2014).

The inevitable discovery doctrine only applies, "[i]f the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means . . . ." *United States v. Soto-Peguero*, 978 F.3d 13, 20 (1st Cir. 2020), citing *Nix v. Williams*, 467 U.S. 431, 446 (1984). Therefore, the preliminary point regarding this issue is that the Government cannot prevail unless it presents evidence at a hearing and proves inevitable discovery by a preponderance of the evidence. In the absence of such proof, the claimed exception does not apply. *United States v. Del Rosario-Acosta*, 968 F.3d 123, 130 (1st Cir. 2020).

When attempting to carry its burden of proof at a hearing, "[t]he government bears the burden of showing, by reference to demonstrated historical facts and by a preponderance of the evidence, that the information or item would inevitably have been discovered by lawful means." (quotation marks and citation omitted). *United States v. Delgado-Pérez*, 867 F.3d 244, 258 (1st Cir. 2017). Furthermore, the trial court must consider whether "'the lawful means of [the evidence's] discovery are independent and would necessarily have been employed' absent the earlier unlawful search, and whether 'discovery by that [lawful] means is in fact inevitable.'" *Id.*, citing *United States v. Zapata*, 18 F.3d 971, 978 (1st Cir. 1994). Moreover, the Government cannot carry its burden by mere speculation about how a suspect might have acted if the illegal search had not taken place. *Delgado-Pérez*, 867 F.3d at 259. Finally, the court must also consider whether the law enforcement officer whose conduct was unconstitutional acted intentionally and

**JOINT APPENDIX 124**

thus whether allowing an exception to the exclusionary rule would create an incentive to violate the constitution. *Soto-Peguero*, 978 F.3d at 21.

The Government will not be able to carry its burden of proving inevitable discovery in this case. The Government says that a "search of the Target Vehicle would have inevitably occurred as a result of the parole violations of both Emilio Flores and the defendant, which subjected their persons and property to a warrantless search based on their parole conditions." Government Objection, p. 24. While the defense has no obligation to prove the inapplicability of the inevitable discovery doctrine here, the defense notes that the Government's proffered explanation of inevitable discovery is the kind of speculation the First Circuit has rejected.

The Government's claim that a search of the Honda and the discovery of cocaine there would have inevitably taken place is pure speculation. By the Government's own account, Francis drove his car to an apartment building where Flores put a bag in the back seat of the car. The cocaine was in that bag. The only person whoever handled that bag was Flores. No agent claims to have seen Francis touch or even look in the bag. The Government cannot offer any evidence that Flores put the bag in Francis's car at Francis's instruction. The Government does not even have any evidence that Francis knew what was in Flores's bag. Most importantly, the Government cannot offer any evidence that the bag belonging to Flores would have remained in Francis's car until the time of some other "inevitable" search in the future. To the contrary, there is every reason to believe that Flores would not have left his bag in the Honda for very long at all. And the agents' own conduct shows that they did not intend to make an arrest based only on parole violations for violating the rule against felons associating with each other. After all, they had observed Francis and Flores together an hour and a half earlier at 231 Thornton Street, and then later at 153 Joliette Street, but no arrest was made at those times when the bag from Flores

**JOINT APPENDIX 125**

was not in the Honda. In short, the Government speculation here is just the kind of speculation about a suspect's future conduct which the First Circuit rejected in *Delgado-Perez* and which this court should reject after a hearing.

Finally, the court should recognize that applying the inevitable discovery doctrine in this case would incentivize unconstitutional conduct. As set forth in the *Franks* discussion above, Agent Burke's conduct in omitting the informant's record was either reckless or intentional. He had run the informant's criminal record the same day that he applied for the search warrant in this case. The informant had a conviction for a felony of attempting to deceive law enforcement in a drug investigation. Burke knew his search warrant application depended on the Magistrate accepting the word of the informant, yet he did not mention the informant's criminal record at all. In these circumstances, application of the inevitable discovery doctrine would "sully the prophylaxis of the Fourth Amendment." *Zapata*, 18 F.3d at 978; *see also United States v. Hughes*, 640 F.3d 428, 440 (1st Cir. 2011).

Conclusion.

If the court agrees that the affidavit is flawed on its face, it should grant the motion to suppress without a heading. Otherwise, a hearing is necessary, both to address the Franks issue and to address the Government's assertion of the inevitable discovery doctrine. Whether or not there is a hearing, after considering the law and facts before it, the court should grant the defense motion to suppress all evidence seized from the white Honda Accord.

Date: November 20, 2022

Respectfully submitted
by counsel for Michael Francis,

*/s/ Richard Guerriero*
Richard Guerriero, Esq.
N.H. Bar No. 10530
Lothstein Guerriero, PLLC
Chamberlain Block Building
39 Central Square, Suite 202
Keene, NH 03431
Telephone: (603) 352-5000
richard@nhdefender.com

CERTIFICATE OF SERVICE

I hereby certify that this document, filed through the ECF system, will be sent electronically to registered participants identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to the nonregistered participants on the date the document was signed by me.

_

*/s/ Richard Guerriero*
Richard Guerriero

**JOINT APPENDIX 127**

Case: 24-1386    Document: 00118186996    Page: 131    Date Filed: 09/06/2024    Entry ID: 6665919

## AFFIDAVIT IN SUPPORT OF AN
## APPLICATION FOR A SEARCH WARRANT

I, Ryan S. Burke, depose and state as follows:

### AGENT BACKGROUND

1.     I am a Special Agent of the Federal Bureau of Investigation ("FBI") and have been so employed since October 2012. I am currently assigned to the FBI's New Hampshire Resident Agency where I am tasked with investigating violent criminals and major offenders throughout the state. I primarily work alongside the Manchester Police Department ("MPD") as part of an initiative focused on reducing gun violence and other crime in the city of Manchester.

2.     Throughout my career, I have led and/or been involved with investigations of robberies, kidnappings, murders, fugitives, extortions, threats, drug distribution, illegal possession of firearms, and other crimes. My investigations have included the use of the following investigative techniques: physical surveillance; handling of cooperating sources and witnesses; exploitation of cellular, social media, and Internet Protocol ("IP") based communications data; execution of search and seizure warrants; wire, electronic, and oral wiretaps; and the execution of arrest warrants.

3.     Based on my training, experience, and information provided to me by other law enforcement officers, I am familiar with the modus operandi used by individuals engaged in the violation of various criminal offenses, such as those related to acts of violence, firearms, and controlled substances. For example, I have handled many cooperating sources and witnesses who have provided information to me specifically related to shootings, the distribution of controlled substances, and various firearms offenses. I have also reviewed thousands of court-authorized wiretap intercepts between drug traffickers, violators of firearm offenses, individuals conspiring to commit armed robberies, and individuals engaged in the violation of other offenses. Many of

**JOINT APPENDIX 128**

these investigations have resulted in the execution of search warrants, arrest warrants, and eventual convictions.

## PURPOSE OF AFFIDAVIT

4.     I submit this affidavit in support of an application for a warrant to search the following premises (hereafter, the "**Target Premises**"):

a.     Unit 2 of the ████████████████████████ located at ████ ████ Street in ████████, New Hampshire.

5.     Based on the information contained herein, there is probable cause to believe that the **Target Premises** contains evidence, fruits, and instrumentalities of the crime of 18 U.S.C. § 922(g)(1) [Felon in Possession of Ammunition & Firearm].

6.     The information set forth in this affidavit is based on my personal participation in this investigation, as well as my training and experience, and information received from other law enforcement officers. I have not set forth every detail I or other law enforcement officers know about this investigation but have set forth facts that I believe are sufficient to evaluate probable cause as it relates to the issuance of the requested warrant.

## PROBABLE CAUSE

7.     On ████████, 2021, ██████ (████████) was arrested in ████████ pursuant to an active state warrant for Controlled Drug Violations. He was subsequently transported to MPD for processing and to be interviewed. Prior to the interview, ████ was informed of his Miranda rights, acknowledged his understanding of those rights, and signed a form to memorialize his willingness to answer questions without an attorney present. In the audio-video recorded interview that followed, ████ provided, amongst other things, information related to a firearms transaction that took place at the **Target Premises**.

**JOINT APPENDIX 129**



8.   Between sometime in ▮▮ 2021 when ▮▮ was released from prison and approximately ▮▮ 2021, ▮▮ was present at the **Target Premises** for a meeting with ▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮Based on a review of the criminal histories for ▮▮ ▮▮ ▮▮ and ▮▮ I know they have each been convicted of one crime or more punishable by imprisonment for a term exceeding one year. Therefore, each individual is federally prohibited from possessing firearms.

9.   According to ▮▮ during the meeting, ▮▮ instructed ▮▮ to retrieve two assault rifles and a shotgun from an unknown location in New Hampshire and bring them to the **Target Premises**, which he did. When ▮▮ arrived at the **Target Premises**, ▮▮ observed the three firearms and handled at least one of them. ▮▮ also observed ▮▮ pay an unknown amount of money to ▮▮ for retrieving the firearms.

10.   During approximately the second week of ▮▮ 2021, ▮▮ contacted ▮▮ and asked her if she still had any of the firearms. ▮▮ inquiry was based on his knowledge that ▮▮ had been arrested in early ▮▮ 2021 and remained in custody. ▮▮ informed ▮▮ at that time that she was still in possession of at least one rifle.

11.   ▮▮ in-house records for individuals associated with the **Target Premises** confirmed ▮▮ was the primary occupant, as described by ▮▮ In fact, on ▮▮ 2021, ▮▮ was arrested inside the **Target Premises,** which she described as her home. Furthermore, on ▮▮ 2021, law enforcement observed ▮▮ exit ▮▮ Street, which further substantiated her continued occupancy of the **Target Premises**. ▮▮ had previously been convicted of a felony Controlled Drug Violation [RSA 318-B:2] in ▮▮▮▮▮ ▮▮▮▮▮▮▮ and is therefore prohibited from possessing firearms.

**JOINT APPENDIX 130**

Case: 24-1386   Document: 00118186996   Page: 133   Date Filed: 09/06/2024   Entry ID: 6665919

Case: 24-1386     Document: 00118186996     Page: 134     Date Filed: 09/06/2024     Entry ID: 6665919

Case: 24-1386   Document: 00118186996   Page: 135   Date Filed: 09/06/2024   Entry ID: 6665919

Case: 24-1386   Document: 00118186996   Page: 136   Date Filed: 09/06/2024   Entry ID: 6665919

Case: 24-1386     Document: 00118186996     Page: 137     Date Filed: 09/06/2024     Entry ID: 6665919

Case: 24-1386     Document: 00118186996     Page: 138     Date Filed: 09/06/2024     Entry ID: 6665919

Case: 24-1386     Document: 00118186996     Page: 139     Date Filed: 09/06/2024     Entry ID: 6665919

Case: 24-1386    Document: 00118186996    Page: 140    Date Filed: 09/06/2024    Entry ID: 6665919

Case: 24-1386     Document: 00118186996     Page: 141     Date Filed: 09/06/2024     Entry ID: 6665919

Case: 24-1386     Document: 00118186996     Page: 142     Date Filed: 09/06/2024     Entry ID: 6665919

Case: 24-1386    Document: 00118186996    Page: 143    Date Filed: 09/06/2024    Entry ID: 6665919

Case: 24-1386   Document: 00118186996   Page: 144   Date Filed: 09/06/2024   Entry ID: 6665919

Case: 24-1386    Document: 00118186996    Page: 145    Date Filed: 09/06/2024    Entry ID: 6665919

/s/ Ryan S. Burke
Ryan S. Burke, Special Agent
Federal Bureau of Investigation

The affiant appeared before me by telephonic conference on this date pursuant to Fed. R. Crim.
P. 4.1 and affirmed under oath the content of this affidavit and application.

Date: **8/25/21**
Time: **11:28 am**

HONORABLE DANIEL J. LYNCH
UNITED STATES MAGISTRATE JUDGE

**JOINT APPENDIX 142**

Case: 24-1386     Document: 00118186996     Page: 146     Date Filed: 09/06/2024     Entry ID: 6665919

Case: 24-1386     Document: 00118186996     Page: 147     Date Filed: 09/06/2024     Entry ID: 6665919

Case: 24-1386   Document: 00118186996   Page: 148   Date Filed: 09/06/2024   Entry ID: 6665919

Case: 24-1386    Document: 00118186996    Page: 149    Date Filed: 09/06/2024    Entry ID: 6665919

Case: 24-1386    Document: 00118186996    Page: 150    Date Filed: 09/06/2024    Entry ID: 6665919

UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 1:21-cr-00153-SM |
| | ) | |
| MICHAEL FRANCIS | ) | |

## GOVERNMENT'S NOTICE OF SUPPLEMENTAL CASE LAW

The government submits this notice to inform the Court and the defendant that, at the

upcoming hearing on the defendant's motions to suppress in the above-captioned matter, the

government intends to reference in its oral argument the following cases, which are not otherwise

cited in the parties' briefs:

- *United States* v. *Cardona*, 903 F.2d 60 (1st Cir. 1990)
- *United States* v. *Comer*, 565 F. App'x 729, 733–34 (10th Cir. 2014)
- *United States* v. *Naranjo*, 309 F. App'x 859, 864–65 (5th Cir. 2009)

Each of the above cases is hyper-linked to where they can be found on Westlaw, for ease of

review.

Respectfully submitted,

JANE E. YOUNG
United States Attorney

/s/ Aaron G. Gingrande
Dated:  June 14, 2023

By:    Aaron G. Gingrande
Assistant U.S. Attorney
53 Pleasant Street, 4th Floor
Concord, New Hampshire 03301
(603) 225-1552

**JOINT APPENDIX 148**

*NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO JANUARY 31, 2024

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE


\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*
                                          \*
UNITED STATES OF AMERICA                  \*
                                          \*   1:21-cr-153-SM
              v.                          \*   June 14, 2023
                                          \*   1:36 p.m.
MICHAEL FRANCIS                           \*
                                          \*
\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*


TRANSCRIPT OF HEARING ON MOTION TO SUPPRESS
BEFORE THE HONORABLE STEVEN J. MCAULIFFE


Appearances:


For the Government:          Charles L. Rombeau, AUSA
                             Aaron G. Gingrande, AUSA
                             United States Attorney's Office



For the Defendant:           Richard Guerriero, Esq.
                             Lothstein Guerriero



Court Reporter:              Liza W. Dubois, RMR, CRR
                             Official Court Reporter
                             United States District Court
                             55 Pleasant Street
                             Concord, New Hampshire 03301
                             (603)225-1442


**JOINT APPENDIX 149**

2

I N D E X

| WITNESS: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| Ryan Burke | | | | |
| By Mr. Rombeau | 6 | | 56 | |
| By Mr. Guerriero | | 31 | | |
| | | | | |
| Brian Benard | | | | |
| By Mr. Gingrande | 60 | | 99 | |
| By Mr. Guerriero | | 85 | | |
| | | | | |
| Joseph Lorenzo | | | | |
| By Mr. Gingrande | 111 | | | |
| By Mr. Guerriero | | 131 | | |

| EXHIBITS: | FOR ID | IN EVD. |
|---|---|---|
| (None marked.) | | |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**JOINT APPENDIX 150**

3

```
 1                    P R O C E E D I N G S
 2            THE CLERK:  The court is in session and has for
 3   consideration an evidentiary hearing in the matter of the
 4   United States vs. Michael Francis, criminal case
 5   21-cr-153-01-SM.
 6            THE COURT:  All right.  Mr. Gingrande.
 7            MR. GINGRANDE:  Yes, your Honor.
 8            THE COURT:  Fire away.
 9            MR. GINGRANDE:  Oh, all right.  Well, I will defer
10   then to --
11            THE COURT:  All right.  Mr. Guerriero?
12            MR. GUERRIERO:  Could I bring up one preliminary
13   matter, your Honor?
14            THE COURT:  Of course.
15            MR. GUERRIERO:  Seated to my right is Oliver Bloom.
16   He's not quite yet a lawyer.  He's interned for us the last
17   couple of summers.  He's studying for the New Hampshire Bar
18   right now.  And the government doesn't have any objection to
19   him joining me at counsel table, if that's okay with the Court.
20            THE COURT:  That's fine.  Welcome.
21            MR. BLOOM:  I appreciate it.
22            MR. GUERRIERO:  Thank you.
23            MR. ROMBEAU:  Your Honor, I'm going to present the
24   testimony from Agent Burke, but there's one preliminary matter
25   I wanted to address with the Court.
```

**JOINT APPENDIX 151**

1          We submitted the unredacted copy of the affidavit

2   for the search warrant here that's been marked as Government's

3   Exhibit 1.  If there's no objection from the defense, we would

4   like to keep that under seal in this case.  So I know we

5   normally do this in advance, but I'd like to make an oral

6   motion to keep that under seal for this proceeding and if

7   there's any appeal that follows for that unredacted copy.

8          THE COURT:  You lost me.  It is under seal.

9          MR. ROMBEAU:  Yes.  Well, I don't think we had

10  actually ever made a motion to seal it, your Honor --

11         THE COURT:  Oh, okay.

12         MR. ROMBEAU:  -- so I just wanted to do that.  I

13  know we submitted it saying we wanted it to be under seal, but

14  since we hadn't submitted a motion, I wanted to do that here in

15  open court.

16         THE COURT:  Okay.  Any objection?

17         MR. GUERRIERO:  No objection, your Honor.  And my

18  intention is to refer to the person referenced in that

19  under-seal affidavit as the CI, for lack of a better phrase.  I

20  won't use his name during the proceedings and I redacted the

21  affidavit that I filed with my motion.

22         THE COURT:  All right.  Appreciate it.

23         MR. GUERRIERO:  Okay.  If the government has any

24  other witnesses or if there are any witnesses in the courtroom,

25  I would request the witness be sequestered except for the first

```
 1   witness.
 2              THE COURT:  The government only has one witness,
 3   right?
 4              MR. ROMBEAU:  We expect that this case will probably
 5   just turn on the testimony of Agent Burke, your Honor, but
 6   there are a couple other witnesses that the government has made
 7   available that Attorney Guerriero had subpoenaed.  But we're
 8   only expecting to call Agent Burke, really, at this point.  And
 9   then there's a possibility, depending on how that goes, we may
10   get into issues with a Probation Officer Benard who is here.
11   But I expect this is largely going to be about the testimony of
12   Agent Burke.
13              THE COURT:  All right.  Any witnesses -- I don't
14   know who they are.  Any anticipated witnesses?
15              MR. ROMBEAU:  Our -- the law enforcement witnesses
16   subpoenaed by Attorney Guerriero have been sequestered.
17              THE COURT:  Okay.
18              MR. ROMBEAU:  Okay.  With that, the government will
19   call Special Agent Ryan Burke, your Honor.
20              THE CLERK:  Please remaining standing and raise your
21   right hand.
22              RYAN BURKE, having been first duly sworn, testified
23   as follows:
24              THE CLERK:  Thank you.  Please state your full name
25   for the record.
```

**JOINT APPENDIX 153**

```
 1              THE WITNESS:  Ryan Burke, R-y-a-n, B-u-r-k-e.

 2              THE CLERK:  Please be seated.

 3              THE WITNESS:  Thank you.

 4         Good afternoon, your Honor.

 5              THE COURT:  Good afternoon.

 6                      DIRECT EXAMINATION

 7    BY MR. ROMBEAU:

 8         Q.   Good afternoon, Special Agent Burke.

 9              Could you start by telling the Court where you're

10    currently employed?

11         A.   Sorry.  I am currently employed with the FBI here in

12    New Hampshire on the Major Offender Task Force.

13         Q.   Okay.  And how long have you worked for the FBI in

14    total?

15         A.   Ten and a half years.

16         Q.   Did you work in law enforcement prior to joining the

17    FBI?

18         A.   I did.  I was a police officer for the Transit

19    Police in Boston for two years.

20         Q.   And in your -- were there any other jobs in law

21    enforcement other than that?

22         A.   No.

23         Q.   Okay.  In your time here -- well, I'm sorry.

24              In your time overall at the FBI, have you had a

25    particular subject matter of focus of the kinds of cases you
```

```
 1   work?
 2        A.    Yes.  I've been assigned in three geographic regions
 3   and primarily worked on gang and drug task forces, along with
 4   violent crime task forces.
 5        Q.    And has that been consistent with the type of work
 6   you've done in the three or so years you've been assigned here
 7   to New Hampshire?
 8        A.    Yes.
 9        Q.    Okay.  And over the course of your career, have you
10   drafted a number of search warrant or arrest complaint warrant
11   affidavits?
12        A.    I have, dozens, probably over a hundred.
13        Q.    And in your current role here in New Hampshire, are
14   you frequently collaborating with local law enforcement or are
15   you tending to work on your own with federal agencies?
16        A.    Generally, everything I do is with local and state
17   law enforcement officers.
18        Q.    Okay.  And I think you alluded to a task force.
19   What -- who makes up the task force that you're a part of right
20   now?
21        A.    It's myself, another agent -- the particular
22   agencies?
23        Q.    Yes.
24        A.    New Hampshire State Police, Manchester Police,
25   Goffstown Police, Rockingham County Sheriff's Office, Rochester
```

1    Police, Hudson Police.  I may have forgotten one or two, but

2    there's a total of eight agencies that work on the task force.

3        Q.    And how many agents from the FBI are assigned to it?

4        A.    Myself and one other.

5        Q.    I want to shift your focus, Special Agent Burke, to

6    the investigation that brings you to court today.

7              And back in the summer of 2021, you -- were you

8    already up here in New Hampshire then?

9        A.    I was, yes.

10       Q.    Okay.  And can you tell the Court how you first

11   became familiar with the name Michael Francis?

12       A.    So at the time I was not on the task force that I'm

13   on now, but instead I was working essentially full time with

14   the Manchester Police Department anticrime unit.  And during

15   that time I was, you know, in the city of Manchester on a daily

16   basis and I was familiar with Michael Francis through my

17   Manchester Police colleagues and prison officials and knew him

18   to be a member of the Gangster Disciples in a leadership role

19   as well.

20       Q.    Okay.  And what -- what exactly are the Gangster

21   Disciples?

22       A.    They're a criminal street gang, and Mr. Francis was

23   purported to be the leader of them in New Hampshire.

24       Q.    And so you alluded to being made aware of him.  Were

25   there particular criminal activity that you were focused on

**JOINT APPENDIX 156**

```
 1   connecting -- connected to Mr. Francis?
 2        A.    So at the time there was -- there had been a string
 3   of shootings in the city.
 4             MR. GUERRIERO:  Excuse me, sir.  Excuse me, sir.
 5             Your Honor, I have an objection.  The focus of a
 6   Franks hearing, once we get beyond general background, is
 7   really limited to the evidence relating to whether or not there
 8   was an omission of an important fact from the affidavit.  I
 9   don't think it's appropriate for the government to try to
10   reform an affidavit that the Court is supposed to judge on its
11   four corners by putting in other evidence relating to the
12   alleged criminal activity of the defendant.
13             The Court is going to be looking at what is in this
14   affidavit; what was --
15             THE COURT:  Correct me --
16             MR. GUERRIERO:  -- left out that should have been --
17             THE COURT:  -- if I'm wrong, but the omission is the
18   prior conviction of the confidential informant; isn't it?
19             MR. GUERRIERO:  That's right.
20             THE COURT:  There's no other claim.
21             MR. GUERRIERO:  That's right.
22             THE COURT:  All right.  There's no harm.
23             MR. GUERRIERO:  And in some -- I don't think it's
24   been raised in this circuit.  In other circuits, there have --
25   there's case law on the issue of the corrected affidavit
```

**JOINT APPENDIX 157**

1   doctrine where essentially the government would say, well, if

2   the defendant wants to add in information to the affidavit, we

3   want to try to reform the affidavit to show there was more

4   facts to support probable cause.  And that's been rejected, for

5   example, in the Second Circuit and other circuits and I would

6   suggest it's not proper for the Court to try to introduce that

7   kind of evidence.

8              So, for example, other --

9              THE COURT:  Is that what you're trying to do?

10             MR. ROMBEAU:  No, your Honor.

11             THE COURT:  Okay.  I didn't think so.  I don't think

12  he's trying to add information to the affidavit.  The affidavit

13  is what it is.

14             MR. GUERRIERO:  Right.

15             THE COURT:  I agree.

16             MR. GUERRIERO:  I just -- and I'm fine with the

17  background because the Gangster Disciples are mentioned in the

18  affidavit.  But once we go beyond who -- the question he was

19  asked was what other criminal activities.  And I think at that

20  point I have to say, no, let's stick to the affidavit.

21             THE COURT:  Well, I suppose it goes to his

22  expertise, experience, and analytical talent, I suppose.

23             All right.  To the extent you've objected, it's

24  overruled.

25             Go ahead, Mr. Rombeau.

**JOINT APPENDIX 158**

1    Q.    So -- so we talked a little bit about the -- your

2    prior knowledge of Mr. Francis.  And then did an arrest occur

3    in August of 2021 of an individual I'll refer to as the

4    cooperating witness or cooperating informant that advanced your

5    interest in Mr. Francis?

6    A.    Yes, there was an arrest of an individual that did.

7    Q.    Okay.  And how would you like to refer to this

8    individual in the hearing today, Special Agent Burke, as the

9    cooperating witness, cooperating informant?  What terminology

10   would you prefer I use?

11   A.    Well, to be frank, he's referred to by true name in

12   my report in the affidavit.  He's on video.  But, I mean, I

13   understand the concerns amongst the counselors here.  So he's

14   certainly not an informant by any stretch according to the FBI,

15   but I can refer to him however we agree.

16   Q.    All right.  Well, we'll get back to that.  So we'll

17   start with I'll just say the cooperating witness.

18        And so I want to talk a little bit about the

19   background of the trouble the cooperating witness had gotten

20   himself into.  Can you tell the Court about that, what -- what

21   happened, how did he -- he come to be interviewed by you and

22   other members of law enforcement?

23   A.    So in June, the individual had been stopped by

24   Manchester Police Department.  The vehicle was seized from him,

25   subsequently searched.  There was a significant amount of

**JOINT APPENDIX 159**

1    controlled substances located in the vehicle.  Charges were

2    filed, arrest warrant was issued.

3            Then later in July or late July, the individual was

4    stopped again by Manchester Police Department, arrested on the

5    previously issued arrest warrants.  Car was seized,

6    subsequently searched.  A pound of methamphetamine was found in

7    the vehicle.  He had -- he had been quickly released, bailed on

8    the initial charges, and then another arrest warrant was issued

9    for him which led to my participation in his arrest in August

10   just prior to our interview with him.

11       Q.    Okay.  And so was that on or about August 19th that

12   the cooperating witness is arrested on these outstanding

13   warrants from the two traffic stops?

14       A.    Yes.

15       Q.    Okay.  And what happened after he's arrested?

16       A.    He was transported from Loudon.  He was arrested at

17   a hotel in Loudon.  He was transported back to Manchester

18   Police Department because of -- that's where the arrest

19   warrants had been issued.

20           And there, myself and a detective from the

21   Manchester Police Department read him his rights, elicited

22   incriminating statements from him regarding his possession of

23   the drugs from those two car stops, and then segued into any

24   information he might have or would be willing to provide us

25   about where those drugs came from.

**JOINT APPENDIX 160**

1      Q.    Okay.  So let's -- let's break that out a little

2  bit.

3            So you said the witness waived his rights.  Was he

4  represented by counsel during that interview?

5      A.    No.

6      Q.    Okay.  And was that interview -- was that interview

7  given subject to any sort of proffer agreement with the

8  government, as far as you know?

9      A.    No, it was not.

10     Q.    Okay.  And was it recorded?

11     A.    It was audio- and video-recorded, correct.

12     Q.    Okay.  And did -- over the course of that -- about

13 how long did the interview last, if you recall?

14     A.    I believe it was an hour and 54 minutes.

15     Q.    Okay.  And during -- during that hour-plus

16 interview, did the CW talk about his own criminal conduct that

17 led to his arrest that day?

18     A.    He did.

19     Q.    Okay.  And did he talk about individuals other than

20 Michael Francis?

21     A.    He did, yes.

22     Q.    Okay.  And did -- in talking about his own criminal

23 conduct, did the CW admit to possessing the drugs from the two

24 traffic stops that served as the basis for the charges?

25     A.    Yes, he did.

**JOINT APPENDIX 161**

1    Q.   And is that -- is that meaningful to you as an

2    investigator?

3    A.   It was meaningful.  He admitted to us that not only

4    was, you know, he the possessor of those drugs but that he

5    intended to distribute them throughout the state of New

6    Hampshire and that that was what he did on a daily basis to

7    generate income.

8         He had been informed, you know, prior to those

9    admissions that, you know, just based on the quantity of

10   controlled substances he was caught with and his criminal

11   history that he would be charged federally no matter what.  And

12   so he -- you know, he made those admissions to us.

13   Q.   And shifting to the information that he provided

14   about Mr. Francis, did you, following that interview with the

15   CW, begin an investigation into Mr. Francis?

16   A.   Yes.

17   Q.   Okay.  And in connection with that investigation, a

18   few days later did you draft and obtain the search warrant

19   that's at issue in the hearing today?

20   A.   I did.

21   Q.   Okay.  And did you have a chance to review that

22   affidavit prior to the hearing today?

23   A.   Yes, I have.

24        MR. ROMBEAU:  Okay.  Your Honor, may I approach the

25   witness?

**JOINT APPENDIX 162**

15

```
 1                THE COURT:  Of course.  Anytime.
 2        Q.    Special Agent, just so the record's clear on this, I
 3   have provided you what's been marked as Exhibit 1, Government's
 4   Exhibit 1 under seal in this matter.  Is that the unredacted
 5   affidavit that you submitted in connection with this search
 6   warrant?
 7        A.    It is.
 8        Q.    Okay.  And was the information provided to you by
 9   the CW on August 19th the primary source of the information you
10   relied upon in seeking that warrant?
11        A.    Yes.
12        Q.    Okay.  Did you include every fact from your
13   interview with the CW that you alluded to a few minutes ago in
14   your affidavit?
15        A.    No.
16        Q.    Did you include every fact that you knew about the
17   investigation in your affidavit?
18        A.    No.
19        Q.    Okay.  Why not?
20        A.    Well, I only included facts I thought were relevant
21   in the application to search Mr. Francis's vehicle.  And I
22   also -- you know, we also knew that Mr. Francis was on parole,
23   so we likely didn't need a warrant, but we, out of an abundance
24   of caution, decided we might as well submit for one and if not,
25   you know, we could always rely on the parole conditions.  But I
```

**JOINT APPENDIX 163**

1    produced this affidavit and kept the facts limited to what was

2    specifically related to the vehicle.

3         Q.   Okay.  I want to spend a little time on the facts

4    that are in the affidavit and what the cooperating witness told

5    you on August 19th.  And I -- I think that really starts in

6    paragraph 10 on page 3.

7              Have you found that, Special Agent?

8         A.   Yes.  I'm sorry.

9         Q.   So when the -- the CW is arrested in August and is

10   talking about his two incidents, the June incident and the July

11   incident, did he identify the source of the drugs from his June

12   incident?

13        A.   He did.

14        Q.   Okay.  And was that individual Mr. Francis?

15        A.   His direct supplier --

16        Q.   Poor question.  Let me rephrase.

17             Did he say that the June -- the drugs he had at the

18   June stop had been provided to him directly by Mr. Francis?

19        A.   No.

20        Q.   Who, in fact, had they been provided by?

21        A.   An individual named Ryan Call, who's a fellow

22   Gangster Disciples member.

23        Q.   Okay.  And -- but did the informant have any

24   information that he received from Mr. Call about the origin of

25   those drugs from the June stop?

**JOINT APPENDIX 164**

1    A.    Mr. Call told the individual that they -- they came

2    from Mr. Francis.

3    Q.    Okay.  And did the -- and then sort of

4    fast-forwarding to the July stop, did there come a change in

5    the supply to the confidential -- to the cooperating witness?

6    A.    Yes.

7    Q.    Okay.  What did he say happened?

8    A.    So he mentions that Mr. Call had been arrested in

9    Manchester and following that arrest, he was contacted by

10   Mr. Francis who informed him that he would now be directly

11   providing the controlled substances to the interviewee.

12   Q.    Okay.  And in -- and did that, in fact, continue as

13   sort of recapped by that initial phone call?  Is that what the

14   confidential -- the cooperating witness ultimately said

15   happened from that point forward?

16   A.    He did.  And it -- and it made sense to us because

17   Mr. Call and Mr. Francis were known by law enforcement to be

18   close associates, both members of the Gangster Disciples.  And,

19   in fact, the interviewee didn't know Mr. Francis personally; he

20   met him through Mr. Call.  And so it would -- it made sense to

21   us that when Mr. Call was arrested that someone else in the

22   gang would probably reach out to continue that supply.

23   Q.    Okay.  And how much controlled substances did the

24   cooperating witness say he was obtaining from Mr. Francis once

25   Mr. Francis became his supplier?

**JOINT APPENDIX 165**

1    A.    He approximated that he would be directed to meet

2    with Mr. Francis in Manchester on a -- nearly a daily basis and

3    each time would receive approximately, and it wasn't the same

4    each day, but a pound of methamphetamine, a half pound to a

5    half kilo -- kilogram of fentanyl, and a few ounces of coke or

6    crack.

7    Q.    All right.  And was the cooperating witness able to

8    identify the prices that he paid Francis for those -- those

9    drugs?

10    A.    He did.  And they were approximated at about 66- to

11    $6,800 per pound of methamphetamine, $1,400 per ounce of

12    cocaine, and then $5,000 per half kilo of fentanyl.

13    Q.    And based on your knowledge of drug trafficking in

14    and around the Manchester area, were those prices consistent

15    with what you had been seeing in drug trafficking at the time?

16    A.    They were, yes.

17    Q.    Okay.  And so the -- the cooperating witnesses I

18    think you said alluded to making that purchase on a daily

19    basis.  Did -- did he tie it to the July 30th stop that you

20    spoke about a few minutes ago?

21    A.    Yes.

22    Q.    Okay.  And what did he say about the drugs that he

23    had at that July 30th stop?

24    A.    They were provided to him directly by Mr. Francis.

25    Q.    Okay.  And did he say when the last time he had been

**JOINT APPENDIX 166**

19

```
 1   supplied by Mr. Francis was?

 2        A.    Two days prior to our interview on August 19th.

 3        Q.    Okay.

 4             MR. GUERRIERO:  Excuse me.  Your Honor, I just want

 5   to make my objection to any facts relating to probable cause

 6   that are beyond the scope of the affidavit.  Could I just make

 7   that a continuing objection?  I understand you've overruled it,

 8   but to the extent that he's -- for example, he's talking about

 9   specific dates that things happened.  Some of those dates are

10   not in the affidavit.  And so I'd -- I really want to make sure

11   I'm objecting to any expansion of the factual basis for

12   probable cause in the affidavit.  I have to make a record on

13   that.

14             THE COURT:  Of course.  I don't see a problem with

15   that.  But we're not here to decide that, are we?  We're here

16   to decide just the *Franks* issue with respect to this.

17             MR. GUERRIERO:  Exactly.

18             THE COURT:  Yeah.

19             MR. GUERRIERO:  Thank you.

20             THE COURT:  I got it.

21             MR. ROMBEAU:  And I --

22             THE COURT:  You're not challenging probable cause

23   except with respect to the omission?

24             MR. GUERRIERO:  That's exactly -- well, we're saying

25   the affidavit is insufficient on its own and that even if
```

**JOINT APPENDIX 167**

1    that's a close case, then we're saying, well, with *Franks*, it

2    definitely pushes it over the edge.

3              THE COURT:  Let's clear it up then.

4              It's not insufficient on its own.  It's perfectly

5    fine.  It's solid.

6              Now, the next issue is you claim there was a

7    material omission deliberately or recklessly made --

8              MR. GUERRIERO:  Yes.

9              THE COURT:  -- that would detract from the -- would

10   negate the probable cause if included.

11             MR. GUERRIERO:  Yes.

12             THE COURT:  That's what we're here for.

13             MR. GUERRIERO:  Yes.

14             THE COURT:  All right.  I get it.  What are you

15   troubled by?  You seem very upset about --

16             MR. GUERRIERO:  To the extent --

17             THE COURT:  Usually defense counsel will take all

18   the information they can get as a discovery tool.  I'm happy to

19   hear you want to limit it, but what's the problem really?

20             MR. GUERRIERO:  Well, we -- I understand your Honor

21   just ruled contrary to this, but our position in our motion is

22   that the affidavit on its face does not state probable cause --

23             THE COURT:  Yeah, that's not even credible.  That's

24   not even close.  The affidavit is perfectly fine to establish

25   probable cause.

**JOINT APPENDIX 168**

1          Now we're at the real issue.

2          MR. GUERRIERO:  Now you're saying yes, but had it

3    included critical material information, that would have negated

4    probable cause and that information was deliberately or

5    recklessly excluded.  That's what we're here for.

6          MR. GUERRIERO:  I agree.

7          THE COURT:  Okay.

8          MR. GUERRIERO:  And so --

9          THE COURT:  Well --

10          MR. GUERRIERO:  -- any facts --

11          THE COURT:  Mr. Rombeau, you know, I'm on board with

12    let's keep this focused and short and save time.

13          MR. ROMBEAU:  I apologize.

14          THE COURT:  I don't need to hear all the background.

15    I'm not going to try the case.  The jury is.

16          MR. ROMBEAU:  I appreciate that, your Honor.  I

17    think we had come in expecting the need to establish the

18    probable cause for the warrant, so I'll -- your Honor having

19    ruled on --

20          THE COURT:  No, the affidavit is absolutely solid.

21     Q.    Okay.  So we'll just cover this next portion in more

22    of a summary fashion then, Special Agent Burke.

23          In receiving the daily deliveries or the daily

24    distribution from Mr. Francis, did the cooperating witness

25    identify the means in which it was provided to him for which he

**JOINT APPENDIX 169**

22

1   would obtain the narcotics?

2   A.   Yes.   The individual didn't live in Manchester, but

3   he would be directed to Manchester.   And during his near daily

4   meetings with Mr. Francis, Mr. Francis would arrive in the

5   vehicle which we requested to search and then sometimes

6   actually do the transactions inside that vehicle with the

7   interviewee.

8   Q.   Okay.   And was the witness able to identify the

9   vehicle with any sort of specificity?

10   A.   He did.   He described it to a T, a white Honda

11   Accord, newer, grayish rims, 20s, which are the type of rim,

12   with the permanent plate from New Hampshire which is, you know,

13   a vehicle that we identified that was registered to Mr. Francis

14   and one which he had reported to parole as well.

15   Q.   Okay.   And did the cooperating witness mention ever

16   being inside that vehicle?

17   A.   He did.

18   Q.   And did he make any observations of note to you from

19   inside the vehicle?

20   A.   He described it on -- and, of course, there are many

21   of these, but sometimes the drugs would be somewhere within the

22   passenger compartment of the vehicle, sometimes they were

23   stored in the trunk.   And then additionally Mr. -- he described

24   that Mr. Francis would regularly keep a pistol tucked between

25   the driver's seat and the center console.

**JOINT APPENDIX 170**

23

1      Q.    Okay.  And so after this interview ends on

2   August 19th, did you undertake efforts to corroborate any of

3   the information provided to you?

4      A.    We did.  So we contacted -- well, we first looked

5   at Department of Motor Vehicle records and confirmed that the

6   vehicle described to us by the interviewee was actually a

7   vehicle registered to Mr. Francis.

8           He had also just told us that Mr. Francis was on

9   parole, which we had known originally, but we contacted parole,

10  they were familiar with this particular vehicle, and so that

11  checked out.

12          He had described an area on the west side of

13  Manchester where he suspected Mr. Francis lived, although he

14  had never been there, just suspicion based on the general

15  meeting location that they would -- a location they would

16  typically meet.  You know, we were able to identify a residence

17  that was consistent with that area and then ultimately observed

18  Mr. Francis with the vehicle in question at -- in that area at

19  that residence.

20     Q.    All right.  And I think the one thing you didn't

21  mention that -- were you able to confirm this timeline

22  regarding the arrest of the original supplier, Ryan Call, and

23  whether or not he was, in fact, incarcerated?

24     A.    He was.  He -- the interview -- during the interview

25  described that he had been arrested in early July and, in fact,

**JOINT APPENDIX 171**

24

1    Mr. Call was arrested I believe it was July 6th or 7th in

2    Manchester after a large standoff and was incarcerated

3    following that incident.

4        Q.    Okay.  And you mentioned, I think, doing a little

5    bit of surveillance on the area and seeing Mr. Francis; is that

6    right?

7        A.    Yes.

8        Q.    How -- did you personally do that surveillance?

9        A.    I did.

10       Q.    Okay.  And how did you identify Mr. Francis in

11   connection with the vehicle?

12       A.    I observed an individual that matched his

13   description.  He was shirtless, many tattoos exposed, and

14   consistent with skin color, height, weight, stuff like that,

15   next to the vehicle registered to Mr. Francis.

16       Q.    And what sort of background did you do to review to

17   be able to identify Mr. Francis prior to going out to do your

18   surveillance?

19       A.    Previous booking photographs from Manchester Police.

20       Q.    Okay.  And shifting back to the cooperating witness,

21   I think you alluded to earlier that you were going to refer his

22   case to federal prosecutors to adopt.  Did that, in fact,

23   happen?

24       A.    It did.

25       Q.    Okay.  And did you obtain a complaint on that

**JOINT APPENDIX 172**

1  cooperating witness within a couple days of the -- that

2  interview?

3       A.   About 18 hours later.

4       Q.   Uh-huh.  And as part of that process in getting a

5  complaint or referring it to the U.S. Attorney's Office, did

6  you run the cooperating witness's criminal history?

7       A.   I did.

8       Q.   Okay.  And just so the timeline is clear, was that

9  prior to getting the warrant at issue here on August 25th?

10      A.   Yes, it was.

11      Q.   Okay.  Do you recall reviewing that criminal history

12  after obtaining it?

13      A.   I did, yes.

14      Q.   Did -- did anything stand out to you from that

15  review that you made note of?

16      A.   Numerous felony convictions, drugs.  There was a

17  falsifying physical evidence.  There might have been some other

18  offenses, but a significant criminal history which was part of

19  the decision to bring forth this case in federal court.

20      Q.   And you would agree with me, Special Agent, that the

21  affidavit in connection with the car warrant here does not make

22  any mention of the cooperating witness's criminal history; is

23  that right?

24      A.   That's right.

25      Q.   Okay.  Why did you not include anything about the

1    informant's criminal history at -- in that affidavit?

2         A.    He's -- he wasn't an informant.  He hasn't been an

3    informant for the FBI.  It's been my understanding and my

4    practice that when we're referring to some individual providing

5    information in an affidavit and that person's described

6    anonymously that as a means to permit the magistrate who's

7    evaluating probable cause and, you know, the credibility of

8    that individual's statement, in lieu of their name and full

9    identification, we'll provide a summary of their background,

10   criminal history, any other information they provided that

11   we've been able to evaluate ourselves.

12        And in this case, because he -- he was simply an

13   individual that was arrested and we conducted a Mirandized

14   postarrest interview, he wasn't someone that we -- I viewed it

15   as an informant.  I've referred to him as true name in my

16   report and the affidavit and because of that, I -- I just

17   didn't feel at the time that it was required I include a

18   criminal history.

19        Q.    All right.  And based on your experience as an

20   FBI agent, did you have an understanding as to whether the

21   cooperating witness faced substantial exposure for -- were this

22   case to be adopted -- were his case to be adopted federally?

23        A.    Absolutely, which he was told.

24        Q.    And did -- did that fact have bearing on your --

25   your determination of his credibility?

**JOINT APPENDIX 174**

1    A.    It did.  It was explained to him at the onset that,

2    you know, you've been arrested in vehicles with multiple --

3    with large quantities of controlled substances; you will be

4    charged federally.

5         In fact, at the conclusion of the interview, we told

6    him he was going to federal custody.  There was a bit of a

7    snafu, so he didn't go until a few days later, but it was very

8    clear, you are going to end up in federal court; because of the

9    drugs you've been found with, you're facing significant time.

10         And -- and, yeah, so he was -- he was aware of that.

11    And because of that he knew that, you know, it was sort of his

12    moment to make a decision whether or not he wanted to provide

13    information in hopes of some leniency and -- which was

14    difficult for him because he was also in great fear for his

15    safety because of statements that -- as far as the individual

16    told us -- Mr. Francis had made to him about threatening him if

17    he cooperated with law enforcement.

18         So it wasn't -- it wasn't information that he

19    provided to us lightly.  It was under great consideration.  But

20    I found it to be completely credible.

21    Q.    Okay.  Shifting briefly to the postissuance of the

22    warrant and the actual arrest, because there's a second motion

23    to suppress here related to the day of the arrest, after you

24    got the warrant on August 25th, did you and your team

25    immediately execute the warrant?

**JOINT APPENDIX 175**

28

1      A.    No, not until September 1st.

2      Q.    Okay.  And, generally speaking, can you tell us what

3 happened on September 1st?

4      A.    Sure.  So myself and a significant number of

5 Manchester Police Department detectives and officers initiated

6 surveillance at the residence at 231 Thornton Street, where we

7 had observed Mr. Francis.  We also had the FBI surveillance

8 plane with us conducting recorded surveillance as well.  We

9 observed -- and long story short, I suppose, we eventually

10 observed an individual -- another parolee arrive at the

11 residence and then depart who was identified.

12      Mr. Francis ultimately departed the residence in the

13 vehicle for which we had obtained a search warrant.  He drove

14 around town for some time, picked up Mr. Flores.  Mr. Flores --

15 this is the other parolee -- was observed putting a bag in the

16 back seat of Mr. Francis's car.  They eventually made their way

17 to a bank in Manchester, at which point the execution of the

18 search warrant was initiated.

19      Q.    Okay.  Where was Mr. Francis at the point you

20 actually descend on the vehicle to execute the warrant?

21      A.    He -- ultimately he was in the bank, more or less,

22 because when they had parked in the parking lot, there were

23 some tactical discussions going on about whether that was safe

24 to execute there.

25      Q.    Okay.  And did you -- where were you personally

1　during all of this?

2　　　A.　I would say a car or two behind the SWAT team that

3　initiated the issuance of the search warrant.

4　　　Q.　Okay.　And had you or other members of the team been

5　in touch with Mr. Francis's probation officer or parole officer

6　with the state that day?

7　　　A.　Yes, another Manchester detective had been.

8　　　Q.　Okay.　And who was his state parole officer?

9　　　A.　PPO Duffy.

10　　　Q.　Okay.　And then did you have any understanding at

11　that time as to whether PPO Duffy had authorized the arrest of

12　Mr. Francis in connection with a parole violation?

13　　　A.　It's -- I'm unclear of the terminology that was used

14　in that conversation, but I -- I recall over the radio hearing

15　that contact had been made with PPO Duffy, circumstances

16　explained to him about, you know, the residence that had been

17　not reported to parole, and then Mr. Francis's association that

18　day with another parolee, both of which are violations of his

19　parole conditions.　And it was everyone's understanding that

20　that would result in a violation of his parole.

21　　　Q.　And so when Mr. Francis is approached while he's

22　inside the TD Bank, do you have any understanding, is he placed

23　under arrest or what happens?

24　　　A.　Whether those individuals felt like they were

25　arresting him, detaining him, I mean, unclear to me what their

1    mindset was.  I mean, we were executing the search warrant on

2    his vehicle, so --

3              THE COURT:  You -- you didn't arrest him.

4              THE WITNESS:  I did not.

5              THE COURT:  All right.

6        Q.    And did you have any understanding of what he was

7    doing inside the bank?

8        A.    It turns out he was -- he had an approximately

9    $50,000 check from a casino that he was trying to deposit into

10   his account and then receive immediately a bank check in

11   return.

12       Q.    And the actual search of the vehicle, so it was --

13   is Mr. Flores in the vehicle when law enforcement descends to

14   seize the vehicle for the search?

15       A.    Yes, he was.  And he had an active parole warrant at

16   the time, so he was arrested.

17       Q.    And so he's removed from the vehicle.  And did you

18   or anyone do any sort of immediate triage search on site prior

19   to towing the vehicle?

20       A.    We did.  I -- I pulled into the lot a minute or two

21   later and then maybe a minute or two after that, since we had a

22   warrant for the vehicle, peeked into the bag that Mr. Flores

23   had put in the back seat and it was clearly a kilogram of

24   cocaine in there.

25              MR. ROMBEAU:  Okay.  Nothing further.  Thank you,

```
 1    your Honor.
 2              THE COURT:  All right.  Mr. Guerriero?
 3              MR. GUERRIERO:  Yes, your Honor.
 4              THE COURT:  Just before you start, Mr. Guerriero,
 5    Agent Burke, do I understand correctly you -- if you were
 6    dealing with an anonymous confidential informant, you would --
 7    you would disclose the -- the criminal background?
 8              THE WITNESS:  I would have, yes, your Honor.
 9              THE COURT:  But you didn't in this case because I
10    guess it's your practice if it's a named, known, identified
11    informant or reporter, then you generally don't provide them
12    with the background?
13              THE WITNESS:  Yes.
14              THE COURT:  It seems like the criminal background
15    would be relevant to credibility.
16              THE WITNESS:  It was just -- I guess I -- it was a
17    postarrest interview and not an informant, not someone that was
18    going to work for us anonymously.  And so at the time I just,
19    as I would with any witness or --
20              THE COURT:  Because they're named, identified?
21              THE WITNESS:  Yes.
22              THE COURT:  All right.
23                            CROSS-EXAMINATION
24    BY MR. GUERRIERO:
25         Q.   Maybe let's start there.
```

**JOINT APPENDIX 179**

```
 1              You said that you did not regard this person the

 2   government's calling a cooperating witness to be what you refer

 3   to as an informant; is that right?

 4        A.   He's not an FBI informant.

 5        Q.   Okay.  And so what is the FBI definition of an

 6   informant?

 7        A.   Someone we sign up, provide a code name and a code

 8   number, to make some agreement that the information he or she

 9   provides will be reported anonymously --

10        Q.   Okay.

11        A.   -- I think is the general definition we could use.

12        Q.   Okay.  But the witness in this case provided

13   information that you used in order to obtain a search warrant,

14   right?

15        A.   Yes.

16        Q.   And his name was redacted from the search warrant,

17   right?

18        A.   I didn't -- I used his true name.  I didn't redact

19   anything.

20              THE COURT:  From the affidavit?

21              MR. GUERRIERO:  From the affidavit, sorry.

22        Q.   From the affidavit in support of the search warrant,

23   wasn't his name redacted from that?

24        A.   Not by me.

25        Q.   Was the application for the warrant filed under
```

**JOINT APPENDIX 180**

1   seal?

2       A.   I believe there was a motion to seal, yes.

3       Q.   Okay. And it was filed under seal because it would

4   jeopardize the investigation to have the witness's name out

5   there?

6       THE COURT: Well, but the real question is did the

7   magistrate know. Right?

8       A.   He did.

9       Q.   Did the magistrate know the name of the person?

10      A.   Yes, he did. Yes.

11      Q.   All right. Let me go back a -- well, what do you

12   call a person who's not, quote, unquote, signed up as an

13   informant and is just giving you information about somebody

14   else, a cooperating witness?

15      A.   A witness, I suppose.

16      Q.   A witness?

17      A.   If I go interview any witness, victim, subject,

18   they're all informing me of information, but they're not

19   informants necessarily until I'm making some agreement that --

20      Q.   Okay.

21      A.   -- they'll be referred to anonymously.

22      Q.   You hit the nail on the head. They're all informing

23   you and providing information, but they're not technically an

24   informant, according to an Attorney General or FBI definition?

25      A.   Correct. Everyone's an informant, so to speak.

**JOINT APPENDIX 181**

34

```
 1        Q.    Right.  Okay.
 2              Just a couple of things -- more things about your
 3   background, if we could go back to that.
 4              I mean, I -- I won't belabor the point, but I assume
 5   you've had -- between being a police officer and then being a
 6   special agent with the FBI, you've had a fair amount of
 7   training?
 8        A.    Yes.
 9        Q.    And you've had a fair amount of training working
10   with, let's say, informants and witnesses who provide
11   information for you in investigations?
12        A.    Correct.
13        Q.    Okay.  And are there -- with respect to the
14   informants, are there specific policies and procedures that you
15   have to follow?
16        A.    Yes.
17        Q.    Okay.
18        A.    Many.
19        Q.    And those don't necessarily apply to someone that
20   you would regard as a witness rather than an informant, right?
21        A.    Those policies would not apply to this individual,
22   correct.
23        Q.    Okay.  Do you think some of them apply?
24        A.    No, I don't.
25        Q.    Okay.  So, for example, when you're assessing
```

**JOINT APPENDIX 182**

35

1  someone to be an informant, do you make a determination of

2  whether or not the person is credible and reliable?

3       A.   Of course.

4       Q.   Okay.  And if you were relying on a witness to

5  obtain a search warrant, would you also assess that person's

6  credibility and reliability?

7       A.   Absolutely.

8       Q.   So there are things in common between the two?

9       A.   There's absolutely -- policy, maybe not, but yes,

10  absolutely.

11       Q.   Okay.  Well, I'm just thinking about specific things

12  in the policy.

13            For example, another thing in the policy -- is it

14  called a suitability determination for an informant?

15       A.   If that's the specific policy.  I don't recollect

16  offhand, but --

17       Q.   Okay.

18       A.   -- I'd be happy to review it.

19       Q.   Is one of the factors you consider for an informant

20  the person's motivation in providing information?

21       A.   Yes.

22       Q.   Okay.  And would you agree that that also applies to

23  any other witness, like if the witness had a motive to help the

24  police or a motive to help themselves, or a motive to impede an

25  investigation, you would want to know what their motive was,

1    right?

2         A.   For everyone I talk to, yes.

3         Q.   Okay.  And you would also want to know the person's

4    relationship or lack of relationship with the suspect?

5         A.   Would I?

6         Q.   Yeah, in assessing their credibility.

7         A.   Absolutely.  I get background from everyone, yeah.

8         Q.   So if people were, you know, closely related and

9    friends, that might affect their credibility; if they were

10   enemies, that might affect their credibility?

11        A.   Yes.

12        Q.   And if they were unknown to each other, that could

13   be a factor?

14        A.   Yes.

15        Q.   Do you also look at the kind of information the

16   person is providing to you?

17        A.   I suppose I do.

18        Q.   So, for example, if the person provided information

19   about a suspect that anybody could obtain from being in public

20   or searching the Internet, that might not be as reliable as

21   some private, personal information that's not readily

22   available, right?

23        A.   Agreed.

24        Q.   So if somebody said, you know, Guerriero's office is

25   on Green Street a half a block from here, that doesn't tell you

**JOINT APPENDIX 184**

```
 1   much because anybody can see that, right?

 2       A.    Right.

 3       Q.    Okay.  But if a witness provides you with

 4   information that's not generally available to the public, then

 5   that indicates some special knowledge and maybe that they're

 6   more reliable?

 7       A.    Right.  Yes.

 8       Q.    Do you also look at whether or not they can predict

 9   any future conduct of the suspect?

10       A.    I mean, not specifically.  I guess I don't think of

11   it that way, but --

12       Q.    Okay.  Suppose they say, look, this guy meets me

13   once a week behind the Dunkin' Donuts on such and such street

14   and that's when I pick up my drugs from him and then that

15   prediction comes true when you sent -- when the person is there

16   and you observe it at a distance, that would be an indication

17   of reliability, right?

18       A.    It would, yes.

19       Q.    Okay.  Would you also -- and I'm kind of going

20   through a list of things.

21             Would you also look at evidence of any phone contact

22   between the two?

23       A.    That could help.

24       Q.    Okay.  Including phone calls or text messages?

25       A.    Yes, if available.
```

**JOINT APPENDIX 185**

38

```
1        Q.    I mean, we're all familiar with Cellebrite now.  You
2   do these phone dumps and say, okay, there's 500 text messages
3   between this witness and this suspect or at least between this
4   suspect's phone number, some indication that they know each
5   other and they have dealings with each other?
6        A.    That would be helpful.
7        Q.    Okay.  Would you also look for anything negative
8   about the informant or the witness?
9        A.    Yes.
10       Q.    Prior criminal record?
11       A.    Yes.
12       Q.    Would you want to know if they had ever attempted to
13  deceive law enforcement?
14       A.    Yes.
15       Q.    Okay.  Because you wouldn't want to, or at least you
16  would want to think twice about relying on someone who had
17  attempted to deceive law enforcement before?
18       A.    Sure.
19       Q.    One way to find out whether or not a person has a
20  record of dishonesty would be to look at their criminal record
21  because there's crimes that involve dishonesty, right?
22       A.    There are some, yes.
23       Q.    And there is a specific crime in New Hampshire
24  called falsifying physical evidence?
25       A.    There is a specific crime called that.
```

**JOINT APPENDIX 186**

1          Q.    Okay.  And one version of that crime is to move or

2     conceal or otherwise alter physical evidence with a purpose to

3     make it not available to a law enforcement officer?

4          A.    That's a widely used crime, yes.

5          Q.    Yeah.

6          A.    That is a very widely used statute I'm familiar

7     with.

8          Q.    And if a person was convicted of that crime and if

9     the conviction required that they have a purpose to deceive law

10    enforcement, that would be pretty important in assessing their

11    credibility?

12         A.    It would.  It's also, as you know, brought like a

13    broad statute that covers much more than specifically deceiving

14    law enforcement.

15         Q.    Right.  I'm not asking you a legal question.  I'm

16    just saying -- I'm asking you, in your experience as an

17    experienced FBI agent, if the New Hampshire state law said in

18    order to be convicted of this, you have to acknowledge a

19    purpose to deceive and a person had been convicted of a crime

20    that required a purpose to deceive law enforcement, that's

21    something that would be important to a special agent relying on

22    that guy's information, right?

23         A.    Well, it is, but I also understand the broad use of

24    that statute and that -- I mean, based on my experience, that

25    wasn't enough for me to dismiss the other indications of his

**JOINT APPENDIX 187**

40

```
1    credibility that he provided in the interview.  I was very much

2    aware of that condition.

3        Q.    Would you ignore it completely?

4        A.    I would -- it would definitely override it if there

5    was enough information provided during an interview that

6    corroborated and was plausible, yes.

7        Q.    Okay.  You said that you've applied for many search

8    warrants and arrest warrants.  I'm sure that's true.

9            Now, you have a pretty good understanding of how the

10   search warrant and the arrest warrant application process

11   works, right?

12       A.    I do.

13       Q.    You prepare an application with an attached

14   affidavit and often there's attachments to the affidavit that

15   kind of have this boilerplate.  You've done that hundreds or

16   even thousands of times, right?

17       A.    Probably hundreds, maybe not thousands.

18       Q.    Hundreds.  Well, I'm old.  I think of everything in

19   thousands.

20            And the way the process works is that you complete

21   this application with your affidavit and attachments and it's

22   not up to you to determine whether there's probable cause,

23   right?

24       A.    Correct.

25       Q.    It's up to a judge.
```

**JOINT APPENDIX 188**

```
 1        A.    Right.

 2        Q.    Or magistrate in federal court, magistrate judge.

 3        A.    Yes.

 4        Q.    Okay.  And you understand that the judge doesn't

 5   have any information other than what you put in the affidavit?

 6        A.    Correct.

 7        Q.    And in this case, and in many cases, I believe the

 8   government's question to you was was the primary source of

 9   information for the affidavit in this case the cooperating

10   witness that we're talking about.

11        A.    And it was.

12        Q.    And so this affidavit in this case that we're

13   talking about, the affidavit for the white Honda or search

14   warrant for the white Honda, that pretty much depended on the

15   credibility of the cooperating witness we're discussing?

16        A.    It did.

17        Q.    So I want to go through the chronology a little bit

18   more.

19              In -- what was your -- you were with the task force

20   in June of 2021 in Manchester, the drug traffic force?

21        A.    Well, I worked -- I was alone by myself as an FBI

22   agent working with their anticrime unit.

23        Q.    Okay.  All right.  I guess what I'm getting at is,

24   like, is there -- like in this investigation, is there one

25   person in charge of the investigation or is it kind of
```

**JOINT APPENDIX 189**

42

1   everybody doing their own thing, or --

2       A.   Well, we work as a team, but, you know, obviously

3   I'm the affiant here, so --

4       Q.   Yeah.

5       A.   -- it would sort of be led by me.

6       Q.   Is it correct to say you were the lead investigator

7   in this investigation?

8       A.   That's fair.

9       Q.   Okay.  And so this cooperating witness, I guess the

10  first time he was arrested was on June 13th of 2021.  Does that

11  sound right?

12      A.   It does.

13      Q.   And he had 284 grams of meth, 85 grams of

14  heroin/fentanyl and 7.5 grams of crack and a scale?

15      A.   Correct.

16      Q.   Does that sound right?

17      A.   Uh-huh.

18      Q.   Okay.

19      A.   Yes.

20      Q.   And then somehow he got out on bail for that, or he

21  didn't get charged quick enough, and he got arrested again on

22  July 30th?

23      A.   Correct.

24      Q.   Okay.  And this time he had $2,400 and 464 grams of

25  meth and two scales?

**JOINT APPENDIX 190**

1      A.    He did.

2      Q.    And so when he finally got arrested and brought to

3  the Manchester Police Department on August 19th, as you said,

4  he's looking at a pretty substantial penalty in terms of

5  federal mandatory minimums and wherever he gets prosecuted,

6  he's looking at a very long sentence?

7      A.    He is.

8      Q.    And so he's substantially motivated to do something

9  to try to help himself?

10      A.    He is, but he's also been threatened by Mr. Francis

11  that if he cooperated with law enforcement, he would be killed.

12  So it was -- he -- you know, it's not an easy decision.

13  Although probably wanted a lesser sentence, probably also

14  didn't want to risk physical harm to himself, which was part of

15  my sort of --

16      Q.    Well, let's talk about that.

17            So who -- of all the people in the whole world and

18  all the evidence that you have that Mr. Francis ever threatened

19  this cooperating witness, like who do you have?  Do you have

20  anybody besides this cooperating witness?

21      A.    Just the statement.

22      Q.    Okay.  So like you don't have like a message, hey,

23  you rat me out, you're going to get it; or you don't have a

24  message from some other possibly known gang member; you don't

25  have, like, anybody observe Mr. Francis engaging in threatening

**JOINT APPENDIX 191**

44

```
 1   behavior; you don't have anything like that?
 2        A.   No, we don't.
 3        Q.   Just a claim made by this witness?
 4        A.   Right, that we certainly didn't want to dismiss,
 5   because he was --
 6        Q.   Of course.
 7        A.   -- emotional at the interview.
 8        Q.   But it's an uncorroborated, unverified claim?
 9        A.   Correct.
10        Q.   Okay.  And I believe you confirmed that you had
11   actually run a criminal record check on this cooperating
12   witness, not just in connection with this case but in
13   connection with another case as well, right, to apply for
14   another search warrant based on his information?
15        A.   Yes.
16        Q.   Okay.  And you represented in there, like, literally
17   on the same day you applied for a different search warrant and
18   you represented in the affidavit for that search warrant that
19   you had run a criminal history on this cooperating witness?
20        A.   I did, absolutely.
21        Q.   Okay.  So there's -- you had -- well, let's see.
22             Do you remember seeing that he had a falsifying
23   physical evidence conviction?
24        A.   Today, do I remember?  No.  But, I mean, I'm
25   thorough.  I would have noticed that.
```

**JOINT APPENDIX 192**

45

1      Q.    Okay.

2      A.    It was someone we were charging in federal court, so

3  his criminal history would have been relevant --

4      Q.    Okay.

5      A.    -- in making that evaluation.

6      Q.    Okay.  So is it fair to say you looked at his

7  criminal record, saw a falsifying physical evidence conviction,

8  and you decided that that was not a relevant thing to put in

9  the application for the search warrant?

10     A.    Like I said, I didn't view -- whether right or

11  wrong, he's not an informant for us.  He was not -- his

12  information wasn't listed in the affidavit anonymously; it was

13  his true name.  I sort of equated him to any other witness who

14  might provide information on other crimes who I -- you know, I

15  don't include their criminal histories and I'm just referring

16  to the information that they provide so long as I, you know,

17  have reason to believe it's credible.

18     Q.    Well, I'll break one of the rules for a defense

19  lawyer and ask why would you think that a judge considering

20  whether to issue a search warrant would not want to know that

21  the witness that you had -- that the primary witness for your

22  affidavit had a falsifying physical evidence conviction?

23     A.    Well, in the state of New Hampshire I see all types

24  of people get charged in -- with falsifying physical evidence

25  and it could be as -- for as simple as covering up a beer can

**JOINT APPENDIX 193**

1  when you get stopped by the police or, you know, throwing a

2  joint on the street when a police officer approaches you.  It's

3  not necessarily -- it's such a commonly charged statute that,

4  to me, it's just not indicative of any real significant --

5      Q.   Well, it could be --

6      A.   -- necessarily a crime.

7      Q.   In some instances it could be, right?

8      A.   Well, it could be, but the judge obviously wouldn't

9  have the context of that case just by looking at a list of

10  bulleted convictions.

11      Q.   All right.  And would you have the ability to

12  conduct a follow-up investigation and look, for example, in the

13  Concord Police files or the Merrimack Police files or the

14  Manchester Police files and say, hey, send me the report on

15  this falsifying physical case so -- physical evidence case so I

16  can see what happened?  Could you do that?

17      A.   I could, and I did, to State Police and it's been

18  archived.  I don't recall seeing what the background on that

19  charge was.

20      Q.   Either you or somebody in your office has access to

21  the state court system online, right?

22      A.   The state what?

23      Q.   To the -- to the state courts, to the superior

24  courts.  Could you access the superior courts and look at the

25  nature of the charges there?

**JOINT APPENDIX 194**

```
 1          A.    I -- I don't have access to that.

 2          Q.    Okay.  Did you do any investigation about this

 3    falsifying physical evidence conviction to determine, okay, you

 4    know, was this a falsifying physical evidence where somebody

 5    hid the murder weapon or was it a guy hiding half a marijuana

 6    cigarette behind his car?  Did you do that?

 7          A.    I didn't investigate that incident, no, and,

 8    frankly, you know, the information provided during the

 9    interview and the affidavits doesn't include all the details,

10    but the -- you know, as a -- as an interviewer who has

11    interviewed maybe thousands of people, hundreds at least, when

12    you listen to certain facts being provided by individuals, some

13    of which you are already aware of and are sort of automatically

14    instantly corroborated with corroboration and others that you

15    follow up on afterwards, you can make some assessment of

16    whether or not you believe the person's telling the truth.

17            I'm not sure the falsifying charge would have --

18    would not have swayed my opinion whether or not the interviewee

19    was providing accurate information and, frankly, investigating

20    drugs, violent crime, and gangs for the last ten years,

21    virtually everyone I interview has a lengthy criminal history.

22    So it's also not uncommon to me.  It's just sort of part of the

23    business, so to speak.

24            And I just found -- I found the interviewee to be

25    credible for -- because of the details of the information he
```

1    provided.  And I was aware of his criminal history, didn't

2    think it was necessary to include it because he was not an

3    informant, he was listed by true name, the judge saw his true

4    name --

5        Q.    Okay.

6        A.    -- and that was my rationale.

7        Q.    Okay.  So you didn't give that information to the

8    judge; you decided that it wasn't -- the judge didn't need to

9    know about that?

10       A.    I didn't include it because I didn't feel like it

11   was necessary -- again, right or wrong -- was my rationale.

12       Q.    Well, and since you mention it, you said that you

13   didn't think it was necessary because of the other detail that

14   was provided.

15           Did any witness other than this cooperating witness

16   ever tell you that they had seen Mr. Francis and this

17   cooperating witness together?

18       A.    No, we didn't have any --

19       Q.    Do you have any evidence from anywhere that they've

20   ever been together at any point other than the cooperating

21   witness's word?

22       A.    No.

23       Q.    Did you ask the cooperating witness for his cell

24   phone and look on his phone to see if there were text messages

25   between him and a known number with Mr. Francis?

**JOINT APPENDIX 196**

49

```
 1        A.   No.
 2        Q.   Did you look at his call log on his phone to see if
 3   he had any calls associated with a phone number with
 4   Mr. Francis?
 5        A.   Well, we didn't apply for a search warrant for his
 6   phones until after the fact, so no.
 7        Q.   No, but he was cooperating with you and giving you
 8   information about a suspect, right?
 9        A.   He was.
10        Q.   If he said -- if you had said, okay, you know, if
11   you want to do this and show us you're credible so that you
12   don't get a mandatory minimum X number of years, let us look at
13   your phone, he would have done that, right?
14        A.   Well, we did have a phone that day from his
15   girlfriend.  And he had -- he told us it was a phone that he
16   used but it belonged to his girlfriend and so we didn't ask for
17   his consent to search his girlfriend's phone.  So, no, we
18   didn't have a phone.
19        Q.   So there's no information in the affidavit that you
20   corroborated some contact between the cooperating witness and
21   Mr. Francis by telephone?
22        A.   No.
23        Q.   Did -- and, again, I'm focusing on the details that
24   you said are the explanation for leaving out the falsifying
25   physical evidence conviction.
```

**JOINT APPENDIX 197**

50

```
 1              In a lot of cases I see, they have the cooperating
 2   witness make a controlled buy.  Did you have this guy make a
 3   controlled buy?
 4          A.   No, because I was sending him to federal custody.
 5          Q.   Okay.
 6          A.   So he wouldn't have had the ability to do that.
 7          Q.   Okay.  Could you have arranged for him to at least
 8   have some contact with Mr. Francis?
 9          A.   No, I couldn't have.  I mean, he was -- he was not
10   getting -- our purpose that day was to take him into federal
11   custody.  He was not going to be given the opportunity to then
12   go back on the street and make contact.  That wasn't -- that
13   wasn't an option.
14          Q.   So are you saying that because of the seriousness of
15   his drug offense, you were not going to use him as an
16   informant; is that what you're saying?
17          A.   Well, and we also would -- there were concerns for
18   his safety if we were to do that and -- which is we weren't
19   going to release him again after he'd been stopped multiple
20   times with all those drugs.
21              And, again, frankly, this application was made
22   truly; we felt we could easily, very easily, coordinate with
23   his -- Mr. Francis's parole officer to search his car whenever
24   we wanted.  And, honestly, maybe we shouldn't have applied for
25   a warrant; we should have just done that.  But we thought, why
```

**JOINT APPENDIX 198**

51

1  not, let's just put the facts we have together today, send them

2  to a magistrate.  If -- it was Judge Lynch that day.  If he

3  grants it, great; otherwise, he's still subject to parole

4  conditions; we can search his vehicle when we want.  So we just

5  thought we would do due diligence and at least present the

6  information we had.

7      Q.   I'm going to get to that in a second.

8           Had this cooperating witness provided you any

9  information in prior cases?

10     A.   That was the first I had met him.  No.

11     Q.   So it's not like he had a track record of

12 reliability.

13     A.   He wasn't an informant, no.  He was just a

14 postarrest interview.  First time I met him.

15     Q.   Okay.

16     A.   Took a confession, additional information was

17 provided, and he went to jail.

18     Q.   All right.  But it's also not like a private citizen

19 that said, oh, my God, they're dealing drugs on my corner, let

20 me tell you about it; this is a guy who is himself a drug

21 dealer.  Right?

22     A.   Agreed.  I probably would not believe the random

23 citizen who said Mr. Francis was a drug dealer, but the guy who

24 has been caught two times with a significant amount of drugs

25 seems to me like someone who would have information about, you

**JOINT APPENDIX 199**

52

1    know, high-level drug trafficking.  So that did help my

2    assessment of his -- the information he was providing.

3         Q.    Okay.  So it sounds like in your view that the

4    determination of the credibility and the reliability of the

5    informant, that that's your job and not the judge's?

6         A.    Well, I do a lot of assessment myself, sure, but I

7    obviously recognize I'm not the one issuing warrants.  It's

8    totally up to the judge.

9         Q.    All right.

10        A.    But just in the course of doing our job, we -- we

11   have to make decisions on whether someone's telling the truth

12   or not telling the truth, guide investigations, and ultimately

13   do a lot of that.

14        Q.    With regard to the parole issue, did PPO Duffy from

15   the New Hampshire Department of Corrections, did he make a

16   request that -- to you that you arrest Mr. Francis on

17   September 1st?

18        A.    He didn't request I arrest him, no.

19        Q.    Or before September 1st?  Was there any request from

20   New Hampshire parole, Department of Corrections parole of

21   New Hampshire to arrest Mr. Francis on or about September 1st?

22        A.    No, not to my knowledge.

23        Q.    Okay.  Was there any request from New Hampshire

24   probation -- I mean DOC parole to search Mr. Francis's car?

25   Did parole request that you search the car?

**JOINT APPENDIX 200**

53

```
 1        A.   No.

 2        Q.   Okay.  And what you're saying is that you believed

 3   that since he was on parole that, really, if you wanted to, you

 4   could arrange for his car to be searched by a parole officer?

 5        A.   Yes, because he signed a form acknowledging that.

 6        Q.   Well, that's a --

 7        A.   It's on his parole condition form that his -- his

 8   car, residence, can be searched at any time.

 9        Q.   Okay.  You think that's what the form says?

10        A.   Something to that effect, yes.

11        Q.   Okay.  Does -- it's condition 9 of the standard

12   New Hampshire parole conditions.  Are you familiar with that?

13        A.   Probably not as familiar as you are.  I can't recite

14   it, but I've reviewed it before.

15        Q.   All right.  Are you aware that condition 9 says "on

16   request he shall submit"?

17        A.   I don't recall, but I trust that you --

18        Q.   Okay.

19        A.   -- seem to know it.  Sure.

20        Q.   All right.

21        A.   But, regardless, we've collaborated with parole

22   before --

23        Q.   All right.

24        A.   -- and, you know, have -- in task force

25   environments, we sort of rely on each other's different
```

**JOINT APPENDIX 201**

54

```
 1    authorities.  In fact, prior to my time on the FBI task force,

 2    we used to have a probation/parole officer on there and, you

 3    know, that's the point of a task force.  So if someone's on

 4    parole, you -- we collaborate with our fellow law enforcement

 5    officers and if it makes sense for them to utilize their

 6    authorizations in an investigation, that's typical.

 7         Q.   But that's not what happened here, right?

 8         A.   Well, we didn't need to because we got a warrant

 9    issued --

10         Q.   That --

11         A.   -- but, otherwise, we would have.

12         Q.   That's what I'm saying is that the search that

13    happened here was not because of a request or direction from

14    parole, although you're saying you thought you could do that;

15    the search that happened here happened pursuant to the search

16    warrant, right?

17         A.   It did.  Had we not had the search warrant, we would

18    have collaborated with parole.

19         Q.   Okay.  Is there anything in the affidavit in support

20    of the search warrant about parole or any contact with

21    New Hampshire DOC parole?

22         A.   I don't believe so.

23         Q.   If I told you I don't think there's anything there,

24    would you agree?

25         A.   I don't --
```

**JOINT APPENDIX 202**

55

```
1        Q.    This speaks for itself, but --

2        A.    Right.  I didn't think his parole conditions were

3  relevant to the particular federal crimes that are -- you know,

4  we're describing in the affidavit.  So --

5        Q.    And, just to be clear, like sometimes a judge or

6  magistrate reads an application for a warrant and they ask for

7  some additional information.  In my experience, they always

8  make a note of it somewhere.

9              But you didn't provide any additional information to

10 Magistrate Lynch in this case that's not in your affidavit, did

11 you?

12       A.    I don't believe so.

13             MR. GUERRIERO:  Okay.  Could I have one second, your

14 Honor?

15             THE COURT:  Of course.

16       Q.    I believe you indicated on your direct testimony

17 that there was a -- a warrant for a parole violation.  Do you

18 remember saying that?

19       A.    For Mr. Flores, yes.

20       Q.    Yeah.  And I can show it to you if you want, but if

21 I told you that the warrant for the parole violation -- and

22 this is attached to Document 54 as Exhibit 5.

23             If I told you that the warrant for the parole

24 violation is dated on September 8th, a week after Mr. --

25             THE COURT:  Well, are you -- he's talking about
```

**JOINT APPENDIX 203**

56

```
 1   Flores.  Are you talking about the defendant?
 2            MR. GUERRIERO:  Yes.
 3            THE COURT:  He's talking about Flores.
 4            MR. GUERRIERO:  Oh, okay.  I'm sorry.
 5            THE WITNESS:  That's okay.
 6            MR. GUERRIERO:  Say your answer again because the
 7   judge is right; I totally misheard what you said.
 8       A.   I believe my -- in my direct testimony, the
 9   reference, parole warrant, was for Emilio Flores.
10       Q.   Oh, okay.  It was for Flores.  Okay.  Well, then,
11   let me ask the question:  Was there a warrant from DOC for
12   Mr. Francis's arrest on September 1st, 2021?
13       A.   There was not.
14            MR. GUERRIERO:  Okay.  That's all I have, your
15   Honor.  Thank you.
16            THE COURT:  All right.  Thank you.
17            Any redirect?
18            MR. ROMBEAU:  Very brief, your Honor.
19                      REDIRECT EXAMINATION
20   BY MR. ROMBEAU:
21       Q.   Special Agent Burke, you were asked a number of
22   questions about the cooperating witness's motivation at the
23   time of providing you information.  What did you understand
24   that motivation to be?
25       A.   I think he recognized that he was facing significant
```

**JOINT APPENDIX 204**

57

```
1    exposure, he knew his criminal history, that it would result in

2    you know, a lengthy prison sentence.  And so it's not something

3    he probably wanted to do and decided the only way to

4    potentially receive consideration is to provide truthful

5    information to us that we could then verify.  Otherwise,

6    obviously, if he provided fake information to us, that could

7    just backfire.

8              So I believe that motivated him to provide accurate

9    information so that he could eventually, hopefully, receive

10   some type of compensation or benefit.

11        Q.   And there was a reference towards the end about

12   the communications with the parole officer on the day of the

13   warrant execution.  Were you the one in direct contact with

14   either PPO Duffy or PPO Benard that day?

15        A.   No, I wasn't.

16             MR. ROMBEAU:  Okay.  Nothing further, your Honor.

17   Thank you.

18             THE COURT:  All right.  Mr. Guerriero?

19             MR. GUERRIERO:  I just want to retrieve my water.

20   Thank you.

21             THE COURT:  All right.  Thank you, Special Agent

22   Burke.  Appreciate it.

23             THE WITNESS:  Thank you, your Honor.

24             THE COURT:  You may step down.  You're excused as a

25   witness.
```

**JOINT APPENDIX 205**

58

```
 1                    (Witness excused.)

 2          THE COURT:  Any other witnesses you'd like to call,

 3   Mr. Rombeau or Mr. Gingrande?

 4          MR. GINGRANDE:  So, your Honor -- so I just wanted

 5   to clarify with the Court that we are here discussing two

 6   separate motions to suppress today.

 7          THE COURT:  Right.  Right.

 8          MR. GINGRANDE:  The first is, obviously, as to the

 9   affidavit -- the search of the vehicle and that warrant.  The

10   second is the motion to suppress a statement and cell phone

11   that were seized incident to his arrest.

12          And so in regards to that second -- well, that

13   second motion, when it comes to parole involvement, I would

14   like to call a witness and I'd -- and as to a threshold legal

15   issue that we discuss in the brief as to the -- the

16   expectations of privacy or lack thereof that someone on parole

17   may have that applies to, frankly, both of these warrants, I

18   would like to call the same witness, and it's Parole Officer

19   Benard, and then I would seek to introduce his testimony.

20          THE COURT:  So far you haven't established that he

21   has been arrested.

22          MR. GINGRANDE:  I'm sorry.  Haven't established --

23          THE COURT:  That he was arrested.

24          MR. GINGRANDE:  That Mr. Francis -- well, that's

25   true, and that's -- that's the -- that's the, I imagine, the
```

**JOINT APPENDIX 206**

59

```
 1  │  burden of the defense.  But I -- I will --
 2  │          THE COURT:  Well, you're claiming search incident to
 3  │  an arrest.
 4  │          MR. GINGRANDE:  Well, sure.  The defense is
 5  │  saying -- okay.  Fair enough, your Honor.
 6  │          THE COURT:  I assumed.  Maybe I'm wrong.  What are
 7  │  you claiming?
 8  │          MR. GINGRANDE:  Yeah.  No, we are -- we are claiming
 9  │  a search incident to arrest --
10  │          THE COURT:  Okay.  So it's step one, he was
11  │  arrested.
12  │          MR. GINGRANDE:  Right.
13  │          THE COURT:  All right.
14  │          MR. GINGRANDE:  Sure.  Sure.
15  │          THE COURT:  You don't have any evidence of that.
16  │          MR. GINGRANDE:  Okay.  Sure, your Honor.
17  │          So if I could call Parole Officer Benard.
18  │          THE COURT:  Of course.
19  │          MR. GINGRANDE:  Thank you.
20  │          Your Honor, I apologize.  I just learned that he
21  │  just went to the restroom.  If we could just --
22  │          THE COURT:  You know, it's probably a good time to
23  │  take a break anyway.  Why don't we take 10 or 15 minutes.
24  │          MR. GINGRANDE:  Thank you.
25  │          THE CLERK:  All rise.
```

**JOINT APPENDIX 207**

60

```
 1              (Recess taken from 2:47 p.m. until 3:03 p.m.)
 2              THE COURT:  All right.  Mr. Gingrande.
 3              MR. GINGRANDE:  Thank you, your Honor.
 4              Just before the government calls its next witness, I
 5    did want to put on the record that the parties have agreed in
 6    this case that the exhibits to the filings, the -- for the two
 7    motions, the objections, replies, should all be admitted as
 8    exhibits and the Court can rely on --
 9              THE COURT:  Of course.
10              MR. GUERRIERO:  Agreed.
11              THE COURT:  They're attached.  Sure.  Thank you.
12              MR. GINGRANDE:  Thank you, your Honor.
13              With that, the government calls to the stand Parole
14    Officer Brian Benard.
15              THE CLERK:  Please remain standing and raise your
16    right hand.
17              **BRIAN BENARD**, having been first duly sworn,
18    testified as follows:
19              THE CLERK:  Thank you.  Please be seated.
20              And please state your full name for the record.
21              THE WITNESS:  It's Brian Benard.
22                        DIRECT EXAMINATION
23    BY MR. GINGRANDE:
24         Q.   Good afternoon, Parole Officer Benard.
25              Can you tell the Court, please, where you're
```

**JOINT APPENDIX 208**

61

1    employed?

2         A.    With the New Hampshire Department of Corrections.

3         Q.    Okay.  And what is your title at --

4         A.    Probation and parole officer.

5         Q.    Okay.  How long have you been employed in that

6    capacity?

7         A.    I've been with the department since February 2nd of

8    2007 and a parole officer since September of 2008.

9         Q.    Okay.  And prior to working for the New Hampshire

10   Department of Corrections, what was your work experience?

11        A.    I came right from college to work for the

12   department.

13        Q.    Okay.  Now, so, I'm sorry.  If I'm doing the math

14   right -- well, could you do the math for us?  How many years

15   actually, what was that, that you've been --

16        A.    So roughly 16 and a half years total, about 15 of it

17   as a parole officer.

18        Q.    Okay.  And prior to your experience as a parole

19   officer there, what were you?

20        A.    I'm sorry?

21        Q.    Prior to -- prior to being a parole officer there --

22        A.    Yes, I was a correctional officer at the state

23   prison in Concord from my hire date in '07 to September of '08.

24        Q.    Okay.  Thank you.

25              And based on your years working for the

1  New Hampshire Department of Corrections, are you familiar with

2  the system of parole?

3       A.   I am.

4       Q.   And are you familiar with its policies and

5  practices?

6       A.   Yes.

7       Q.   And are you familiar with its goals?

8       A.   Yes.

9       Q.   Are you familiar with conditions of release for

10 parolees?

11      A.   Yes.

12      Q.   Are you familiar with the defendant in this case,

13 Michael Francis?

14      A.   Yes.

15      Q.   And how do you know Mr. Francis?

16      A.   During my time in my capacity working at the prison

17 as a parole officer, him being in the system, it's not an

18 overly large system, so the name is familiar to me and I

19 believe I've dealt with him in some capacities over the years.

20      Q.   Okay.  And is one of the basis -- bases through

21 which you know Mr. Francis through Emilio Flores or his

22 associations with Emilio Flores?

23      A.   Yes.  So also he -- he's also on parole at the time

24 out of my office.  So even though it was a different parole

25 officer -- obviously we have all caseloads, but we do deal with

63

1   everybody that comes through the door.  So as well as

2   Mr. Flores, yes.

3        Q.    Okay.  And how long did you supervise Mr. Flores,

4   approximately?

5        A.    I believe it was only a few months before he

6   absconded from parole.  I think he was out for less than a year

7   before he absconded.

8        Q.    Okay.  And when you say absconded from parole, can

9   you explain what that meant?

10       A.    Yup.  So he ran into some new criminal charges

11  allegedly and so he was due to report to me and he never did.

12  He was no longer residing where he was supposed to be residing.

13  Therefore, I could not locate him, so a warrant was obtained

14  for absconding from parole.

15       Q.    Okay.  And do you know what -- why he was on parole

16  to begin with?

17       A.    Mr. -- I don't recall.  It was -- yeah, I don't --

18  it's like six years ago.

19       Q.    Okay.  That's fair.

20             So I'd like to show you now what is document -- it's

21  been filed as Document 61-1.  That's the ECF number.

22             Your Honor, should I use the ELMO or --

23             THE COURT:  Whatever's convenient.

24             MR. GINGRANDE:  Okay.  If you don't mind, I'm going

25  to -- I think I will do that just so everyone can kind of see

64

 1   it at the same time.

 2           Parole Officer Benard, are you able to view that

 3   document on the screen in front of you?

 4       A.   I am.

 5       Q.   Okay.  And what is this document?

 6       A.   It is a parole certificate for Mr. Michael Thomas

 7   Francis.

 8       Q.   Okay.  And so -- and this is the -- that's the

 9   defendant in this case; is that correct?

10       A.   Correct.

11       Q.   Now, I'd like to turn to the second page of this

12   document.

13           Okay.  It's just a little small, and I can zoom in

14   as I direct you to the specific provisions, but for now, just

15   looking at this, can you tell the Court what this is?

16       A.   Yup.  So these were the conditions for adult parole.

17   They would be 1 through 12 are the standard conditions and

18   rule -- sorry, condition 13A through I would be special

19   conditions.

20       Q.   And can you explain what -- what -- what a special

21   condition is versus a standard condition?

22       A.   Yup.  So a standard condition 1 through 12 would be

23   every individual that's released on to parole would agree to

24   these terms.  It's verbatim the same thing, same copy,

25   everything.

**JOINT APPENDIX 212**

65

```
 1              When you get into rule 13A through I, that's where
 2   you have specifics of the case and the individual, depending
 3   upon what they need for their release and their restrictions to
 4   be released and/or what they need to accomplish while they're
 5   out.
 6       Q.    Understood.  So every parolee who is subject to
 7   the -- the jurisdiction, if you will, of the New Hampshire
 8   Department of Corrections has those same first 12 conditions;
 9   is that correct?
10       A.    Correct.
11       Q.    Okay.  Now, I'd like to direct your attention to
12   condition 8 and so I will zoom in for you.
13              I hope that does it.
14              All right.  I'm going to try to move it so the
15   whole -- okay.  Yeah, I think I can just get it on the page.
16              So if you look at that number there --
17       A.    Yup.
18       Q.    -- and you just lead with your eye to where it says
19   "I will submit to breath," do you see that?
20       A.    Yeah, I do.
21       Q.    Okay.  Could you just read that for us?
22       A.    Sure.  So it states:  I will submit to breath,
23   blood, or urinalysis testing for the presence of any substance
24   or provide such other sample for testing or submit to such
25   other test or procedure as may be directed by the parole board
```

**JOINT APPENDIX 213**

66

1    or my parole officer.

2         Q.   Okay.  And can you explain to the Court what -- what

3    this provision means?

4         A.   Yup.  So it grants us the authority to do

5    breathalyzer tests.  We can conduct those in the field at the

6    office, which would be for alcohol.

7              Blood test, I have never personally come across

8    actually mandating a blood test for an individual, but per the

9    condition, we could actually do that, if necessary, if we feel

10   like there's a reason to go to that level.

11             And then the last part talks about urinalysis, would

12   be a urine test for illicit substances.

13        Q.   Okay.  And when can you conduct those tests?

14        A.   At any time.

15        Q.   Okay.  And what's the purpose of this condition?

16        A.   Specifically to confirm or dispel any belief that

17   there's -- an individual is using things they shouldn't be,

18   whether it's illegal substances and/or not prescribed

19   medication.

20        Q.   Okay.  And I think you said earlier this is a

21   standard condition for all parolees; is that right?

22        A.   Yes.

23        Q.   Okay.  And, by the way, just because I don't think

24   we discussed it, do you know approximately how many parolees

25   there are in the New Hampshire Department of Corrections

**JOINT APPENDIX 214**

1    system?

2        A.    I don't know the number.  I know the office I work

3    out of in Manchester, we cover half of Hillsborough County.

4    There's probably close to 1,500 cases just in half that county

5    alone.

6        Q.    1,500 cases just in half the county?

7        A.    Yeah.

8        Q.    Okay.  And safe to say that New Hampshire Department

9    of Corrections has parolees located throughout the state of New

10   Hampshire?

11       A.    Correct.  There's 70 some-odd parole officers

12   throughout the state of New Hampshire.

13       Q.    Okay.  So now I'd like to direct your attention to

14   condition number 9, and that's the one that begins "I will

15   permit the parole officer."

16            If you could just read that out loud.

17       A.    Yup.

18            "I will permit the parole officer to visit my

19   residence at any time for the purpose of examination and

20   inspection and the enforcement of the conditions of parole and

21   submit to searches of my person, property, and possessions as

22   requested by the parole officer."

23       Q.    Okay.  And what does this condition mean?

24       A.    So it -- this condition gives us the authority to

25   conduct searches without applying for a search warrant and/or

68

1    consent from the individual.

2        Q.    Okay.  And, specifically -- well, I think -- I think

3    we'll come back to this in a minute, but can you explain

4    generally what these -- which searches are authorized by this

5    condition?

6        A.    It would be any search of an individual, their

7    property.  If you go to their house, you can search their

8    house, curtilage, vehicle, their -- their person as you will,

9    you know, pockets or whatnot, even just areas in close

10   proximity to the individual, depending on circumstance.

11       Q.    Okay.  I'm going to ask you some more questions on

12   that in just a minute, but for now I want to proceed to

13   condition 10.

14           Can you read condition 10?  It's the one that says

15   "I will not associate with criminal companions."

16       A.    Yup.

17           "I will not associate with criminal companions or

18   such other individuals as shall be ordered by the Court or

19   parole board.  Prohibited contacts include victims, other

20   parolees or probationers, and other persons known to the board

21   or to the parole officer as having criminal records."

22       Q.    Okay.  And what does this mean?

23       A.    So there's a prohibition against individuals that

24   are on supervision, whether it's probation or parole, and/or

25   have criminal records to associate with one another.

**JOINT APPENDIX 216**

```
 1        Q.    Okay.  Now, if I could direct your attention to
 2   condition number 3.  Can you read what that says?
 3        A.    States --
 4        Q.    I'm sorry.  There it is.
 5        A.    Yup.
 6              "I will obtain the parole officer's permission
 7   before changing residence or employment or traveling out of
 8   state."
 9        Q.    Okay.  And what's the purpose of that condition?
10        A.    So, again, you know, we're accountable for where
11   individuals are residing and, per the conditions, they're
12   supposed to obtain permission prior to making a change in any
13   of those three things, whether it's a residence where they're
14   residing, where they're employed, or before they're -- prior to
15   traveling out of state.
16        Q.    Okay.  And upon a parolee first coming within the
17   jurisdiction of the New Hampshire Department of Corrections,
18   are parolees required to provide their address?
19        A.    I'm sorry.  Say it one more time.
20        Q.    When someone is first -- first comes into the parole
21   system, for lack of a better phrase --
22        A.    Gotcha, yup.
23              So they do what's called a parole plan.  Okay?  So
24   they'll submit a packet to the parole board which comes to the
25   office and they will investigate the residence that they
```

**JOINT APPENDIX 217**

1    propose to live at as well as any potential employment.

2        Q.    Okay.  And this condition says that if that

3    residence is different than -- if it changes, they have to

4    report that; is that right?

5        A.    Correct.  They're supposed to get permission, but

6    the very least notify.

7        Q.    Okay.  Now I'd like to direct your attention to the

8    bottom of the document.  And I think I'll just see after this.

9            Do you see that there's a signature block?

10       A.    I do.

11       Q.    This keeps going in.  Sorry.

12           Do you see a signature block at the bottom of that

13   document?

14       A.    Yes.

15       Q.    Now, are parolees required to sign the conditions of

16   their parole?

17       A.    They are.

18       Q.    Okay.  And are there other ways in which parolees

19   may or may not be made aware of the conditions of their parole?

20       A.    So aside from signing this document prior to

21   release, they also have it reviewed with them when they are

22   released.  As the parole officer supervising them, you do that

23   as part of their case opening.  You review the rules with them,

24   their conditions again.

25       Q.    Okay.  Now, I'd like to go back and discuss that

**JOINT APPENDIX 218**

71

1    condition, I believe it was condition number 9, about searches.

2         So -- and you started getting into this, but what is

3    the scope of your authority as a parole officer to search a

4    parolee?

5         A.   So the purpose is obviously to enforce the

6    conditions of parole, and one of the ways we're able to do that

7    is our ability to conduct these searches without warrants

8    and/or without consent in order to, unfortunately sometimes,

9    discover the truth of a situation.

10        You know, people, when they're up to things that

11   they shouldn't be doing as far as parole is concerned, they're

12   going to try to hide that.  So this allows us to search their

13   person, whether they're carrying something they shouldn't be

14   carrying, it could be something in the bedroom, something in

15   the fridge, it could be something in the car, it could be

16   something outside.

17        So, again, it gives us the power to do our job,

18   which is to investigate those circumstances and, again, to

19   either confirm or dispel whether or not they're following those

20   conditions of parole.

21        Q.   Okay.  And can you search a parolee for any reason

22   or do you need probable cause?

23        A.   Any reason.

24        Q.   Okay.  Can you search them even when they're not at

25   their home?  I think --

**JOINT APPENDIX 219**

```
 1        A.   Yes.
 2        Q.   -- what you just said suggests it, but can you
 3  answer that question?
 4        A.   Yes.
 5        Q.   Yes, you can?  Okay.
 6             And does it matter where their vehicle is located
 7  when you search it?
 8        A.   No.
 9        Q.   Okay.  So you can conduct the search of the vehicle
10  anyplace that vehicle may be?
11        A.   Correct.
12        Q.   What about the time of day or night?  Does that
13  matter when you conduct a search of a parolee?
14        A.   It does not.
15        Q.   Okay.  And -- and that's true as to parolees and
16  their property as well; is that right?
17        A.   Correct.
18        Q.   Okay.  Now, is that -- that different from someone
19  who is on probation as opposed to parole?
20        A.   Slightly, yes.
21        Q.   Okay.  And what's the difference?
22        A.   I don't have it front of me, but I believe that the
23  only difference in language for that condition which would be
24  the rule number 9 is instead of at any time, it states at a
25  reasonable time.
```

**JOINT APPENDIX 220**

73

1          So probation specifically states at a reasonable

2     time.  It's not defined so obviously it's up for

3     interpretation, but that's the only verbiage differences, at a

4     reasonable time versus saying at any time as the parole

5     conditions say.

6          Q.    Thank you.

7               Now, so you were talking about the purpose of

8     including a condition of searching parolees and I think you had

9     mentioned that one of those purposes is to ensure compliance

10    with the terms of parole; is that fair?

11         A.    Correct.

12         Q.    Are there other purposes that you would want to

13    search a parolee?

14         A.    It could be suspicion, whether you have an

15    individual that you've dealt with over time, you may have

16    things that will rise your suspicion as to whether or not they

17    may be up to something they shouldn't be doing, so, therefore,

18    you may conduct a search at that point because of multiple

19    different factors.

20              It could be simply for officer safety purposes.

21    When you deal with somebody, just as a police officer would do

22    a patdown, we may do the same exact thing just to make sure

23    that while we're dealing with this individual they're not armed

24    with something.

25         Q.    Okay.  And so is it fair to say that there's a

**JOINT APPENDIX 221**

74

```
 1    public safety element of these searches?

 2         A.    Absolutely.

 3         Q.    Okay.  What about when it comes to the specific

 4    individual, you know, are you trying to prevent them from

 5    recidivating, possibly, by conducting searches?

 6         A.    Correct.

 7         Q.    Okay.  So now I'd like to talk about the authority

 8    of police officers in relation to your authority to authorize

 9    searches.

10         So do you have authority to utilize police officers

11    to search a parolee for you?

12         A.    Yes.

13         Q.    Okay.  And -- and when I say you, I mean you as a

14    parole officer.  The parole officers have this authority?

15         A.    Correct.

16         Q.    Can police officers conduct that search even if you

17    are not available to be on the scene at the time of the search?

18         A.    Yes.

19         Q.    Okay.  Now I'd like to discuss scope of arrests.

20              THE COURT:  What's the authority for that?  Where

21    does that come from?

22              MR. GINGRANDE:  I'm sorry, your Honor?

23              THE COURT:  What's the --

24              MR. GINGRANDE:  504-A --

25              THE COURT:  Sorry.
```

**JOINT APPENDIX 222**

75

```
 1              MR. GINGRANDE:  504-A:4 for the scope of arrests.
 2              THE COURT:  It doesn't say anything about searches.
 3              MR. GINGRANDE:  I'm sorry, your Honor?
 4              THE COURT:  RSA 504-A:4 says not a word about
 5    searches.
 6              MR. GINGRANDE:  That's -- that's true, your Honor.
 7    You're asking for the --
 8              THE COURT:  You asked about searches.
 9              MR. GINGRANDE:  Oh, I'm sorry.  I apologize.  So --
10              THE COURT:  Not a word about searches in that
11    statute.
12       Q.   Okay.  So -- so, Parole Officer Benard, can you
13    discuss authority for working with parole officers to
14    conduct -- I'm sorry -- working with police officers to conduct
15    searches?
16       A.   Yup.  So over my time throughout my career,
17    obviously we have policies, we have procedures, state law.  We
18    also have training we do and real-life scenarios that we deal
19    with.
20              I've come across in my career where I'll get a phone
21    call -- it might be after hours, might be a weekend, might be a
22    holiday, I might be out of state -- where maybe a law
23    enforcement agency is interacting with one of my individuals
24    that I supervise.  In a case where they have a -- you know,
25    whether they pulled him over in a motor vehicle stop, maybe
```

**JOINT APPENDIX 223**

1    it's a stop on the street, if I have reason to believe that

2    they may be in violation of their parole, I can request that

3    the officer search the individual on my behalf, because I'm not

4    expected to be there 24/7 to conduct that, if I feel it's

5    necessary.

6         Q.   Okay.  And so you -- you alluded to these --

7    these -- these various sorts of authority.  I think -- so you

8    said one is policy documents; is that right?

9         A.   Yes.

10        Q.   Okay.  And what, if anything, can you say about

11   those policy documents?  Is this something that is distributed

12   or -- distributed throughout New Hampshire probation --

13        A.   The policy?

14        Q.   -- and parole?  Yeah, the policy authorizing you to

15   work with police officers to search parolees.

16        A.   Yeah, we do have a -- yeah, we do have a policy,

17   yes.

18        Q.   Okay.  And when it comes to -- to the law, I'm not

19   going to ask you for specific cases or any other authorities.

20   I can cite those in argument, I suppose.  But you're generally

21   aware that it is lawful for you to use police officers to

22   conduct searches?

23        A.   Yes.  Under certain circumstances, yup.

24        Q.   Okay.  So -- so now I'd like to discuss arrests.

25             So what's the scope of your authority to arrest a

**JOINT APPENDIX 224**

1    parolee?

2         A.    So we have the ability to either arrest somebody

3    when there's an active warrant, whether that's a warrant that

4    we do ourselves or any -- any valid warrant signed by a judge,

5    or we can do a warrantless arrest.

6         Q.    Okay.  And what are the conditions for a warrantless

7    arrest?

8         A.    So a warrantless arrest, our authority states that

9    if we believe that someone's committed a criminal offense or

10   they're acting in a way to be a menace to public safety, we can

11   arrest them, as well as if we believe that they are going to --

12   they're a threat to abscond from supervision or commit new

13   criminal offenses if not arrested, that is when we can effect a

14   warrantless arrest.

15        Q.    Okay.  And -- and do you -- do you have authority to

16   utilize police officers to conduct an arrest of a parolee for

17   you?

18        A.    Yes.

19        Q.    And can police officers conduct that arrest even if

20   you're not available to be on the scene at the time of that

21   arrest?

22        A.    Yes.

23        Q.    Okay.  Now, when it comes to each of these things

24   we've discussed, using police officers to conduct searches,

25   using police officers to conduct arrests, are these things that

**JOINT APPENDIX 225**

78

1    you have done in your career as a -- as a parole officer?

2        A.    Yes.

3        Q.    Okay.  Numerous occasions, you've done this?

4        A.    Yes.

5        Q.    Okay.  Is it fairly standard practice?

6        A.    It seems to be.  It depends.  A lot of it depends on

7    the area of coverage.  We have a lot of rural places that, you

8    know, we cover as far as parole goes and so a lot of times

9    it'll be just one PO, so they will have a lot of assistance

10   from local and/or state authorities or sheriffs.

11       Q.    Okay.  So now I'd like to direct your attention to a

12   document that I'll put on the ELMO.  This document is ECF

13   Document 46-2.

14             Okay.  Now, I will zoom in on this, Officer Benard,

15   but for now, can you please tell the Court what this is?

16       A.    Yeah.  It's an affidavit in support of the objection

17   to motion to suppress.

18       Q.    Okay.  And there are -- there are two pages here.

19   I'm sorry.  There's actually -- there's -- there's more than

20   two pages; there's three pages, 14 paragraphs.  Is that -- is

21   that right?

22       A.    Correct.

23       Q.    Okay.  Now, is there -- is there anything in this

24   affidavit -- well, is there -- would you say that everything in

25   this affidavit is still true and accurate to the best of your

**JOINT APPENDIX 226**

79

1    knowledge?

2        A.    Yes.

3        Q.    Okay.  You already discussed Emilio Flores a bit,

4    but I want to discuss a little more specifically, and perhaps

5    drawing your attention to certain paragraphs.

6              So let's start with paragraph 5.

7              Was -- okay.  Can you see that or do you need me to

8    blow it up?  You can see it?

9        A.    Yup.

10       Q.    And then it continues on to the next page.  Do you

11   see that there?

12       A.    (Nods head.)

13       Q.    So -- so did -- did Mr. Flores have an outstanding

14   drug charge from September 30th of 2018 at the time that --

15   that he absconded?

16       A.    So September 30th, 2018, is when he had contact with

17   Bedford Police.  I don't know -- I would assume a warrant would

18   have been later because it would have been a failure to appear.

19   So it would have been a UBW after the fact.

20       Q.    Okay.  And so I think you actually reference in

21   paragraph 6, is that right, you say:  After Mr. Flores's arrest

22   on the above-referenced heroin charge, he posted bail and then

23   absconded from parole supervision.

24             Is that right?

25       A.    Correct.

**JOINT APPENDIX 227**

80

```
1        Q.    Okay.  So what did you do at that time, when he
2   absconded from your supervision?
3        A.    So Mr. Flores was due to report to me in October of
4   2018 and he failed to report as directed.  I also confirmed
5   with his last known residence that he was no longer residing
6   there.  So he at that point had been absconded from
7   supervision.
8             So at some point very near to that date I would have
9   obtained a warrant from the parole board for absconsion as well
10  as probably the TAC use.
11       Q.    Okay.  Prior to September 1st of 2021, had
12  Mr. Flores been apprehended by either the parole officer or law
13  enforcement?
14       A.    Not to my knowledge, no.
15       Q.    Okay.  And so -- and so, to your knowledge, he was
16  still wanted by parole and Bedford PD at that time?
17       A.    Yes.
18       Q.    All right.  And do you know whether he was located
19  on September 1st, 2023?
20       A.    Yes.  20 --
21       Q.    I'm sorry.  Yeah, I got the date wrong.  2021.  I
22  apologize.
23       A.    Yes.
24       Q.    Thank you for the correction.
25             And do you know -- generally, without you -- you
```

**JOINT APPENDIX 228**

81

1    don't have to go into any specifics that you don't know, but to

2    the extent you are aware, do you know the general circumstances

3    of how he was located or --

4         A.   Yeah.  I was informed -- I don't think it was the

5    day of, it may have been either later that evening or the next

6    day that he was taken into custody and he was -- when he was

7    arrested, he was with another parolee, Mr. Michael Francis.

8         Q.   Okay.  And do you know whether Mr. Francis and

9    Mr. Flores were violating their parole in any way on

10   September 1st, 2021?

11        A.   Simply by associating with one another would be a

12   violation.  And the fact that Mr. Flores was a fugitive from

13   justice could be construed as potentially, you know, a criminal

14   act by Mr. Michael Francis by potentially harboring a fugitive.

15   I mean, you're associating with somebody that has an active

16   warrant, so obviously that's not something we want to

17   encourage.

18        Q.   Okay.  And were they also -- were would they also

19   have been -- I'm sorry.

20             Would Mr. Francis also have been violating the terms

21   of his parole if they were at an address that he not did report

22   to parole officers?

23        A.   If he -- what about the address?

24        Q.   If there was an address that Mr. Francis had not

25   provided to parole officers of a place of his residence.

**JOINT APPENDIX 229**

82

```
 1          A.   Correct, yes.
 2          Q.   Okay.  And do you know whether or not -- well, first
 3    let me ask you this.
 4               Do you know who Mr. Francis's parole officer is?
 5          A.   Yes.
 6          Q.   Okay.  Who is it?
 7          A.   Well, it -- at the time it was --
 8          Q.   At the time.
 9          A.   -- William Duffy.
10          Q.   Okay.
11          A.   Bill Duffy.
12          Q.   Okay.  And do you know from -- from Mr. Duffy
13    whether or not he was aware at the time of various violations
14    of parole that Mr. Francis was -- was conducting at that time
15    of -- as of September 1st of 2021?
16          A.   Yeah, I believe Bill was the one who told me that
17    Emilio was arrested with Mr. Francis.
18          Q.   Okay.  Thank you.
19          A.   Mr. Flores.
20          Q.   Now, I'd like to direct your attention to paragraph
21    12.  Can you see that?
22               Can you see that, Parole Officer Benard?
23          A.   I can.
24          Q.   Okay.  And can you please -- can you read it?
25          A.   Sure.
```

**JOINT APPENDIX 230**

1    "So based on the knowledge I had during the time

2    surrounding Mr. Flores's arrest, had law enforcement not

3    already obtained a search warrant to search Mr. Francis's

4    vehicle in which Mr. Flores had been an occupant, I would have

5    conducted a search of Mr. Francis's vehicle, including a search

6    of the bag that Mr. Flores was seen carrying into the vehicle.

7    In my capacity as a parole officer, I would have had authority

8    to search Mr. Francis's person and property including his

9    vehicle based on his status as a parolee."

10    Q.    Okay.  And would you also have had the authority,

11    based even on just Mr. Flores's conduct, to search a bag that

12    he had brought into that vehicle?

13    A.    Yes.

14    Q.    Okay.  Now, directing your attention to the

15    following paragraph, 13, and I can ask you -- you don't have to

16    necessarily say it verbatim, but what -- what was the reason

17    that you would have conducted that search?

18    A.    So with Mr. Flores being wanted for absconding from

19    parole, obviously I was aware it had been many years he had

20    been absconded for.  A couple that things we would do,

21    obviously, at the time of arrest is there could be new criminal

22    charges.

23    Q.    Uh-huh.

24    A.    So if an individual is taken into custody, they

25    could very often be violating as far as how they came into

**JOINT APPENDIX 231**

1   contact with police.  It could be a new criminal charge,

2   resisting, could be possession of new illegal substances, a

3   weapon.

4          And on top of that, we also do a criminal record

5   check because we could have confirmed if while they were a

6   fugitive if they committed more criminal offenses.

7          And the reason for doing those things is because

8   we're not just limited to just the violation that was filed at

9   the time of the abscansion.  So if I come across more

10  information as far as more alleged criminal -- sorry, not

11  criminal, but conduct as opposed to following the rules, I

12  can file what's called a supplemental parole violation and,

13  therefore, add to what's already potentially being faced by the

14  parolee at the time of seeing the parole board.

15      Q.   Understood.  And, now, just to -- just to -- to make

16  it clear, could you have used police officers to conduct --

17  actually, I'll scratch that.

18          So when it comes to the -- the association -- the --

19  these additional supplemental parole violations, if you will,

20  that you described, you know, in this particular case, would

21  you have been interested in exploring those?

22      A.   Absolutely.

23      Q.   Okay.  Now, do you know whether Mr. Flores was taken

24  into custody on September 1st, 2021?

25      A.   He was.

**JOINT APPENDIX 232**

85

```
 1        Q.   Okay.  And do you know if Mr. Francis was taken into
 2   custody on September 1st, 2021?
 3        A.   Yes.
 4        Q.   Okay.  And do you know that they were both arrested
 5   that day?
 6        A.   Yes.
 7             MR. GINGRANDE:  Okay.  Just -- one minute, your
 8   Honor?
 9             THE COURT:  Of course.
10             MR. GINGRANDE:  I'd just request the Court's
11   indulgence.  Thank you.
12             Thank you, Parole Officer Benard.  No further
13   questions at this time.
14             THE COURT:  Mr. Guerriero?
15             MR. GUERRIERO:  You can leave that up, that exhibit.
16             MR. GINGRANDE:  Oh, sure.
17                        CROSS-EXAMINATION
18   BY MR. GUERRIERO:
19        Q.   Good afternoon, sir.
20        A.   Good afternoon.
21        Q.   I'm Richard Guerriero.  I represent Mr. Francis.
22             I guess I have a couple of different categories of
23   questions, but first of all, so you were Mr. Flores's parole
24   officer, not Mr. Francis's parole officer; is that right?
25        A.   Correct.
```

**JOINT APPENDIX 233**

1      Q.    And as of September 1st, 2021, there was a warrant

2    to arrest Mr. Flores from the parole board for absconding?

3      A.    Prior to that.

4      Q.    Yes.

5      A.    Yes.

6      Q.    Yes.  As of that day.

7      A.    Yes.

8      Q.    Yes.

9      A.    Yes.

10      Q.    So on September 1st, there was a warrant for his

11    arrest?

12      A.    Correct.

13      Q.    To your knowledge, there was not a warrant for the

14    arrest of Mr. Francis?

15      A.    Nope.

16      Q.    You didn't make any request to Manchester PD or the

17    FBI to arrest Mr. Francis?

18      A.    No, I did not.

19      Q.    You did not make any request to the Manchester PD or

20    the FBI to search Mr. Francis or any of his belongings on that

21    day, September 1st?

22      A.    No.

23      Q.    And any request that you're aware of came after that

24    day?

25      A.    I don't know who requested any of those things.  I

**JOINT APPENDIX 234**

87

 1   wasn't involved in that conversation.

 2       Q.   Okay.  So I want to ask you questions in two

 3   categories:  One deals with what you described as your

 4   authority to request law enforcement to make an arrest and the

 5   other category is what you described as your authority to

 6   request law enforcement to engage in a search.  Okay?  On your

 7   behalf for a parolee, to be clear.

 8            Can you -- do you believe that according to the law

 9   you can ask, say, Manchester PD to arrest a parolee for a

10   parole violation that is not itself an independent crime?

11       A.   Yes.

12       Q.   You can?

13       A.   Yes.

14       Q.   So something like not notifying you of a change of

15   address?

16       A.   That wouldn't be one of the examples, no.

17       Q.   It would not?

18       A.   No.

19       Q.   Okay.

20       A.   Not in and of itself.  I guess my -- to answer your

21   question, it would depend on the situation.  Again, it's --

22   every case is unique.  So the factors involved with that

23   individual, that's what the parole officer would have to take

24   into account when making that decision.

25       Q.   Okay.

**JOINT APPENDIX 235**

1        A.    So it's not necessarily tied to a specific rule that

2    would trigger that, if that makes sense.

3        Q.    Okay.  Are you aware of any law or rule that says,

4    well, you can authorize law enforcement to make an arrest on

5    your behalf, on behalf of the parole officer of a parolee, if

6    they've committed a violation that's a new crime or if they're

7    going to abscond or if they're a menace to the public?

8        A.    Yup, that's the statute.  Yup.

9        Q.    Okay.  And are you also aware that there's a statute

10   that says if they haven't committed a new crime, if there's no

11   information that they're going to abscond, and if they're not

12   apparently a threat to the public at the moment but they are in

13   violation of their parole that you cannot request law

14   enforcement to do that; you have to get a warrant from the

15   parole board.  Right?

16            MR. GINGRANDE:  Your Honor, I would object to this

17   question on the grounds that it's a mischaracterization of the

18   law.  It's legal argument.  And I don't think this witness --

19            THE COURT:  It's legal argument.  Overruled.

20            I'm curious.  What statute?  What's the statute?

21            MR. GUERRIERO:  It is RSA 504-A:4, I believe.

22            THE COURT:  It doesn't say any such thing.

23            MR. GUERRIERO:  Well -- and I know your Honor's

24   looking at it, so --

25            THE COURT:  I am.

**JOINT APPENDIX 236**

1          MR. GUERRIERO:  -- how about I just read it to him?

2          THE COURT:  First of all, it's poorly written.  You

3   can construe it many different ways.

4          Before we go much further, though, let me ask you,

5   what are we arguing about?  Are we arguing about a Fourth

6   Amendment violation here or are we arguing about violation of a

7   state statute authorizing arrests?

8          MR. GUERRIERO:  I would agree with you if your

9   Honor's --

10         THE COURT:  You can't agree with me.  I'm asking a

11  question.

12         MR. GUERRIERO:  Okay.  We are arguing about a Fourth

13  Amendment violation.  I understand that a violation of state

14  law may not necessarily result in application of the

15  exclusionary rule, but I'm in this circumstance where it was

16  unlawful for the -- it would have been unlawful for the parole

17  officer to authorize law enforcement to engage in this search.

18         I mean, this is their explanation for inevitable

19  discovery, that it would be a lawful search pursuant to state

20  law.  I mean, they're not offering this as the -- as the --

21  as -- as the basis for the search.  They're saying it's

22  inevitable discovery or a lack of expectation of privacy.

23         THE COURT:  They have a couple of arguments, as I

24  understand it.

25         MR. GUERRIERO:  Yup.

**JOINT APPENDIX 237**

90

```
 1              THE COURT:  One of them is it's consistent with

 2    504-A:4.  I'm not sure it is, but that's the argument.

 3              And the other argument is inevitable discovery.

 4    Once the drugs are found in the car, of course he's going to be

 5    arrested; and once he's arrested, of course they're going to

 6    search the phone and, by the way, we've got a warrant to search

 7    the phone.

 8              Right?  Isn't that their argument?

 9              MR. GUERRIERO:  That's their argument.  It is.

10              THE COURT:  Yeah.  But I'm curious about whether --

11    I -- obviously I'm going to have to think about it more, but

12    you know, in the state hierarchy, violations aren't crimes.

13    They're still offenses of some sort.  Right?

14              MR. GUERRIERO:  I respectfully disagree, your Honor.

15    I --

16              THE COURT:  You think they're not offenses?

17              MR. GUERRIERO:  Yeah.  And I practice in the state

18    court system.  I mean, they are -- I mean, as -- you know, as a

19    practical effect, if you have a violation of parole, you go

20    before the parole board on your violation and you can get a

21    setback, 90 days --

22              THE COURT:  That's because terms of probation and

23    parole --

24              MR. GUERRIERO:  Yes.

25              THE COURT:  -- are not necessarily crimes.
```

**JOINT APPENDIX 238**

 1              MR. GUERRIERO:  It's not even necessarily an

 2    offense.  For example, changing your address without giving

 3    proper notice, that's not an offense of any kind.

 4              THE COURT:  I know we're going far afield here just

 5    for a moment, but how do you read the statute?  The -- the --

 6    as I'm -- one reading that I see here is the parolee may be

 7    arrested anytime any probation or parole officer or any other

 8    officer authorized to arrest -- means sworn police officers, I

 9    assume -- upon request of the probation or parole officer when

10    the probation or parole officer has reason to believe that he

11    probably has committed a new criminal offense, conducting

12    himself in such a way as to be a menace to public safety, or

13    there's probable cause to believe that the probationer or

14    parolee will abscond or commit new criminal offenses if not

15    arrested.

16              Does it specifically say for a violation of the

17    terms of parole under the section titled Violation of Terms?

18              MR. GUERRIERO:  I struggled with this, too, and I

19    think that -- honestly, I think the problematic language, at

20    least I -- in my opinion, is at the end of the first line and

21    the beginning of the second line, "any other officer."

22              And I would agree that that -- does that mean any

23    other parole officer or does it mean any --

24              THE COURT:  No, it means any other police officer, a

25    sworn -- I think the term is sworn officer, but anybody with

**JOINT APPENDIX 239**

 1   the power to arrest, power -- you know, anybody imbued with the

 2   power to arrest.  That's the way I would construe it.

 3            It says authorized to arrest, but arrest for what?

 4   Upon request.  So this -- this statute seems to require prior

 5   request from a probation or parole officer, which makes sense

 6   to me if it's related to a violation of the terms of probation

 7   or parole, because sometimes parole officers may not want them

 8   arrested; sometimes they may want to work with them; sometimes

 9   they may want to seek a warrant from the board or whatever.

10            But it doesn't seem to -- it doesn't seem to say the

11   obvious:  If you violate the terms of parole, you can be

12   arrested.

13            MR. GUERRIERO:  Right.  And --

14            THE COURT:  I understand that's not our point.  Your

15   point is he doesn't fall into any of these other -- first,

16   there's no request; and, second, he doesn't fall into any of

17   these categories.

18            MR. GUERRIERO:  That's exactly right.

19            THE COURT:  That's your point.

20            And then the -- then that gives rise to the

21   question, so what.  This statute doesn't limit the power of a

22   sworn officer in this state to make an arrest under the usual

23   circumstances to prevent commission of crime, because you're

24   engaged in crime, because there's probable cause to believe

25   you're engaged in crime or about to engage in crime.  Right?

93

```
 1              MR. GUERRIERO:  Right.  So, I mean -- I'm sorry.  I
 2    didn't mean to interrupt.
 3              THE COURT:  Yeah.  So -- so a sworn officer doesn't
 4    need a request from a parole officer to do any of that.
 5              MR. GUERRIERO:  If they had probable cause to
 6    arrest.
 7              THE COURT:  Correct.  Right.
 8              MR. GUERRIERO:  If I may, I mean, our contention
 9    is --
10              THE COURT:  So that gives rise to the --
11              MR. GUERRIERO:  They didn't --
12              THE COURT:  So what are we talking about?  You're
13    talking about Fourth Amendment.  If you're just strictly
14    limited to the Fourth Amendment, violation of the terms of
15    parole, you're saying an arrest for -- based on probable cause
16    to believe someone has violated -- is violating the terms of
17    their parole or probation somehow violates the Fourth
18    Amendment?
19              MR. GUERRIERO:  I'm saying that --
20              THE COURT:  It might violate the statute in the
21    sense that you're not authorized to make the arrest, but how
22    does it violate the Fourth Amendment if a crime, an offense,
23    has been -- is being committed?
24              MR. GUERRIERO:  It -- it would not violate the
25    Fourth Amendment if they had probable cause to believe that a
```

94

1　felony had been committed.  I think that that would be -- they

2　can make a warrantless arrest.

3　　　　　　　THE COURT:  A misdemeanor in their presence --

4　　　　　　　MR. GUERRIERO:  But that --

5　　　　　　　THE COURT: -- that also counts.  Misdemeanor in

6　their presence counts as well.  You can arrest based on -- the

7　fact that you think a misdemeanor is being committed in your

8　presence.

9　　　　　　　MR. GUERRIERO:  In your presence, yes.

10　　　　　　　THE COURT:  It doesn't have to be a felony.

11　　　　　　　MR. GUERRIERO:  That's right.

12　　　　　　　THE COURT:  And so then -- so this violation fits

13　where?

14　　　　　　　MR. GUERRIERO:  This violation, well --

15　　　　　　　THE COURT:  Below misdemeanor but still an offense,

16　a crime?

17　　　　　　　MR. GUERRIERO:  I -- it's not a crime.

18　　　　　　　THE COURT:  Okay.

19　　　　　　　MR. GUERRIERO:  I mean, I think that the -- we'll

20　see.

21　　　　　　　THE COURT:  So you're saying it's a Fourth Amendment

22　issue because it's an arrest not based on probable cause to

23　believe a crime has been committed or is being committed.

24　　　　　　　MR. GUERRIERO:  And I -- and on that point, it's

25　very important for us to be clear that at the time that

**JOINT APPENDIX 242**

```
 1   Mr. Francis was arrested, and we'll hear from Detective O'Neill

 2   and Detective Lorenzo, but at the time he was arrested, there

 3   had not been a search of the car, so they didn't have the kilo

 4   of cocaine from in the car; there had not been a search of

 5   Mr. Francis's apartment at the time when they had the --

 6             THE COURT:  No, no, no, I don't think anybody's

 7   claiming there was some other independent probable cause basis

 8   for an arrest.

 9             MR. GUERRIERO:  But that's important, because if

10   they don't have probable cause to believe that he committed a

11   felony or misdemeanor in the presence of an officer, then it's

12   a violation of the Fourth Amendment.  That's the answer to your

13   question.

14             THE COURT:  Okay.  All right.  Thanks.

15             MR. GUERRIERO:  Okay.

16             Let me get back to where I was.  All right.

17             All right.  I think I will -- I think I will not ask

18   further questions about the seizure issue.  I think we've

19   sorted that out.

20             THE COURT:  Well, this witness didn't request an

21   arrest, didn't make the arrest.

22             MR. GUERRIERO:  Yes.  Yeah.

23   Q.   And you didn't request a search that day --

24   A.   No.

25   Q.   -- of Mr. Francis's vehicle or of Mr. Flores or
```

**JOINT APPENDIX 243**

96

1    anybody; you didn't make any request that day?

2        A.    Nope.

3        Q.    Okay.  And just maybe one last area with regard to

4    this condition number 9.

5            And, again, I'll violate my own rule but ask you, I

6    mean, this says, I will permit the parole officer -- this is

7    condition number 9 in the conditions of parole and Document 61,

8    Exhibit 1:  I will permit the parole officer to visit my

9    residence at any time for the purpose of examination and

10   inspection and the enforcement of the conditions of parole and

11   submit to searches of my person, property, and possessions as

12   requested by the parole officer.

13           So as requested, that means that in order for there

14   to be a requirement that the person submit, there has to be a

15   request from the parole officer, right?

16       A.    We don't need -- I guess I'm -- maybe I'm

17   misconstruing the question.

18       Q.    Okay.

19       A.    As far as getting permission from the individual?

20       Q.    Every person who's on parole in New Hampshire

21   from the New Hampshire Department of Corrections and the

22   New Hampshire State Prison signs these conditions, right?

23       A.    Yes, sir.

24       Q.    And what he has agreed to is to permit a search upon

25   request by a parole officer?

**JOINT APPENDIX 244**

1    A.    Yes, that's --

2    Q.    That's exactly what he agreed to?

3    A.    Yup.

4    Q.    He doesn't -- there's not some other document where

5    the person agrees, okay, I agree to be searched by -- you know,

6    if I'm driving down Main Street in Keene and a Keene police

7    officer pulls me over and they want to search me, someone on

8    parole is not obligated to consent to that, right?

9    A.    Correct.

10    Q.    You -- you could not file a violation of parole for

11    them refusing consent to a Keene police officer if you had not

12    requested the search?

13    A.    Correct.

14    Q.    Okay.  And you said that the first that you knew

15    about this matter was -- did you say the next day or a couple

16    of days later?

17    A.    It was either -- again, I'm just going by memory.

18    It was either later that evening, because I believe it was like

19    an afternoon when it happened, but it was midweek, so it would

20    have been either later that day or the next day, just because I

21    had to do paperwork on Mr. Flores --

22    Q.    Right.

23    A.    -- within a couple of days that I had to get done,

24    so I know I knew fairly quickly.

25    Q.    Okay.  And did you know that Mr. Flores had been

**JOINT APPENDIX 245**

```
 1   arrested at that point?

 2        A.   Yes.  That's how I found out.

 3        Q.   Yes.

 4        A.   It was stated to me, your guy was picked up while

 5   they were arresting my guy, I believe was what the conversation

 6   I had with Bill at the time was; just so you know, your guy was

 7   with him when he got arrested and I had the warrant.  So the

 8   officer would notify me of that.

 9        Q.   So you also knew Mr. Francis was arrested?

10        A.   Yes, I believe --

11        Q.   You also knew --

12        A.   -- so.

13        Q.   You also knew that the car had been searched?

14        A.   At the time, no.

15        Q.   You didn't?

16        A.   I -- no, I don't believe so.

17        Q.   Okay.  Did you at that point say, I direct you to

18   search Michael Francis's car because I'm Emilio Flores's parole

19   officer and I want that car searched?

20        A.   It wasn't at the time of the incident.  Like I said,

21   it would have sort of been hours later or the next day.  So the

22   scene obviously wouldn't still be active at that point.

23             So when I found out, I -- when it happened, it had

24   already transpired.  I was just notified, hey, he's going to be

25   at the jail, so I could do my paperwork with Mr. Flores.
```

**JOINT APPENDIX 246**

```
 1        Q.    So was there ever a point at any point where you
 2   said, hey, search that car where Mr. Flores had been?
 3        A.    That I said that?
 4        Q.    Yeah.
 5        A.    No.
 6        Q.    Okay.  All right.  And when a person consents to --
 7   you know, agrees to condition number 9 and they agree to search
 8   of their person, property, or possessions, or their residence,
 9   it's -- I should use the exact words.
10             It says:  My person, property, and possessions as
11   requested by a parole officer.  Right?  It says "my" and that
12   refers to the parolee.
13        A.    If that's what it says, yes.
14        Q.    Yes.  Okay.  Well, I mean, so, for example, suppose
15   that a parolee was in a car with, you know, person X on
16   Wednesday.  Would you say that you had authority as the parole
17   officer for the parolee to search that car days later when the
18   person -- your parolee was no longer in the car?
19        A.    No.
20             MR. GUERRIERO:  Thank you.
21             THE COURT:  Mr. Gingrande, any redirect?
22             MR. GINGRANDE:  Just briefly, your Honor, if I
23   could.
24                       REDIRECT EXAMINATION
25   BY MR. GINGRANDE:
```

**JOINT APPENDIX 247**

1      Q.    Parole Officer Benard, I'd now like to discuss the

2  issue that the judge was discussing with defense counsel just

3  now about the -- the basis for an arrest under 504-A:4.

4         So I believe you -- you testified earlier to some of

5  the bases of arrests that can be made pursuant to that statute.

6      A.    Correct.

7      Q.    Can you describe -- and then you were asked the

8  question, can you arrest a parolee for a violation that's not

9  an independent crime.

10      A.    Correct.

11      Q.    And you said yes, I believe.

12      A.    Yes, you can.

13      Q.    Can you -- can you explain that?

14      A.    If you'd like an example, a very simple one, I can

15  probably provide it.

16         So if I have an individual, let's say, that went to

17  prison for a crime of first-degree assault and the underlying

18  mitigating issue with it was alcohol use.  There is a

19  circumstance where if police stop the individual, and let's say

20  they're intoxicated, they did not commit one crime whatsoever

21  and they notify me that they have him in custody and they

22  believe he's intoxicated, I very -- very much would say you're

23  going to arrest an individual for my -- for violating parole on

24  my request, not for new charges, for violations, because with

25  that specific individual, that would be a trigger for them to

**JOINT APPENDIX 248**

Case: 24-1386   Case: 24-1386   Document: 00118186996   Document: 52   Page: 252   Filed: 09/06/2024   Date Filed: 09/06/2024   Entry ID: 6665919

101

```
 1    be falling under the category of potentially new criminal

 2    conduct occurring and/or being a menace to society because you

 3    had that component with the alcohol.

 4               And that's just one example.

 5         Q.   Okay.  Understood.  And when it comes to the

 6    absconsion part --

 7               THE COURT:  You know, that's a good example, but

 8    that comes under the classification of the parole officer has

 9    reason to think that the parolee is acting in a way that he

10    poses a menace to public safety.

11               MR. GINGRANDE:  That's true, your Honor.

12               THE COURT:  So the statute -- I mean, where in the

13    statute does it say police officers -- sworn officers who are

14    not parole and probation officers may arrest for a violation of

15    a term of probation without changing -- not keeping the parole

16    officer informed of his change in address?

17               This statute would seem to say you -- a sworn

18    officer cannot arrest a parolee for that.

19               MR. GINGRANDE:  I don't think the statute speaks to

20    that scenario, your Honor.  I would agree.

21               THE COURT:  Okay.  Then what are we talking about --

22    what's the point?  I'm missing your point then.

23               MR. GINGRANDE:  I apologize, your Honor.  I'm just

24    trying to get at the various scenarios in which there is --

25    there's a violation of parole, for instance, that might raise
```

**JOINT APPENDIX 249**

1　the parole officer's attention that then results in a lawful

2　arrest.

3　　　　THE COURT:  Yeah.  I'm willing to grant -- despite

4　the way this is written, I'm willing to grant the commonsense

5　interpretation that if you violate the terms of your parole or

6　probation, the parole or probation officer can certainly arrest

7　you for it.  Even though what you've done doesn't amount to a

8　crime in any universe, he can still arrest you.  Right?

9　　　　MR. GINGRANDE:  Yeah.  Yeah.

10　　　　THE COURT:  That's not entirely clear, but let's

11　assume that's the case.

12　　　　MR. GINGRANDE:  Yup.

13　　　　THE WITNESS:  I can provide another example, if

14　you'd like.

15　　　　THE COURT:  No, I accept that.

16　　　　THE WITNESS:  Okay.  Thank you, your Honor.

17　　　　THE COURT:  That makes common sense.  But it also

18　makes sense to me that the parole officer may not want a

19　parolee arrested, may not want to arrest him, and may not want

20　him arrested because he's working with him in drug counseling

21　or whatever, a hundred reasons.

22　　　　This seems to limit the ability of a sworn officer

23　to make an arrest of a parolee or probationer, right?  It

24　seems -- it seems to say two things:  One, you've got to be

25　asked by a parole or probation officer before you can do that;

**JOINT APPENDIX 250**

103

1   and, two, the parole or probation officer has to find that he's

2   in -- the parolee falls into one of these conditions, he's

3   about to take off, he's a menace to society, something, before

4   that sworn officer can make the arrest.

5              MR. GINGRANDE:  Yup.

6              THE COURT:  It seems to be.

7              MR. GINGRANDE:  I --

8              THE COURT:  So then we get back to the issue of

9   what's a violation.  What is it?

10             MR. GINGRANDE:  What is a violation of parole or --

11             THE COURT:  Sure.

12             MR. GINGRANDE:  -- what is a qualifying --

13             THE COURT:  What's its nature, what's its character,

14  what's its content?  What is it?  Because does a sworn officer

15  have an authority to just arrest a parolee because he violated

16  the terms of parole that don't amount to a crime?  The answer

17  seems to be no.

18             MR. GINGRANDE:  Under the terms of that statute, I

19  agree with you, your Honor.

20             THE COURT:  Okay.

21             MR. GINGRANDE:  I wouldn't say anything --

22             THE COURT:  The next step, did that happen here.

23  The answer seems to be yes.  Right?

24             MR. GINGRANDE:  That -- well, the arrest certainly

25  happened, your Honor.  And maybe I can direct --

**JOINT APPENDIX 251**

104

```
 1            THE COURT:  Oh, no.  No, no.  A qualifying -- an
 2    unqualified arrest, an arrest that doesn't qualify under RSA
 3    504-A:4.
 4            MR. GINGRANDE:  I would --
 5            THE COURT:  Nobody asked him, it wasn't a crime
 6    independently, and the parolee didn't fall into one of these
 7    conditions.  And even if they did, no parole or probation
 8    officer made the judgment that he had reason to believe that he
 9    fell into those.  The triggers are many.  The parole officer
10    also has to have reason to believe that the parolee falls into
11    one of these categories, right?
12            So it's got nothing to do with Officer Jones or the
13    Manchester Police Department on scene.  It has to do with the
14    judgment of a parole officer.
15            MR. GINGRANDE:  Uh-huh.
16            THE COURT:  Right?
17            MR. GINGRANDE:  Uh-huh.
18            THE COURT:  And none of that happened.  We -- I
19    think we all agree, right?
20            MR. GINGRANDE:  Well, could I ask the witness a
21    couple questions on that, your Honor?
22            THE COURT:  Well, you could, except is he qualified?
23    It's not the defendant's parole officer.  He didn't request
24    anything.  He didn't make the arrest.  And what are you going
25    to ask him, did Duffy request?
```

105

1          MR. GINGRANDE:  No, no, that's not what I was

2    going -- what I would ask him, your Honor, no.  But I was just

3    going to ask him on the basis of absconsion when it comes to

4    Michael Francis in particular, whether that --

5          THE COURT:  No, no.  What -- do you have evidence

6    that some authorized parole or probation officer made the

7    judgment that this defendant posed a risk of absconding?

8          MR. GINGRANDE:  Well, I was -- well, I -- I -- not

9    through -- not necessarily through this witness, no.  It was

10   just to ask the question about -- about the authority on that

11   basis.

12         THE COURT:  I can read the statute.

13         MR. GINGRANDE:  Okay.

14         THE COURT:  You know, I'm not perfect, but I can get

15   the gist of it.

16         MR. GINGRANDE:  Fair enough.  Fair enough, your

17   Honor.

18         THE COURT:  And the facts so far, and I don't think

19   anybody's making a different contention, are they, there was no

20   request for a parole or probation officer to make this arrest

21   of the defendant, correct?

22         MR. GINGRANDE:  You're going to hear some -- some

23   officer testimony about that, your Honor.  And I think

24   that's --

25         THE COURT:  Well, is your contention that a -- a

**JOINT APPENDIX 253**

Case: 24-1386 Case: 24-1386 Document: 00118186996 Document: 257 Page: 257 Date Filed: 09/06/2024 Date Filed: 09/06/2024 Page 1 of 1 Entry ID: 6665919

106

1   probation or probation officer made the request that this

2   arrest be accomplished?

3           MR. GINGRANDE:  It's certainly law enforcement's

4   contention that that is -- that is the case, without making the

5   representations --

6           THE COURT:  Well, it doesn't need to be --

7           MR. GINGRANDE:  -- myself as to the --

8           THE COURT:  It doesn't need to be contention.

9   There's got to be some evidence that some identified authorized

10  parole and probation officer said please make this arrest

11  because I -- it doesn't have to say I made the judgment, but

12  there's got to be evidence that he made the judgment that he

13  falls into one of these categories, right?

14          MR. GINGRANDE:  Yeah.  And --

15          THE COURT:  Will you have evidence?

16          MR. GINGRANDE:  What I expect you to hear, your

17  Honor, from the officer --

18          THE COURT:  Mr. Gingrande, I don't want to be here

19  at six o'clock and find out that you don't have that evidence.

20          MR. GINGRANDE:  Sure.

21          THE COURT:  I want to just ask you.  Do you have

22  that evidence and are you going to present it?

23          MR. GINGRANDE:  We're going to present an officer

24  who says he received that authority from PPO Duffy.  He

25  believed he had that authority from PPO Duffy.

**JOINT APPENDIX 254**

```
 1               THE COURT:  His belief is irrelevant.  The question
 2     is was he asked.
 3               MR. GINGRANDE:  I think -- I -- I think we'll have
 4     to --
 5               THE COURT:  Was he --
 6               MR. GINGRANDE:  Was he asked specifically to make
 7     the arrest?
 8               THE COURT:  Okay.  Give it a whirl.
 9               MR. GINGRANDE:  I think he would say yes.  I can't
10     make the representation yes or no based on whether there was a
11     specific request.
12               THE COURT:  Why don't we get to that because that's
13     the pivotal point here, right?
14               MR. GINGRANDE:  Okay.  Sure.  I just want -- if I
15     could just see if I have any further questions for this
16     witness.
17               Yeah, I have no further questions for this witness,
18     your Honor.
19               THE COURT:  Thank you, Officer Benard.  I appreciate
20     it.
21               THE WITNESS:  Thank you, your Honor.
22               THE COURT:  And you're excused as a witness.  You
23     may step down.
24               THE WITNESS:  Thank you, sir.
25               THE COURT:  All right.
```

**JOINT APPENDIX 255**

108

```
 1                    (Witness excused.)
 2           THE COURT:  Do you have another witness?
 3           MR. GINGRANDE:  Yes, your Honor.  I'd like to call
 4   Sergeant Joe Lorenzo to the stand.  I'll be right back.
 5           THE COURT:  While we're waiting, Mr. Guerriero, I
 6   haven't -- I just have looked at 504-A:4.  Are there other --
 7   is there a statutory provision around it somewhere that clarify
 8   those issues?
 9           MR. GUERRIERO:  I -- I read all of the statutes in
10   504-A and -- to see, because the First Circuit case had said it
11   did not -- it appeared that New Hampshire's conditions are
12   different than other states, so I was worried that it had been
13   updated since that First Circuit case.
14           I didn't see anything else that applied.  So it's
15   really -- this is it, as far as I know.
16           THE COURT:  I assume you agree that it's implicit at
17   least that a parole officer can arrest a parolee for violation
18   of a term of release no matter how minor.
19           MR. GUERRIERO:  The way I read it is that the -- a
20   probation -- a parole officer can offer -- can authorize
21   another law enforcement --
22           THE COURT:  No, no, I'm not talking about that.  I'm
23   saying the first sentence.  The section itself seems to start
24   out with of course a probation and parole officer himself or
25   herself can arrest a parolee for violating the terms of parole.
```

**JOINT APPENDIX 256**

```
 1                    MR. GUERRIERO:  Of course.

 2                    THE COURT:  No other -- no other requirement.

 3                    MR. GUERRIERO:  That's right.

 4                    THE COURT:  Okay.

 5                    MR. GUERRIERO:  The parole officer can make the

 6     arrest.

 7                    THE COURT:  Well, it's not entirely -- it's not

 8     written that way.  It's just in that section, violation of

 9     terms, and it goes off on when -- when another sworn officer

10     can make an arrest.

11                    MR. GUERRIERO:  Our contention is that for -- if you

12     look at the first sentence of paragraph 2, whenever it doesn't

13     meet the conditions of parole for immediate arrest, and I take

14     that to mean when there is either a new crime, a menace to the

15     public, or a risk of flight, as set forth in I, then they can

16     authorize a law enforcement officer.  But as for other

17     violations that don't fall into those categories, the parole

18     officer has to get a warrant from the parole board and then

19     once there's a warrant, then anybody can arrest him.

20                    THE COURT:  All right.  Sorry.  Go ahead,

21     Mr. Gingrande.  We're just discussing the interpretation of the

22     statute.

23                    MR. GINGRANDE:  Understood.

24                    Your Honor, the government calls Sergeant Joe

25     Lorenzo to the stand.
```

**JOINT APPENDIX 257**

110

```
 1              THE CLERK:  Please remain standing and raise your
 2   right hand.
 3              JOSEPH LORENZO, having been first duly sworn,
 4   testified as follows:
 5              THE CLERK:  Thank you.  Please be seated.
 6              MR. GUERRIERO:  If I could, and I apologize for
 7   interrupting the government, but because of your Honor's
 8   concern about getting right to the point, I -- we have not
 9   alerted you previously, but the -- Mr. Francis's actual parole
10   officer, who is Mr. Duffy, William Duffy, had a family matter.
11   And he was under subpoena, but we agreed that if it became
12   necessary to call him as a witness here that we would ask the
13   Court for permission to come back another day and bring him.
14              So Mr. Duffy, Mr. Francis's actual parole officer,
15   is not here.  So I didn't want to keep going forward and have
16   you think that -- that we were going to call him today because
17   that might try your patience.  So --
18              THE COURT:  It won't try my patience.  Thank you.
19   I'd like to -- you're telling me we may not finish.
20              MR. GUERRIERO:  We're going to come back another
21   day, it sounds like, anyway.
22              THE COURT:  Okay.  We'll see how it goes.
23              MR. GINGRANDE:  Thank you, your Honor.
24              THE CLERK:  Please state your full name for the
25   record.
```

**JOINT APPENDIX 258**

```
 1              THE WITNESS:  Joseph Lorenzo.

 2                    DIRECT EXAMINATION

 3   BY MR. GINGRANDE:

 4       Q.    Sergeant Lorenzo, can you please tell the Court

 5   where you're employed.

 6       A.    At the Manchester Police Department.

 7       Q.    And how long have you been with the Manchester

 8   Police Department?

 9       A.    17 years.

10       Q.    And in what capacity were you employed with

11   Manchester Police?

12       A.    As of now, I'm a sergeant with the anticrime unit.

13       Q.    Okay.  How long have you been a sergeant with the

14   anticrime unit?

15       A.    About two and a half years.

16       Q.    Okay.  And prior to that, were you employed by

17   Manchester Police as well?

18       A.    Yup.  Prior to that, I was a sergeant in patrol.

19       Q.    Okay.

20       A.    Just previous to that, I was in detectives, the

21   investigative division, for eight years.

22       Q.    Okay.  Any law enforcement experience prior to being

23   with Manchester Police?

24       A.    Yes, sir.  I was with the Hampton Police Department,

25   Hampton, New Hampshire, for -- I started in March of '04.
```

**JOINT APPENDIX 259**

112

```
 1          Q.    And what was your position there?
 2          A.    I was a part-time police officer.
 3          Q.    Part-time police officer?
 4          A.    Yes, sir.
 5          Q.    Okay.  Thank you, your Honor -- thank you, Sergeant
 6     Lorenzo.  I apologize, your Honor.
 7                Any other relevant law enforcement experience that
 8     you had prior to that point?
 9          A.    No, sir.
10          Q.    Okay.  Now, are you aware of an investigation into
11     the defendant in this case, Michael Francis?
12          A.    Yes, sir.
13          Q.    And were you involved in that investigation?
14          A.    I was.
15          Q.    And how -- in what capacity were you involved?
16          A.    So it was my -- the anticrime unit was with Special
17     Agent Burke.  We were investigating and I was in charge of the
18     anticrime unit at the time.
19          Q.    Okay.  And so you were in charge of the anticrime
20     unit and what -- how did that relate to Mr. Francis?
21          A.    The -- an investigation spun up concerning him.  I
22     know Special Agent Burke at the time was going to be taking a
23     search warrant for his vehicle and we were going to be
24     assisting in that capacity with the members of the unit.
25          Q.    Okay.  And was there any other information that you
```

**JOINT APPENDIX 260**

113

1  had about your -- your involvement or why you were involved

2  with -- with Mr. Francis regarding that investigation?

3        A.    No, it was just at the time Special Agent Burke was

4  working by himself.  He wasn't part of the task force he is

5  now.  He was working with the guys in my unit.  One of the guys

6  on the unit did a postarrest interview with Special Agent Burke

7  that kind of led to this investigation, that got it going, and

8  I just kind of oversaw, you know, the other detectives doing

9  the work.  You know, so if there was other investigations going

10  on, I would just oversee the detectives in the unit and this

11  was just part -- one of the investigations.

12        I don't know if I had a major role in it other than,

13  you know, approving reports and some of the logistics of stuff

14  that came up.

15        Q.    Okay.  But you were involved with -- with the

16  investigation itself as of September 1, 2021; is that right?

17        A.    Correct.  I mean, I knew what was going on, and on

18  that day I was there and I was involved with the day of the

19  search warrant.

20        Q.    Okay.  So can you explain just briefly for the Court

21  your recollection of how the events of that day unfolded?

22        A.    Yeah.  So there was a search warrant for the vehicle

23  at some point, you know, while we were on surveillance.  I --

24  I -- I gave the order that we could stop the vehicle and search

25  the vehicle.

**JOINT APPENDIX 261**

114

```
 1              Our SWAT team was the -- was in charge of executing
 2    the search warrant.  They executed the search warrant and
 3    shortly after they executed the search warrant, like almost
 4    simultaneous, I was kind of in traffic and I showed up as -- as
 5    they were, you know, executing it.
 6         Q.   Okay.  Well, let me take a step back.
 7              So were you involved with -- did you have knowledge
 8    of the observations that law enforcement was making when it
 9    regards Michael Francis driving a vehicle that day prior to --
10    driving his vehicle that day prior to the -- your showing up in
11    person on the scene?
12              THE COURT:  I'm sorry.  Why are we doing this?
13              MR. GINGRANDE:  I'm sorry, your Honor.  I'm just
14    trying to get to the arrest eventually, but --
15              THE COURT:  Ask him about the arrest.
16              MR. GINGRANDE:  Okay.  I will -- I'll cut to the
17    chase.
18              THE COURT:  Did you arrest him?
19              MR. GINGRANDE:  I'll cut to the chase, your Honor.
20         Q.   So was Michael Francis arrested that day?
21         A.   Yes, sir.
22         Q.   Okay.  And -- and were you -- did you -- you were
23    aware of that arrest?
24         A.   I am.
25         Q.   Okay.  And what were -- and on what basis did you
```

**JOINT APPENDIX 262**

```
 1  make that arrest?  Let me be more specific.

 2          Were there conversations with Parole Officer Duffy

 3  prior to that arrest?

 4      A.    There was.  So I was -- I was made aware that

 5  Detective Connor Mefford was speaking with PPO Duffy and from

 6  my recollection, my understanding was that we were -- we were

 7  good to arrest Mr. Francis on a parole violation.

 8      Q.    Okay.

 9          MR. GUERRIERO:  Could I ask that he repeat that?  I

10  heard him say a detective was speaking to PPO Duffy, but I

11  didn't hear the detective's name.

12          THE COURT:  From his recollection -- oh, Connor

13  Mefford.

14          THE WITNESS:  Connor Mefford.

15          MR. GUERRIERO:  Mefford.

16          THE WITNESS:  Yes.

17          MR. GUERRIERO:  Okay.

18      Q.    And -- and so it was your understanding that you

19  were authorized -- you, you not personally, but you as in

20  Manchester Police Department were authorized -- by PPO Duffy to

21  make that arrest, right?

22      A.    To make the arrest yes, sir.

23      Q.    Okay.  And did that -- did that arrest, in fact,

24  occur?

25      A.    It did, sir.
```

**JOINT APPENDIX 263**

116

 1    Q.    Okay.  And were you -- what can you tell the Court

 2  about how that arrest happened?

 3    A.    So Detective Mefford and Detective Kevin Lally,

 4  they're part of the anticrime unit.  They're also part of the

 5  SWAT team.  So when Mr. Francis went to the bank, I know the --

 6  I believe it was Captain Murphy who gave the command to

 7  initiate that they were able to go inside.

 8        They go inside.  They make the arrest.  I show up

 9  shortly after that.  And I believe there was another detective

10  who was standing by with Mr. Francis while he was in handcuffs.

11    Q.    Okay.  And are you aware of any concerns from law

12  enforcement about Mr. Francis potentially trying to abscond

13  just prior to your making the actual arrest?

14    A.    Yes.  So I know that there was discussion,

15  especially while he was driving his --

16        MR. GUERRIERO:  Your Honor, I have to object on this

17  point.  To my -- and the government can please correct me if

18  I'm wrong.  But I don't recall there being anything in any

19  report or any discovery about Manchester Police having concerns

20  that Mr. Francis would abscond.

21        The government dutifully made *Jencks* disclosures to

22  me before this hearing.  I don't -- if it's there, I don't

23  recall it, that -- that Manchester Police were aware of a risk

24  of him absconding.

25        MR. GINGRANDE:  Well, we have an exhibit --

**JOINT APPENDIX 264**

117

```
 1          THE COURT:  Since you've stood up and since we're
 2   not going to finish today anyway, I think I've been misreading
 3   the statute again.
 4          I think that -- you know, I think what it really
 5   addresses is -- it addresses the situation in which an arrest
 6   is to be made for a parole violation or probation violation in
 7   the absence of a warrant.  In other words, the rule is you
 8   can't make an arrest of a parolee or probationer unless there's
 9   a warrant.
10          Second point, but you can make a warrantless arrest
11   under these circumstances, and these circumstances require the
12   probation officer to have a reasonable -- or have reason to
13   believe that the parolee has committed a new criminal offense
14   or is conducting himself in such a way as to be a menace to
15   public safety or there's probable cause to believe that the
16   probationer or parolee will abscond or commit new criminal
17   offenses if not arrested.
18          That's when you can arrest without a warrant,
19   whether you're a probation or parole officer or a sworn
20   officer.
21          MR. GUERRIERO:  I agree.
22          THE COURT:  Isn't that the way you read it?
23          MR. GUERRIERO:  Yes, sir.
24          THE COURT:  Well, then, what is -- what -- don't you
25   have to establish -- if you're trying to say this was a valid
```

**JOINT APPENDIX 265**

118

1  arrest under 504-A:4, don't you have to establish that a parole
2  officer made the request and the parole officer had reached
3  this conclusion or had reason to believe one of these
4  categories presented itself?
5          MR. GINGRANDE:  I think that's correct, your Honor,
6  yeah.
7          THE COURT:  Well, how are you going to do that?  Do
8  you have a parole officer to say I requested a sworn officer to
9  make this arrest because I had reason to believe one of the
10  following categories?
11         MR. GINGRANDE:  Yes, your Honor --
12         And if you do, why didn't you present him at 1:30?
13         MR. GINGRANDE:  Well, it's because -- Mr. Francis's
14  parole officer is not available today, as --
15         THE COURT:  Then you stand up and you say, you know,
16  we have evidence that these criteria are met, but the witness
17  isn't here and maybe we can do this some other time.
18         MR. GINGRANDE:  Well, I apologize, your Honor.  I'm
19  trying to get some of that from this witness who -- who was on
20  the scene at the time --
21         THE COURT:  No, this witness wasn't on the scene.
22  This witness was directing the -- it sounds like directing the
23  operation and conveying you now may go into the bank to others.
24         MR. GINGRANDE:  Involved in the arrest, sure.
25         THE COURT:  Well, sure.  Some other sworn officer

**JOINT APPENDIX 266**

119

1    actually put the arrest on him, made -- took him into --

2    under -- in custody, right?

3         MR. GINGRANDE:  Yes, your Honor.

4         THE COURT:  And I assume you're not going to -- if

5    you're going to produce that officer, he's not going to say

6    Officer Duffy called me up and said he requested me to put him

7    under arrest for a parole violation because Officer Duffy

8    thought he fell into the category of possible absconding, did

9    he?  Do you have that?

10        MR. GINGRANDE:  I -- your Honor, I -- I think

11   that -- that -- I don't want to misrepresent to the Court what

12   PPO Duffy would say -- what PO Duffy, excuse me, would say, but

13   I -- but I do think that PO Duffy would agree that there was a

14   basis, based on Francis possibly skipping, based on the nature

15   of the parole violations themselves, the fact that they didn't

16   provide an address to parole officers, he's associating and

17   harboring a fugitive in this case, Mr. -- Mr. Flores --

18        THE COURT:  We -- we, sadly, don't get to go back in

19   time and rewrite the script.  The script is the script.

20   Whatever happened, happened, right?

21        MR. GINGRANDE:  Yes, your Honor.

22        THE COURT:  Okay.  So doesn't this statute say that

23   if you don't have a warrant to arrest a probationer or a

24   parolee for a violation of the terms of his parole or

25   probation, if you don't have a warrant, you can still arrest

**JOINT APPENDIX 267**

```
 1   him for that, but he's got to fall into one of these
 2   categories; and, by the way, a parole officer has to ask a
 3   sworn officer to make the arrest because you don't want sworn
 4   officers just making violation arrests all the time because
 5   that might disrupt the supervision and the relationship and on
 6   and on.  Right?
 7              MR. GINGRANDE:  Right.
 8              THE COURT:  So you've got to have a request so that
 9   we don't have that problem; and, secondly, probation officer,
10   you've got to be able to say you have reason to think one of
11   these categories, one of these situations, exists.  Right?
12              MR. GINGRANDE:  Uh-huh.
13              THE COURT:  So for you to prove that the arrest was
14   not an unlawful arrest, it was a valid arrest, don't you have
15   to bring in a probation officer to say, you know what, I asked
16   the sworn officer to make the arrest because I had reason to
17   believe one of these categories existed and, by the way, I
18   didn't have a warrant, so I had to have one of these.
19              Don't you have to have that?
20              MR. GINGRANDE:  I -- your Honor, yes.  Honestly, I
21   thought I could -- I might be able to establish that by the --
22   by the exhibits and -- but you're right.
23              THE COURT:  You can't establish it by the sworn
24   officers who made the arrest saying, yeah, I thought everything
25   was good.
```

**JOINT APPENDIX 268**

1          MR. GINGRANDE:  Well, to the extent that they

2 believed they at least had the authority.

3          And, again, you know, this -- ultimately what we're

4 deciding is a question of Fourth Amendment reasonableness,

5 right?

6          THE COURT:  I'm not sure of that.

7          MR. GINGRANDE:  Well, when it comes to the -- when

8 it comes to the search itself, that -- that was --

9          THE COURT:  But you're claiming search incident to

10 an arrest.  Predicate of search incident to an arrest is valid

11 arrest.  It's step one.

12          MR. GINGRANDE:  That's one of the bases, your Honor,

13 absolutely.

14          THE COURT:  That's the basis of search incident to

15 arrest.  Valid -- one, valid arrest; two, search incident to

16 that arrest.  Right?

17          MR. GINGRANDE:  Yes.  Yes, your Honor.

18          THE COURT:  So we're at square one.

19          Where is the valid arrest?

20          MR. GINGRANDE:  Okay.  No, your Honor, I -- I agree

21 and I -- I do think at this point, you know, the parties had

22 discussed that if it became necessary to call PPO -- Parole

23 Officer Duffy, even though he's unavailable today, that we

24 would do that.  We weren't necessarily sure of how things were

25 going to play out --

122

```
 1              THE COURT:  Since it's 4:15, here's an old-school
 2   solution.  Make a proffer.  What do you have?  What are you
 3   going to be able to produce by way of evidence of a lawful,
 4   valid arrest of Mr. Francis in the bank?
 5              MR. GINGRANDE:  Well, when it comes to what Parole
 6   Officer Duffy would say, I -- I feel --
 7              THE COURT:  No.  The way you make a proffer is you
 8   say, I'm going to put on evidence from a witness who's going to
 9   get on that stand, swear under oath that he requested that an
10   arrest be made of Mr. Francis because he violated the terms of
11   his parole and probation in that, whatever, he gave a bad
12   address, and based on my knowledge of him generally and so
13   forth, I had reason at that time to believe that he was in a --
14   he was going to abscond or he was a menace to public safety or
15   he was about to commit another crime, something like that.
16              MR. GINGRANDE:  Yeah.
17              THE COURT:  Because I didn't have a warrant, so I
18   had to make a warrantless arrest and this is the requirement
19   for a warrantless arrest.
20              Do you have that evidence?
21              MR. GINGRANDE:  I -- I cannot -- I do not feel
22   comfortable making that proffer, your Honor, because my
23   understanding of -- it's hard for me to -- to fully articulate
24   what Parole Officer Duffy's position was.  And --
25              THE COURT:  Did anybody interview him?
```

**JOINT APPENDIX 270**

123

 1              MR. GINGRANDE:  Yes, I -- yeah, I spoke to him.  I
 2   did speak to him.
 3              THE COURT:  What did he say?
 4              MR. GINGRANDE:  I spoke to Parole Officer Duffy.
 5              Well, my best understanding of what Parole Officer
 6   Duffy said, and that's all I can really tell you, is that --
 7   that he did not necessarily think that the parole violation of
 8   not reporting an address was a basis to arrest Francis in this
 9   case; he didn't say to arrest him for that parole violation.
10   And I think that's consistent with the law, as we've discussed.
11              He did say that -- that he did agree that --
12              THE COURT:  No, it's not consistent with the law
13   because if he had a warrant, he could have arrested him for
14   that.
15              MR. GINGRANDE:  Well, that's true, your Honor, if he
16   had a warrant.  But in this case, there was no warrant.
17              THE COURT:  Yeah.
18              MR. GINGRANDE:  That's all I'm saying.
19              THE COURT:  So you're saying -- so you're telling me
20   Duffy, the star witness on this arrest, is going to say, I
21   didn't think what he did would warrant an arrest -- a
22   warrantless arrest under this provision?
23              MR. GINGRANDE:  No -- no, not necessarily.  No, I
24   wouldn't go that far.  But what I was about to say is that I
25   do think that Parole Officer Duffy felt -- and just based on

**JOINT APPENDIX 271**

124

1    the circumstances, not reporting the parole violation and

2    harboring a fugitive from justice -- that he was a threat to

3    abscond.  And so that is why I'm trying to get at these

4    questions about abscersion from this witness, to help, you

5    know, support that position.

6              THE COURT:  You want Sergeant Lorenzo to say based

7    upon my personal analysis of the situation, I would think he

8    posed a risk of absconding and then that evidence reflects upon

9    what Duffy might have thought as well that would have been more

10   credible because Sergeant Lorenzo also agreed, something like

11   that?

12             MR. GINGRANDE:  Well, only to the extent, your

13   Honor, that there was actually a flight risk here.  There was a

14   flight risk.

15             THE COURT:  Well, sure, but -- there might have well

16   been.  But prior to his arrest, do you have evidence that a

17   parole officer or probation officer from the state of New

18   Hampshire had made that judgment and had requested that a

19   warrantless arrest be conducted by a sworn police officer?  Or

20   are you saying after the fact, when we've kind of cobbled

21   together this arrest, hey, of course any reasonable person

22   would have thought he would have been an absconding risk

23   because, after all, he had drugs in the car.

24             MR. GINGRANDE:  And --

25             THE COURT:  Are we in the former or the latter?

**JOINT APPENDIX 272**

125

```
 1              MR. GINGRANDE:  Your Honor, I think that -- again,
 2    I -- to the extent that I can make a proffer, it's the proffer
 3    that I just made as to what I thought Parole Officer Duffy
 4    would make on that point.  I don't know if Parole Officer Duffy
 5    would definitively say, you know, yes, I -- I told them
 6    arrest -- arrest him at that time because he was -- he would
 7    abscond or I believed he would abscond.
 8              THE COURT:  Yeah.  You know, time's linear, sadly.
 9              MR. GINGRANDE:  I understand.  I understand, your
10    Honor.  I'm not trying to rewrite the record.
11              THE COURT:  There comes a point when he's arrested,
12    right?
13              MR. GINGRANDE:  Right.
14              THE COURT:  And before he was arrested, do you have
15    evidence that a probation or parole officer requested that a
16    sworn officer make that arrest?
17              MR. GINGRANDE:  Again, I --
18              THE COURT:  Before he was arrested.  Time, tick,
19    tick, tick, tick, tick.  Before he was arrested.
20              MR. GINGRANDE:  I understand, your Honor.  I think
21    what might have happened here -- I think there might have
22    been -- there were definitely communications between Parole
23    Officer Duffy and law enforcement about making this arrest.
24              THE COURT:  Before the arrest.
25              MR. GINGRANDE:  Before the arrest was made, not
```

**JOINT APPENDIX 273**

126

 1  after the fact, before the arrest was made, that as you just

 2  heard Sergeant Lorenzo report, was, okay, this is the go-ahead

 3  to arrest him.

 4          So what -- what I don't know is how that was

 5  expressed by Parole Officer Duffy and whether he said, look, do

 6  this on the basis to -- of absconsion; do this on, you know,

 7  some other grounds.  I cannot speak to that.  All I can speak

 8  to --

 9          THE COURT:  Fair enough.  Fair enough.

10          MR. GINGRANDE:  All I can speak to, your Honor, is

11  that --  what my understanding is what he did not say is arrest

12  him on the basis of not reporting the address as an independent

13  parole violation because -- and there was no warrant.

14          THE COURT:  Okay.  I'm going to let you off the

15  hook, but just one more time.

16          You interviewed him.

17          MR. GINGRANDE:  I did interview him.  And what he

18  said was very clear, your Honor.  And it's part of the reason,

19  that, you know, we submitted the affidavit from Parole Officer

20  Benard in this case instead of Parole Officer Duffy, because I

21  wasn't -- I wasn't quite clear myself on his recollection of

22  events and whether that was consistent with law enforcement.

23          Because what you'll see is law enforcement believed

24  they had that authority to make that arrest.  It's in Connor

25  Mefford's report; it's in Detective O'Neill's report; Sergeant

**JOINT APPENDIX 274**

 1    Lorenzo is saying that.

 2              And so to the extent that -- and, obviously, look,

 3    there's another argument here to be made which is to the extent

 4    that the parole officer did not, in fact, authorize that -- and

 5    so this was an unlawful arrest at the time it was made -- two

 6    minutes later, he gets -- they search the car, they do a

 7    cursory search of the car, as Special Agent Burke testified.

 8    They find the drugs, and now there's probable cause to make the

 9    arrest of Francis.

10              THE COURT:  Right.  That's a different argument.

11              MR. GINGRANDE:  So, ultimately, I'm not sure all

12    this really matters, but --

13              THE COURT:  It matters because defense counsel's

14    raising it and it presents a legal issue that has to be

15    resolved and this is the way we have to resolve it.

16              MR. GINGRANDE:  Understood, your Honor.  And that's

17    why, you know, I -- I acknowledge that it may be a bit

18    frustrating because of -- essentially, I wish I had a

19    clearer --

20              THE COURT:  I assure you, it's not frustrating to

21    me.  They pay me to sit through these hearings.  I find them

22    interesting.  I'm just kind of perplexed that you don't --

23    you're telling me you're presenting this issue, but yet you

24    don't seem to have the evidence that would -- that would

25    support it, the argument.

**JOINT APPENDIX 275**

128

```
 1                MR. GINGRANDE:  Well --

 2                THE COURT:  I mean, if you interviewed him and you

 3     can't tell me what he said, what -- what kind of witness is he?

 4                MR. GINGRANDE:  What I -- what I can't tell you is

 5     what he said at that time because I -- and I'm not, frankly,

 6     sure he knows what he said at that time, to be honest.

 7                THE COURT:  Well, that's not a good start.

 8                MR. GINGRANDE:  Well, it's not a good start, but

 9     what we do have is law enforcement officers who believe they

10     got that directive from -- from Parole Officer Duffy.

11                THE COURT:  Okay.  Why don't we go -- why don't we

12     go and give Mr. Guerriero a chance and then see where we are.

13                MR. GINGRANDE:  Okay.

14                THE COURT:  Let's focus on the arrest and who said

15     what to who.

16                MR. GINGRANDE:  Okay.  Understood.  But so should I

17     just -- I was going to ask just a --

18                THE COURT:  I'm not interested in the feng shui of

19     absconding and the feng shui --

20                MR. GINGRANDE:  Okay.

21                THE COURT:  -- of he poses a risk to society.

22     That's not -- that's not the question.  The question is who

23     said what to who.  Did a parole officer request this arrest?

24     On what basis?  Who did he ask, you know.

25                MR. GINGRANDE:  Yup.
```

**JOINT APPENDIX 276**

129

```
 1              THE COURT:  If the -- if the Manchester Police
 2   officers were under the impression that they were authorized to
 3   make an arrest for a parole violation, great; why, and then
 4   move on.
 5              MR. GINGRANDE:  Okay.  Okay.  Your Honor.
 6              THE COURT:  Thanks.
 7              MR. GINGRANDE:  Yup.  Thank you.
 8              So, yeah, with that, no further questions.
 9              THE COURT:  You were under the impression that the
10   Manchester Police Department had the authority to make an
11   arrest of Mr. Francis for a state parole violation?
12              THE WITNESS:  Yes, sir.
13              THE COURT:  Do you -- why did you have that
14   impression?  Where does it come from?
15              THE WITNESS:  I don't know exactly.  I believe it
16   went over the radio and I just know that the communications
17   that were being made over the radio.  It was a plan to execute
18   the search warrant safely, but also get him into custody safely
19   because we were going to be arresting him.  I -- I can't speak
20   to, you know, where all that came from, but I knew our plan.
21              And going into the day we didn't have an arrest
22   warrant, but it -- our plan now was to arrest him and search
23   the vehicle.  So I know the plan had changed.
24              THE COURT:  So you knew you weren't going to arrest
25   him based on what you were about to find even though you were
```

**JOINT APPENDIX 277**

130

```
 1    sure you were about to find it.  Your plan was to arrest him on
 2    the parole violation.
 3              THE WITNESS:  Correct.  Yes, sir.
 4              THE COURT:  Okay.  And that was radio chatter?
 5              THE WITNESS:  Radio chatter, yes, sir.
 6              THE COURT:  Okay.
 7              THE WITNESS:  And it was all about --
 8              THE COURT:  So in your mind, the plan was we are
 9    going to search the car, but first we're going to is arrest him
10    on that other basis?
11              THE WITNESS:  Yes.
12              THE COURT:  Okay.  Got it.
13              MR. GINGRANDE:  Your Honor, I apologize.  Can I ask
14    just one more question?
15              THE COURT:  Sure.
16              MR. GINGRANDE:  Thank you.
17        Q.    So one of the things that is being challenged here
18    is seizure of a phone based on the arrest.
19              Can you please explain to the Court whether
20    Mr. Francis had a -- was in possession of a phone at the time
21    that he was arrested.
22        A.    It was on the bank counter.  So it was his wallet
23    and phone were on the bank counter.
24              At the time of his arrest, I don't know exactly
25    where he was in the bank when -- when they -- when the SWAT
```

**JOINT APPENDIX 278**

131

1    team went in, if he was away or he had just set it down.  I

2    know when I got -- Mr. Francis was outside in custody, in

3    cuffs, and I -- I retrieved the wallet and the cell phone from

4    the bank counter.  The moment that he made police contact, I

5    don't know exactly the dynamic there.

6         Q.    Okay.  But what -- what led you to believe that that

7    was his wallet and phone that were on the bank counter?

8         A.    The security guard.  So I was going inside the bank

9    and the security guard saying, hey, that guy you just arrested,

10   he has his phone and wallet on the counter in here.

11              MR. GINGRANDE:  Okay.  Thank you.

12              THE COURT:  Sorry, Mr. Guerriero.

13                           CROSS-EXAMINATION

14   BY MR. GUERRIERO:

15        Q.    Just a few questions to make sure that I have sort

16   of the order necessary for things for my motion.

17              You were at TD Bank on September 1st, 2021, with the

18   Manchester Police, right?

19        A.    Yes, sir.

20        Q.    And the SWAT team, a group of guys in all kinds of

21   gear, they're the ones that actually effectuated the arrest of

22   Mr. Francis?

23        A.    Yes, sir.

24        Q.    That was inside the bank?

25        A.    Yes, sir.

**JOINT APPENDIX 279**

132

1      Q.   You went inside the bank immediately after them,

2   right?

3      A.   It was within minutes, yes, sir.

4      Q.   Within minutes?

5      A.   Yeah.

6      Q.   Okay.  And you saw that Mr. Francis was arrested

7   that day inside TD Bank?

8      A.   By the time I got there, I believe he was outside.

9      Q.   Okay.

10      A.   I was in a little bit of traffic.  So --

11      Q.   Was he in cuffs?

12      A.   Yes, sir.

13      Q.   Was he in police custody?

14      A.   Yes, sir.

15      Q.   He was not free to leave?

16      A.   No, sir.

17      Q.   Okay.  And then some other officer told you that his

18   wallet and his cell phone were on the counter in the bank?

19      A.   It was a bank security guard.

20      Q.   Who was it?

21      A.   A bank security guard.

22      Q.   Bank security guard.  Okay.  I remember seeing him

23   on the video.  Yup.

24           And so -- and he told -- the bank security guard

25   told you that the phone and the wallet on the counter were the

**JOINT APPENDIX 280**

```
1    phone and the wallet of the person who was arrested?

2         A.   Yes, sir.

3         Q.   And you seized the phone and the wallet at that

4    time?

5         A.   Yes, sir.

6         Q.   Okay.  And you put it into custody, into evidence,

7    with Manchester PD?

8         A.   Yes, sir.

9         Q.   And then I believe you were involved in the search

10   of the car after you retrieved the wallet and the phone from

11   the counter?

12        A.   Correct, yes.  So I was involved -- I was made aware

13   of the cursory search of the vehicle on scene and then the

14   official search I was a part of back at the station.

15        Q.   Okay.  All right.  So that was later when the car

16   was removed to the station?

17        A.   Yes, sir.

18        Q.   And also later at the station, you had Mr. Francis

19   in an interview room?

20        A.   Yes, sir.

21        Q.   And, to your knowledge, he had remained in custody

22   since his arrest inside TD Bank?

23        A.   Yes, sir.

24        Q.   Is it fair to say that the statements he made at

25   that same day, September 1st, in the Manchester Police
```

**JOINT APPENDIX 281**

134

1    Department interview room directly followed on his arrest

2    inside TD Bank?

3         A.    It was.  I advised him that he was under custodial

4    arrest and custodial interrogation.

5              MR. GUERRIERO:  Thank you.  That's all I have.

6              THE COURT:  All right.  Any redirect based on that?

7              MR. GINGRANDE:  No, your Honor.

8              THE COURT:  Thank you, Sergeant Lorenzo.  Appreciate

9    it.

10             THE WITNESS:  Thank you, sir.

11             THE COURT:  You're excused as a witness.  Thank you.

12                  (Witness excused.)

13             THE COURT:  Do you have any other witnesses?

14             MR. GINGRANDE:  Your Honor, the government has no

15   further witnesses at the time, but we would --

16             THE COURT:  Right, right, Mr. Duffy.  Sure.

17             And, Mr. Guerriero, do you -- do you have witnesses

18   you want to --

19             MR. GUERRIERO:  We do have Detective O'Neill here,

20   but I think that he would pretty much be repetitive of what

21   Detective Lorenzo said, so --

22             THE COURT:  Okay.

23             MR. GUERRIERO:  I mean, it's -- I don't think I'll

24   call him back.

25             But I would alert the Court that I haven't made a

**JOINT APPENDIX 282**

135

1   final mental decision on this because I'm sort of thinking out

2   loud, but I believe that there may be recordings and video, at

3   least portions of those, that could be relevant to some of the

4   questions the Court has asked today, so I may like to submit

5   those whenever -- before we come back.  And those are not in

6   the record yet.

7          I mean, for example, there's a recording of the

8   interrogation of Mr. Francis where -- I don't think I've

9   submitted this -- where the two detectives state the reason for

10  the arrest.  So that's evidence of what they believed at the

11  time.

12         And there's also a statement on video from Special

13  Agent Burke at the moment of arrest.  So those could be

14  relevant as well.

15         THE COURT:  They could be relevant in establishing

16  that some authorized probation officer requested the arrest on

17  that basis.

18         MR. GUERRIERO:  Well, I mean, I will tell you, I'll

19  make a proffer to you, my recollection of what -- and it didn't

20  stick out to me too much today -- although we've talked about

21  it, until today it didn't really stick out to me.

22         But my recollection is that Special Agent Burke says

23  on the video inside the bank, someone asks him what's the basis

24  for the arrest.  And he says, warrant, other agency.

25         I think that's -- and what that means, I don't know,

**JOINT APPENDIX 283**

136

1    but apparently he was representing that there was a warrant

2    which, by all accounts, there was not.  So that may have

3    contributed to the confusion, I think.

4                THE COURT:  Well, I'm warming to the notion that

5    this A:4 is really a provision that describes when a

6    warrantless arrest can be made.  And unless there's evidence

7    that a probation officer made the judgment or had reason to

8    believe that he fell into one of these categories and had

9    violated, I suppose -- well, I suppose that the violation is

10   the predicate and then these conditions are the triggers that

11   authorize the -- the arrest if requested.  That's the way it

12   seems to read.

13               But, again, you know, as Mr. Gingrande points out,

14   okay, if it wasn't an authorized arrest under state law, do we

15   still analyze it as a Fourth Amendment arrest or do you say

16   it's not an arrest at all?

17               MR. GUERRIERO:  I think we -- I agree that we do

18   have to analyze it under the Fourth Amendment, that the federal

19   exclusionary rule would not apply to a mere state statutory

20   violation.

21               However, I don't think that there was probable cause

22   to believe that Mr. Francis had committed any crime that day

23   and we know that because all of the reports from all of the

24   agents, they don't say, we're arresting him for some other

25   crime.

**JOINT APPENDIX 284**

137

```
 1              THE COURT:  No, no, I understand your -- that --
 2   that's the -- that's the normal Fourth Amendment point, which
 3   is there was no arrest for a crime.
 4              MR. GUERRIERO:  Right.
 5              THE COURT:  End of story.  No Fourth Amendment
 6   arrest -- I mean arrest, but no -- not within the Fourth
 7   Amendment, not a reasonable arrest.
 8              MR. GUERRIERO:  So unless they had some other
 9   authority --
10              THE COURT:  I think if there's a state -- an
11   authorized state arrest, then this is -- obviously it is a
12   reasonable arrest --
13              MR. GUERRIERO:  If the statute --
14              THE COURT:  -- in accordance with the Fourth
15   Amendment.
16              MR. GUERRIERO:  Right.
17              THE COURT:  But then we're going to move on,
18   obviously, to --
19              MR. GUERRIERO:  Okay.
20              THE COURT:  -- everything else, inevitable discovery
21   and so on and so forth.
22              Okay.  When do you want to -- well, why don't you
23   figure out when it's convenient for you to get Mr. Duffy --
24              MR. GUERRIERO:  I know he's not available this week.
25   I actually emailed with Mr. Duffy as well.  So we'll have to
```

**JOINT APPENDIX 285**

138

```
 1    touch base with him and notify the case manager.

 2              THE COURT:  Yes, that -- yes, convenient to you

 3    and --

 4              MR. GUERRIERO:  Oh, and our schedules.

 5              THE COURT:  -- and Lianne will make it convenient to

 6    me as well.

 7              MR. GUERRIERO:  All right.

 8              THE COURT:  All right.  Thank you.  Appreciate it.

 9              THE CLERK:  All rise.

10              (Proceedings adjourned at 4:30 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**JOINT APPENDIX 286**

139

C E R T I F I C A T E


        I, Liza W. Dubois, do hereby certify that

the foregoing transcript is a true and accurate transcription

of the within proceedings, to the best of my knowledge, skill,

ability and belief.


Submitted: 11/2/23              /s/   Liza W. Dubois
                               LIZA W. DUBOIS, RMR, CRR

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**

UNITED STATES OF AMERICA

     v.                      No. 1:21-cr-00153-01-SM

MICHAEL FRANCIS

<u>SUPPLEMENT BASED ON NEW DISCOVERY
TO MOTION TO SUPPRESS EVIDENCE SEIZED WHEN
EXECUTING SEARCH WARRANT FOR A WHITE HONDA ACCORD</u>

       The defense supplements its motion to suppress with new evidence that, in addition to the informant's Falsifying Physical Evidence conviction, Agent Burke omitted from his search warrant affidavit the newly revealed fact that, in the previous month, two Manchester Police officers had described the informant as "deceptive," "not telling me the truth," and "attempting to provide deceitful answers."

<u>Agent Burke Has Already Acknowledged that He Omitted from his Affidavit the Informant's Conviction for a Crime of Dishonesty.</u>

       The defense moved to suppress evidence seized from Mr. Francis's car because the affidavit in support of the search warrant did not state probable cause and because Agent Burke recklessly or intentionally omitted information which would have resulted in the magistrate finding no probable cause. Doc. 35. As set forth in the original motion, the omitted information was that the informant, on whose credibility the affidavit depended, was convicted of a felony crime of dishonesty, Falsifying Physical Evidence. *Id*. at 4. That conviction involved the informant attempting to conceal his guilt in a drug case.

       The hearing on the motion to suppress started on June 14, 2023, and continues tomorrow. In his June testimony, Agent Burke acknowledged that he was aware the informant had been

**JOINT APPENDIX 288**

1

convicted of a felony crime of dishonesty. He said that he did not include that information in his affidavit because he decided it did not affect the informant's credibility.

The Government notified defense counsel by email on June 27, 2023, that new discovery was forthcoming. The Government then sought a protective order regarding the new discovery. The defense received a link from the Government on June 30, 2023, to download the new discovery. The defense could not download the discovery at the initial link provided but eventually was able to gain access to the discovery on July 3, 2023. The new discovery consisted of over 400 pages and 9 videos. The defense now supplements the motion to suppress with new information from that discovery.

Agent Burke Left Out Other Evidence of the Informant's Dishonesty.

The new discovery contains previously undisclosed evidence regarding the informant's dishonesty. The affidavit offered by Burke detailed the motor vehicle stops of the informant which led to his arrest and interrogation by the police, and then his accusations against Francis. However, it now turns out that two of the officers who conducted the motor vehicle stops of the informant were careful to note in their reports that the informant was being dishonest with law enforcement during those encounters. They said the informant was "deceptive," "not telling me the truth," and "attempting to provide deceitful answers."

Manchester Police Officer Brendan Newell stopped a car being driven by the informant on July 30, 2021. Officer Newell questioned the informant about where he had been and where he was going. After getting inconsistent answers, Officer Newell wrote in his report, "I believed [the informant] was being deceptive and not telling me the truth about who he was meeting." Later in the encounter, Officer Newell asked the informant, "what was in the driver's side door?" The informant answered, "sunglasses." The informant was lying. As detailed in the new

**JOINT APPENDIX 289**

2

discovery, the police found a bag of crystal meth and a "loaded needle" in the driver's side door storage compartment.

Manchester Police Officer Austin Biery described a similar experience with the informant. Officer Biery said, "I also found this physical reaction and behavior to be suspicious and indicative of our suspicion of drug activity as [the informant] was clearly nervous, was providing erroneous statements, and was tripping over his own statements attempting to provide deceitful answers."

Since the Government sought a protective order regarding the new discovery, the reports of Officer Newell and Officer Biery are being filed under seal contemporaneous with this supplement.

The July 30, 2021, stop described by Officers Newell and Biery is selectively detailed in paragraph 8 of Agent Burke's affidavit for the search warrant. Agent Burke provided a variety of other details about the motor vehicle stop – the date, the kind of car the informant was driving, the police department involved, the specific drugs seized, and the specific weights of each kind of drug. Yet, Agent Burke left out of his affidavit the fact that two Manchester Police officers described the informant's dishonesty in that drug investigation. Reviewing the officers' reports, it is not reasonable to think that Agent Burke had all of the other details but did not know that the officers described the informant as "deceptive," "not telling me the truth," and "attempting to provide deceitful answers." The only reasonable conclusion is that Burke recklessly or intentionally omitted from his affidavit important information regarding the informant's credibility.

As already established, the informant had a relatively recent prior felony conviction for falsifying physical evidence. Agent Burke knew about that but left that out of the affidavit. Now,

the Government has revealed that during the July 30, 2021, motor vehicle stop of the informant detailed by Burke in his affidavit, two Manchester police officers described the informant as dishonest. Significantly, the July 30th conclusions of the two officers that the informant was dishonest came just a few weeks before Burke submitted his affidavit to Magistrate Lynch on August 25, 2021. In short, Agent Burke had information about his informant's recent and repeated dishonesty in drug investigations, yet he left that information out of his affidavit.

<u>If Agent Burke Had Told the Entire Story, Magistrate Lynch Would Not Have Found Probable Cause for the Search of Francis's Car</u>.

The Government has argued in its objection, Doc. 46, and Agent Burke claimed in the first hearing, that the informant was credible because he was "a known individual in law enforcement custody who was named in the unredacted affidavit submitted to the magistrate." Doc. 46, p. 8; *See generally, United States v. Tanguay*, 787 F. 3d 44, 50 (1st Cir. 2015). However, when the identity of the informant is considered in the light of Agent Burke's omissions regarding the informant's dishonesty, this factor cuts the other way. Yes, law enforcement knew the informant well, but stopping there leaves out the important part of the story. The fact is that they knew him well and knew he was not to be trusted. The problem is that law enforcement did not reveal that to the magistrate. In these circumstances, the Government cannot claim "he was known to us" as the basis for the informant's credibility when what was known, but not revealed to the magistrate, was that the informant recently and repeatedly lied to law enforcement during drug investigations.

The omissions by Burke relate to other factors the First Circuit says to consider in assessing an informant's credibility. *See United States v. Maglio*, 21 F.4th 179, 185 (1st Cir. 2021); *United States v. Gifford*, 727 F.3d 92, 99-102 (1st Cir. 2013); *United States v. Tiem Trinh*, 665 F.3d 1, 10 (1st Cir. 2011) (all discussed at length in the original motion suppress).

**JOINT APPENDIX 291**

4

The First Circuit says to look at the "probable veracity" of the informant. Gifford, 727 F.3d at 99. The Government would argue that the probable veracity of this informant is high because his identity was known and he claimed to know details of incriminating conduct involving Mr. Francis. However, when those claims are reassessed in light of the informant's repeated and recent dishonesty, a finding of probable veracity cannot be justified. As Burke admitted in his testimony, no incriminating facts had been corroborated. The informant did not predict any future criminal behavior. He did not provide any text messages or call logs which might incriminate Francis. The only information which was actually corroborated were innocent facts, such as the description of the car Francis drove. Moreover, the fact the informant offered some details in his claims of criminal conduct by Francis is hardly persuasive. After all, the informant had offered details when he lied to Officer Newell less than one month before Burke submitted the affidavit. Lastly, the informant had no "track record." He had never provided law enforcement with reliable information in the past which turned out to be true. Rather, the circumstances are exactly the opposite. He provided information to law enforcement in the past which turned out to be false. Surely, if the magistrate had known of the informant's past lies, he would have doubted the "probable veracity" of the informant, especially in the absence of corroboration.

Similarly, Agent Burke cannot legitimately claim that when submitting the affidavit, he "assessed, from his professional standpoint, experience, and expertise, the probable significance of the informant's provided information." *Gifford*, 727 F.3d at 99; *Tiem Trinh*, 665 F.3d at 10. Burke left out of his affidavit the fact that, within previous month, two Manchester Police officers had described the informant as "deceitful," "deceptive," and "not telling the truth."

**JOINT APPENDIX 292**

Skipping over those facts, in addition to the Falsifying Physical Evidence conviction, is not how a professional, experienced, and expert law enforcement officer assesses credibility.

Lastly, with respect to "first-hand knowledge" and "corroboration," *Gifford*, 727 F.3d at 99; *iem Trinh*, 665 F.3d at 10, the Court should recognize that when the informant's credibility is in doubt, claimed first-hand knowledge does not mean much if none of it is verified. To be sure, the informant made claims of receiving specific drugs in specific amounts for specific prices from Francis. No doubt, the informant was receiving such drugs in such a manner from someone, but the affidavit contains no evidence any such claims of criminal conduct were ever verified. There is no evidence at all corroborating that the informant had even met Francis. There is no corroborating evidence in the affidavit that they had ever talked or sent messages over the phone. The informant did not offer any specific dates. If he had, perhaps surveillance video from the claimed location would be available to support or refute his claims. The bottom line is that it is just common sense that corroboration is essential when the claimed first-hand knowledge comes from an informant known to be dishonest.

Conclusion

When both the omission regarding the informant's conviction for Falsifying Physical Evidence and the omission of the informant's deceptive and deceitful statements to Manchester Police officers are "read into" the affidavit, it clearly fails to provide probable cause for the search of Francis's car. The affidavit already relied on general claims by the informant that Francis provided drugs on unspecified dates, with no other witnesses, no physical evidence, and with no corroboration of any incriminating details. When the documented dishonesty of the informant is added to the mix, it is clear that a reasonable magistrate would not have found the affidavit to provide probable cause for the search.

**JOINT APPENDIX 293**

6

.

Date: July 11, 2023

Respectfully submitted
by counsel for Michael Francis,

*/s/ Richard Guerriero*
Richard Guerriero, Esq.
N.H. Bar No. 10530
Lothstein Guerriero, PLLC
Chamberlain Block Building
39 Central Square, Suite 202
Keene, NH 03431
Telephone: (603) 352-5000
richard@nhdefender.com

CERTIFICATE OF SERVICE

I hereby certify that this document, filed through the ECF system, will be sent electronically to registered participants identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to the nonregistered participants on the date the document was signed by me.

_

*/s/ Richard Guerriero*
Richard Guerriero

**JOINT APPENDIX 294**

7

1                       UNITED STATES DISTRICT COURT
                      FOR THE DISTRICT OF NEW HAMPSHIRE
2

3       * * * * * * * * * * * * * * * * *
                                        *
4       UNITED STATES OF AMERICA        *
                                        *
5                                       *  No. 1:21-cr-00153-SM
                        v.              *  July 12, 2023
6                                       *  1:38 p.m.
                                        *
7       MICHAEL FRANCIS,                *
                                        *
8                          Defendant.   *
                                        *
9       * * * * * * * * * * * * * * * * *

10

             TRANSCRIPT OF DAY TWO OF EVIDENTIARY HEARING
11
             BEFORE THE HONORABLE STEVEN J. MCAULIFFE
12

13

        APPEARANCES:
14

15      For the Government:        Charles L. Rombeau, AUSA
                                   Aaron G. Gingrande, AUSA
16                                 United States Attorney's Office

17

        For the Defendant:        Richard Guerriero, Esq.
18                                 Lothstein Guerriero, PLLC

19

20

        Court Reporter:           Brenda K. Hancock, RMR, CRR
21                                 Official Court Reporter
                                   United States District Court
22                                 55 Pleasant Street
                                   Concord, NH 03301
23                                 (603) 225-1454

24

25

                              **JOINT APPENDIX 295**

1                          I   N   D   E   X

2   WITNESS:              DIRECT_____  CROSS____  REDIRECT_   RECROSS

3   RYAN BURKE

4   By Mr. Rombeau                                  37
    By Mr. Guerriero                                           28/41
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**JOINT APPENDIX 296**

```
 1                  P  R  O  C  E  E  D  I  N  G  S

 2            THE CLERK:  All rise for the Honorable Court.  Please

 3     be seated.  The Court is in session and has for consideration

 4     an evidentiary hearing, day two, in the matter of The United

 5     States versus Michael Francis, criminal case 21-cr-153-01-SM.

 6            THE COURT:  Mr. Guerriero, you were going to call

 7     another witness, I think.  Was that right?  You were going to

 8     call the probation officer?

 9            MR. GINGRANDE:  Your Honor, so if I could just follow

10     up on the conversation that we had at the beginning of the last

11     day of hearing, you had asked for a proffer as to what the

12     probation officer would say, and you may remember that I

13     couldn't really directly address your question.

14            THE COURT:  All right.  I'm probably off base.  I

15     thought you needed the time to call him.

16            MR. GINGRANDE:  Well, right.  I'm sorry.  We didn't

17     have him ready to -- readily available that day.  After the

18     last hearing we've since had a more robust opportunity to sit

19     down with Parole Officer Duffy and speak with him about the

20     events of September 1st, and we can now say that Parole Officer

21     Duffy's testimony would be that he did not authorize the arrest

22     of the defendant.

23            THE COURT:  He didn't ask for it.

24            MR. GINGRANDE:  I'm sorry?

25            THE COURT:  He didn't request it.
```

**JOINT APPENDIX 297**

1      MR. GINGRANDE:  He didn't request it.  That's right.

2  He would say that he spoke with law enforcement about Francis

3  and what was happening on September 1st, which was the day of

4  the arrest, but he would not say that he authorized Francis's

5  arrest.  He just generally spoke about conditions on which he

6  could be violated on parole but did not specifically request

7  the arrest.  And we aren't going to make the argument that

8  Duffy authorized the arrest in any way.  We're not going to

9  call other officers to say, No, he did say that --

10      THE COURT:  More to the point, you concede the arrest

11  was unlawful, then?

12      MR. GINGRANDE:  That's right.  To the point we do

13  concede that the arrest was unlawful under 504-A:4, yes, your

14  Honor.  So, I don't know if --

15      THE COURT:  Words matter.  That implies that it might

16  be lawful under some other theory.

17      MR. GINGRANDE:  Well, we would argue that his

18  detention was lawful and then, as I think you're aware, five

19  minutes later they discovered the drugs in the car, and so our

20  argument is that at that point after the initial unlawful

21  arrest five minutes later the drugs are found, they have

22  probable cause for the arrest.  The intervening time we would

23  say he could be lawfully detained during that time but not

24  lawfully arrested.  So, that's why I phrased it that way, your

25  Honor.

**JOINT APPENDIX 298**

| 1 | THE COURT:  We all agree there's no claim that the |
|---|---|

1     THE COURT:  We all agree there's no claim that the

2     search of the car was in any way based upon a lawful arrest?

3          MR. GINGRANDE:  The search of the car -- the search of

4     the car was based on --

5          THE COURT:  A warrant.

6          MR. GINGRANDE:  You're right.  You're right, your

7     Honor.  Yes.

8          THE COURT:  So, Mr. Guerriero, I'll give you a chance.

9     The impact of this is what?

10          MR. GUERRIERO:  Well, I think a factual point that the

11     government did not recite, and I don't think it was

12     intentional, but during those five minutes is when

13     Mr. Francis's phone was taken from him.  They arrested him and

14     left his phone on the counter.  So, even before they discovered

15     what was in the car they had acquired custody of the phone.

16     So, I understand they may have an inevitable discovery

17     argument.  I think that's speculation.  But that's an important

18     point, that he was arrested and his phone was left there on the

19     counter and the police essentially had custody of it at that

20     point.

21          THE COURT:  But he was arrested shortly thereafter

22     based on what they found in the car, right?

23          MR. GUERRIERO:  No.  He was arrested inside the bank,

24     and he was not --

25          THE COURT:  Yeah.  There's no rearrest.  They just

**JOINT APPENDIX 299**

1    continued to march, right?

2         MR. GUERRIERO:  That's right.  You're correct in the

3    sense that he was held on what they thought was a state arrest

4    at Valley Street.  Some days later, I think a week later, there

5    was a warrant from this court based on a complaint filed here;

6    I think the initial charge was a firearm charge.  Then he was

7    arrested technically at Valley Street and brought into federal

8    custody at that point, but that was a week later.

9         That's actually the subject of one of the motions to

10   suppress that the government is not contesting.

11        THE COURT:  So, if the government concedes the arrest

12   was not lawful, the impact, from your point of view, is the

13   seizure of the phone.  That's all we're talking about?

14        MR. GUERRIERO:  That's right.

15        THE COURT:  The seizure of the phone was unlawful, the

16   phone should have been returned, subsequent warrant was issued,

17   searched the phone.

18        MR. GUERRIERO:  Right.

19        THE COURT:  And what's your view; they can't search

20   the phone pursuant to the subsequent warrant because they

21   shouldn't have still had it, or what?

22        MR. GUERRIERO:  They had it -- the phone itself is the

23   fruit of an unlawful arrest, and therefore they would not have

24   had it in their possession.

25        THE COURT:  But for the intervening warrant.

**JOINT APPENDIX 300**

1    MR. GUERRIERO:  But for the -- well, they did not have

2    a warrant for the phone at that time.

3        THE COURT:  No, no, no.  I mean but for the

4    intervening warrant the phone would have been returned, but if

5    they didn't have it --

6        MR. GUERRIERO:  Well, if they hadn't arrested

7    Mr. Francis, he would have walked out of the bank with his

8    phone, and the government wouldn't have it.

9        THE COURT:  Right.  And you're suggesting -- I don't

10   know what you're suggesting -- that in the interim he would

11   have the phone, life goes on.  Then the warrant is issued.  Now

12   the phone is subject to search.  And what's your view, that the

13   search would have been unproductive because he would have wiped

14   the phone, or they can't get a warrant because they unlawfully

15   had seized it in the first place or what?  The arrow of time,

16   should have given back, didn't, but got a warrant, then

17   searched.

18       MR. GUERRIERO:  The phone itself is a direct product

19   of the unlawful arrest.

20       THE COURT:  Forever and ever and ever you can never

21   get a warrant?

22       MR. GUERRIERO:  Well, I mean, if they had returned it

23   to him and then they got a warrant later, then that might be

24   different, but that's not what happened.

25       THE COURT:  That's what I'm focusing on.  What would

**JOINT APPENDIX 301**

1   be the difference?  The only thing I can think of is you're

2   implying, well, he would have wiped it, and therefore there

3   wouldn't have been any evidence when they executed the warrant.

4   But absent that, I don't see the harmful effect.  They didn't

5   give me my phone on Thursday.  They should have.  I didn't get

6   it till -- I never got it.  They should have given it.  But in

7   the meantime they got a warrant to search it and they searched

8   it pursuant to a warrant.  I've been harmed.

9       How have you been harmed other than you didn't have

10  your phone for a few days?  Well, I would have wiped it,

11  because I knew what was on it, and there wouldn't be evidence

12  against me.  That's more compelling, but is that a valid

13  argument?

14      MR. GUERRIERO:  That's another argument, your Honor,

15  that he would --

16      THE COURT:  So, your argument is just, because they

17  didn't give it back to him, they couldn't search it once they

18  got a warrant?

19      MR. GUERRIERO:  Well, I mean, for example, he could

20  have taken further security measures and made it more secure so

21  that they couldn't break into it, and then we could have

22  litigated whether they got a chance to break into it in court,

23  you know, even if they had a search warrant, and he could have

24  made changes without destroying evidence that prevented access

25  to the phone.  I mean, I suppose, if he wanted to, he could

**JOINT APPENDIX 302**

1    have gone and hired a lawyer and said, Here's my phone, I'm

2    worried about it, you can't -- I know you can't destroy it, I

3    know you can't keep it from the government, but I want to

4    litigate in court whether the government has access to it

5    before they're allowed to search it, and the lawyer could have

6    said, I had his phone, but we don't agree you can search it,

7    let's litigate it.

8         THE COURT:  It seems a bit circular, because the

9    argument would be, yes, there is a warrant, but you can't

10   search it pursuant to a warrant because...because why?  Because

11   you once illegally possessed it.

12        MR. GUERRIERO:  I mean, I would have intervened and

13   asked the Court to have a hearing on whether or not it was a

14   valid search, whether there was a basis to search his phone and

15   how far to go on the phone.

16        THE COURT:  And the answer would be, well, I don't

17   know.  Why is the warrant bad?  Is a warrant presumably valid?

18   What would your argument be?  You can't have a warrant to

19   search his device that they unlawfully possessed.  That doesn't

20   sound persuasive.  What other argument is there?

21        MR. GUERRIERO:  The drugs that were found in the car,

22   and this is really more of a trial argument, but the drugs that

23   were found in the car, there's really not any established

24   connection between those drugs and any arguably incriminating

25   stuff on the phone.  Everything on the phone is from a month or

**JOINT APPENDIX 303**

1   longer beforehand, arguably looking at some of the messages on

2   the phone.  Perhaps Mr. Francis bought drugs for personal use.

3   But there's nothing on the phone connected to Mr. Flores and

4   that kilo of cocaine that was in Mr. Francis's car that day.

5   There's nothing on the phone that connects --

6            THE COURT:  Obviously, some magistrate or some judge

7   thought otherwise when they issued the warrant.

8            MR. GUERRIERO:  Well, once they were arrested together

9   with the kilo in the car, then obviously there's a presence

10   there, but they wouldn't have had that that day.

11            THE COURT:  Wouldn't have had what?

12            MR. GUERRIERO:  They wouldn't have had any information

13   about that.  I mean, before September 1st they had no

14   connection between the cocaine and Mr. Francis and Mr. Flores.

15            THE COURT:  No, but, once they discover it, First

16   Circuit precedent I think is phones are generally connected

17   with drug dealing.  So, they find the drugs.  They already have

18   the phone.  Let's concede they shouldn't have had the phone,

19   but they get a warrant to search the phone, right?

20            MR. GUERRIERO:  Okay.  I think I understand your

21   Honor's point.  And my point would be that, you don't just --

22   at least my contention in a lot of motions is that you can't

23   just search the whole phone and hope you find something that's

24   incriminating.

25            THE COURT:  No.  You get a warrant, and the warrant

**JOINT APPENDIX 304**

1    tells you what you can search for and what you can search.

2    MR. GUERRIERO:  The time frame would have been limited

3    to I assume -- you know, I would expect the probable cause

4    would be the days surrounding September 1st.

5    THE COURT:  I haven't looked at the warrant to search

6    the phone.  I just assume the warrant describes what you can

7    search for and where you can search in the phone, doesn't it?

8    They got a warrant to search the phone, right?

9    MR. GUERRIERO:  Yeah.  I believe the warrant for the

10   phone, I'm going from memory here, but my recollection is it

11   goes from May to September.

12   THE COURT:  All right.  So, presumably a search from

13   May to September.

14   MR. GUERRIERO:  Right.

15   THE COURT:  And your argument would have to be, I

16   think, you can't get a warrant to search a phone that you

17   possess unlawfully.  Is there any law to that effect?

18   MR. GUERRIERO:  Well, I think the government has to

19   establish some break between the illegal conduct and the search

20   warrant.  They can't just say, well, we've seized this phone

21   and -- suppose they had no probable cause whatsoever, and they

22   seized the phone, and then while it's in their custody a week

23   later they develop probable cause to search it.

24   THE COURT:  Right.

25   MR. GUERRIERO:  It's a product of the illegal seizure.

**JOINT APPENDIX 305**

1    THE COURT:  Well, I guess I'm not following you with

2    that.  They have it as a result of an illegal seizure, they

3    should have given it back, but what's the harm to the

4    defendant?  Well, they have my phone and I can't use it.  Okay.

5    Have they accessed it?  No.  Have they accessed your personal

6    information?  No.  They get a warrant.  They persuade a

7    magistrate, a neutral and detached magistrate, that there's

8    probable cause to think that there's evidence of criminal

9    activity on that phone.  The magistrate judge, or whoever

10   issued the warrant, state -- was it a state warrant?

11   MR. GINGRANDE:  No.  Federal warrant, your Honor.

12   THE COURT:  So, magistrate judge says, All right.

13   You've persuaded me there's probable cause to believe there's

14   incriminating evidence on that phone based upon the affidavit

15   and so forth.  Here's a warrant.  Search that phone for this

16   for this period of time.  And you say, Oh, no, no, no, no.  I'm

17   going to argue about that, and I would have argued better if

18   you had given it back to me.  I'm not sure what that better

19   argument would be if it had been given back.

20   But right now we didn't give it back, so what's the

21   argument?  The argument is the warrant is invalid.  That's the

22   only argument.  And why would it be invalid, in what way?  And

23   you keep saying, Well, because they shouldn't have had the

24   phone.  And I'm thinking to myself what difference does it make

25   whether they had the phone, or the defendant had the phone, or

**JOINT APPENDIX 306**

1    the proffered lawyer had the phone, or it was in a lock -- what

2    difference does it make?

3         MR. GUERRIERO:  Well, the difference is that the

4    exclusionary rule which excludes evidence of police unlawful

5    conduct doesn't mean much if they can accomplish their goals

6    the way the Court describes.

7         THE COURT:  But, of course, they can't, because they

8    can't search the phone unless they have a warrant.  They can't

9    search it incident to an arrest, and they didn't.  If they had

10   done that, easy, then it's a search incident to an unlawful

11   arrest, it's all suppressed.  But they didn't search it.  They

12   just had it.  You're trying to say having it is a necessary

13   predicate to searching it, and I'm not sure it is, because, as

14   you say, you made the argument you can't destroy the evidence,

15   so you can't argue that it would have been wiped.  The lawyer

16   can't hide the evidence from the government.  So, that's not --

17   it wouldn't be altered or changed in any way from the lawyer's

18   possession of the phone.  So, why is the information obtained

19   pursuant to a warrant the fruit of a poisonous tree action in

20   some way?

21        MR. GUERRIERO:  At the risk of repeating myself, your

22   Honor, the arrest was unlawful --

23        THE COURT:  Go ahead, because I don't understand it

24   yet, and maybe I will.

25        MR. GUERRIERO:  I mean, I guess the word that's used

**JOINT APPENDIX 307**

1    in this case is "attenuation."  If the evidence is sufficiently

2    attenuated from the original unlawful conduct, then it may be

3    that they can get it and have access to it and it's

4    sufficiently removed from unlawful conduct.  But what's the

5    point of having an exclusionary rule for unlawfully arresting

6    someone and excluding the fruits of that unlawful arrest if

7    they can just keep the fruits of that arrest and get a warrant

8    and search it later?  The exclusionary rule completely fails in

9    that --

10           THE COURT:  I disagree.  But that's where we are.

11    Tell me why the search warrant somehow is dependent on the

12    unlawful seizure.

13           MR. GUERRIERO:  Could I have a second to pull up the

14    warrant?

15           THE COURT:  Sure.  Yeah.

16                      (Pause)

17           MR. GUERRIERO:  Can I have one second with my client?

18           THE COURT:  Certainly.

19                      (Pause)

20           MR. GUERRIERO:  Your Honor, after discussing with

21    Mr. Francis, the affidavit for the phone contains information

22    that was obtained from the search of the other defendant's

23    phone, from Flores's phone.  It's a little bit complicated in

24    that that phone was searched after the arrest as well.

25           But I do think that the Court should -- regardless of

**JOINT APPENDIX 308**

1    what the Court does on this, a consequence of what your Honor

2    is suggesting your finding should be would be that nothing --

3    no information derived from the phone prior to the execution of

4    the search warrant should be admissible.  So, if they got other

5    information from looking at the phone before they executed the

6    search warrant at a minimum that would not be admissible.

7         THE COURT:  Right.  I was just thinking that what's

8    suppressible based upon an unlawful seizure?  The evidence

9    seized.  What's the evidence seized?  That device.  So, if they

10   tried to offer the phone, it's not evidence of anything.  If

11   they tried to offer the phone you'd say, No, that's the fruit

12   of a poisonous tree; that was seized pursuant to an unlawful

13   arrest, so that's not evidentiary --

14        MR. GUERRIERO:  Well --

15        THE COURT:  -- but the content of the phone is

16   something different.  They didn't seize the content of the

17   phone until they got a warrant and it was authorized, so the

18   content of the phone is different.

19        MR. GUERRIERO:  But the government witness is going to

20   be Michael Francis was standing here at the counter with this

21   phone and with this check at the time that the SWAT team came

22   in and arrested him.

23        THE COURT:  Yes, it's his phone, but the contents of

24   the phone remained unavailable to the government until after

25   subsequent events justified the application for a warrant,

**JOINT APPENDIX 309**

1   which was issued, and the information was gained pursuant to

2   execution of that warrant.  So, maybe it's easier to separate

3   it out to phone and content.  Phone, sure, suppress it.

4   Content?  That's different.

5          MR. GUERRIERO:  I don't disagree with that, but their

6   ability to authenticate the phone and connect it to Michael

7   Francis I think depends on information from before the

8   execution of the search warrant.  Certainly, the testimony of

9   the clerk -- and they may say, well, the contents reveal that

10  it's Michael Francis's phone, or, We have messages from another

11  phone that are to Francis's phone number.  They can try to do

12  that at trial, if your Honor rules as you suggest you will, but

13  any information from the seizure of the phone --

14         THE COURT:  Don't be misled by what I'm implying,

15  because I'm not implying anything.  I'm actually trying to

16  figure it out.

17         MR. GUERRIERO:  No.  If that's the case, it would

18  still remain the Court's finding that any information obtained,

19  including the phone itself or any information related to the

20  phone from the time of the unlawful arrest until the execution

21  of the search warrant, that should not be admissible, including

22  the clerk's --

23         THE COURT:  Maybe you're onto something here.

24         Don't worry, Mr. Gingrande.  I'll give you a shot.

25         But I missed what you were saying.  He's unlawfully

**JOINT APPENDIX 310**

| | |
|---|---|
| 1 | arrested.  He's in possession of a phone.  They seize the |
| 2 | phone.  You said there was some information obtained pursuant |
| 3 | to the arrest, some other information that tied the phone to |
| 4 | the defendant? |
| 5 | MR. GUERRIERO:  So, they didn't -- the affidavit for |
| 6 | the search of the phone, I'm just repeating it quickly, it |
| 7 | doesn't only contain information about the arrest; it contains |
| 8 | information obtained from Emilio Flores's phone purporting to |
| 9 | be communications with Michael Francis. |
| 10 | THE COURT:  I don't see a problem there.  What's the |
| 11 | problem there? |
| 12 | MR. GUERRIERO:  It's information they didn't have at |
| 13 | the time that they seized the phone.  So -- |
| 14 | THE COURT:  You're losing me.  They get information |
| 15 | from some other phone, Flores's phone? |
| 16 | MR. GUERRIERO:  Yup. |
| 17 | THE COURT:  And that somehow indicates that what, that |
| 18 | Flores is in communication with the defendant?  But they |
| 19 | haven't gotten any information from the defendant or the |
| 20 | defendant's phone yet, right? |
| 21 | MR. GUERRIERO:  Well, I think they do -- |
| 22 | THE COURT:  Other than, It's my phone. |
| 23 | MR. GUERRIERO:  Well, there's also a motion to |
| 24 | suppress his statements which are also the result of the |
| 25 | unlawful arrest.  So, like I say, any information before the -- |

**JOINT APPENDIX 311**

|    |                                                              |
|----|--------------------------------------------------------------|
| 1  | THE COURT: Let's try to keep it clear. So, what              |
| 2  | statement he makes, That's my phone, something like that?    |
| 3  | MR. GUERRIERO: Well, the clerk says that he's                |
| 4  | standing there in possession of it.                          |
| 5  | THE COURT: That's not a statement.                           |
| 6  | MR. GUERRIERO: No, it's not, but --                          |
| 7  | THE COURT: What statement are you seeking to                 |
| 8  | suppress?                                                     |
| 9  | MR. GUERRIERO: That information is a fruit of the            |
| 10 | unlawful arrest.                                             |
| 11 | THE COURT: It may be, but you referred to a                  |
| 12 | statement. What statement are you trying to suppress?        |
| 13 | MR. GUERRIERO: He made statements back at the                |
| 14 | station.                                                     |
| 15 | THE COURT: No, no, no, no. I mean when he's arrested        |
| 16 | does he make any statements about the phone?                 |
| 17 | MR. GUERRIERO: I don't believe that he made a                |
| 18 | statement about the phone.                                   |
| 19 | THE COURT: Okay. So, now going on, they take the            |
| 20 | phone, but it's obviously his phone, right?                  |
| 21 | MR. GUERRIERO: Right.                                        |
| 22 | THE COURT: Okay. So, they take the phone. Now you           |
| 23 | go back to the station, now he makes statements related to the |
| 24 | phone?                                                        |
| 25 | MR. GUERRIERO: I don't think so.                             |

**JOINT APPENDIX 312**

1          THE COURT:  Okay.  So, there are no statements to

2     suppress there.  We're still just talking about a phone, and

3     based, I assume, based upon finding the drugs in the car and so

4     forth they apply for an affidavit, I mean, a warrant to search

5     the contents of the phone.

6          MR. GUERRIERO:  That's correct, your Honor, but

7     there's no -- I mean, there's no break between the illegal

8     seizure of the phone and them applying for a search warrant, so

9     the consequences --

10         THE COURT:  No.  But why is that significant unless

11    the argument is, once you illegally seize a phone you can

12    never, ever get a search warrant to search the content of that

13    phone; or, maybe alternatively, you can't get a warrant to

14    search the content of that phone unless you first give it back,

15    then you can get a warrant?  But I am aware of no case that

16    says anything like that.

17         MR. GUERRIERO:  I think what the cases say, your

18    Honor, is that there has to be something to remove the evidence

19    from the illegal conduct.  The issuance of a warrant --

20         THE COURT:  That begs the question what evidence are

21    we talking about, that thing called a phone or its contents?

22         MR. GUERRIERO:  I guess I don't understand how you

23    suppress the phone itself without also suppressing the content.

24         THE COURT:  Easy, easy.  Evidence that he had that

25    black phone with his name on it is suppressed:  You may not

**JOINT APPENDIX 313**

```
 1    present that to the jury because it was the subject of an

 2    unlawful seizure based upon an unlawful arrest.  That's easy.

 3    Oh, I'm not going to present the phone, but I'm going to

 4    present evidence that he had a phone and in that phone was the

 5    following, I got a search warrant to search the content, and

 6    that's what I found.  Is that relevant evidence?  Yes.  It

 7    should be suppressed.  Why?  Well, because you unlawfully

 8    seized the phone.  Yes, but I got a warrant.

 9          Is your argument you can't get a warrant unless you,

10    what, give it back first?  How do you attenuate the unlawful

11    seizure of the phone?  If your answer is you can't attenuate

12    it, I mean, you can't break that chain, I'm not sure that's

13    persuasive.  Obviously, we'll look into it.

14          MR. GUERRIERO:  Well, I think the way you would have

15    it be attenuated would be that there was no evidence in the

16    affidavit relating to the unlawful arrest.

17          THE COURT:  No evidence in the affidavit related to

18    the unlawful arrest.  But why would that be relevant to whether

19    there's probable cause to search based on subsequent events,

20    i.e., the search of the car?

21          MR. GUERRIERO:  Well, because they're using

22    information that was obtained as a result of the unlawful

23    conduct.  I mean, if they had --

24          THE COURT:  You're mixing words, and that makes me

25    skeptical.  The unlawful arrest, not conduct, the unlawful
```

**JOINT APPENDIX 314**

```
 1   arrest.

 2           MR. GUERRIERO:  Okay.

 3           THE COURT:  So, incident to an arrest, seizure

 4   incident to an arrest.  Unlawful arrest, unlawful seizure,

 5   suppress the evidence.  What evidence?  The phone.  What about

 6   the content?  Is that different?

 7           MR. GUERRIERO:  If they had an affidavit that did not

 8   describe the unlawful arrest and the seizure incident to that

 9   arrest, but suppose they had, you know, some other witness that

10   said -- that gave them -- an unrelated witness that gave them

11   probable cause for the phone, I recognize this phone, I know he

12   used it, here's his phone number, you didn't know about me but

13   I'm telling you, you know, I'm a totally reliable witness, if

14   they had probable cause from that witness, then I think that

15   would be attenuated, but they have an affidavit partly based on

16   the search of the codefendant's phone and partly based on the

17   unlawful arrest in this case.  And so, to say that that's

18   attenuated from the original unlawful conduct is just not

19   correct.  If they had completely independent basis for

20   searching the phone, then, yes, I don't think I would have a

21   motion to suppress.

22           THE COURT:  Okay.  Thank you.

23           Mr. Gingrande.  Just let me know your view, your

24   position.

25           MR. GINGRANDE:  Your Honor, I mean, our position is
```

**JOINT APPENDIX 315**

1 | essentially what the Court -- first of all, it's what I said

2 | about the fact that there was a lawful detention, you know,

3 | then there was a --

4 | THE COURT:  You've conceded unlawful arrest.

5 | MR. GINGRANDE:  Correct.  But five minutes later you

6 | have -- there is probable cause to arrest --

7 | THE COURT:  I think we're at unlawful arrest, unlawful

8 | seizure.  Now what?

9 | MR. GINGRANDE:  Okay.  So, if we're at unlawful

10 | seizure, then I think the argument is essentially what the

11 | Court was suggesting, which is, they applied for a warrant, the

12 | warrant was valid, it included facts about why the evidence

13 | that was sought would be on that phone.  It is content that

14 | they're searching the phone for.  That here we don't have an

15 | issue about, you know, a statement -- I don't believe that the

16 | phone -- the phone was not searched prior to application for

17 | the warrant.  We aren't talking about statements made by the

18 | defendant about his phone and suppressing those prior to

19 | application for the warrant.  So, really the warrant in this

20 | instance should be sufficient to search the phone.

21 | THE COURT:  Are you aware of precedent that talks

22 | about search of illegally seized objects, subsequent warranted

23 | searches of illegally seized objects?

24 | MR. GINGRANDE:  Well, to the extent that it has to be

25 | attenuated, your Honor, I would just say that there would be

**JOINT APPENDIX 316**

1 | other ways that that could be introduced.  Attorney Guerriero
2 | was talking about the clerk in this case.  The clerk would be
3 | able to identify this phone as being the defendant's phone,
4 | right?  And, you know, giving back the phone, as you said, I
5 | think would be a funny way to cure that attenuation.  I don't
6 | have precedent readily available to cite for you as to that
7 | particular issue.
8 |           THE COURT:  All right.  The other argument is how did
9 | you know what phone to get a warrant to search it?
10 |           MR. GINGRANDE:  Well, right.  But that's my point,
11 | your Honor, is that I think the government would be able to
12 | establish that through the clerk who saw the phone even prior
13 | to the illegal arrest in this case.  So, there's evidence from
14 | a non-law-enforcement source, right, that I feel would be
15 | sufficient.  Remember, that was left on the bank counter.
16 |           Now, I did want to just say for the record, your
17 | Honor, that we have -- I've conducted a review of body camera
18 | footage, et cetera, and other evidence in this case.  I do not
19 | believe it's correct that the phone was seized prior to the
20 | discovery of the drugs in the car.  I don't want to get
21 | sidetracked with all of that, but I did want to just state
22 | that --
23 |           THE COURT:  But that wasn't a basis for seizing it.
24 |           MR. GINGRANDE:  That's right, your Honor.  So, that's
25 | why I don't want to get sidetracked with that, but Attorney

**JOINT APPENDIX 317**

1    Guerriero said that he believed it was seized prior to

2    discovery of the drugs.  I don't think that's the case.  It was

3    left on the bank counter.

4         So, my only point, your Honor, is there's a bank

5    teller there who was actually the one -- and I believe Sergeant

6    Lorenzo testified to this, that he was made aware of the phone

7    being on the counter at the bank by the bank teller.  So, you

8    know, to the extent that --

9         THE COURT:  None of that addresses the point that it

10   was an unlawfully seized item, and the warrant that was sought

11   and obtained probably was necessarily based upon information

12   related to the unwarranted seizure, which would be, That's his

13   phone.  We want a warrant to search a phone.  What phone?  The

14   defendant's phone.  How do you know it's the defendant's phone?

15   We took it.  Did you take it lawfully?  No.  None of that

16   addresses that point.

17        MR. GINGRANDE:  Well, my point, your Honor, is let's

18   imagine a world in which he's not arrested at all, okay?  And,

19   instead, what happens is law enforcement, they walk in the

20   door.

21        THE COURT:  Are you heading for inevitable discovery?

22        MR. GINGRANDE:  I'm sorry?

23        THE COURT:  Are you heading towards inevitable

24   discovery?

25        MR. GINGRANDE:  I don't know if I would categorize it

**JOINT APPENDIX 318**

1    necessarily as inevitable discovery.  I'm just trying to think

2    about whether that's really what this would be.

3            THE COURT:  Or inevitable seizure, I guess, inevitable

4    inventory.

5            MR. GINGRANDE:  Well, what I'm getting at, your Honor,

6    is essentially that the -- you're asking about how we could

7    identify, you know, this particular phone.

8            THE COURT:  Mr. Guerriero's point of view is it's all

9    fruit of the poisonous tree.  It starts with an illegal

10   seizure, and once you seize it any warrant you get in the

11   future is necessarily going to be based on information related

12   to an unlawful seizure.  What's that information?  It's his

13   phone.  And that's key to everything, because, when you apply

14   for the warrant, you have to say, I think there's evidence of a

15   crime on that phone?  Why?  Because it's his phone.  Whose

16   phone?  The defendant's phone.  Why do you think there's

17   unlawful evidence, evidence of unlawful activity?  Well,

18   because we seized a bunch of drugs from his car; we might have

19   arrested him unlawfully, but we seized a bunch of drugs from

20   his car.  So, drugs, phones, they all go together, issue a

21   warrant.  And I think what Mr. Guerriero is arguing is you were

22   in that position because you unlawfully seized the phone, in

23   that position to identify in the warrant application that phone

24   as the subject of the search, and that makes it fruit of the

25   poisonous tree.  I'm not sure I buy that, but that's the

**JOINT APPENDIX 319**

1    argument, I think.

2         MR. GINGRANDE:  Yeah, and I understand the argument

3    the same way, and I guess what I'm saying is I think the

4    counter argument is that's actually not how we would be aware

5    -- we wouldn't even need the arrest in this particular instance

6    to be aware of the phone and the phone's existence and the

7    phone's existence as the defendant's phone, because in this

8    case we have a phone that is left on a bank counter while

9    Mr. Francis is attempting to deposit a check and the bank

10   teller saying the defendant had that phone.  So, that's my

11   position, your Honor.

12        THE COURT:  All right.  Obviously, we have to look at

13   that as to that.

14        All right.  Who is calling the witnesses?  We don't

15   need the probation officer anymore, and you're going to recall

16   the FBI agent?

17        MR. GUERRIERO:  I think as long as it's based on what

18   the government has offered as its proffer and as it's

19   stipulated to that, that Parole Officer Duffy did not authorize

20   anyone to make an arrest, and that it was an unlawful arrest,

21   then I don't want to call him; I don't think we need him to

22   testify.

23        THE COURT:  All right.  So, that's conceded, right?

24        MR. GINGRANDE:  Yeah, that's conceded.

25        MR. GUERRIERO:  We have Agent Burke is back here

**JOINT APPENDIX 320**

1   today.  I primarily wanted him because there was new discovery,

2   and I apologize for filing it at the last minute, but I just

3   have questions for him about that.  I don't intend to revisit

4   much, if anything, we talked about last time.

5           THE COURT:  Okay.  And, obviously, you can respond to

6   his supplemental.  You don't have to.  You can.

7           MR. GINGRANDE:  Yeah.  Your Honor, I mean, we were

8   going to -- I guess we can make our arguments, but if that

9   might help the Court, we would be happy to put it in writing.

10           THE COURT:  Well, I shouldn't assume.  Are you going

11   to put the agent on to say -- to determine whether he knew

12   about those police reports or didn't?

13           MR. GUERRIERO:  Yes.

14           THE COURT:  Okay.  So, that should be brief?

15           MR. GUERRIERO:  I think so.  I mean, I have a page and

16   a half of questions, so not much.  Okay?

17           THE COURT:  Perfect.  All right.

18           MR. GUERRIERO:  We are going to tell Officer Duffy

19   he's free to go.

20           THE COURT:  Thank you.

21           THE CLERK:  Remain standing and raise your right hand.

22           **RYAN BURKE,** having been duly sworn by the Clerk, was

23   examined and testified as follows:

24           THE CLERK:  Thank you.  Please be seated.  Please

25   state your full name for the record.

**JOINT APPENDIX 321**

```
 1              THE WITNESS:  Ryan Burke, R-y-a-n, B-u-r-k-e.

 2              Good afternoon, your Honor.

 3              THE COURT:  Good to see you again.

 4                    RECROSS-EXAMINATION

 5   BY MR. GUERRIERO:

 6   Q.   Agent Burke, thank you for coming back today.  I have some

 7   additional questions for you in light of some new reports that

 8   were produced since our last hearing.  But just to quickly put

 9   us in context in 2021, especially May through September,

10   approximately, you were working for the FBI?

11   A.   Yes, I was.

12   Q.   And you were working in conjunction with the Manchester

13   Police Department?

14   A.   I was.

15   Q.   And you were investigating drug cases and firearms cases

16   and that sort of thing?

17   A.   That's correct.

18   Q.   Okay.  And in this case --

19              MR. GUERRIERO:  Your Honor, at the last hearing we

20   discussed openly the identity of the witness, the informant in

21   this case.  I can refer to him as the "informant," but --

22              MR. ROMBEAU:  I don't think we did, actually.  I think

23   we called him the "cooperating witness."

24              MR. GUERRIERO:  Okay.  I remember saying it, but

25   that's fine.
```

**JOINT APPENDIX 322**

1    Q.    So, when I refer to the "informant," I'm referring to the

2    primary witness in your affidavit for the search of

3    Mr. Francis's white Honda.  Do you remember that person?

4    A.    I do.

5    Q.    Okay.  And is it correct that at the time that you wrote

6    the affidavit in support of the search warrant for

7    Mr. Francis's Honda that you were aware that the informant had

8    been arrested in both June and July of 2021?

9    A.    I was aware, yes.

10   Q.    And you described those arrests in your affidavit?

11   A.    I did, yes.

12   Q.    And specifically with regard to the July 30th, 2021

13   arrest, where Mr. Francis was -- I mean where the informant was

14   basically stopped in a motor vehicle stop, were you present for

15   that motor vehicle stop?

16   A.    I was not.

17   Q.    And your information about that motor vehicle stop came

18   from reports from Manchester Police Officers?

19   A.    It did.

20   Q.    Okay.  And were those Manchester Police Officers Officer

21   Biery, B-i-e-r-y and Officer Newell (ph)?

22   A.    I don't remember their names, but --

23   Q.    Do you remember reading the reports?

24   A.    I do remember -- if those are on the reports, then those

25   would be the names, yes.

**JOINT APPENDIX 323**

1    Q.   Repeat that for me.

2    A.   I did review the reports.  I don't know those two people

3    personally, so I don't recall their names.

4    Q.   Okay.  You recall that there was a motor vehicle stop in

5    Manchester by two Manchester Police Officers?

6    A.   I do.

7    Q.   And you included in your description of that stop in your

8    affidavit the location of the stop and the police department

9    involved?

10   A.   I did.

11   Q.   And you included a description of the automobile that the

12   informant was driving?

13   A.   Yes.

14   Q.   A black Audi A4?

15   A.   Yes.

16   Q.   And you included a description of the specific drugs that

17   were found in the informant's car?

18   A.   I did.

19   Q.   Okay.  When you read those reports you also saw that the

20   reporting officers, I know you don't remember their names,

21   Biery and Newell, had described the informant as having been

22   dishonest with them during their encounter?

23   A.   I don't recall reading that back then.  I've reviewed it

24   in the past couple of days, so I'm familiar with that

25   description.

**JOINT APPENDIX 324**

1    Q.    Okay.  Did you review those two police reports?

2    A.    I would have, yes.

3    Q.    Well, I mean, tell me if you disagree with this.  I have

4    copies of them I can show you.  Well, first of all, the reports

5    that you reviewed before coming to court, were they reports

6    from the Manchester Police Department?

7    A.    They were.

8    Q.    And were they the reports from the two police officers who

9    stopped the informant in Manchester on July 30th, 2021?

10    A.    They were.

11    Q.    Okay.  And you've read those -- you're confident that you

12    read all of those reports?

13    A.    Yes.

14    Q.    Okay.  And is it correct to say that one of the police

15    officers described the informant as being deceptive?

16    A.    Yes, it does say that.

17    Q.    And is it correct that one of the police officers said

18    that the informant was not telling the truth about who he was

19    meeting?

20    A.    Yes.

21    Q.    And the same officer reported or described the informant

22    lying about what was contained in the driver's side door

23    compartment of the car?

24    A.    I recall reading recently that he said there were

25    sunglasses.  I'm not sure if there were or there weren't

**JOINT APPENDIX 325**

| | |
|---|---|
| 1 | sunglasses. |
| 2 | Q.   And I can show you a copy of the report.  If I told you |
| 3 | the report says that it wasn't sunglasses, it was meth and a |
| 4 | needle loaded -- a loaded needle with drugs, does that sound |
| 5 | right? |
| 6 | A.   If that's what the report says, then, yes. |
| 7 | Q.   Okay.  All right.  And the other officer, the second |
| 8 | officer, wrote that this informant was being deceitful. |
| 9 | A.   Yes. |
| 10 | Q.   And that he had been trying to get an understanding or |
| 11 | information from the informant about where he was coming from |
| 12 | and where he was going, and the informant was nervous and |
| 13 | behaving suspiciously, and the officer described him as |
| 14 | deceitful? |
| 15 | A.   He did. |
| 16 | Q.   Did you include the information that the informant had |
| 17 | been deceptive during that motor vehicle stop in your |
| 18 | affidavit? |
| 19 | A.   No, I didn't. |
| 20 | Q.   You described all the other details about the motor |
| 21 | vehicle stop? |
| 22 | A.   The details related to the drug -- |
| 23 | Q.   The law enforcement agency.  Yes? |
| 24 | A.   Yes. |
| 25 | Q.   The location in Manchester, the kind of drugs, even the |

**JOINT APPENDIX 326**

1  specific make and model of the car?

2  A.    Correct.

3  Q.    But you left out of your report that both the officers had

4  described this informant as dishonest.

5  A.    Those were their opinions.  I didn't speak to them about

6  those opinions.  Again, I don't recall reading those words back

7  then when I wrote the affidavit, although surely I must have

8  read the report in its entirety, but I know that virtually

9  everyone is deceptive to an extent when they're pulled over by

10  the police.  It's a stressful situation, so it didn't -- it

11  wouldn't have impacted my assessment of the informant's

12  statement to me when I interviewed him.

13  Q.    Okay.  But they were deceptive during a drug investigation

14  by the Manchester Police Department?

15  A.    Well, it wasn't a drug investigation, I don't think, it

16  was just a car stop, and it was an individual with an arrest

17  warrant who was trying not to get arrested that day.

18  Q.    Okay.  So, your position would be that, even though there

19  had been a prior stop of this informant and there was a warrant

20  out for his arrest on a drug charge, that they weren't

21  conducting any kind of drug investigation?

22  A.    No.  Unless the report says otherwise, I think it was just

23  a car stop like police do on a daily basis.  I don't think they

24  knew -- they clearly didn't know who it was in the vehicle, I

25  don't think, when they went to stop the vehicle.  I believe he

**JOINT APPENDIX 327**

1    was stopped for a motor vehicle infraction.

2    Q.    Okay.

3    A.    But I can review the report if you think it suggests

4    otherwise.

5           MR. GUERRIERO:  May I approach, your Honor?

6           THE COURT:  Of course.

7    Q.    Let me just quickly look at the -- look at the first, the

8    top of this page, the first half of it.

9    A.    Okay.  It just looks like they were working a shift from

10   4:00 to 12:00 and pulled over a car.  You want me to read more?

11   Q.    Well, read as much as you're comfortable.  I'll have some

12   questions for you.  It's not a major point but --

13   A.    Right, yeah.  I think this is a couple of officers who

14   were wearing plainclothes and probably out patrolling the city

15   not for anyone in particular, and they just so happened to stop

16   an individual who they then identified as the -- who we're

17   calling the informant.  I don't think it was a targeted

18   operation by any stretch.

19   Q.    All right.  Is it fair to say that they're not officers in

20   uniform; they're in plainclothes, right?

21   A.    They are, but they're not -- I don't believe they are

22   assigned to any of the drug units for Manchester.  I think it's

23   just patrol officers that dressed down that day.

24   Q.    Okay.  And they saw a vehicle that looked suspicious to

25   them, right?

**JOINT APPENDIX 328**

1    A.    I suppose.  I could read it again.  I don't know if it
2    looked suspicious or if it committed a -- I would assume it
3    would have had to have committed a motor vehicle infraction for
4    them to pull it over.
5    Q.    Well, and I'll let you read it again.  It says, the
6    officer writes:  Through my training and experience this
7    behavior appeared to be consistent with that of drug activity,
8    especially activities observed by other vehicles engaged in a
9    drug transaction, et cetera.
10          And whatever initially provoked their interest in this
11   vehicle, their suspicion is that the person is involved in some
12   sort of drug dealing, right?
13   A.    That certainly states it.
14   Q.    Sounds like it?
15   A.    It does.  I didn't read that paragraph when you had it up
16   here, but it wasn't any sort of long-term investigation by
17   those two.  They would have just been on patrol that night.
18   Q.    Okay.  My point is that these two officers concluded in
19   their reports that, while they were investigating what they
20   considered to be drug activity, this informant lied to them.
21   A.    They certainly did write that, and I haven't spoken to
22   them, so I can't obviously testify to, you know, their
23   interactions with the individual, but just in my experience and
24   I think everyone's experience when people get pulled over by
25   the police it's stressful, and sometimes they're deceptive

**JOINT APPENDIX 329**

1   about how fast they might have been driving or whether they

2   used their blinker or not used their blinker, and in this case

3   obviously the individual we're calling "informant" knew that he

4   had an arrest warrant, which would have been the reason he was

5   deceptive about his name, and I believe that's all -- I believe

6   that's all -- the only thing that's described with relation to

7   the deception they describe.  It wasn't about the drug

8   activity, just his name.  So, it seems to me, again, just

9   reading it over the past couple of days, he's probably just

10  trying to avoid being arrested.

11  Q.   All right.  So, in summary, you would have been aware of

12  this information from the two officers, the comments about the

13  informant being deceitful and deceptive, but you didn't think

14  it belonged in the affidavit for the search warrant for

15  Mr. Francis's car?

16  A.   Again, I don't recall reading it back then.  I assume I

17  must have.  But, no, it just seems ordinary that somebody would

18  be stressful, would be stressed out and try to avoid being

19  arrested in a car stop, but I obviously didn't put it in the

20  affidavit.

21  Q.   Okay.  So, I just want to -- I'm only going to briefly

22  refer to the last hearing, but you knew that the informant had

23  a falsifying physical evidence felony conviction at the time

24  you wrote the affidavit?

25  A.   I did.

**JOINT APPENDIX 330**

1    Q.   And you knew, even if you don't remember it now, where you

2    had access to the reports of two police officers that described

3    the informant as being deceitful, deceptive and not telling the

4    truth when during the very stops that you describe in your

5    affidavit, and you do not include that information either.

6    A.   I didn't, no.

7            MR. GUERRIERO:  That's all I have, your Honor.

8            THE COURT:  All right.  Mr. Gingrande.

9            Sorry.  Mr. Rombeau.

10           MR. ROMBEAU:  May I approach, your Honor?

11           THE COURT:  Any time.

12                    REDIRECT EXAMINATION

13   BY MR. ROMBEAU:

14   Q.   Special Agent Burke, I have you handling the report that

15   Attorney Guerriero was just asking you about.  The vehicle that

16   was pulled over the night of July 30th, 2021, was that

17   registered to the individual we've been referring to as the

18   "informant"?

19   A.   No.

20   Q.   In fact, was it registered to some other individual?

21   A.   It was, yes.

22   Q.   Okay.  And did that individual, according to the

23   Manchester Police report that you reviewed, have his own

24   drug-dealing history that was of concern to Manchester Police

25   when they initiated that stop?

**JOINT APPENDIX 331**

1   A.   Actually, it does.  It says they checked their in-house

2   system and showed that the registered owner had drug arrests,

3   and, Due to this, we decided to follow the vehicle.

4   Q.   And when the stop concludes on that evening of July 30th,

5   did the stopping officers ultimately seek a search warrant for

6   that Audi A4 we've been talking about?

7   A.   They did.

8   Q.   And what did that lead to the discovery of?

9   A.   Of controlled substances.

10  Q.   And was this in excess of 400 grams of what ultimately

11  tested positive for methamphetamine?

12  A.   Yes.

13  Q.   And in your experience as a drug investigator at the FBI

14  is 400 grams of methamphetamine a significant dealing quantity?

15  A.   It certainly is.

16  Q.   And the discovery of 400 grams of methamphetamine in a

17  car, does that, in your experience, impact an individual's

18  willingness to be truthful with law enforcement?

19  A.   I would say so, yes.

20  Q.   Okay.  And why don't we expand on that a little.  Can you

21  tell the Court why, in your experience, individuals are not

22  truthful when they're in a car that turns out to have a

23  significant amount of drugs in it?

24  A.   Well, they know, obviously, if those drugs are found that

25  they're going to face significant punishment, and then in this

**JOINT APPENDIX 332**

1    individual's case he would have known from the last car stop,

2    which is sort of a --

3         MR. GUERRIERO:  I'm going to object to the speculation

4    about the informant's state of mind.  I mean, those are things

5    the Court -- you could draw those conclusions yourself.  I

6    don't think the agent's in any better position than anyone else

7    to draw those conclusions.

8         THE COURT:  Up to you.  I'll give you latitude, but

9    the issue is was there evidence that should have been presented

10   in the warrant for the magistrate.

11        MR. ROMBEAU:  I'll rephrase, your Honor.  Thank you.

12   Q.  And in your experience working with informants who have --

13        THE COURT:  Is this going -- is this heading down the

14   road of, In my experience I don't report information like

15   deceptive, lying and so forth in my affidavits?  Because I'm

16   not sure that would affect anything, right?  The legal question

17   is should or shouldn't this information have been in this

18   affidavit.

19        MR. ROMBEAU:  And maybe I'll just ask it this way,

20   your Honor, since I know the Court does have to make a

21   reckless --

22        THE COURT:  It's not intentional.  I don't think

23   anybody's claiming intentional.

24        Are you, Mr. Guerriero?

25        MR. GUERRIERO:  As a practical matter, it doesn't make

**JOINT APPENDIX 333**

1    any difference.  It's at least reckless, is what I've said in

2    my motion, and I think that's fine.

3    Q.   Is it noteworthy to you, as an investigator, that an

4    individual does not immediately confess to involvement in 400

5    grams of methamphetamine?

6    A.   Not at all, and I would go so far as to say that, if

7    someone's being deceptive to law enforcement on a car stop

8    precluded them from providing honest information to me, then I

9    don't think I could probably interview anyone in this courtroom

10   or elsewhere.  I just think it's that common a thing that

11   people are stressed on car stops and they say things they don't

12   mean and they just try to, you know, avoid getting in trouble.

13   That's sort of human nature.

14   Q.   All right.  And when you first came into contact with the

15   cooperating witness a few weeks later, after his arrest in

16   Loudon, was the informant -- what did the informant have to say

17   at that point about this July 30th stop?

18   A.   Well, my interaction with him, I confronted him directly

19   about the drugs that were found, and he immediately confessed.

20   I mean, there wasn't much of a --

21        MR. GUERRIERO:  I have to raise the objection I raised

22   at the last hearing.  I mean, the point of this is what was

23   left out, and everything else is decided by the four corners of

24   the affidavit.  What other information he had or he may have

25   put in the affidavit is not relevant in this hearing.

**JOINT APPENDIX 334**

```
 1            THE COURT:  I think I agree.
 2    Q.   I'll just finish, Special Agent Burke, on your interaction
 3    with the informant that led you to drafting the affidavit.  Did
 4    that interaction affect your assessment of whether or not he
 5    was truthful with you about the circumstances of the July 30th
 6    stop?
 7    A.   No, not at all.  Again, I think deception on a traffic
 8    stop is so common that it didn't affect my assessment of the
 9    information he provided; and, again, I just think deception on
10    any traffic stop, if that were such a deal breaker for, you
11    know, collecting information from people, that we wouldn't have
12    anybody to talk to.  So, when I read that I didn't really think
13    anything of it.  I just thought that's sort of human nature.
14            MR. ROMBEAU:  Nothing further.  Thank you, your Honor.
15            THE COURT:  All right.  Anything else, Mr. Guerriero?
16            MR. GUERRIERO:  I couple of questions.
17                  FURTHER RECROSS EXAMINATION
18    BY MR. GUERRIERO:
19    Q.   You routinely in your job apply for arrest warrants and
20    search warrants, right?
21    A.   I do.
22    Q.   And you draft affidavits in support of those search
23    warrants and arrest warrants?
24    A.   I do.
25    Q.   And I know, because I've read them, but I want to make
```

**JOINT APPENDIX 335**

1    sure that you agree with me, in some of your search warrants

2    you write that you find a particular witness or informant to be

3    credible?

4    A.    Yes.

5    Q.    You didn't write that in the affidavit in this case, did

6    you?

7    A.    I don't recall, but I did.  Otherwise, I wouldn't have

8    wrote it in an affidavit and put my name on it.

9         MR. GUERRIERO:  That's all the questions I have, your

10   Honor.  I do want to make sure that -- the government filed a

11   Motion for Protective Order regarding the new discovery.  I

12   filed two police reports under seal, because they had asked for

13   a protective order.  I'd like to ask that those two police

14   reports be made part of the record of this hearing, because I

15   think at the last hearing we agreed that all exhibits to the

16   pleadings would be part of the record, but we didn't have those

17   filed at the time.

18        THE COURT:  Any objection?

19        MR. ROMBEAU:  No, your Honor.

20        THE COURT:  All right.  I think I just said grant that

21   protective order.  Anyway, that's granted.

22        MR. ROMBEAU:  Thank you, your Honor.

23        THE COURT:  You attached them.  But with that

24   exception, I guess, the reports will be exhibits for this

25   hearing.

**JOINT APPENDIX 336**

```
 1          MR. ROMBEAU:  Yes.  I believe they were filed under

 2   seal, and I just ask that they remain under seal but as part of

 3   the record.

 4          THE COURT:  You want to seal the police reports?

 5   Aren't they public record?

 6          MR. ROMBEAU:  They identify the informant by name.

 7          THE COURT:  Oh, they do?  Aren't they redacted?  I

 8   thought I looked at them and they were redacted.

 9          MR. GUERRIERO:  They're redacted, but the name of the

10   informant is not redacted.

11          THE COURT:  Oh, okay.  All right.

12          MR. ROMBEAU:  We can provide a new copy.

13          THE COURT:  Perfect.  We'll just substitute a redacted

14   copy for the exhibit in this hearing.

15          MR. ROMBEAU:  Thank you, your Honor.  Yes, we will.

16   Thank you.

17          THE COURT:  Thank you, Agent Burke.  You may step

18   down.  You're excused as a witness.

19          THE WITNESS:  Thank you.

20                      (Witness stepped down)

21          THE COURT:  Anything else?  Any other witnesses?

22          MR. GUERRIERO:  No, your Honor.

23          THE COURT:  Do you want to be heard?

24          MR. GUERRIERO:  I would like to be heard, your Honor.

25          THE COURT:  All right.
```

**JOINT APPENDIX 337**

44

1          MR. GUERRIERO:  Your Honor, I think I'll start at

2     what, frankly, surprised me a little at the last hearing when

3     your Honor expressed the view that the affidavit for the search

4     warrant was solid and clearly stated probable cause, and I

5     would respectfully ask you to reconsider that.

6          THE COURT:  On its face.

7          MR. GUERRIERO:  Excuse me?

8          THE COURT:  On its face.

9          MR. GUERRIERO:  Yes.  I would respectfully ask you to,

10    even if you don't reconsider that conclusion, consider the

11    basis for it, because it directly impacts how you will review

12    the evidence that was left out of the warrant when it's read

13    into the warrant.  Obviously, it's our view that the evidence

14    that the informant had a prior falsifying physical evidence

15    conviction for felony --

16         THE COURT:  Just so you're not overly upset or

17    confused, on its face, not knowing anything else, I don't think

18    anybody could make an argument that that affidavit is

19    insufficient to establish probable cause, okay?  That's not

20    what we're talking about here.

21         MR. GUERRIERO:  That's right.

22         THE COURT:  Okay.

23         MR. GUERRIERO:  But I do want to point out what's

24    missing from the affidavit, to the extent that you were going

25    to -- and my criticisms of it, that there's no corroboration.

**JOINT APPENDIX 338**

1    Well, I'll jump to --

2         THE COURT:  As I understand it, the only criticism you

3    could have in challenging it is to say there's a <u>Franks</u>

4    violation.

5         MR. GUERRIERO:  That's right, your Honor.  Well, this

6    is what I think I would say is the basis for your conclusion

7    that it's valid on its face, that under normal circumstances if

8    the identity of the informant is known to the police, and if

9    they offer some details that sound reasonable to the police and

10   the police say, Okay, we're asking for this warrant, and so

11   it's implied that in their training and experience this person

12   is credible, that, in the absence of anything else, that is

13   often found by courts, district and the appellate court, to be

14   sufficient.

15        But what I would note that's missing from this

16   affidavit is other information that would add to probable

17   cause, because the one thing that this warrant depends on, the

18   identity and credibility of the informant, pertains directly to

19   what was left out of it, so with respect to --

20        THE COURT:  Another way of saying there's a <u>Franks</u>

21   violation.

22        MR. GUERRIERO:  Right.

23        THE COURT:  Right.  No need to confuse it.  We all

24   know what a <u>Franks</u> violation is.

25        MR. GUERRIERO:  Right.

**JOINT APPENDIX 339**

1          THE COURT:  So, you've got to show that.

2          MR. GUERRIERO:  So, the officer left out information

3    directly regarding the agent -- I'm sorry -- left out

4    information directly relating to the credibility of the

5    informant.  Under those circumstances, as the First Circuit has

6    written in the Gifford case, there has to be some effort by the

7    police, by the agent to essentially do away with the concern

8    that this person --

9          THE COURT:  But you've got to show that it was either

10   reckless or intentional; then you've got to show it was

11   material, it would have made a difference in whether the

12   warrant was issued.  That's all you have to show.

13         MR. GUERRIERO:  Well, I'll take that framework.  It

14   was clearly reckless.

15         THE COURT:  That's not my framework.  That's Franks.

16         MR. GUERRIERO:  I understand.  So, leaving out the

17   information about the credibility of the informant was clearly

18   reckless.  He knew about a felony crime involving dishonesty

19   for this informant.  He knew or should have known, he had

20   access to the reports, he said he would have read the reports,

21   that two different Manchester Police Officers had called this

22   informant deceitful, deceptive, not telling the truth, and that

23   the informant had actually lied to them during their

24   investigation, which, characterize it how you want, they were

25   suspicious of drug activity, and, in fact, he was driving some

**JOINT APPENDIX 340**

1     other drug dealer's car.

2          So, he left all of that information out.  I don't see

3     how the Court could find that that is not reckless.

4          So, then, to go to the next step, is it relevant to

5     this warrant?  Well, yes, it is, because there is nothing else

6     providing probable cause in this warrant.  There is no other

7     witness, there is no corroboration of any criminal conduct

8     alleged by the informant.  It's not like the informant engaged

9     in a controlled buy.  It's not like he predicted some future

10    criminal conduct.  He literally did not predict any future

11    conduct of Mr. Francis.  We're going entirely on the

12    informant's word in this affidavit.  There is no other evidence

13    from beyond the informant, such as surveillance video, forensic

14    evidence, like, you know, he brought them a bag that had drugs

15    in it and they found Mr. Francis's DNA or fingerprints on the

16    bag.  There's nothing like that.  There's no observations by

17    police or third parties.

18          I mean, there's not even in the affidavit an

19    allegation that any person in the world had ever seen

20    Mr. Francis and this informant together.  I mean, this is

21    entirely on the informant's word.

22          In terms of what they did corroborate were purely

23    innocent details.  The kind of car that Mr. Francis drove, I

24    mean that's hardly something -- that Mr. Francis is a felon,

25    again, I mean, it's hard to keep that sort of thing a secret.

**JOINT APPENDIX 341**

1   And that's not criminal conduct, and it's certainly not future

2   conduct.  And that the informant claimed that the drugs had

3   been delivered to him in an area of Manchester where the police

4   had sometimes seen Mr. Francis.  I mean, that could apply to

5   hundreds of people, anybody that's ever in that area.  So,

6   there's no corroboration of any criminal conduct.

7           And, most importantly, and this was the reason for my

8   last question, this is not an informant that has a track

9   record.  Sometimes agents have informants that have a track

10  record; they've provided reliable information in the past.  The

11  agent does not relate any circumstances where this informant

12  ever described some criminal conduct where the police

13  investigated and confirmed that the informant had provided

14  accurate information about criminal conduct.

15          And, again, I understand, I don't want to go so far as

16  to, I don't think I have to go so far as saying intentionally,

17  but I think the Court has seen and I have seen there are times

18  when an agent does vouch for the credibility and say, I find

19  this information to be believable that such and such, and maybe

20  it's implied in the warrant, but I'll just note that in this

21  affidavit Agent Burke did not specifically say, I find this

22  person -- I personally find this person to be credible based on

23  my training and experience.

24          So, what you have is a warrant that nothing but the

25  informant's word and the fact that he revealed his identity and

**JOINT APPENDIX 342**

1    under those circumstances then you look and say, well, under

2    those circumstances the agent withheld that there was a felony

3    conviction for dishonesty, that literally 30 days before the

4    application for this search warrant, 25 days before the

5    application for this search warrant two Manchester Police

6    Officers had described this informant as deceitful and

7    dishonest and not telling the truth.

8              And, frankly, I mean, my point is that where the

9    affidavit for the warrant depends entirely on the word of the

10   informant, I think Magistrate Lynch or your Honor or any other

11   judge would have wanted to know and would have seriously

12   questioned the sufficiency of this affidavit and would have

13   found that it was not sufficient in the absence of something

14   else, in the absence of some corroboration, some prediction of

15   future behavior, some evidence from some other source.  But if

16   you're going to base it entirely on the word of this informant

17   and hide from the Court or not reveal to the Court that there's

18   this evidence of dishonesty, under those circumstances I think

19   there is a Franks violation, it would have made a difference to

20   the issuing magistrate, and the Court has to suppress the

21   evidence.

22             THE COURT:  Thank you, Mr. Guerriero.

23             Mr. Gingrande.

24             MR. GINGRANDE:  Your Honor, I just want to clarify.

25   Are we going to discuss these motions one by one?  I'll give my

**JOINT APPENDIX 343**

1  response as to the search warrant, because obviously there's

2  also the arrest issue.

3  MR. GUERRIERO:  I don't have anything else on the

4  arrest issue.  I think we have covered it pretty thoroughly?

5  MR. GINGRANDE:  Okay.

6  THE COURT:  On that issue, I've just got to look at

7  the cases and see what the precedent is in this Circuit with

8  respect to content search as being different from physical

9  object searches.  I know there's a relationship in the phone.

10  I just don't know what the precedent is.

11  MR. GINGRANDE:  Your Honor, if I could, I might just

12  extrapolate a bit on my arguments in my closing here, but I'll

13  keep it brief, in light of what you just said.

14  In order to prove reckless disregard for the truth in

15  this case, your Honor, the defendant must prove that the

16  affiant in fact entertained serious doubt as to the truth of

17  the allegations that are made in the complaint.  That is United

18  States versus Ranney, a First Circuit case from 2002.

19  Here, there's no evidence whatsoever that the affiant

20  entertained doubt as to the truth of the informant's allegation

21  of the defendant's criminal activity.  He believed the

22  information provided by the affiant to be true, and he

23  testified as to why that was.  There are statements against

24  penal interest in this case.  He was implicating himself in a

25  conspiracy by explaining what his relationship with

**JOINT APPENDIX 344**

1    Mr. Francis, the defendant, was and the fact that he was

2    acquiring large amounts of drugs from him.  There were

3    statements about the details of Mr. Francis, Mr. Francis's car,

4    about his residence and other personal-identifying information.

5    He gave specific references to places where the deals were

6    conducted.  He presented information as to the fact that

7    Mr. Francis often carried a gun in his car.  He provided other

8    information that showed his personal knowledge of these events.

9    I'll circle back to that when I discuss the corroboration that

10   law enforcement was able to conduct in this instance.

11        But the point in the context of the Franks standard is

12   that Agent Burke testified that he believed the informant, and

13   he expressed the reasons for those beliefs.  Now, the question

14   becomes the omissions in this case, were they reckless, and did

15   they show that he should have entertained serious doubts as to

16   the credibility of this informant?  And, if anything, the

17   omissions here are negligent, they are not reckless, because

18   they're so commonplace, essentially initial denials of criminal

19   wrongdoing when someone is confronted by law enforcement, that

20   a law enforcement officer would not have reason to believe that

21   this affected the credibility of the information being provided

22   in a post-arrest interview, as occurred in this case.

23        And so, now I want to go specifically about the

24   falsification charge and then discuss the additional reports in

25   this case.  The violation of New Hampshire RSA, I think it's

**JOINT APPENDIX 345**

1    641:6, for which the informant was convicted was based on the

2    informant's concealing what appeared to be drugs by dropping

3    them to the ground and stepping on them in order to impair

4    their availability, and that was in a simple drug possession

5    investigation, and that's the language that's in our exhibit to

6    our objection to defendant's motion.  The statute -- this

7    tracks Subsection I of the statute for falsifying physical

8    evidence, which states:  A person commits a class B felony if,

9    believing an official proceeding as defined in 641:1, Section

10   II, or an investigation is pending or about to be instituted,

11   he:  I. Alters, destroys, conceals or removes any thing with a

12   purpose to impair its verity or availability in such proceeding

13   or investigation; or II.  Makes, presents or uses anything

14   which he knows to be false with a purpose to deceive a public

15   servant who is or may be engaged in such proceeding or

16   investigation.

17          This is comparable to a criminal trying to hide

18   evidence or trying to dust off his fingerprints so he doesn't

19   get caught, and it's a predictable response from a criminal who

20   is being investigated for the crime in the heat of the moment

21   and when he's being confronted.  So, it doesn't in any way

22   refute probable cause in this instance, and there's case law to

23   support that.

24          In United States versus Rumney, and this is cited in

25   our brief, that's a First Circuit case from 1989, the First

1    Circuit found that omission of the informant's criminal record

2    in addition to original denials of his involvement in a

3    criminal activity did not warrant a <u>Franks</u> hearing because the

4    facts would not have changed the overall finding of probable

5    cause, and the court said, and I'm just going to substitute the

6    word "the informant" for the informant's name in this:  The

7    informant's denials of involvement were made predictably before

8    he was confronted with evidence linking him to the robbery.

9    Once the police gathered enough information to arrest the

10   informant, he changed his story.  That the police chose not to

11   include the informant's denials along with the reason for his

12   recantation is not material to a finding of probable cause.

13   The informant's credibility was not undercut merely because he

14   made predictable denials until the police could produce

15   evidence linking him to the robbery.

16        Similar to in <u>Rumney</u>, here the cooperating witness's

17   physical falsification of drugs as law enforcement was trying

18   to pin drugs on him is predictable, and it doesn't undermine

19   his personal involvement at all in the activity that he

20   describes in the post-arrest interview; and furthermore it's

21   not a conviction for perjury, and it's not a false statement

22   conviction, and it doesn't speak to his willingness to falsely

23   throw someone else under the bus.  It's just simply not what

24   happened with that violation.  So, the kinds of lies that

25   matter are the kinds that show that, the defendant's

**JOINT APPENDIX 347**

1    willingness to throw someone else under the bus to save

2    himself, and this conviction doesn't show that willingness, and

3    neither do the other reports that the defendant cites.

4         And I just wanted to say that there are cases to this

5    effect, your Honor, and we cite one of them.  It's United

6    States versus Comer, a 10th Circuit case that's listed in the

7    government's Notice of Supplemental Case Law.

8         Now, it's also worth noting that, even if there was

9    some possibility that the cooperating witness was lying in this

10   case, a warrant application need not entirely eliminate the

11   risk that the informant was lying in order to establish

12   probable cause.  That's First Circuit case law cited in our

13   brief.  That's the Capozzi case.  Instead, the application must

14   merely suggest a fair probability that evidence of a crime will

15   be found in the place to be searched.

16        And the logic of the Rumney and Conner (ph) cases,

17   your Honor, also applies to the supplemental exhibits that were

18   just submitted by defendant.  They're essentially cumulative to

19   this falsification charge, because they show when he's

20   initially confronted by law enforcement the cooperating witness

21   did something to try to evade or throw police off the scent,

22   and so under Rumney that is the type of roadside lie that is

23   not really relevant to a finding of probable cause.

24        Now, I want to get specifically into those lies now.

25   So, if you look at the reports that were submitted as exhibits

**JOINT APPENDIX 348**

1    here, the language in the report says that the cooperating

2    witness said that he was visiting his girlfriend on Prospect

3    Street, but, upon being asked her name, he stated that he

4    thought his name was and then began mumbling a name that did

5    not appear to be a familiar name.  And the other report says

6    that he said that the name was Eunice or something like that.

7    And then, when he was asked further about that, as to what

8    "Eunice" means, he says, Oh, I meant, and then it said his

9    name, the cooperating witness said, Oh, I meant her name.  And

10   then that is the context in which the report goes on to say, I

11   found this behavior to be suspicious and indicative of our

12   suspicion of drug activity as to the cooperating witness, who

13   was clearly nervous, was providing erroneous statements, was

14   tripping over his own statements attempting to provide

15   deceitful answers.

16          That is the basis of this additional finding -- the

17   references that Attorney Guerriero was making to these reports

18   about deceit, that is the context, his not being forthright

19   about who the name was of his girlfriend who he was visiting in

20   the context of the car stop, and that's precisely the type of

21   misinformation, the type of lie that the First Circuit has

22   found does not support probable cause, because it's so

23   predictable.  And it speaks to the reason that it is not

24   reckless for the agent to have omitted that information,

25   because this is information that, frankly, just didn't pop out

**JOINT APPENDIX 349**

1    at him.  He doesn't really recall specifically whether he had

2    read that language, but he said that, even if it had, this is

3    something that's commonplace, he wouldn't hold that against

4    him, and then goes on to explain or previously at the last day

5    of hearing, at least, explain why he found him to be credible.

6          So, the next point I want to make is that, even if you

7    assume that the omissions were reckless such as the affidavit

8    would be reformed, the reformed affidavit would still establish

9    probable cause in this case, and I want to get into that a bit,

10   because Attorney Guerriero says that there's basically nothing

11   that was corroborated, there was no criminal activity

12   corroborated, there was no credible information presented.

13         So, I believe the parties believe (ph) on the

14   appropriate standard in this case, your Honor, and that

15   standard is United States versus Gifford.  That's a First

16   Circuit case, 2013, and it sets forth this list of

17   considerations when determining whether an affidavit in support

18   of a search warrant that's based primarily -- I apologize --

19   that's based primarily on information from an informant

20   establishes probable cause, and the first factor is that the

21   affidavit establishes the veracity and basis of knowledge of

22   the cooperating witness's information.

23         Now, here the cooperating witness was not an anonymous

24   tipster.  This was someone who was providing information while

25   in law enforcement custody, and the cooperating witness was

**JOINT APPENDIX 350**

1    named in the affidavit so he could be held accountable if the

2    information he provided was false.  There's case law that says

3    that knowing the cooperating witness's identity itself bolsters

4    the informant's credibility because it opens the informant up

5    for charges related to making a false report, and that's United

6    States versus Croto cited in our brief.

7         The cooperating witness also gave the post-arrest

8    interview in person, it wasn't just some information conveyed

9    over the phone, and it gave law enforcement an opportunity to

10   evaluate personally his mannerisms, expressions and his tone,

11   and Agent Burke testified as to the fact that he found him

12   credible based on the information he was providing and the

13   circumstances and being able to evaluate him.

14        The cooperating witness's statements against penal

15   interest, as I already mentioned, they have inherent

16   reliability, and we cite the case law in our brief as to that.

17        And then, importantly, the defense asserts and

18   asserted during the cross-examination of Agent Burke that an

19   arrestee has incentives to lie to curry favor with law

20   enforcement, but cases in the First Circuit support the

21   government's view that cooperating sources in post-arrest

22   interviews are actually incentivized to tell the truth, and

23   that's in United States versus Vongkaysone, which I probably

24   butchered.  The First Circuit reasons that, when an informant

25   has been caught dealing in drugs, it is to his advantage to

**JOINT APPENDIX 351**

1    produce accurate information to the police so as to qualify for

2    the leniency that he seeks.

3              Here, the cooperating witness risked receiving no

4    benefit and possibly additional charges if he provided false

5    information, and, as Special Agent Burke testified, they didn't

6    have a cooperation agreement or something that would have given

7    him immunity in this case.  That only bolsters that point.

8              So, now I want to get into the discussion of the

9    corroboration, because, your Honor, I do believe that there is

10   sufficient corroboration here and that it established probable

11   cause.

12             So, the first point I want to make is that law

13   enforcement, you know, they conducted a search of a database to

14   find the defendant's residence, which was near the intersection

15   where the cooperating witness had said he conducted drug

16   transactions with the defendant, and you'll recall this address

17   was a true discovery when law enforcement searched for and

18   corroborated it because it was different than the address that

19   Francis had reported to his probation officer, and that was the

20   issue that had been identified as to what the officers believed

21   that the parole violation was in this case, was not reporting

22   his correct address to Francis's parole officer.  And so, the

23   magistrate judge could reasonably find that the proximity of

24   the informant's reported drug deals to the defendant's

25   confirmed address through this corroboration of looking through

**JOINT APPENDIX 352**

1    the database did, in fact, show that the informant was

2    providing truthful information.

3         Law enforcement also confirmed, through contacting the

4    defendant's parole officer and through on-site surveillance,

5    that the defendant's vehicle matched the detailed description

6    that had been provided by the cooperating witness, and that

7    included the make, color, license plate of the vehicle, which

8    showed, at a minimum, the informant's familiarity with that

9    vehicle.  And the cooperating witness described that the

10   defendant took over supplying the cooperating witness with

11   drugs after the cooperating witness's former supplier, Ryan

12   Call, who was a member of the same gang as the defendant, the

13   Gangster Disciples, was incarcerated, and law enforcement

14   corroborated that the dates that the cooperating witness

15   provided for that change in his supplier matched up with the

16   time that the former supplier, Ryan Call, was arrested.

17        They were familiar, you know, law enforcement was

18   familiar with Ryan Call as being in the Gangster Disciples,

19   they confirmed that he was arrested in early July, and he was

20   still incarcerated as of the writing of that affidavit, and

21   that corroborated the informant's description that the

22   defendant took over the informant's former supplier's operation

23   after Mr. Call was arrested and between the June 13th, 2021 and

24   July 30, 2021 car stops.

25        Furthermore, the informant's description of the amount

**JOINT APPENDIX 353**

1   of methamphetamine he bought from the defendant per day was

2   consistent with the amount recovered from the informant's

3   vehicles, and the prices that he listed were known to law

4   enforcement to be going rates at that time, and law enforcement

5   determined that the defendant was a convicted felon, which the

6   First Circuit has held to be material to the probable cause

7   determination, and I believe we cite that in our brief as well.

8   It's <u>United States versus Taylor</u>.

9        The defendant's being a felon, therefore, of course,

10   lent credibility to the informant's assertion that the

11   defendant was engaging in illegal activity and confirmed that

12   his regularly carrying a gun in between the driver's seat and

13   the center console of the vehicle was itself criminal activity.

14        So, your Honor, there is sufficient corroboration, we

15   believe, to show that the information he was providing was

16   credible in this case, and that, even if you were to add the

17   omitted information in this case, that probable cause would

18   still be established.

19        Now, having said that, I do want to address, actually,

20   one more point, just briefly, which defense counsel makes this

21   point that there was no corroboration of actual criminal

22   activity that was observed as being ongoing, et cetera, by the

23   police, but the Supreme Court has explicitly reasoned that

24   corroboration of things other than illegal activity is

25   sufficient to validate an informant's report of illegal

**JOINT APPENDIX 354**

1   activity.  That's in <u>Illinois versus Gates</u>, where the Supreme

2   Court reasoned that corroboration of innocent events described

3   in an anonymous letter suffice to establish a fair probability

4   that the defendants were engaged in the uncorroborated criminal

5   activity that the letter described.  So, even if you believe

6   that's the case, that does not militate against finding

7   probable cause in this case.

8        I do want to, if I could briefly, address the other

9   argument that I started to make in the context of the arrest.

10  There is one other argument that we didn't thoroughly hash our

11  earlier, your Honor, and that is based on the Supreme Court

12  cases in <u>Samson versus California</u> and in <u>United States versus</u>

13  <u>Knights</u>, which we cite in our brief, and the argument goes like

14  this:  It's that here, because Mr. Francis was on parole at the

15  time that the search of his phone was conducted, the search

16  being the seizure in this case of the phone, was conducted,

17  Mr. Francis lacked any privacy interest recognized by society

18  as legitimate as against that search at issue, and the

19  government has a strong countervailing interest in searching

20  parolees and their property to protect public safety, to

21  prevent recidivism and to aid a parolee's societal

22  reintegration, and I do want to extrapolate on that a bit.

23       I think the Court is already familiar that, in order

24  to show that a search is unreasonable, there has to be a

25  finding that it was both -- there was no subjective -- in

**JOINT APPENDIX 355**

1    addition to showing a subjective expectation of privacy, that

2    the person searched had an objective expectation of privacy,

3    one that was objectively reasonable, and the Supreme Court had

4    held in Samson versus California that a condition of release

5    can so diminish or eliminate a released prisoner's reasonable

6    expectation of privacy that a suspicionless search by a law

7    enforcement officer would not offend the Fourth Amendment; and

8    then the Supreme Court goes on to analyze United States versus

9    Knights, which dealt with probationers, and then in Samson

10   holds that a parolee has even fewer privacy rights, because

11   parole is essentially an alternative to prison; it's

12   essentially a prisoner walking around in society.

13          And that fits into this case, because the defense's

14   argument as against why this search was unreasonable we've been

15   focusing on -- we've been focusing on the arrest, which we have

16   already discussed at length, but it doesn't necessarily mean

17   that the search itself in this case of the phone, that seizure

18   of the phone -- I'm calling it a "search," because under Fourth

19   Amendment law it would be considered a search to seize the

20   phone, even though the content wasn't searched --

21          THE COURT:  It is a seizure.

22          MR. GINGRANDE:  Well, okay.  We'll call it a seizure,

23   then, your Honor.

24          THE COURT:  It is a seizure.

25          MR. GINGRANDE:  It is a seizure; I agree with that.

**JOINT APPENDIX 356**

1    But that seizure would be justified based on the fact that at

2    the time of this arrest -- I'm sorry -- at the time of the

3    seizing of the phone these surrounding circumstances of his

4    being on parole, of his being in active violation of his parole

5    and the information provided by the informant about his

6    criminal activity and his conditions of parole that

7    substantially diminished his expectation of privacy as

8    against --

9         THE COURT:  I don't think so.  Those cases turned on

10   expectations of privacy, as I recall, being limited by things

11   like imposition of terms, saying, You understand that we can

12   search your phone anytime, anywhere, anyhow for no reason.  But

13   that's not the case here.  Here there is a statutory

14   expectation of privacy saying without a warrant you won't be

15   arrested unless these conditions occur and the probation

16   officer requested any law enforcement officer otherwise capable

17   of arresting, unless they're asked to do it.  So, you're not

18   suggesting that the Fourth Amendment says if you're on parole

19   any federal law enforcement officer at any time can seize and

20   search anything that a parolee has.  That's not the law.

21        MR. GINGRANDE:  I'm not suggesting that, your Honor,

22   but I thought you might make that point, and so I wanted to

23   address, point your attention to a specific cases that's

24   actually cited in the defendant's brief, and that case is

25   United States versus Graham, 553 F.3d 6, and that's a First

**JOINT APPENDIX 357**

1    Circuit case from 2009.

2         THE COURT:  I'm sorry.  I got the cite but not the

3    title.  Graham?

4         MR. GINGRANDE:  Yeah, Graham, G-r-a-h-a-m.  But you

5    got the cite?

6         THE COURT:  Yes.

7         MR. GINGRANDE:  And so, and that case specifically

8    addresses what happens -- the extent to which state law

9    affects, excuse me, a parolee's expectation of privacy.

10   Actually, in this case it was a probationer, but, if anything,

11   parolees have fewer expectations of privacy than probationers,

12   as the Supreme Court has established.  And what that case said

13   is that how the search actually occurred and whether it

14   occurred according to the correct procedure under state law is

15   not dispositive of whether it was reasonable.  What matters is

16   not who authorized the search but whether the evidentiary

17   standard in the probationer or parolee's conditions to the

18   search were met.

19        And in Graham the First Circuit found that whether a

20   search is constitutional, of course, is governed by federal law

21   and not state law, and you look at the totality of the

22   circumstances, as one would expect, and they discussed how

23   under Massachusetts law, unlike under New Hampshire law, police

24   were required to obtain a search warrant when conducting a

25   probation search, and I just note that that is not the law here

**JOINT APPENDIX 358**

1    in New Hampshire.  There's no requirement of obtaining a search

2    warrant to conduct a probation search.  And the First Circuit

3    found that the police did not obtain such a search warrant in

4    that case when conducting a probation search of the defendant.

5         So, here they violated state law, didn't get it,

6    didn't get the warrant, and this was not dispositive in the

7    case, didn't show that the search was unreasonable.  It was

8    only one factor in considering the totality of the

9    circumstances.  And the First Circuit went on to hold that the

10   police officer's search was reasonable under the totality of

11   the circumstances despite that failure and by stating as

12   follows, and they said in <u>Graham</u> -- I think I mentioned Graham

13   was the appellant.  Graham's expectation of privacy was greatly

14   diminished by both his status as a probationer and the

15   probation condition in his probation order that expressly

16   informed him that the government could force him to submit to

17   random drug testing and could search him, his property, his

18   residence or a place he may be living based on reasonable

19   suspicion rather than the more protective probable cause

20   standard.  Although Graham's probation --

21        THE COURT:  Let me just stop you right there.  That's

22   just what I was saying earlier.  It's a function of the terms

23   that are imposed and made known to the person.  It's not a

24   blanket you can be searched anytime, anywhere, by anyone.

25   Terms basically require suspicion.

**JOINT APPENDIX 359**

1          MR. GINGRANDE:  Well, your Honor, so the exhibit I

2     would point to is document, ECF document 61-1, which is Michael

3     Francis's conditions of parole in this case, and in those

4     conditions of parole they're very similar to the ones here.

5     They say, condition number 8 says, I will submit to breath,

6     blood or urinalysis testing for the presence of any substance

7     or provide such other sample for testing or submit to such

8     other test or procedure as may be directed by the Parole Board

9     or my parole officer; and separately, I will permit the parole

10    officer to visit my residence at any time for the purpose of

11    examination and inspection in the enforcement of the conditions

12    of parole and submit to searches of my person, property and

13    possessions as requested by the parole officer.

14          So, here there's no standard of, really any

15    evidentiary standard for the parole officer other than the

16    request of the parole officer.

17          THE COURT:  Well, I would disagree.  We talked about

18    this at the last hearing.  Sometimes parole officers aren't

19    really like police officers; they are also like guidance

20    counselors, and they're like coaches, and they're like

21    reformists, and they're doing social work as well as law

22    enforcement work, and sometimes they don't want the police

23    arresting their parolees because they violated some condition

24    of parole because they're trying to bring them along.  So, what

25    you just read, that doesn't translate -- I assume you're not

**JOINT APPENDIX 360**

1    arguing that doesn't translate into any law enforcement officer

2    at any time can, based on their suspicion, search his apartment

3    or search his phone.

4         MR. GINGRANDE:  No, your Honor.  All I'm saying is

5    that someone who is on parole would be required to submit to

6    those searches.

7         THE COURT:  By the probation officer, as he agreed to,

8    not by every person with a badge throughout the nation he might

9    be traveling in.  Not that.

10         MR. GINGRANDE:  I would agree with that, your Honor.

11         THE COURT:  Right.  Well, then, what's the issue here?

12         MR. GINGRANDE:  Well, so the issue here gets back to

13   this case in Graham, which is, it's very similar to in Graham,

14   because what the probationer agreed to in Graham was that these

15   searches, they could be conducted pursuant to law enforcement

16   but only if law enforcement obtained a warrant.

17         THE COURT:  He has two things going for him.  He has

18   an agreement that he signed that says, I understand that a

19   probation officer can search me.  He didn't say, I understand

20   any law enforcement officer in any county in any state that I

21   happen to be in can search me.  He didn't say that.  He has a

22   statute that says you have a statutory expectation of privacy

23   created by the New Hampshire legislature in that you will not

24   be searched without a warrant unless certain conditions apply,

25   one of which is these things occur:  We think you're going to

**JOINT APPENDIX 361**

```
1    abscond, and a probation officer asks a law enforcement officer
2    to arrest you.  Right?
3              MR. GINGRANDE:  Yup.
4              THE COURT:  I don't think I'm buying the argument that
5    the Fourth Amendment is so broad that, as long as he agreed to
6    some search condition, anybody can search him at any time.
7              MR. GINGRANDE:  And I would agree with that, your
8    Honor.  My counter-argument would be that, again, that's not
9    what the conditions say, and I agree with your interpretation,
10   because that's not what the condition is.
11             THE COURT:  Did a probation officer seize his phone?
12             MR. GINGRANDE:  No, no, he did not.  No, he did not,
13   but he had the expectation that a parole officer could order a
14   law enforcement officer under certain conditions, certainly.
15             THE COURT:  Could ask, right?  Could ask, request.
16             MR. GINGRANDE:  Could ask, could request.
17             THE COURT:  Not order.
18             MR. GINGRANDE:  I apologize.  Yes, could request, and
19   then law enforcement could thereby search -- conduct that
20   search, right?  So, that sets the reasonable expectation of
21   privacy, your Honor, is it is very, very, very low when it
22   comes to law enforcement searches of his person.
23             THE COURT:  You just made two transitions.  Yes, it's
24   a low expectation compared to what a normal citizen would have,
25   but, no, it doesn't authorize any law enforcement officer to
```

**JOINT APPENDIX 362**

1    search him at any time.

2         MR. GINGRANDE:  And that's right, but here what you

3    look at is the totality of the circumstances as against that

4    background, right, the totality of the circumstances, the

5    reasonableness of the search?

6         THE COURT:  Why are we arguing about an unlawful

7    seizure that you conceded about two hours ago?

8         MR. GINGRANDE:  Well, we conceded that it was an

9    unlawful arrest, your Honor, and so when we are talking about

10   the actual --

11        THE COURT:  The seizure was incident to an unlawful

12   arrest.  That makes it an unlawful seizure.

13        MR. GINGRANDE:  I guess -- I think this argument is a

14   little bit broader as to whether or not, even putting the

15   arrest aside, whether law enforcement could reasonably grab

16   that phone, because we were talking earlier about scenarios in

17   which --

18        THE COURT:  But not pursuant to an unlawful arrest.

19   So, now you're switching gears and saying, sure, it was an

20   unlawful arrest, therefor an unlawful seizure, but you know

21   what?  The Fourth Amendment is so broad that in this instance

22   it covers unlawful seizures and makes them lawful because

23   they're reasonable because his expectations are so low.  Is

24   that your argument?

25        MR. GINGRANDE:  Well, I mean, I think I'd phrase it a

**JOINT APPENDIX 363**

```
 1    little bit differently, your Honor.

 2              THE COURT:  Of course you would, but is that it?

 3              MR. GINGRANDE:  But essentially when it comes to the

 4    privacy interests of parolees, yes, you look at the totality of

 5    the circumstances.

 6              THE COURT:  We don't need to waste the rest of the

 7    afternoon.

 8              MR. GINGRANDE:  Okay.

 9              THE COURT:  I'm not inclined to issue a ruling that

10    says the Fourth Amendment allows the introduction of evidence

11    unlawfully seized pursuant to an unlawful arrest because the

12    expectation of parolees is so weak.  That's not going to

13    happen.

14              MR. GINGRANDE:  Okay.  Fair enough, your Honor.  Fair

15    enough, your Honor.  So, I will move on -- well, and I should

16    say, when it comes to this issue about the other grounds for

17    the arrest, the case law, if your Honor was inquiring about,

18    you know, would it make sense for us to try and supplementally

19    brief that issue?

20              THE COURT:  About the phone?

21              MR. GINGRANDE:  Yeah.

22              THE COURT:  If you'd like, sure.  Sure.

23              MR. GINGRANDE:  Okay.  All right.  Because I think

24    there are -- I think it's an issue that we would like

25    certainly --
```

**JOINT APPENDIX 364**

1          THE COURT:  I'm curious.  There might be a simple

2     answer.  I'm just not aware of it.

3          MR. GINGRANDE:  Okay.  Absolutely.  So, we will submit

4     supplemental briefing on that, and then, when it comes to the

5     supplemental brief the defense files, we'll kind of decide

6     whether or not that might be helpful to the Court.

7          THE COURT:  All right.  Anything else, Mr. Guerriero?

8          MR. GUERRIERO:  Just briefly, your Honor.  Nothing

9     else regarding the phone and the arrest, but regarding the

10    informant -- and I guess I have two points.  One, I mean, it

11    seems to be the government's position that they conclude, the

12    agent concluded that this informant is the kind of person who

13    makes things up when he's scared, who lies when he's scared,

14    which is not surprising, and they describe how scary it is to

15    be caught with 400 grams of methamphetamine.  That seems to be

16    a pretty obvious motive to lie and to create a duty on the

17    agent's part to be suspicious and concerned about the person's

18    credibility.  I mean, it may be that his dealing with the

19    agent, that that's a motive for him to say, well, I'd better

20    give them something good in plain English, but it's also a

21    motive to protect himself, to try to find something he can say

22    that is going to help himself.

23          And so, under those circumstances we have a person

24    with maybe a motive to give something good, maybe a motive to

25    lie because they're scared, and certainly a track history of

**JOINT APPENDIX 365**

1    lying because they're scared, according to the government, and

2    then you're faced with evidence of two officers saying he's

3    dishonest, and a prior felony conviction for dishonesty, and it

4    comes down to the question of is this a judgment for the agent

5    in deciding what he leaves in or out, or is this something

6    where the agent has a duty to reveal it to the court and the

7    court should decide, you know?  Under these circumstances I

8    can't just go on the fact that the guy's facing a lot of time

9    so he's motivated to give him something good.  I need something

10   more, because you haven't corroborated any criminal activity,

11   he has a motive to lie in addition to a motive to give

12   something good, and the agent shouldn't be making this decision

13   by himself, he should be putting it in the affidavit.  That's

14   our position.

15        THE COURT:  All right.  Thank you.  Appreciate it.

16   Take it under advisement.  How long do you want, ten days?

17        MR. GINGRANDE:  Yeah, that would be great, your Honor.

18        THE COURT:  You'll file a supplemental brief.

19        MR. GUERRIERO:  Yes.

20        THE COURT:  All right.  Thank you.

21        THE CLERK:  All rise.

22     (WHEREUPON, the proceedings adjourned at 3:20 p.m.)

23

24

25

**JOINT APPENDIX 366**

                        C E R T I F I C A T E


        I, Brenda K. Hancock, RMR, CRR and Official Court

Reporter of the United States District Court, do hereby certify

that the foregoing transcript constitutes, to the best of my

knowledge, skill, ability and belief, a true and accurate

transcription of the within proceedings.




Date: ___11/2/23_____    /s/ *Brenda K. Hancock*
                           Brenda K. Hancock, RMR, CRR
                           Official Court Reporter

**JOINT APPENDIX 367**

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW HAMPSHIRE

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | **Criminal Case No. 1:21-cr-153-SM** |
| **v.** | ) | |
| | ) | |
| **MICHAEL FRANCIS** | ) | |
| | ) | |

## GOVERNMENT'S OBJECTION TO DEFENDANT'S
## SUPPLEMENT TO MOTION TO SUPPRESS

The government submits this brief objection for the purpose of specifically addressing in writing the defendant's argument regarding the sealed exhibits to defendant's supplement (ECF #73).[1]

### I.   Inclusion in the Affidavit of the Information in Defendant's Exhibits Would Not Have Altered the Finding of Probable Cause

The defendant's supplement asserts FBI Special Agent Burke omitted from his affidavit that two Manchester Police officers had described the cooperating witness who provided information for the search warrant affidavit at issue (the "CW") as being "deceptive" and "not telling the truth" during a motor vehicle stop on July 30, 2021. The defendant argues that, had these police officer statements about the CW been included in the affidavit along with the CW's criminal falsification charge, they would have led the Magistrate Judge to conclude the search warrant lacked probable cause.

---

[1]   The government incorporates in this objection its initial objection to defendant's initial motion to suppress evidence seized during the search of defendant's Honda Accord (ECF #46) as well as its closing argument at the suppression hearing, which also addressed the arguments raised in defendant's supplemental filing.

**JOINT APPENDIX 368**

This is simply not so.  These exhibits are essentially cumulative to the physical falsification of evidence charge defendant previously argued vitiates probable cause: The exhibits show that, when initially confronted by law enforcement, the CW did something to throw police off the scent of his crime. But the CW's statements that are characterized as deceitful by the officers are precisely the type of "predictable denials" of criminal culpability made prior to confrontation with evidence of guilt that the First Circuit has held do *not* undermine an informant's credibility or refute probable cause.  In *United States v. Rumney*, 867 F.2d 714 (1st Cir. 1989), the First Circuit found that omission from a search warrant affidavit of original denials of an informant's involvement in criminal activity, along with omissions of his criminal record would not have changed the overall finding of probable cause.  *Id.* at 720.  In that case, the affiant omitted information that the informant initially lied to investigators on two separate occasions by denying being involved with a robbery before later admitting his involvement.  The Court reasoned:

> [The informant's] denials of involvement were made, predictably, before he was confronted with evidence linking him to the robbery. Once the police gathered enough information to arrest [the informant], he changed his story. That the police chose not to include [the informant's] denials along with the reason for his recantation is not material to a finding of probable cause. [The informant's] credibility was not undercut merely because he made predictable denials until the police could produce evidence linking him to the robbery.

*Id*. at 720.[2]

---

[2]    The Court even characterized the informant's information supporting the search warrant affidavit in *Rumney* as lacking police corroboration, similar to the way the defendant (wrongly) attempts to classify this case; but the First Circuit still found that the CW's predictable denials of guilt did not change the probable cause analysis.  *See id*. ("Although this is not a case where the affidvit was supported by police corroboration,  it is also not a case where the magistrate was misled . . . .") (internal citations omitted).

**JOINT APPENDIX 369**

Similar to *Rumney*, here, the CW made predictable denials to law enforcement of his criminal involvement in the heat of the moment, prior to being confronted with evidence of his guilt.  The statement that caused the two police officers to describe the CW as deceptive was his response to a question regarding where he had been coming from when he was first pulled over in his vehicle.  The CW said he was coming from his girlfriend's place, and then, when pressed on her name, said "Eusis or something like that is his real name."  *See* Exhibit A to Defendant's Supplement ("Supplement Ex. A").  When officers asked him to clarify why he said "his" real name, the CW corrected himself, stating "her name."  *Id.*  The officer therefore concluded he "was deceptive and not telling the truth."  *Id.*; *see also* Supplement Ex. B (stating second police officer's similar opinion).  The CW was also asked about what was in the car side door, and he said "sunglasses," but police later found drugs there.  Supplement Ex. A.  The officers believed he was under the influence of drugs at the time he provided these responses.  Supplement Ex. A & B.

These deflective statements simply do not refute the specific information the CW provided roughly three weeks later in an in-person, post-arrest interview, when the CW was not apparently under the influence of drugs, and after his car was searched and law enforcement confronted him with evidence of his guilt.  They do not undermine the CW's knowledge of the defendant's criminal activity, or the corroborative work performed by law enforcement to verify the CW's information, which ranged from corroborating the CW's former drug supplier's gang connection to the defendant, to corroborating that the defendant had access to an apartment which was unknown even to defendant's parole officer and was near the site where the CW said the defendant conducted drug deals with him. *See Rumney*, 867 F.2d at 721 (finding the

informant's criminal record, omitted from the affidavit, had "no bearing on his intimate knowledge of the crime").

In contrast to the misleading statements the CW made during the July 30, 2021 car stop, the kinds of lies that matter to probable cause analysis are those that show an informant's willingness to falsely accuse someone else to save himself.  *United States v. Comer*, 565 F. App'x 729, 733–34 (10th Cir. 2014) (holding the failure to disclose the criminal history of an informant including a crime of dishonesty—a check forgery conviction—did not affect the probable cause analysis of a search warrant affidavit because it did not show the informant's willingness to falsely implicate another person in a crime, or undermine the basis of the informant's knowledge).  Those lies are simply not present in this case.

Finally, even if there was some possibility that the CW was lying, a warrant application need not entirely eliminate the risk that the informant was lying to establish probable cause. *See United States v. Capozzi,* 347 F.3d 327, 333 (1st Cir. 2003). Instead, the application must merely "suggest a 'fair probability' that evidence of a crime will be found in the place to be searched." *Gates*, 462 U.S. at 238.  The affiant's Affidavit does so, and would do so regardless of reference to the new exhibits the defendant cites, or the physical falsification of evidence conviction.

## II.    <u>Special Agent Burke Was Not Reckless in Omitting the Information Contained in Defendant's Exhibits</u>

Special Agent Burke was not reckless in omitting the information about the CW's misleading statements during the earlier motor vehicle stop.  "To prove reckless disregard for the truth, the defendant must prove that the affiant 'in fact entertained serious doubts as to the truth' of the allegations.'" *United States v. Ranney*, 298 F.3d 74, 78 (1st Cir. 2002) (quoting *United States v. Williams*, 737 F.2d 594, 602 (7th Cir. 1984).  There is no evidence whatsoever that

**JOINT APPENDIX 371**

Agent Burke entertained such doubts as to the truth of the CW's statements about the defendant's criminal activity: to the contrary, he testified that he believed CW to be credible when he interviewed the CW on August 19, 2021, and the information he provided to be true. As Agent Burke testified, he did not specifically recall reading the information about the deceptive statements the CW made when first confronted by police during the motor vehicle stop: he said this is likely because they did not stand out to him, since the behavior is commonplace. As *Rumney* shows, the First Circuit agrees with Special Agent Burke's assessment: these lies are "predictable" and do not undermine a CW's reliability. Even if the Court concludes the information should nonetheless have been included in the Affidavit, at most this would show negligence, which is insufficient to find a *Franks* violation: defendant has not met its burden to show the omission was reckless.

### III.    <u>Conclusion</u>

For all of the foregoing reasons, the Court should find that the additional exhibits do not change the probable cause analysis, and deny defendant's motion to suppress.

DATED:  September 15, 2023

JOHN J. MCCORMACK
Attorney for the United States
Acting under authority conferred by
28 U.S.C. § 515

<u>/s/ Aaron G. Gingrande</u>
Aaron G. Gingrande
Charles L. Rombeau
Assistant United States Attorneys
53 Pleasant Street, 4th Floor
Concord, New Hampshire 03301

**JOINT APPENDIX 372**

UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

United States of America

     v.                                    Case No. 1:21-cr-153-1-SM
                                          Opinion No. 2023 DNH 126
Michael Francis

<u>**O R D E R**</u>

Michael Francis has been indicted on three counts of
conspiracy to, and possession with intent to, distribute
cocaine, fentanyl, and methamphetamine, as well as two firearms
charges.  Francis moves to suppress (1) evidence obtained in the
search of his vehicle; and (2) evidence obtained during his
arrest on September 1, 2021.[1]  In his motion to suppress evidence
obtained during the search of his vehicle, Francis challenges
the veracity of statements made in the affidavit in support of

---

[1]     In addition, defendant also moves to suppress the
introduction of evidence gathered by law enforcement during a
search of his apartment on September 2, 2021.  The government
has agreed that it will not seek to introduce such evidence at
trial, will move to dismiss Counts 3, 4, and 5 of the indictment
(all of which are based on evidence seized from the apartment),
and asks the court to deny the motion as moot.

Finally, defendant moves to suppress statements he made on
September 7, 2021.  <u>Edwards v. Arizona</u>, 451 U.S. 477 (1981).
The government agrees that it will not use those statements at
trial, and asks the court to deny the motion as moot.

**JOINT APPENDIX 373**

the warrant, arguing for a hearing under <u>Franks v. Delaware</u>, 438
U.S. 154, 155 (1978).

Over the government's objections, the court held a combined
<u>Franks</u> and suppression hearing on June 14, 2023, and July 12,
2023.  Having considered the evidence presented at the hearing,
as well as the motions, and the parties' supporting memoranda,
both motions to suppress are denied.

### Factual Background

Michael Francis is alleged to be a member of the Gangster
Disciples criminal street gang.  At the time of the events
relevant to this prosecution, he was an active state parolee.
The conditions of his parole required Francis to agree to
searches of his person, property, and possessions, as requested
by a parole officer; that he would obtain his parole officer's
permission before changing residences; and that he would not
associate with other parolees.

1.    <u>Cooperating Witness ("CW")</u>

A cooperating witness ("CW") provided information to law
enforcement officers during a post-arrest interview regarding
Francis's alleged criminal activity.  The witness had been
arrested on warrants relating to two prior motor vehicle stops

**JOINT APPENDIX 374**

(on June 13, 2021, and July 30, 2021), both of which led to the seizure of a large amount of drugs. During his August 19, 2021, interview, the CW admitted to possessing the drugs seized during the June and July motor vehicle stops, and admitted that he intended to distribute those drugs. He also provided significant information about his drug suppliers.

The CW reported that the drugs seized during the June 13 stop were provided to him by Ryan Call, a member of the Gangster Disciples whom the CW had met in prison, and with whom he had maintained a relationship. The CW said that Call informed him that the drugs came from Michael Francis, another Gangster Disciples member. After Call was arrested in the early part of July, 2021, the CW said he was contacted by Francis, who told the CW that he, Francis, would be his supplier going forward. The drugs recovered during the July 30 motor vehicle stop had been provided by Francis, said the CW.

In his post-arrest interview, the CW detailed the price and quantity of drugs he received regularly from Francis, and described the locations where those drug transactions took place. One location, according to the CW, was near Rimmon Street and Putnam Street, in Manchester, close to where the witness believed Francis lived. The CW said that Francis met with him

**JOINT APPENDIX 375**

personally to conduct the transactions.  He described in detail the vehicle Francis drove (a Honda Accord), and reported that Francis routinely kept a pistol between the driver's seat and center console of the vehicle.

2.   Law Enforcement Corroboration of CW's Information

Following their interview with the CW, law enforcement officers corroborated that Ryan Call (the CW's initial supplier) had been arrested in early July, 2021, and remained incarcerated at the time of the August interview.  Officers also conducted a records check of vehicles registered to Francis, which confirmed that Francis's car matched the Honda Accord described by the CW, and Francis's parole officer confirmed that he regularly used that vehicle.[2]

In addition, using a law enforcement database, investigators corroborated that Francis resided at 231 Thornton Street, in Manchester,[3] close to where the CI said his drug transactions with Francis were conducted.  On August 20, 2021,

___

[2]    The vehicle was registered to 73 Schiller St., Apt. 2, in Manchester, which was the address that Francis had given to his parole officer as his residence.

[3]    Francis had not reported this address to his parole officer as his current residence.

**JOINT APPENDIX 376**

officers set up a surveillance operation at 231 Thornton Steet. They observed a person in the rear parking lot of the residence, next to a Honda Accord.  Based on his physical characteristics, that person appeared to be Michael Francis.  Subsequent surveillance conducted at 231 Thornton Street resulted in further observations of Francis and/or the Honda Accord.

Finally, investigators determined that Francis was a convicted felon, federally prohibited from possessing any type of firearm.

### 3.    Warrant to Search Vehicle

On August 25, 2021, FBI Special Agent Ryan Burke applied for a warrant to search the Honda Accord.  That application was based primarily on information obtained from the CW, as well as law enforcement's corroboration of that information.  The affidavit in support of the warrant was signed by Burke.

A search warrant was issued by the magistrate judge on August 25, 2021.  She found probable cause to believe that a search of Francis's car would result in evidence of criminal activity.  The warrant was executed on September 1, 2021.

**JOINT APPENDIX 377**

4.  <u>September 1, 2021, Arrest</u>

On September 1, 2021, law enforcement agents again conducted surveillance of the Thornton Street apartment (where Francis's car was parked in the rear).  They observed Francis leaving the apartment, enter the Honda Accord, and drive away. Armed with the search warrant, the officers followed.  Francis drove to a residence on Joliette Street, in Manchester.  There, Francis met a man identified by the police as Emilio Flores, an associate of Francis's, a suspected drug dealer, and a state parolee.[4]   Flores had an outstanding warrant for his arrest on a 2018 parole violation.

Flores went inside the building, and came back out holding a bag that he put in the backseat of Francis's car.  He got into the car's passenger seat, and they drove away.  While following Francis and Flores, law enforcement officers contacted Francis's parole officer.  They notified him of the surveillance conducted at Francis's Thornton Street residence, that Francis was associating with Flores, and that Flores had brought a bag into Francis's vehicle.

[4]   As mentioned, as a parolee, Francis's parole conditions prohibited his association with other parolees.

**JOINT APPENDIX 378**

Francis and Flores drove to TD Bank.  Francis got out of the car and went inside (Flores remained in the car).  Officers then executed the search warrant, searching Francis's car. Simultaneously, Francis was placed under arrest while still inside the bank, for violating the conditions of his parole. Flores was arrested as well.

The initial search of the car revealed a firearm holster under the driver's seat, and a kilogram of cocaine.  A subsequent search yielded two cell phones (belonging to Flores), $10,000 in cash, and a black bandana purported to be gang paraphernalia.

Francis's cell phone was sitting on a bank counter when he was arrested.  That phone was seized, incident to his arrest. Francis was later questioned by two Manchester police officers. A recording of that interview is in evidence.  Finally, a warrant to search the contents of Francis's cell phone was obtained and executed (21-mj-277-AJ).  That search yielded evidence of drug distribution activity.

**JOINT APPENDIX 379**

**Motion to Suppress Evidence Seized from the Vehicle**

Francis argues that the search of his car was not supported by probable cause. That is because, he says, the affidavit in support of the search warrant failed to disclose to the issuing magistrate judge that (1) the confidential informant had a prior conviction for falsifying physical evidence; and (2) law enforcement officers had noted in their reports regarding the CW's July 30, 2021, arrest that he had been dishonest during the encounter. Had that information been disclosed, Francis argues, the warrant to search his vehicle would not have issued, since a reformed affidavit including that information would not be enough to establish probable cause.[5]

Francis first contends that the affidavit relies almost entirely on the CW's word alone. The corroboration provided by law enforcement was insufficient, Francis says, because it failed to corroborate any actual criminal conduct. And, Francis says, the affidavit lacks any discussion of the CW's credibility, or whether the CW had provided reliable information to law enforcement in the past. Given those deficiencies,

---

[5]    Francis also makes the argument that the affidavit is facially insufficient to establish probable cause. For the reasons discussed at the evidentiary hearing, that argument is unpersuasive.

**JOINT APPENDIX 380**

Francis argues, the magistrate judge's assessment of probable cause would have been negatively impacted by information concerning the CW's past conviction for falsification of physical evidence, as well as the CW's dishonesty during the July 31 motor vehicle stop, and a warrant would not have issued. Francis argues the affiant's failure to include that relevant information at least constitutes a "reckless disregard for the truth."

"Probable cause for a search exists where there is a fair probability that evidence of a crime will be found in a particular place." U.S. v. Maglio, 21 F.4th 179, 185 (1st Cir. 2021) (citations omitted) (cleaned up). "For a warrant to be voided and the fruits of a search excluded, the defendant must: (1) show that the affiant in fact made a false statement or omission 'knowingly and intentionally, or with reckless disregard for the truth," (2) make this showing by a preponderance of the evidence, and (3) show that, with the recklessly omitted information added to the affidavit, the reformed affidavit fails to establish probable cause.'" U.S. v. Gifford, 727 F.3d 92, 98–99 (1st Cir. 2013) (quoting U.S. v. Tzannos, 460 F.3d 128, 136 (1st Cir. 2006)).

**JOINT APPENDIX 381**

"An allegation is made with reckless disregard for the truth if the affiant in fact entertained serious doubts as to the truth of the allegations or where circumstances evinced obvious reasons to doubt the veracity of the allegations in the application." Gifford, 727 F.3d at 98-99. (internal quotation and citations omitted). "In the case of allegedly material omissions, recklessness may be inferred where the omitted information was critical to the probable cause determination." Id. at 99 (quotation omitted). "Negligent omissions — even negligent omissions of highly probative information — do not satisfy this strict standard." U.S. v. Tanguay, 787 F.3d 44, 49 (1st Cir. 2015) (citing Franks, 438 U.S. at 171) (further citations omitted).

The court fully credits Special Agent Ryan's testimony – there was no intent to omit material information nor any purpose to deceive. Best practices might counsel including the omitted information, but failure to include it did not undermine the magistrate judge's assessment. And, the affidavit, even if reformed to include the omitted facts, still establishes probable cause supporting issuance of the warrant. Neither the CW's prior criminal conviction, nor the CW's dishonesty as described in the July 30 police report are sufficient to undermine the probable cause finding.

**JOINT APPENDIX 382**

As the Court of Appeals for the First Circuit instructed in
U.S. v. Tiem Trinh, 665 F.3d 1, 10 (1st Cir. 2011), when an
affidavit in support of a warrant application relies primarily
on a witness's report to law enforcement, courts should:

> apply a nonexhaustive list of factors to examine the
> affidavit's probable cause showing.  These factors
> include, among others, (1) whether the affidavit
> establishes the probable veracity and basis of
> knowledge of persons supplying hearsay information;
> (2) whether an informant's statements reflect
> firsthand knowledge; (3) whether some or all of the
> informant's factual statements were corroborated
> wherever reasonable and practicable (e.g., through
> police surveillance); and (4) whether a law
> enforcement affiant assessed, from his professional
> standpoint, experience, and expertise, the probable
> significance of the informant's provided information.

(internal quotations and citations omitted) (cleaned up).  Agent
Burke's affidavit adequately satisfies those factors and
establishes probable cause to search, even when the omitted
information is included.

First, the affidavit sufficiently establishes the probable
veracity of the CW.  The CW is identified by name, and he
plainly implicates himself in the offenses described, in a
manner consistent with the evidence found.  See Tanguay, 787
F.32d at 50 ("informant's trustworthiness may be enhanced in a
number of ways, including his willingness to reveal his

**JOINT APPENDIX 383**

identity, the level of detail in his account, the basis of his

knowledge, and the extent to which his statements are against

his interest."). Special Agent Burke credibly testified that,

when assessing the CW's credibility, he took those circumstances

into consideration, as well as the fact that the CW was

providing information while in custody. Burke testified that

he:

> . . . recognized that [the CW] was facing significant
> exposure. [The CW] knew his criminal history, that it
> would result in you know a lengthy prison sentence and
> so it's not something he probably wanted to do and
> decided the only way to potentially receive
> consideration is to provide truthful information to us
> that we could then verify. Otherwise, obviously, if he
> provided fake information to us, that could just
> backfire. So I believe that motivated him to provide
> accurate information so that he could eventually,
> hopefully, receive some type of compensation or
> benefit.

See United States v. Batista, 31 F.4th 820, 823–24 (1st Cir.

2022). ("As we recognized in United States v. Vongkaysone, when

an informant 'has been caught dealing in drugs, it is to his

advantage to produce accurate information to the police so as to

qualify for the leniency he seeks.' 434 F.3d 68, 74 (1st Cir.

2006). . . . An informant's credibility is further bolstered

when the informant incriminates himself, as the CW here did in

revealing his history of purchasing drugs for resale from

[defendant].") (internal citations omitted) (cleaned up). See

**JOINT APPENDIX 384**

also <u>U.S. v. Austin</u>, 991 F.3d 51, 56 (1st Cir. 2021) ("When a self-incriminating statement is provided by an informant whose identity is known to the authorities, the statement is more likely to be true because of the risk inherent in making such a statement.") (internal quotations and citations omitted).

The information provided by the CW was detailed and comprehensive.  Specifically, the CW provided information relating to the make, model and identifying details of defendant's car, the location of the reported drug deals, how his meet-ups with Francis were arranged, where Francis would store drugs to be exchanged at the meet-ups, the nearby location of the defendant's residence, the amounts of drugs the CW purchased from Francis, and the prices at which the drugs were purchased.  That level of detail (all of which is set out in the affidavit) further strengthens the CW's credibility, making his first-hand knowledge plausible.  <u>See</u> <u>U.S. v. Greenburg</u>, 410 F.3d 63, 67 (1st Cir. 2005) ("A specific, first-hand account of possible criminal activity is a hallmark of a credible tip.")

Second, law enforcement corroborated several aspects of the information provided by the CW, as could be done practically. Law enforcement officers corroborated that:

**JOINT APPENDIX 385**

- Francis resided near the intersection where the
  reported drug deals with the CW occurred (an address
  he had not shared with his parole officer);

- Francis drove a Honda Accord matching the detailed
  description provided by the CW, including the color,
  license plate, and a description of the vehicle's
  rims (corroborated with Francis's parole officer and
  through on-site surveillance);

- The CW's former drug supplier, Ryan Call (familiar
  to law enforcement as a member of the Gangster
  Disciples) had indeed been arrested in early July,
  2021, as the CW stated;

- The CW's description of the amount of drugs he
  regularly purchased from Francis was consistent with
  the amount of drugs seized from the CW's vehicles;

- The prices paid by the CW for the drugs were
  consistent with rates known to law enforcement at
  that time; and

- Francis was a convicted felon.

As the Supreme Court has noted, "[b]ecause an informant is right

about some things, he is more probably right about other facts,

— including the claim regarding  . . . illegal activity."

Illinois v. Gates, 462 U.S. 213, 244 (1983) (internal quotation

omitted).  Defendant criticizes law enforcement for not

corroborating the CW's reports of criminal activity, but such

corroboration is not necessarily required: "It is enough, for

purposes of assessing probable cause, that corroboration through

other sources of information reduced the chances of a reckless

or prevaricating tale, thus providing a substantial basis for

crediting the hearsay." Id. at 244-45 (internal quotations and citations omitted). See also Tiem Trinh, 665 F.3d 1, 12 (1st Cir. 2011) ("case law makes clear that corroboration of even innocent activity reported in the tip may support a finding of probable cause, and that corroboration of apparently innocent activity can establish the reliability of the informant because the activity might come to appear suspicious in light of the initial tip.") (internal quotations omitted) (cleaned up).

Third, the information omitted, while not irrelevant, does not meaningfully undermine the substantive information included in the affidavit.  "[T]he commission of a past crime does not necessarily undercut a person's veracity." U.S. v. Tanguay, 787 F.3d 44, 50 (1st Cir. 2015) (citing U.S. v. Rumney, 867 F.2d 714, 720-21 (1st Cir. 1989).  "Even a prior conviction for a crime of dishonesty is not always dispositive of a witness's reliability." Id. (citations omitted).  The omitted criminal conviction here, while sounding ominous, was the result of the CW dropping and then stepping on top of drugs he was holding in an attempt to hide them during an ongoing drug possession investigation – a fairly predictable "in the heat of the moment" response from a criminal under active investigation for a drug crime.  See Rumney, 867 F.2d 714, 720 (1st Cir. 1989) (informant's "credibility was not undercut merely because

**JOINT APPENDIX 387**

[informant] made predictable denials until the police could

produce evidence linking him to the robbery.").  With regard to

the CW's behavior during the July 31 traffic stop, Agent Burke

testified:

> I would go so far as to say that, if someone's being
> deceptive to law enforcement on a car stop precluded
> them from providing honest information to me, then I
> don't think I could probably interview anyone in this
> courtroom or elsewhere.  I just think it's that common
> a thing that people are stressed on car stops and they
> say things they don't mean[,] and they just try to,
> you know, avoid getting in trouble.
>                         . . .
>
> . . . I think deception on a traffic stop is so common
> that it didn't affect my assessment of the information
> he [later] provided, and, again, I just think
> deception on any traffic stop, if that were such a
> deal breaker for . . . collecting information from
> people, that we wouldn't have anybody to talk to.  So,
> when I read that, I didn't really think anything of
> it. I just thought that's sort of human nature.


The affidavit "made no secret" of the CW's criminality,

reporting that the CW had been arrested on two separate warrants

for drug offenses, and had provided the information concerning

Francis during a post-arrest interview.  U.S. v. Belton, 414 F.

Supp. 2d 101, 110 (D.N.H. 2006), aff'd, 520 F.3d 80 (1st Cir.

2008) (noting that "despite the omission of certain details of

that criminality, the magistrate 'issuing the search warrant

would manifestly have been aware that [informant] was not a

model citizen" in considering his reliability'") (quoting U.S.

**JOINT APPENDIX 388**

v. Hall, 171 F.3d 1133, 1142 (8th Cir. 1999)) (cleaned up).
Neither the conviction nor the CW's failure to be entirely
forthright with the police during his July 31 stop would have so
significantly diminished the CW's credibility that the
magistrate judge's probable cause determination would have been
different.  See U.S. v. Tanguay, 907 F. Supp. 2d 165, 183-84
(D.N.H. 2012), ("information from dishonest informants may still
provide a basis for probable cause.' It is 'only in the absence
of additional evidence to bolster the informant's credibility or
the reliability of the tip' that 'an informant's criminal past
involving dishonesty is fatal to the reliability of the
informant's information, and his/her testimony cannot support
probable cause.'") (quoting U.S. v. Patayan Soriano, 361 F.3d
494, 506-07 (9th Cir. 2004) and U.S. v. Elliott, 322 F.3d 710,
716 (9th Cir. 2003)) (cleaned up).

    Finally, Special Agent Burke, a ten-year veteran of the
FBI, assessed the significance of the information provided by
the CW based on his own professional experience, skill, and
knowledge.  There is no evidence suggesting that Burke harbored
any doubts at all – let alone serious doubts – about the
veracity of the affidavit, or that he thought that either of the
omitted facts were significant in assessing probable cause.

**JOINT APPENDIX 389**

In sum, even upon a reformed affidavit, there was a fair probability that contraband or evidence of a crime would be found in defendant's car.  Accordingly, defendant's motion to suppress evidence obtained from the search of his vehicle is **DENIED**.

**Motion to Suppress Evidence Obtained During Arrest**

Francis argues – and the government concedes – that his arrest, on grounds that he was in violation of his state parole conditions, was not authorized under New Hampshire law. Therefore, Francis says, evidence obtained from his cell phone, which was seized from the bank counter incident to his arrest, and the statements he later made to law enforcement officers in a post-arrest interview, should be suppressed.

Francis was arrested in the bank for a state parole violation, pursuant to N.H. Rev. Stat. Ann. 504-A:4 (failure to inform his parole officer of his change of address).  But, that statute provides that an arrest for a parole violation involving non-criminal conduct requires a warrant issued by a parole board member, and a request from a parole officer if the arrest is by local, or other law enforcement officers.  No warrant or written detention order was issued at the time of Francis's arrest, and

**JOINT APPENDIX 390**

a state parole officer did not request that Francis be arrested.
Accordingly, his arrest was not authorized under state law.

Again, the government concedes that point, but objects to
Francis's motion to suppress on several bases.  First, the
government argues that seizure of the phone did not violate the
Fourth Amendment because Francis was a parolee at the time of
his arrest, and, as a result, had a diminished expectation of
privacy.  Second, the government argues that law enforcement was
entitled to detain Francis while the vehicle warrant was being
executed, and, that Francis would have inevitably been arrested
on probable cause to believe he was engaged in drug dealing
after drugs were discovered in his car shortly thereafter.[6]
Therefore, the government says, the seizure of defendant's phone
was inevitable, and defendant's post-arrest interview would have
inevitably been conducted following his inevitable arrest for
drug possession.  Finally, the government argues that, even if
the seizure of the phone was not incident to a lawful arrest,
the exclusionary rule should not apply because the "unique
circumstances of defendant's arrest and compressed timeline with

[6]    Francis was initially detained on the purported parole
violation, until the federal complaint was filed on September 3,
2021, after which he was arrested on federal charges, and
brought into federal custody.

**JOINT APPENDIX 391**

the execution of the vehicle search warrant do not warrant the exclusion of evidence in this case." Govt. Supp. Br. in Support of Obj. at 5. Because the inevitable discovery doctrine applies, the court need not reach the government's additional arguments.

The inevitable discovery doctrine provides that, "evidence that would inevitably have been discovered without reference to the police error or misconduct may be admitted at trial." U.S. v. Hughes, 640 F.3d 428, 440 (1st Cir. 2011) (quotations omitted). "Such evidence is admissible so long as (i) the lawful means of its discovery are independent and would necessarily have been employed, (ii) discovery by that means is in fact inevitable, and (iii) application of the doctrine in a particular case will not sully the prophylaxis of the Fourth Amendment." Id. (quotations and citation omitted).

Here, the "lawful means," the already-issued and contemporaneously executed warrant to search the car, were independent of the defendant's arrest on a parole violation inside the bank. As discussed above, the warrant to search the car was valid. At the time of defendant's arrest inside TD Bank, the search of defendant's car had begun in the bank's parking lot. Had defendant not been arrested inside the bank,

**JOINT APPENDIX 392**

he surely would have been arrested just moments later after
drugs were discovered in his car and that information was
communicated to officers in the bank.  Given the events that
unfolded following execution of the warrant, it is difficult to
imagine any circumstance in which Francis's cell phone would not
have been seized, if only to inventory it.  In other words, it
would have "inevitably" been seized moments later.  The cell
phone's contents would likely, as occurred, have been the
subject of an application for an additional search warrant,
which, when issued, would have been executed, leading to the
inevitable discovery of the incriminating information stored on
the phone.

Finally, application of the inevitable discovery doctrine
in this case would not provide any incentive for future police
misconduct.  The evidence of record makes clear that the
officers who arrested Francis inside the bank honestly, though
mistakenly, believed they were authorized to effect an arrest
based on a clear violation of the terms of Francis's parole
conditions.  And, as mentioned, the officers would have, without
question, arrested Francis moments later when the discovery of
drugs in his car was communicated to them.  See U.S. v. Almeida,
434 F.3d 25, 29 (1st Cir. 2006) (noting that where "officers
would have eventually seized the drugs by arresting Almeida (as

**JOINT APPENDIX 393**

they had planned to do before questioning him), they had little
incentive to try to obtain the crack through unconstitutional
means when a lawful means was readily available."). As the
government persuasively points out, the circumstances of this
case are unusual and unlikely to serve as an incentive for
police to cut constitutional corners in the future. The error
in arresting Francis was not an error related to probable cause,
but an error in applying New Hampshire law.

For these reasons, as well as those argued in the
government's briefing in support of its objection (documents no.
61 and 85), defendant's motion is **DENIED**.

### Conclusion

Defendant's motion to suppress evidence seized when
executing the search warrant for the white Honda Accord
(document nos. 35 and 73) is **DENIED**. Defendant's motion to
suppress cell phone evidence and statements resulting from
unconstitutional arrest (document no. 54) is **DENIED**.

Defendant's motions to suppress the introduction of
evidence gathered by law enforcement during a search of his
apartment on September 2, 2021, (document no. 34), and to
suppress his statements made on September 7, 2021, (document no.
36) are deemed moot.

**JOINT APPENDIX 394**

**SO ORDERED.**

_[signature]_ _____
Steven J. McAuliffe
United States District Judge

October 3, 2023

cc:  Charles L. Rombeau, AUSA
     Aaron G. Gingrande, AUSA
     Richard Guerriero, Esq.
     U.S. Marshal
     U.S. Probation

**JOINT APPENDIX 395**

Case: 24-1386      Document: 00118186996      Page: 399      Date Filed: 09/06/2024      Entry ID: 6665919

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW HAMPSHIRE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 1:21-cr-153-SM |
| | ) | |
| MICHAEL FRANCIS | ) | |

## PLEA AGREEMENT

Pursuant to Rules 11(a)(2), 11(c)(1)(A), and 11(c)(1)(C) of the Federal Rules of Criminal Procedure, the United States of America by its attorney, John J. McCormack, acting under authority conferred by 28 U.S.C. § 515a, and the defendant, Michael Francis, and the defendant's attorney, Richard Guerriero, Esquire, enter into the following Plea Agreement:

1.  The Plea and The Offense.

The defendant agrees to plead guilty to Count 2 of the Superseding Indictment that charges him with possession with intent to distribute more than 500 grams of cocaine, in violation of 21 U.S.C. §§ 841(a)(1) & 841(b)(1)(B)(ii).

In exchange for the defendant's guilty plea, the United States agrees to the sentencing stipulations identified in Section 6 of this agreement.   The United States also agrees to move to dismiss Count 1 of the Superseding Indictment when the defendant is sentenced.[1]

2.  The Statutes and Elements of the Offense.

Title 21, United States Code, Section 841(a)(1) provides, in pertinent part, that it is "unlawful for any person knowingly or intentionally to . . . distribute, or . . . possess with intent to distribute, . . . a controlled substance."   21 U.S.C. § 841(a)(1).

---

[1]      The government is separately dismissing Counts 3, 4 and 5 of the Superseding Indictment, but such dismissal is not conditioned on the defendant's entry into this agreement.

**JOINT APPENDIX 396**

Case: 24-1386     Document: 00118186996     Page: 400     Date Filed: 09/06/2024     Entry ID: 6665919

<u>Count 2:   Possession with Intent to Distribute a Controlled Substance</u>

The defendant understands that the offense in Count Two of the Superseding Indictment has the following elements, each of which the United States would be required to prove beyond a reasonable doubt at trial:

<u>First</u>, that the defendant, on or about the date specified in the Superseding Indictment, possessed a controlled substance, either actually or constructively;

<u>Second</u>, that he did so with a specific intent to distribute the controlled substance over which he had actual or constructive possession; and

<u>Third</u>, that he did so knowingly and intentionally.

*Pattern Criminal Jury Instructions for the District Courts of the First Circuit, District of Maine Internet Site Edition, 2019 Revisions,* Instruction 4.21.841(A)(1)(A), updated Feb. 1, 2019, available at http://www.med.uscourts.gov/pdf/crpjilinks.pdf.

To trigger the enhanced penalties alleged in the Superseding Indictment, the United States would also be required to prove that the offense involved 500 grams or more of cocaine.

3. <u>Offense Conduct</u>.

The defendant stipulates and agrees that if this case proceeded to trial, the government would introduce evidence of the following facts, which would prove the elements of the offense beyond a reasonable doubt:

On September 1, 2021, law enforcement officers conducted a search of the defendant's vehicle pursuant to a federal search warrant.   Law enforcement took custody of the vehicle after the defendant had traveled to a TD Bank in Manchester, New Hampshire.   Upon searching the vehicle, law enforcement officers discovered a gift bag containing a brick of what was later confirmed by Drug Enforcement Administration laboratory analysis to be 1,000.5 grams of cocaine, along with a gun holster, and $10,000 in cash.   The defendant knew the cocaine was in his vehicle, and he constructively possessed it with the intent of distributing it to others for profit.

Entry ID: 6665919    Date Filed: 09/06/2024    Page: 401    Document: 00118186996    Case: 24-1386

4.   Penalties, Special Assessment and Restitution.

The defendant understands that the penalties for the offense are:

A.   A mandatory minimum prison term of 5 years and a maximum prison term of 40 years (21 U.S.C. § 841(b)(1)(B));

B.   A maximum fine of $5,000,000 (21 U.S.C. § 841(b)(1)(B));

C.   A term of supervised release of at least 4 years (21 U.S.C. § 841(b)(1)(B)). The defendant understands that the defendant's failure to comply with any of the conditions of supervised release may result in revocation of supervised release, requiring the defendant to serve in prison all or part of the term of supervised release, with no credit for time already spent on supervised release; and

D.   A mandatory special assessment of $100 for the sole count of conviction, at or before the time of sentencing (18 U.S.C. § 3013(a)(2)(A)).

5.   Sentencing and Application of the Sentencing Guidelines.

The defendant understands that the Sentencing Reform Act of 1984 applies in this case and that the Court is required to consider the United States Sentencing Guidelines as advisory guidelines. The defendant further understands that he has no right to withdraw from this Plea Agreement if the applicable advisory guideline range or his sentence is other than he anticipated.

The defendant also understands that the United States and the United States Probation Office shall:

A.   Advise the Court of any additional, relevant facts that are presently known or may subsequently come to their attention;

B.   Respond to questions from the Court;

C.   Correct any inaccuracies in the pre-sentence report;

D.   Respond to any statements made by him or his counsel to a probation officer or to the Court.

The defendant understands that the United States and the Probation Office may address the Court with respect to an appropriate sentence to be imposed in this case.

**JOINT APPENDIX 398**

The defendant acknowledges that any estimate of the probable sentence or the probable sentencing range under the advisory Sentencing Guidelines that he may have received from any source is only a prediction and not a promise as to the actual sentencing range under the advisory Sentencing Guidelines that the Court will adopt.

6. <u>Sentencing Stipulations and Agreements</u>.

Pursuant to Fed. R. Crim. P. 11(a)(2), the United States agrees and consents in writing (*see* Section 14 of this Agreement) to the defendant reserving the right to appeal the denial of his motions to suppress evidence filed at Docket Numbers 35 and 54 via the Court's October 3, 2023 Order at Docket Number 87.   If the defendant prevails on appeal, the defendant may withdraw his guilty plea.

Pursuant to Fed. R. Crim. 11(c)(1)(C), the United States and the defendant stipulate and agree to the following:

(a)      150 months' imprisonment is an appropriate disposition of this case.

The parties intend the above sentencing stipulation to be "binding" under Fed. R. Crim. P. 11(c)(1)(C). By using the word binding the parties mean that if the Court will not accept the plea agreement under Fed. R. Crim. P. 11(c)(3)(A), the plea agreement is null and void and the defendant will be allowed the opportunity to withdraw his guilty plea.

The parties are free to make recommendations with respect to the terms of imprisonment, fines, conditions of probation or supervised release, and any other penalties, requirements, and conditions of sentencing as each party may deem lawful and appropriate, unless such recommendations are inconsistent with the terms of this Plea Agreement.

7. <u>Acceptance of Responsibility</u>.

The United States agrees that it will not oppose an appropriate reduction in the

Case: 24-1386     Document: 00118186996     Page: 403     Date Filed: 09/06/2024     Entry ID: 6665919

defendant's adjusted offense level, under the advisory Sentencing Guidelines, based upon the defendant's apparent prompt recognition and affirmative acceptance of personal responsibility for the offense. The United States, however, may oppose any adjustment for acceptance of responsibility if the defendant:

A.  Fails to admit a complete factual basis for the plea at the time he is sentenced or at any other time;

B.  Challenges the United States' offer of proof at any time after the plea is entered;

C.  Denies involvement in the offense;

D.  Gives conflicting statements about that involvement or is untruthful with the Court, the United States or the Probation Office;

E.  Fails to give complete and accurate information about his financial status to the Probation Office;

F.  Obstructs or attempts to obstruct justice, prior to sentencing;

G.  Has engaged in conduct prior to signing this Plea Agreement which reasonably could be viewed as obstruction or an attempt to obstruct justice, and has failed to fully disclose such conduct to the United States prior to signing this Plea Agreement;

H.  Fails to appear in court as required;

I.  After signing this Plea Agreement, engages in additional criminal conduct; or

J.  Attempts to withdraw his guilty plea.

The defendant understands and agrees that he may not withdraw his guilty plea if, for any of the reasons listed above, the United States does not recommend that he receive a reduction in his sentence for acceptance of responsibility.

The defendant also understands and agrees that the Court is not required to reduce the offense level if it finds that he has not accepted responsibility.

**JOINT APPENDIX 400**

Entry ID: 6665919   Date Filed: 09/06/2024   Page: 404   Document: 00118186996   Case: 24-1386

If the defendant's offense level is sixteen or greater, and he has assisted the United States in the investigation or prosecution of his own misconduct by timely notifying the United States of his intention to enter a plea of guilty, thereby permitting the United States to avoid preparing for trial and permitting the United States and the Court to allocate their resources efficiently, the United States will move, at or before sentencing, to decrease the defendant's base offense level by an additional one level pursuant to U.S.S.G. § 3E1.1(b).

8. <u>Waiver of Trial Rights and Consequences of Plea</u>.

The defendant understands that he has the right to be represented by an attorney at every stage of the proceeding and, if necessary, one will be appointed to represent him.   The defendant also understands that he has the right:

A.   To plead not guilty or to maintain that plea if it has already been made;

B.   To be tried by a jury and, at that trial, to the assistance of counsel;

C.   To confront and cross-examine witnesses;

D.   Not to be compelled to provide testimony that may incriminate him; and

E.   To compulsory process for the attendance of witnesses to testify in his defense.

The defendant understands and agrees that by pleading guilty he waives and gives up the foregoing rights and that upon the Court's acceptance of his guilty plea, he will not be entitled to a trial.

The defendant understands that if he pleads guilty, the Court may ask him questions about the offense, and if he answers those questions falsely under oath, on the record, and in the presence of counsel, his answers will be used against him in a prosecution for perjury or making false statements.

**JOINT APPENDIX 401**

Entry ID: 6665919     Date Filed: 09/06/2024     Page: 405     Document: 00118186996     Case: 24-1386

9.  Acknowledgment of Guilt; Voluntariness of Plea.

The defendant understands and acknowledges that he:

A.    Is entering into this Plea Agreement and is pleading guilty freely and voluntarily because
      he is guilty;

B.    Is entering into this Plea Agreement without reliance upon any promise or benefit of any
      kind except as set forth in this Plea Agreement or revealed to the Court;

C.    Is entering into this Plea Agreement without threats, force, intimidation, or coercion;

D.    Understands the nature of the offense to which he is pleading guilty,
      including the penalties provided by law; and

E.    Is completely satisfied with the representation and advice received from
      his undersigned attorney.

10.  Scope of Agreement.

The defendant acknowledges and understands that this Plea Agreement binds only the
undersigned parties and cannot bind any other non-party federal, state or local authority. The
defendant also acknowledges that no representations have been made to him about any civil or
administrative consequences that may result from his guilty plea. The defendant understands
such matters are solely within the discretion of the specific non-party government agency
involved. The defendant further acknowledges that this Plea Agreement has been reached
without regard to any civil tax matters that may be pending or which may arise involving the
defendant.

11.    Forfeiture.

The defendant agrees to immediately and voluntarily forfeit to the United States his
interest, if any, in any and all property subject to forfeiture pursuant to 21 U.S.C. § 853 as a
result of his guilty plea, including, but not limited to:    (A) Approximately $10,137.00 in U.S.
Currency seized from the defendant's residence located at 231 Thornton Street, Apt. 3,

**JOINT APPENDIX 402**

-7-

Case: 24-1386     Document: 00118186996     Page: 406     Date Filed: 09/06/2024     Entry ID: 6665919

Manchester, NH; (B) Approximately $10,000.00 in U.S. Currency seized from a 2021 Honda Accord registered to the defendant; (C) Approximately $4,000.00 in U.S. Currency seized from the defendant; (D) $25,000.00 in funds held in Michael Francis's account or for his benefit at Mashantucket Pequot Gaming Enterprise; (E) One Springfield Armory, model XDm-40, .40 S&W caliber pistol bearing serial number MG126009; (F) One Sig Sauer, model P320, 9 mm pistol bearing serial number 58C317762; (G) Five Rounds of Fiochhi 9x18 Makarov Caliber Ammunition; (H) Three Rounds of Hornady 9x18 Makarov Caliber Ammunition; (I) Twenty-six Rounds of Starline Brass .40 S&W Caliber Ammunition; (J) Five Rounds of Atlanta Arms .40 S&W Caliber Ammunition; (K) Ten Rounds of Winchester 9mm Caliber Ammunition, and (L) Twelve Rounds of Hornady .40 S&W Caliber Ammunition ("Forfeitable Property").

The defendant further agrees:

A.   Not to contest any administrative, civil, or criminal forfeiture proceedings commenced against the Forfeitable Property.   Defendant waives the 60- or 90-day notice requirement under 18 U.S.C. § 983 for administrative forfeiture.   Defendant shall withdraw any and all claims and/or petitions for remission for all or part of the Forfeitable Property filed personally or on his behalf by any other individual or entity, and further agrees to waive any right he may have to seek remission or mitigation of the forfeiture of the Forfeitable Property;

B.   That none of the forfeitures set forth in this section shall be deemed to satisfy or offset any fine, restitution, cost of imprisonment, or other penalty imposed upon the defendant, nor shall the forfeitures be used to offset the defendant's tax liability, or any other debt owed by the defendant to the United States;

C.   To waive all constitutional, statutory, and any other challenges in any manner, including, without limitation, by direct appeal and/or habeas corpus, to any forfeiture carried out

**JOINT APPENDIX 403**

in accordance with this Plea Agreement on any grounds, including the following: (i) the forfeiture constitutes an excessive fine or punishment under the Eighth Amendment to the U.S. Constitution; (ii) the Court's failure to comply with any and all requirements of Fed. R. Crim. P. 11(b)(1)(J) at the change of plea hearing; and, (iii) failure to comply with any and all requirements of Federal Rules of Criminal Procedure 32.2 and 43(a) regarding notice of the forfeiture in the charging instrument, announcement of the forfeiture at sentencing, and incorporation of the forfeiture in the judgment.   The defendant further acknowledges that he understands that the forfeiture of assets is part of the sentence that may be imposed in this case;

      D.   To waive and release any and all claims he may have to any property seized by the United States, or any state or local law enforcement agency and turned over to the United States, during the investigation and prosecution of this case, whether forfeited or not; and

      E.   To hold the United States, its agents, and employees, and any state or local law enforcement agency participating in the investigation and prosecution of this case, harmless from any claims whatsoever in connection with the seizure and forfeiture, as well as the seizure, detention and return of any property in connection with the investigation and prosecution of this case.

      The defendant agrees to execute any paperwork necessary to obtain the funds held in his account at the Mashantucket Pequot Gaming Enterprise as listed in (D) $25,000.00 in funds held in Michael Francis's account or for his benefit at Mashantucket Pequot Gaming Enterprise. The defendant agrees to remit this $25,000.00 to the United States prior to sentencing, in the form of a certified or cashier's check made out to the United States Marshals Service and referencing case number 1:21-cr-153-SM/ 21-FBI-008890.   In the alternative, the defendant agrees to cooperate and assist the United States with any government efforts to obtain the funds

Case: 24-1386       Document: 00118186996       Page: 407       Date Filed: 09/06/2024       Entry ID: 6665919

Case: 24-1386   Document: 00118186996   Page: 408   Date Filed: 09/06/2024   Entry ID: 6665919

directly from Mashantucket Pequot Gaming Enterprise.

The defendant acknowledges that the properties to be forfeited under this section are subject to forfeiture as property constituting, or derived from, proceeds obtained, directly or indirectly, as a result of the said violations, or property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of the illegal conduct.

12. Collateral Consequences.

The defendant understands that as a consequence of his guilty plea he will be adjudicated guilty and may thereby be deprived of certain federal benefits and certain rights, such as the right to vote, to hold public office, to serve on a jury, or to possess firearms.

The defendant understands that, if he is not a citizen of the United States, his guilty plea to the charged offense will likely result in him being subject to immigration proceedings and removed from the United States by making him deportable, excludable, or inadmissible. The defendant also understands that if he is a naturalized citizen, his guilty plea may result in ending his naturalization, which would likely subject him to immigration proceedings and possible removal from the United States. The defendant understands that the immigration consequences of this plea will be imposed in a separate proceeding before the immigration authorities. The defendant wants and agrees to plead guilty to the charged offense regardless of any immigration consequences of this plea, even if this plea will cause his removal from the United States. The defendant understands that he is bound by his guilty plea regardless of any immigration consequences of the plea. Accordingly, the defendant waives any and all challenges to his guilty plea and to his sentence based on any immigration consequences and agrees not to seek to withdraw his guilty plea, or to file a direct appeal or any kind of collateral attack challenging his guilty plea, conviction, or sentence, based on any immigration consequences of his guilty plea.

**JOINT APPENDIX 405**

13.  <u>Satisfaction of Federal Criminal Liability; Breach</u>.

The defendant's guilty plea, if accepted by the Court, will satisfy his federal criminal liability in the District of New Hampshire arising from his participation in the conduct that forms the basis of the Superseding Indictment in this case.

The defendant understands and agrees that, if after entering this Agreement, he fails specifically to perform or fulfill completely each one of his obligations under this Agreement, fails to appear for sentencing, or engages in any criminal activity prior to sentencing, he will have breached this Agreement.

If the United States, in its sole discretion, and acting in good faith, determines that the defendant committed or attempted to commit any further crimes, failed to appear for sentencing, or has otherwise violated any provision of this Agreement, the United States will be released from its obligations under this Agreement, including, but not limited to, any agreement it made to dismiss charges, forbear prosecution of other crimes, or recommend a specific sentence or a sentence within a specified range. The defendant also understands that he may not use his breach of this Agreement as a reason to withdraw his guilty plea or as a basis to be released from his guilty plea.

14.  <u>Waivers</u>.

A.  Appeal.

The defendant understands that he has the right to challenge his guilty plea and/or sentence on direct appeal. By entering into this Plea Agreement the defendant knowingly and voluntarily waives his right to challenge on direct appeal:

1.      His guilty plea and any other aspect of his conviction, including, but not limited to, claims challenging the constitutionality of the statute of conviction, or adverse rulings or any other adverse disposition of pretrial motions or issues, except the defendant expressly reserves the right to

appeal the denial of his Motions to Suppress (Docket numbers 35 and 54), a right to which the government hereby consents pursuant to Fed. R. Crim. P. 11(a)(2); and

2.     The sentence imposed by the Court if it is consistent with or lower than the stipulated sentence specified in Section 6 of this agreement.

The defendant's waiver of his rights does not operate to waive an appeal based upon new legal principles enunciated in Supreme Court or First Circuit case law after the date of this Plea Agreement that have retroactive effect; or on the ground of ineffective assistance of counsel.

B.   Collateral Review

The defendant understands that he may have the right to challenge his guilty plea and/or sentence on collateral review, e.g., a motion pursuant to 28 U.S.C. §§ 2241 or 2255.   By entering into this Plea Agreement, the defendant knowingly and voluntarily waives his right to collaterally challenge:

1.     His guilty plea, except as provided below, and any other aspect of his conviction, including, but not limited to, adverse rulings on pretrial suppression motion(s) or any other adverse disposition of pretrial motions or issues, or claims challenging the constitutionality of the statute of conviction; and

2.     The sentence imposed by the Court if it is consistent with or lower than the stipulated sentence specified in Section 6 of this agreement.

The defendant's waiver of his right to collateral review does not operate to waive a collateral challenge to his guilty plea on the ground that it was involuntary or unknowing, or on the ground of ineffective assistance of counsel. The defendant's waiver of his right to collateral review also does not operate to waive a collateral challenge based on new legal principles enunciated by in Supreme Court or First Circuit case law decided after the date of this Plea Agreement that have retroactive effect.

**JOINT APPENDIX 407**

Case: 24-1386   Document: 00118186996   Page: 411   Date Filed: 09/06/2024   Entry ID: 6665919

C. Freedom of Information and Privacy Acts

The defendant hereby waives all rights, whether asserted directly or through a representative, to request or receive from any department or agency of the United States any records pertaining to the investigation or prosecution of the case(s) underlying this Plea Agreement, including without limitation any records that may be sought under the Freedom of Information Act, 5 U.S.C. §552, or the Privacy Act of 1974, 5 U.S.C. §522a.

D. Appeal by the Government

Nothing in this Plea Agreement shall operate to waive the rights or obligations of the Government pursuant 18 U.S.C. § 3742(b) to pursue an appeal as authorized by law.

15. <u>No Other Promises</u>.

The defendant acknowledges that no other promises, agreements, or conditions have been entered into other than those set forth in this Plea Agreement or revealed to the Court, and none will be entered into unless set forth in writing, signed by all parties, and submitted to the Court.

16. <u>Final Binding Agreement</u>.

None of the terms of this Plea Agreement shall be binding on the United States until this Plea Agreement is signed by the defendant and the defendant's attorney and until it is signed by the United States Attorney for the District of New Hampshire, or an Assistant United States Attorney.

17. <u>Agreement Provisions Not Severable</u>.

The United States and the defendant understand and agree that if any provision of this Plea Agreement is deemed invalid or unenforceable, then the entire Plea Agreement is null and void and no part of it may be enforced.

**JOINT APPENDIX 408**

JOHN J. MCCORMACK
Attorney for the United States
Acting under authority conferred by
28 U.S.C. § 515

Date: 11/6/23

By: _____
Aaron G. Gingrande
Jarad Hodes
Assistant United States Attorneys
53 Pleasant St., 4th Floor
Concord, NH 03301

The defendant, Michael Francis, certifies that he has read this 14-page Plea Agreement and that he fully understands and accepts its terms.

Date: 11/6/23

_____
Michael Francis, Defendant

I have read and explained this 14-page Plea Agreement to the defendant, and he has advised me that he understands and accepts its terms.

Date: 11/6/2023

_____
Richard Guerriero, Esquire   NH Bar 10530
Attorney for Michael Francis

AO 245B (Rev. 09/19)    Judgment in a Criminal Case
USDC-NH (8/21)    Sheet 1

# UNITED STATES DISTRICT COURT

### District of New Hampshire

| | |
|---|---|
| UNITED STATES OF AMERICA | )    **JUDGMENT IN A CRIMINAL CASE** |
| v. | ) |
| Michael Francis | )    Case Number: 21-cr-153-01-PB |
| | )    USM Number: 63480-509 |
| | )    Richard Guerriero, Esq. |
| | )    Defendant's Attorney |

## THE DEFENDANT:

☑ pleaded guilty to count(s)    2s of the Superseding Indictment

☐ pleaded nolo contendere to count(s)
   which was accepted by the court.

☐ was found guilty on count(s)
   after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 21 USC §841(a)(1), 841(b)(1)(B) | Possession with Intent to Distribute 500 Grams or More of Cocaine. | 9/1/2021 | 2s |

     The defendant is sentenced as provided in pages 2 through ____7____ of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s)

☑ Count(s) 1s, 3s, 4s, 5s of Superseding Indictment ☐ is ☑ are dismissed on the motion of the United States.

     It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

4/10/2024
Date of Imposition of Judgment

/s/ Paul J. Barbadoro
Signature of Judge

Paul J. Barbadoro U.S. District Judge
Name and Title of Judge

4/10/2024
Date

## JOINT APPENDIX 410

AO 245B (Rev. 09/19) Judgment in Criminal Case
USDC-NH (8/21)      Sheet 2 — Imprisonment

Judgment — Page  2  of  7

DEFENDANT:   Michael Francis
CASE NUMBER:   21-cr-153-01-PB

## IMPRISONMENT

The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of:

One Hundred Fifty (150) months.

☑ The court makes the following recommendations to the Bureau of Prisons:
The Court recommends that the defendant participate in substance abuse treatment while in Bureau of Prisons' custody. The Court recommends that the defendant participate in educational or vocational training while in Bureau of Prisons' custody. The Court recommends participation in the Bureau of Prisons' intensive drug treatment program (RDAP) while in Bureau of Prisons' custody.

☑ The defendant is remanded to the custody of the United States Marshal.

☐ The defendant shall surrender to the United States Marshal for this district:

　☐ at _____ ☐ a.m. ☐ p.m.  on _____ .

　☐ as notified by the United States Marshal.

☐ The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

　☐ before 2 p.m. on _____ .

　☐ as notified by the United States Marshal.

　☐ as notified by the Probation or Pretrial Services Office.

## RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to _____

at _____ , with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

## JOINT APPENDIX 411

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
USDC-NH (8/21)         Sheet 3 — Supervised Release

Judgment—Page   3   of   7

DEFENDANT:   Michael Francis
CASE NUMBER:   21-cr-153-01-PB

## SUPERVISED RELEASE

Upon release from imprisonment, you will be on supervised release for a term of:

Four (4) years.

## MANDATORY CONDITIONS

1.  You must not commit another federal, state or local crime.
2.  You must not unlawfully possess a controlled substance.
3.  You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, not to exceed 72 drug tests per year of supervision.
    ☐ The above drug testing condition is suspended, based on the court's determination that you
       pose a low risk of future substance abuse. *(check if applicable)*
4.  ☐ You must make restitution in accordance with 18 U.S.C. §§ 3663 and 3663A or any other statute authorizing a sentence of restitution. *(check if applicable)*
5.  ☑ You must cooperate in the collection of DNA as directed by the probation officer. *(check if applicable)*
6.  ☐ You must comply with the requirements of the Sex Offender Registration and Notification Act (34 U.S.C. § 20901, *et seq*.) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in the location where you reside, work, are a student, or were convicted of a qualifying offense. *(check if applicable)*
7.  ☐ You must participate in an approved program for domestic violence. *(check if applicable)*

You must comply with the standard conditions that have been adopted by this court as well as with any other conditions on the attached page.

## JOINT APPENDIX 412

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
USDC-NH (8/21)   Sheet 3A — Supervised Release

| | Judgment—Page | 4 | of | 7 |

DEFENDANT:  Michael Francis
CASE NUMBER:  21-cr-153-01-PB

# STANDARD CONDITIONS OF SUPERVISION

As part of your supervised release, you must comply with the following standard conditions of supervision.  These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1. You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.
2. After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.
3. You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.
4. You must answer truthfully the questions asked by your probation officer.
5. You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
6. You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.
7. You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so.  If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
8. You must not communicate or interact with someone you know is engaged in criminal activity.  If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.
9. If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.
10. You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).
11. You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.
12. If the probation officer determines that you pose a risk to another person (including an organization), the probation officer may require you to notify the person about the risk and you must comply with that instruction.  The probation officer may contact the person and confirm that you have notified the person about the risk.
13. You must follow the instructions of the probation officer related to the conditions of supervision.

## U.S. Probation Office Use Only

A U.S. probation officer has instructed me on the conditions specified by the court and has provided me with a written copy of this judgment containing these conditions. For further information regarding these conditions, see *Overview of Probation and Supervised Release Conditions*, available at: www.uscourts.gov.

Defendant's Signature _____   Date _____

**JOINT APPENDIX 413**

AO 245B (Rev. 09/19)     Judgment in a Criminal Case
USDC-NH (8/21)     Sheet 3D — Supervised Release

Judgment—Page __5__ of __7__

DEFENDANT:  Michael Francis
CASE NUMBER:  21-cr-153-01-PB

## SPECIAL CONDITIONS OF SUPERVISION

1. You must participate in a substance use treatment program and follow the rules and regulations of that program. The probation officer will supervise your participation in the program (provider, location, modality, duration, intensity, etc.). You must pay for the cost of treatment to the extent you are able, as determined by the probation officer.

2. You must not use or possess any controlled substances without a valid prescription. If you do have a valid prescription, you must disclose the prescription information to the probation officer and follow the instructions on the prescription.

3. You must submit to substance abuse testing to determine if you have used a prohibited substance. You shall pay for the cost of testing to the extent you are able, as determined by the probation officer. You must not attempt to obstruct or tamper with the testing methods.

4. You must not use or possess alcohol.

5. You must not knowingly purchase, possess, distribute, administer, or otherwise use any psychoactive substances (e.g., synthetic marijuana, bath salts, etc.) that impair a person's physical or mental functioning, whether or not intended for human consumption, except with the prior approval of the probation officer.

6. You must not go to, or remain at, any place where you know controlled substances are illegally sold, used, distributed, or administered without first obtaining the permission of the probation officer.

7. You must participate in a gambling addiction treatment program and follow the rules and regulations of that program. The probation officer will supervise your participation in the program (provider, location, modality, duration, intensity, etc.). You must pay for the cost of treatment to the extent you are able, as determined by the probation officer.

8. You must not engage in any form of gambling (including, but not limited to, lotteries, online wagering, sports betting) and you must not enter any casino or other establishment where gambling is the primary purpose (e.g., horse racetracks, off-track betting establishments).

9. You must not communicate, or otherwise interact, with any known member of the Gangster Disciples, without first obtaining the permission of the probation officer.

10. You must participate in a cognitive-behavioral treatment program and follow the rules and regulations of that program. The probation officer will supervise your participation in the program (provider, location, modality, duration, intensity, etc.). Such programs may include group sessions led by a counselor or participation in a program administered by the probation office. You must pay for the cost of treatment to the extent you are able, as determined by the probation officer.

11. You must submit your person, property, house, residence, vehicle, papers, computers (as defined in 18 U.S.C. § 1030 (e)(1)), other electronic communications or data storage devices or media, or office, to a search conducted by a United States Probation Officer. Failure to submit to a search may be grounds for revocation of release. You must warn any other occupants that the premises may be subject to searches pursuant to this condition. The probation officer may conduct a search under this condition only when reasonable suspicion exists that you have violated a condition of supervision and that the areas to be searched contain evidence of this violation. Any search must be conducted at a reasonable time and in a reasonable manner.

**JOINT APPENDIX 414**

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
USDC-NH (8/21)    Sheet 5 — Criminal Monetary Penalties

Judgment — Page  6  of  7

DEFENDANT: Michael Francis
CASE NUMBER: 21-cr-153-01-PB

# CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

| | Assessment | Restitution | Fine | AVAA Assessment* | JVTA Assessment** |
|---|---|---|---|---|---|
| **TOTALS** | $ 100.00 | $ | $ | $ | $ |

☐ The determination of restitution is deferred until _____ . An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☐ The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| Name of Payee | Total Loss*** | Restitution Ordered | Priority or Percentage |
|---|---|---|---|
| 1 | | | |

| | | | | |
|---|---|---|---|---|
| **TOTALS** | $ | 0.00 | $ | 0.00 |

☐ Restitution amount ordered pursuant to plea agreement  $ _____

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐ The court determined that the defendant does not have the ability to pay interest and it is ordered that:

  ☐ the interest requirement is waived for the  ☐ fine  ☐ restitution.

  ☐ the interest requirement for the  ☐ fine  ☐ restitution is modified as follows:

\* Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, Pub. L. No. 115-299.
\** Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.
\*** Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 19 **JOINT APPENDIX 415**

Judgment — Page ___7___ of ___7___

DEFENDANT:  Michael Francis
CASE NUMBER:   21-cr-153-01-PB

# SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

**A**  ☑  Lump sum payment of $  _100.00_    due immediately, balance due

       ☐  not later than  _____  , or
       ☐  in accordance with  ☐  C,  ☐  D,  ☐  E, or  ☐  F below; or

**B**  ☐  Payment to begin immediately (may be combined with  ☐ C,  ☐ D, or  ☐ F below); or

**C**  ☐  Payment in equal  _____  *(e.g., weekly, monthly, quarterly)* installments of $  _____  over a period of
    _____  *(e.g., months or years),* to commence  _____  *(e.g., 30 or 60 days)* after the date of this judgment; or

**D**  ☐  Payment in equal  _____  *(e.g., weekly, monthly, quarterly)* installments of $  _____  over a period of
    _____  *(e.g., months or years),* to commence  _____  *(e.g., 30 or 60 days)* after release from imprisonment to a
    term of supervision; or

**E**  ☐  Payment during the term of supervised release will commence within  _____  *(e.g., 30 or 60 days)* after release from
    imprisonment.  The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

**F**  ☐  Special instructions regarding the payment of criminal monetary penalties:

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during the period of imprisonment.  All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the Clerk, U.S. District Court, 55 Pleasant Street, Room 110, Concord, N.H. 03301. Personal checks are not accepted.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐  Joint and Several

| Case Number Defendant and Co-Defendant Names *(including defendant number)* | Total Amount | Joint and Several Amount | Corresponding Payee, if appropriate |
|---|---|---|---|
| | | | |

☐  The defendant shall pay the cost of prosecution.

☐  The defendant shall pay the following court cost(s):

☐  The defendant shall forfeit the defendant's interest in the following property to the United States:

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) AVAA assessment, (5) fine principal, (6) fine interest, (7) community restitution, (8) JVTA assessment, (9) penalties, and (10) costs, including cost of prosecution and court costs.

**JOINT APPENDIX 416**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW HAMPSHIRE

UNITED STATES OF AMERICA

     v.                               No. 1:21-cr-00153-01-PB

MICHAEL FRANCIS

### NOTICE OF APPEAL

     Notice is hereby given that Defendant, Michael Francis, appeals to the United States Court of Appeals for the First Circuit from the District Court's Judgment and Sentence entered in the above-captioned proceeding on April 10, 2024. The Defendant's conditional plea permitting the appeal of the denial of his motions to suppress pursuant to Fed. R. Crim. P. 11(a)(2) was accepted by the court that same day.

Date: April 18, 2024.               By counsel for Michael Francis,

                          */s/ Richard Guerriero*
                          Richard Guerriero, Esq.
                          N.H. Bar No. 10530
                          Lothstein Guerriero, PLLC
                          Chamberlain Block Building
                          39 Central Square, Suite 202
                          Keene, NH 03431
                          Telephone: (603) 352-5000
                          richard@nhdefender.com

### CERTIFICATE OF SERVICE

     I hereby certify that this document, filed through the ECF system, will be sent electronically to registered participants identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to the nonregistered participants on the date the document was signed by me.

                          */s/ Richard Guerriero*
                          Richard Guerriero

**JOINT APPENDIX 417**

1